# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **DR. FORD ALBRITTON IV,** § | |
| § | |
| Plaintiff, § | |
| § | **Civil Action No. 3:16-cv-03340-M** |
| v. § | |
| § | |
| **ACCLARENT, INC.,** § | |
| § | |
| Defendant. § | **JURY TRIAL** |
| § | |
| § | |
| § | |
| § | |

<u>**DECLARATION OF WILLIAM ROOKLIDGE IN SUPPORT OF ACCLARENT, INC.'S OPPOSITION TO DR. FORD ALBRITTON IV'S MOTION TO STRIKE**</u>

I, William C. Rooklidge, declare as follows:

1.      I am a partner with the law firm of Gibson, Dunn & Crutcher, LLP.  I am licensed to practice law in the state of California and am admitted to practice *pro hac vice* in this Court.  I represent Defendant Acclarent, Inc. ("Acclarent") in this matter, and my business address is 3161 Michelson Drive, Irvine, CA 92612-4412 USA.

2.      I submit this declaration in support of Acclarent's Brief in Opposition to Albritton's Motion to Strike filed on March 18, 2019.

3.      Acclarent believes in good faith that the asserted patent claims' "adapted to" and "configured to" limitations are unusual, at least in the context in which they appear and the lack of structure in the claims and written description, and involve unsettled legal questions as to their construction and scope.

4.     Acclarent did not expect the Court's claim construction rulings both because they involved unusual claim limitations about which there were unsettled legal questions and Acclarent did not believe the issues could or would be decided in Albritton's favor under Federal Circuit precedent.

5.     After the Court issued its system/apparatus claim construction order, and because of the Court's construction of the "adapted to" and "configured to" limitations, Acclarent realized that all of the Ressemann combination theories it already charted for method claim 8 apply equally to the system/apparatus claims.

6.     After the Court's system/apparatus claim construction order, Acclarent expected that Albritton would amend his infringement contentions to drop all of his contentions that contradict the Court's claim construction rulings, including his contentions that the claims do not require that the index finger and thumb contact the working device and that the device need only be "capable of" the required function.  Acclarent was surprised that Albritton did not do so.

7.     Attached as **Exhibit 1** is a true and correct copy of Acclarent's Preliminary Invalidity Contentions, dated March 19, 2018.

8.     Attached as **Exhibit 1.a** is a true and correct copy of Exhibit 3 of Acclarent's Preliminary Invalidity Contentions, which is an invalidity claim chart for Makower et al., U.S. Pub. No. 2006/0063973, including Makower in view of Jones et al., U.S. Patent No. 4,915,691, dated March 19, 2018.

9.     Attached as **Exhibit 1.b** is a true and correct copy of a <u>sealed</u> version of Exhibit 4 of Acclarent's Preliminary Invalidity Contentions, which is an invalidity claim chart for the Morriss System, including the Morriss System in view of Makower or in view of Ressemann et al., U.S. Pub. No. 2007/0250105, dated March 19, 2018.

10.    Attached as **Exhibit 2** is a true and correct copy of  US Pat. No. 9,011,412 of Albritton et al.

11.    Attached as **Exhibit 3** is a true and correct copy of U.S. Pub. No. 2007/0250105 of Ressemann et al., which is also marked Chang Deposition Exhibit 107.

12.    Attached as **Exhibit 4** is a true and correct copy of Acclarent's Final Invalidity Contentions, dated March 8, 2019.

13.    Attached as **Exhibit 4.a** is a true and correct copy of a <u>sealed</u> version of Exhibit 1 of Acclarent's Final Invalidity Contentions, which is an invalidity claim chart for the Morriss System, dated March 8, 2019.

14.    Attached as **Exhibit 4.b** is a true and correct copy of a <u>sealed</u> version of Exhibit 2 of Acclarent's Final Invalidity Contentions, which is an invalidity claim chart for the Resseman and Morriss System combination, dated March 8, 2019.

15.    Attached as **Exhibit 5** is a true and correct copy of an email from Acclarent to Albritton containing Acclarent's Final Invalidity Contentions, dated March 8, 2019.

16.    Attached as **Exhibit 6** is a true and correct copy of excerpts from the June 27, 2018 hearing transcript regarding claim construction of the '412 patent's method claims.

17.    Attached as **Exhibit 7** is a true and correct copy of excerpts from the November 8, 2018 hearing transcript regarding claim construction of the '412 patent's system and apparatus claims.

18.    Attached as **Exhibit 8** is a true and correct copy of excerpts from the October 24, 2018 hearing transcript regarding Acclarent's motion to dismiss.

19.    Attached as **Exhibit 9** is a true and correct copy of excerpts from Attachment A to Albritton's infringement contentions.

20.    Attached as **Exhibit 10** is a true and correct copy of excerpts from the April 24, 2018 hearing transcript of the IPR proceedings from *Acclarent, Inc. v. Albritton*, No. IPR2017-498.

21.    Attached as **Exhibit 11** is a true and correct copy excerpts from of the deposition transcript of John Morriss, dated July 11, 2018.

22.    Attached as **Exhibit 12** is a true and correct copy of excerpts from the IPR petition from *Acclarent, Inc. v. Albritton*, No. IPR2018-498, IPR Pet., dated December 1, 2017.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 18, 2019.



*/s/ William C. Rooklidge*_____

William C. Rooklidge

# EXHIBIT 1

APP.0005

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **DR. FORD ALBRITTON IV**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Civil Action No. 3:16-cv-03340-M** |
| | § | |
| **ACCLARENT, INC.,** | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## DEFENDANT ACCLARENT INC.'S
## PRELIMINARY INVALIDITY CONTENTIONS

In accordance with Paragraph 3-3 of Miscellaneous Order No. 62, Defendant Acclarent, Inc. ("Acclarent") discloses its preliminary invalidity contentions ("invalidity contentions") for U.S. Patent No. 9,011,412 ("the '412 patent") as follows:

### I. INTRODUCTION

Acclarent's discovery and investigation in connection with this lawsuit are continuing, and, thus, these disclosures are based on information obtained to date. To the extent that Acclarent obtains additional information, Acclarent reserves the right to supplement and/or amend these invalidity contentions.

Acclarent's invalidity contentions are based on its present understanding of the asserted claims as stated in Plaintiff's infringement contentions, *i.e.*, Plaintiff's disclosures under Paragraph 3-1 of Miscellaneous Order No. 62 dated February 1, 2018. Specifically, Plaintiff has only alleged infringement of claims 1, 4-8, 14, and 17-20 of the '412 patent. Acclarent reserves the right to amend or modify its disclosures under Paragraph 3-3 of Miscellaneous Order No. 62

**DEFENDANT ACCLARENT'S PRELIMINARY INVALIDITY CONTENTIONS - Page 1**

should Plaintiff seek to allege infringement of any additional claims or otherwise modify its disclosures under Paragraph 3-1 of Miscellaneous Order No. 62.

Acclarent's invalidity contentions also take into account Plaintiff's apparent claim constructions to the extent they can be gleaned from Plaintiff's disclosures under Paragraph 3-1 of Miscellaneous Order No. 62. By including prior art that would anticipate or render obvious the asserted claims of the '412 patent based on Plaintiff's disclosed and apparent claim constructions, or based on any other particular claim construction, Acclarent is not adopting Plaintiff's claim constructions, nor is it admitting to the accuracy of any particular claim construction. Acclarent objects to any attempt to imply claim constructions from any identification of potential prior art. By providing these disclosures under Paragraph 3-3 of Miscellaneous Order No. 62, Acclarent does not waive, relinquish, or preclude any arguments with respect to the proper scope of the asserted claims or claim terms nor does it waive, relinquish, or preclude any arguments regarding the non-infringement of Acclarent's accused product or the invalidity of the asserted claims on any ground. Acclarent reserves all rights to amend these invalidity contentions, as permitted by Local Rules or agreement by the parties.

Acclarent's investigation into the invalidity of the asserted claims is ongoing. Acclarent's investigations and future discovery also may uncover additional prior art. Acclarent has not yet completed its discovery from Plaintiff. Depositions of the persons involved in the drafting and prosecution of the '412 patent, for example, will likely reveal information that affects the disclosure and contentions contained herein. Acclarent also has not taken discovery from third parties who may have information concerning additional prior art. This and other discovery may reveal information that affects the disclosures and contentions herein, and, upon that discovery, Acclarent reserves the right to update this answer and contentions, as appropriate.

**DEFENDANT ACCLARENT'S PRELIMINARY INVALIDITY CONTENTIONS - Page 2**

Additional obviousness combinations of the references identified in this response are possible, and Acclarent reserves the right to use any such combinations in this litigation. In particular, Acclarent is currently unaware of the extent, if any, to which Plaintiff will contend that limitations of the asserted claims are not disclosed in the art identified by Acclarent as anticipatory. To the extent that an issue arises with any such limitation, Acclarent reserves the right to identify other references that would have made obvious the addition of the allegedly missing limitation to the disclosed device or method of operation.

Acclarent's invalidity contentions are based upon the priority dates claimed on the face of the '412 patent. As explained below, at least claims 4-6 and 17-19 are not entitled to the filing date of provisional application No. 61/127,848 for the purposes of establishing their priority date. Because discovery is ongoing, however, Acclarent does not admit or concede that any of the asserted claims are entitled to any priority date claimed on the face of the '412 patent. Acclarent reserves the right to contest these priority dates.

## II. PARAGRAPH 3-3(a)(1) OF MISCELLANEOUS ORDER NO. 62

Acclarent identifies the following patents and/or patent applications as prior art to the '412 patent. Acclarent contends that the references in the table below independently anticipate, or refer to prior art systems that independently anticipate, the asserted claims of the '412 patent, under 35 U.S.C. § 102, as set forth in the claim charts attached hereto. Additionally, Acclarent contends that each of these references independently or in combination with others renders obvious all of the asserted claims of the '412 patent, under 35 U.S.C. § 103. To the extent that the claim charts attached hereto do not set forth where in the prior art certain claim elements may be found, Acclarent contends that meeting such claim limitations would have been obvious to one of ordinary skill in the art. Acclarent's contentions that the references in this section render

the asserted claims of the '412 patent obvious under 35 U.S.C. § 103 are in no way an admission or suggestion that each reference does not independently anticipate the asserted claims under 35 U.S.C. § 102.

| Patent, Publication, or Application No. | Country of Origin | Inventor(s) | Date of Publication or Issue |
|---|---|---|---|
| 4,915,691 | United States | Jones et al. | 8/10/1990 |
| 5,562,640 | United States | McCabe et al. | 10/8/1996 |
| 8,747,389 | United States | Goldfarb et al. | 6/10/2014[1] |
| 2006/0063973 | United States | Makower et al. | 3/23/2006 |
| 2007/0250105 | United States | Ressemann et al. | 10/25/2007 |

In addition, Acclarent identifies the following prior art systems and inventions to the '412 patent. Acclarent contends that the references in the table below independently anticipate the asserted claims of the '412 patent, under 35 U.S.C. § 102, as set forth in the claim charts attached hereto. Additionally, Acclarent contends that each of these references independently or in combination with others renders obvious all of the asserted claims of the '412 patent, under 35 U.S.C. § 103. To the extent that the claim charts attached hereto do not set forth where in the prior art certain claim elements may be found, Acclarent contends that such claim elements are inherent in the reference and/or that meeting such claim elements would have been obvious to one of ordinary skill in the art. Acclarent's contentions that the references in this section render the asserted claims of the '412 patent obvious under 35 U.S.C. § 103 are in no way an admission or suggestion that each reference does not independently anticipate the asserted claims under 35 U.S.C. § 102. Each of these systems was invented and not abandoned, suppressed, or concealed

---

[1] The '389 Patent disclosure is substantively identical to U.S. Publication No. 2008/0195041, published August 14, 2008. Acclarent reserves the right to assert the '041 application as prior art for the same reasons identified herein.

prior to the alleged invention of the '412 patent and thus is prior art pursuant to at least 35 U.S.C.

§ 102(g).

| Prior Art System/Invention | Persons Involved | Priority Date |
|---|---|---|
| Morriss System | John Morriss | The Morriss System was invented at least by November 3, 2006. |
| Goldfarb System | Eric Goldfarb | The Goldfarb System was invented at least by August 15, 2007. |

In addition, the '412 patent is invalid under 35 U.S.C. § 102(f) because the alleged

invention in at least some of the claims was derived from Acclarent. Claims 4-6 and 17-19

require a "second opening adapted to permit control of the amount of suction coupled to the

distal opening of the lumen" wherein "the structure of the handle" allows the operator "to

control, by one of the thumb or index finger, an amount of suction coupled to the distal opening

of the lumen." As explained below, the provisional application the named inventors filed on

May 16, 2008 does not describe such a "second opening." Instead, the named inventors of the

'412 patent derived the idea for this "second opening" from information disclosed to them by

Acclarent. For example, Serena Swei, an Acclarent employee, disclosed Acclarent's plans to

integrate a second opening into the structure of the handle to control suction through the inner

lumen of the guide catheter in a May 19, 2008 conversation with Dr. Albritton and documented

that disclosure in writing in an email she sent to Dr. Albritton shortly thereafter. In addition,

another Acclarent employee, Greg Garfield, sent Dr. Albritton certain Acclarent patent

applications describing the "second opening" feature on March 31, 2009. There may also be

additional discussions and correspondence between the named inventors and Acclarent relating

to these communications and Plaintiff's subsequent decision to incorporate Acclarent's idea for a

"second opening" into Plaintiff's subsequent non-provisional patent filing.

**DEFENDANT ACCLARENT'S PRELIMINARY INVALIDITY CONTENTIONS - Page 5**

### III. PARAGRAPH 3-3(a)(2) OF MISCELLANEOUS ORDER NO. 62

Acclarent contends that the following references anticipate the following asserted claims, as set forth in the claim charts attached hereto:

| Prior Art Reference | '412 Patent Claims Anticipated |
|---|---|
| U.S. Patent No. 8,747,389 to Goldfarb et al. | 1, 4-7, 14, 17-18, 20 |
| U.S. Patent No. 5,562,640 to McCabe et al. | 1, 4-7, 14, 17-20 |
| U.S. Pub. No. 2006/0063973 to Makower et al. | 1, 7, 14, 20 |
| Moriss System | 1, 4-8, 14, 17-20 |
| Goldfarb System | 1, 7-8, 14, 19-20 |

To the extent that the claim charts attached hereto do not set forth where in the prior art certain claim elements may be found, Acclarent contends that such claim elements are inherent in the reference.

If, and to the extent that Plaintiff asserts that one or more of these references fails to disclose one or more specific elements of an asserted claim, Acclarent reserves the right to use one or more of these contentions to invalidate claims of the '412 patent under 35 U.S.C. § 103. Acclarent's contentions that the references in this section, in various combinations, render the asserted claims of the '412 patent obvious under 35 U.S.C. § 103 are in no way an admission or suggestion that each reference does not independently anticipate the asserted claims under 35 U.S.C. § 102.

References and combinations of references presently known to Acclarent and that render the asserted claims obvious under 35 U.S.C. § 103 are set forth below. Acclarent may rely upon a subset of the references or all of the references depending upon Plaintiff's infringement contentions or claim construction positions (including all amendments or supplements thereto), the Court's claim construction, or further investigation.

| Reference/Combination | '412 Patent Claims Rendered Obvious |
|---|---|
| U.S. Patent No. 8,747,389 to Goldfarb et al. | 1, 4-7, 14, 17-20 |

| | |
|---|---|
| Goldfarb further in view of Makower | 6, 19 |
| U.S. Pub. No. 2007/0250105 to Ressemann et al. further in view of Goldfarb | 8 |
| U.S. Patent No. 5,562,640 to McCabe et al. | 1, 4-7, 14, 17-20 |
| McCabe further in view of Makower | 6, 19 |
| U.S. Pub. No. 2006/0063973 to Makower et al. | 1, 7, 14, 20 |
| Makower further in view of U.S. Patent No. 4,915,691 to Jones et al. | 4-6, 8, 17-19 |
| Morriss System | 1, 4-8, 14, 17-20 |
| Morriss System further in view of Makower | 6, 19 |
| Morriss System further in view of Ressemann | 8 |
| Goldfarb System | 1, 7-8, 14, 20 |
| Goldfarb System further in view of the Morriss System | 4-6, 17-19 |
| Goldfarb System further in view of the Morriss System and Makower | 6, 19 |
| Goldfarb System further in view of Ressemann | 8 |

In the claim charts accompanying this disclosure, Acclarent identifies where each element of each asserted claim of the '412 patent can be found in the prior art. To the extent that any item of prior art is deemed not to satisfy, explicitly or inherently, any limitation of an asserted claim, Acclarent reserves the right to contend that any difference between that item of prior art and the corresponding asserted claim would have been obvious to one of ordinary skill in the art, including as indicated in the below and in the attached claim charts. Further, the prior art cited in the attached claim charts may be combined to meet the limitations of the corresponding claims.

A person of ordinary skill in the art would have been motivated to combine the references identified above for several reasons. For example, each of these references relates to methods and apparatuses for treating conditions, including sinusitis, by, for example, using a guide catheter to guide a working device into a body passage. These references concern the same field of technology and often reference directly competing products within the same industry.

Further, the references may refer to one another, be written by one or more of the same authors, or refer to the same prior art system. Thus, a person of ordinary skill in the art would be motivated to combine the teachings of any of the above references with the system and apparatus disclosed in the other references and would have a reasonable expectation that combination would be successful.

In addition to the motivations set forth above and in the claim charts themselves, motivation to combine any of the prior art references discussed herein is found, explicitly or implicitly, for example, in one or more of the following:

1. a person of ordinary skill in the art's own knowledge or common sense;

2. the prior art references themselves;

3. the subject matter acknowledged as prior art in the '412 patent;

4. the interrelated teachings of multiple prior art references identified herein;

5. the nature of the problem to be purportedly solved by the '412 patent and the existence of similar improvements in similar applications;

6. design incentives and other market forces, including the advantages of creating a superior and more desirable product and the effects of demands known to the design community or present in the marketplace;

7. the ability to implement the alleged invention as a predictable variation of the prior art;

8. improvements in similar devices;

9. any needs or problems known in the field and purportedly addressed by the '412 patent; and

10. the number of identified, predictable solutions to the problem(s) purportedly

addressed by the '412 patent.

Moreover, it would have been obvious to combine any prior art references discussed herein dealing with tools or methods for sinusitis treatment or similar procedures based on, for example, at least a person of ordinary skill in the art's own knowledge or common sense, the teachings of such references, and the nature of the problems to be purportedly solved by asserted claims of the '412 patent. Those looking to design such systems would look to analogous art for features that would be useful in those products.

It would have been obvious to combine any prior art references discussed herein assigned to the same or an overlapping set of inventors based on, for example, at least a person of ordinary skill in the art's own knowledge or common sense, the teachings of such references, and the nature of the problems to be purportedly solved by the '412 patent. Those looking to design such systems would look to analogous art for features that would be useful in those products, and inventions by the same inventor would naturally represent art that should be considered and grouped together.

## IV. PARAGRAPH 3-3(a)(3) OF MISCELLANEOUS ORDER NO. 62

The claim charts, attached as Exhibits 1 through 6 to these contentions, identify where, in each alleged item of prior art, each element of each asserted claim is found. Acclarent may produce supplemented claim charts as new information becomes available consistent with the Federal Rules of Civil Procedure and the Rules and Orders of this Court.

Acclarent cites representative portions of identified references, even where a reference may contain additional disclosure for a particular claim element, upon which Acclarent may rely for support for such particular claim element. Acclarent has endeavored to identify relevant

portions of the references.  The references, however, may contain other or additional support for particular claim limitations.  Acclarent may rely on these uncited portions of the prior art references, other documents including statements in the cited references and file history of the '412 patent, and fact and expert testimony and documents not yet discovered, to provide context or to aid in understanding the cited portions of the references.  Furthermore, where Acclarent cites to a particular figure in a reference, the citation should be understood to encompass the caption and description of the figure and any text relating to the figure.  Similarly, where Acclarent cites to particular text referring to a figure, the citation should be understood to include the corresponding figure as well.

The accompanying claim charts are identified as follows:

- Exhibit 1 is an invalidity claim chart for Goldfarb et al., U.S. Patent No. 8,747,389, including Goldfarb in view of Makower.

- Exhibit 2 is an invalidity claim chart for McCabe et al., U.S. Pat. No. 5,562,640, including McCabe in view of Makower.

- Exhibit 3 is an invalidity claim chart for Makower et al., U.S. Pub. No. 2006/0063973, including Makower in view of Jones et al., U.S. Patent No. 4,915,691.

- Exhibit 4 is an invalidity claim chart for the Morriss System, including the Morriss System in view of Makower or in view of Ressemann et al., U.S. Pub. No. 2007/0250105.

- Exhibit 5 is an invalidity claim chart for the Goldfarb System, including the Goldfarb System in view of the Morriss System, Makower, and/or Ressemann et al., U.S. Pub. No. 2007/0250105.

- Exhibit 6 is an invalidity claim chart for Ressemann et al., U.S. Pub. No. 2007/0250105 in view of Goldfarb et al., U.S. Patent No. 8,747,389.

### V. PARAGRAPH 3-3(a)(4) OF MISCELLANEOUS ORDER NO. 62

The following contentions, made pursuant to Paragraph 3-3(a)(4) of Miscellaneous Order No. 62, are subject to revision and amendment pursuant to Federal Rule of Civil Procedure 26(e) and the Orders of record in this matter to the extent appropriate, *e.g.*, in light of further investigation and discovery regarding the defenses, the Court's construction of the claims at issue, and/or review and analysis of expert witnesses. Acclarent offers these contentions in response to Plaintiff's infringement contentions and without prejudice to any position it may ultimately take as to any claim construction issues. To the extent the following contentions reflect constructions of claim limitations consistent with or implicit in Plaintiff's infringement contentions, no inference is intended nor should any be drawn that Acclarent agrees with any claim construction implied by Plaintiff's infringement contentions, and Acclarent expressly reserves the right to contest such claim constructions.

Subject to the reservation of rights above, Acclarent provides below an identification of asserted claims of the '412 patent along with an identification of the specific limitations that are invalid pursuant to 35 U.S.C. § 112(1) as lacking written description support. *See, e.g.*, *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc).

35 U.S.C. § 112(1) requires that the specification "contain a written description of the" claimed invention. The Federal Circuit has said that this requirement "implements the principle that a patent must describe the technology that is sought to be patented; the requirement serves both to satisfy the inventor's obligation to disclose the technologic knowledge upon which the patent is based, and to demonstrate that the patentee was in possession of the invention that is

**DEFENDANT ACCLARENT'S PRELIMINARY INVALIDITY CONTENTIONS - Page 11**

claimed." *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005); *see also Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000) (stating that the purpose of the written description requirement "is to ensure that the scope of the right to exclude . . . does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification").

Claims 4-6 and 17-19 are invalid because the specification fails to provide adequate written description for the limitations requiring a "second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen" wherein "the structure of the handle" allows the operator "to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen." The minimal description in the specification does not describe a handle that allows an operator to control the suction with the operator's thumb and index finger and Figure 5, showing the operator's palm covering opening 354, affirmatively teaches away from such a configuration. Thus, a person of ordinary skill in the art would not understand the alleged inventors to be in possession of the invention claimed in claims 4-6 and 17-19.

In addition, there is no written description for the limitations of claims 4-6 and 17-19 requiring a "second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen" wherein "the structure of the handle" allows the operator "to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen" in the provisional application, No. 61/127,848, cited of the face of the '412 patent. Accordingly, claims 4-6 and 17-19 are not entitled to the filing date of that provisional application for the purposes of establishing their priority date. *See* 35 U.S.C. § 119.

## VI.  PARAGRAPH 3-4 OF MISCELLANEOUS ORDER NO. 62

In accordance with Paragraph 3-4 of Miscellaneous Order No. 62, Acclarent has produced or will produce the prior art references specifically identified in these invalidity contentions to the extent they are available.

DATE: March 19, 2018

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Betty X. Yang*
     William B. Dawson
     TX State Bar No. 05606300
     wdawson@gibsondunn.com
     Tracey B. Davies
     TX State Bar No. 24001858
     tdavies@gibsondunn.com
     Betty X. Yang
     TX State Bar No. 24088690
     byang@gibsondunn.com
     GIBSON DUNN & CRUTCHER, LLP
     2100 McKinney Ave, Suite 1100
     Dallas, Texas  75201
     Telephone:  214.698.3100
     Facsimile:  214.571.2900

     William C. Rooklidge, (pro hac vice)
     CA State Bar No. 134483
     wrooklidge@gibsondunn.com
     Frank P. Cote
     CA State Bar No. 204529
     fcote@gibsondunn.com
     GIBSON, DUNN & CRUTCHER LLP
     3161 Michelson Drive, Suite 1200
     Irvine, California  92612
     Telephone:  949.451.3800
     Facsimile:  949.451.4220

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of March, 2018, a true and correct copy of the foregoing document was served upon all counsel of record via electronic mail.

*/s/ Betty X. Yang*

Betty X. Yang

# EXHIBIT 1a

APP.0021

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| [1.a] A system comprising: a guide catheter insertable through an external body passage of a subject, said guide catheter having a substantially rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening; | Makower discloses a system which includes a guide catheter insertable through an external body passage of a subject, said guide catheter having a substantially rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening.

Makower discloses various guide catheters "for treating sinusitis and other disorders of the ear, nose, throat and paranasal sinuses." '973 App. ¶ [0008]. Figure 8A (reproduced above with markings) illustrates one embodiment of a "guide catheter 806" (shown in red) that is "introduced in the anatomy." *Id.* ¶ [0167]. Makower describes Figure 8A as "a guide catheter 800 comprising an elongate tube 802 . . . ." *Id.*

Fig. 8 A

Makower teaches that this guide catheter can be "inserted, distal end first, through a nostril of the subject's nose." *Id.* ¶ [0009]. Since the nostril of the nose is an external body passage of a subject, Makower teaches this limitation of claim 1.

Makower discloses "endoscopic guide systems that generally comprise tubular guides (e.g., rigid, flexible and/or malleable guide catheters) that incorporate or are attachable to endoscopic apparatus." |

APP.0022

1

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | *Id.* ¶ [0009]. A person of ordinary skill in the art would understand from this that Makower discloses a catheter having a substantially rigid shaft. |
| | A person of ordinary skill in the art would understand that Makower's disclosed guides have "a proximal end, a distal end and a lumen that extends longitudinally therethrough." *Id.* "FIG. 8A shows a guide catheter 800 comprising an elongate tube 802 ...." *Id.* ¶ [0167]. A person of ordinary skill in the art would understand that the elongate tube 802 would have proximal and distal ends and a lumen extending therebetween. Makower further discloses that "[t]he guide catheter can be used to ... introduce one or more diagnostic or access devices into the anatomy." *Id.* ¶ [0167]. A person of ordinary skill in the art would know that to serve this purpose, the guide catheter would have to have a substantially rigid shaft that includes a lumen extending between proximal and distal openings for receiving a device therethrough. |
| [1.b] a handle coupled to the guide catheter, | Makower discloses system which includes a handle coupled to the guide catheter. |
| | Makower's Figure 8A illustrates a device 800 having a proximal end in the form of a branched or Y-connector 808 having a straight arm 810 and a side arm 812. *See* '973 App. ¶ [0167]. A person of ordinary skill in the art would know that the Y-connector (shown in blue) forms a handle since that is the portion of the device that is held by a user. A person of ordinary skill in the art would know of no other way to handle the guide catheter disclosed in Figure 8A. |

2

APP.0023

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| |  Fig. 8 A |
| [1.c] the handle having a handle opening, a handle coupling and a structure, | Makower discloses a system including a handle having a handle opening, a handle coupling and a structure.[1]<br><br>Makower's disclosed handle in Figure 8A is coupled to the elongate tube 802, which forms the claimed guide catheter. A person of ordinary skill in the art would understand that Makower further discloses a handle opening in the form of a hub 814, as shown in Figure 8A above. Makower explains that device 800 can be used to "introduce one or more diagnostic, therapeutic or access devices into the anatomy." '973 App. ¶ [0167]. A person of ordinary skill in the art would understand that the corresponding device would be inserted through hub 814, since hub 816 is connected to a suction tube 818. |

---

[1] Acclarent contends that the construction of some or all of this element is governed by 35 U.S.C. § 112, ¶ 6, and pursuant to Miscellaneous Order 62 3-3(a)(3) has identified the prior art structure that performs the claimed function below.

APP.0024

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | |

Fig. 8 A

Makower discloses that "[t]he proximal end of side arm 812 comprises a suitable hub 816." *Id.* ¶[0167]. A person of ordinary skill in the art would have equated a "hub" with a coupling. Makower discloses the handle structure, highlighted in blue, in figure 8A above.

Makower supports that interpretation by specifying that the hub 816 connects to a suction tube 818. *See id.* ("Hub 816 is connected to a suction tube 818 that provides suction to the guide catheter 800."). A person of ordinary skill in the art would understand that a connecting hub as disclosed in Makower is no different from the "handle coupling" recited by claim 1.

Makower's structures described above are the same as or equivalent to one or more of the corresponding structures disclosed in the specification of the '412 patent. *See, e.g.,* '412 patent at Figs. 2 (pistol grip structure); Figs 3-6 (y-shaped structure); 2:45-3:50; 4:61-5:33.

4

APP.0025

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| [1.d] wherein the structure is configured to allow a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle, and | Makower discloses a system including a structure that is configured to allow a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle.[2] Makower's handle has a structure that is configured to allow a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. A person of ordinary skill in the art would look at Makower's Figure 8A and understand that the proper way to hold that guide catheter would be with the pinky, ring, and middle fingers positioned around the straight arm, with the pinky positioned more distal.

*Fig. 8 A*

The illustration below demonstrates what the guide catheter of Figure 8A would look like when held by a user. As can be seen in the Illustration, the side arm 812 and suction tube 818 would extend |

---

[2]  Acclarent contends that the construction of some or all of this element is governed by 35 U.S.C. § 112, ¶ 6, and pursuant to Miscellaneous Order 62 3-3(a)(3) has identified the prior art structure that performs the claimed function below.

APP.0026

APP.0027

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | between the thumb and index fingers, or alternatively it could be rotated to extend adjacent to the user's wrist. *See* '973 App. ¶ [0167]. The user would thus use three fingers of one hand to control movement of the guide catheter. *See id.* At the same time, the user's thumb and index finger would remain free and available to operate other aspects of the device. *See id.* As shown in the illustration above, the thumb and index finger are grasping a working device so as to manipulate the working device.<br><br><br><br>Makower's structures described above are the same as or equivalent to one or more of the corresponding structures disclosed in the specification of the '412 patent. *See, e.g.,* '412 patent at Figs. 2 (y-shaped structure); Figs 3-6 (pistol grip structure); 2:45-3:50; 4:61-5:33. |

6

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| [1.e] wherein the handle coupling is configured to couple a source of suction to the lumen; and | Makower discloses a system containing a handle with a coupling configured to couple a source of suction to the lumen. As discussed above, Makower discloses that the handle hub 816 of Figure 8A is connected to a suction tube. *See* '973 App. ¶ [0167] ("Hub 816 is connected to a suction tube 818 that provides suction to the guide catheter 80."). A person of ordinary skill in the art would understand that this part of Makower to disclose a handle coupling configured to couple a source of suction to the lumen. Fig. 8 A |
| [1.f] a working device adapted to be insertable through the handle opening into the lumen of the guide catheter, | Makower discloses a system including a working device adapted to be insertable through the handle opening into the lumen of the guide catheter. A person of ordinary skill in the art would understand that Makower teaches this limitation. Makower teaches that "[i]n one embodiment, hub 814 comprises a rotating hemostasis valve such as a Tuohy-Borst adapter." '973 App. ¶ [0167]. A person of ordinary skill in the art would have known that |

7

APP.0028

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
|  | Tuohy-Borst adapters are specifically designed to allow small diameter instruments, such as guidewires, to be inserted therethrough. Makower's disclosure supports that by teaching that "[t]he guide catheter can be used to … introduce one or more diagnostic or access devices into the anatomy." *Id.* Tuohy-Borst adapters have a small port that will form a seal around a guidewire and prevent the backflow of fluids. Given Makower's disclosure, a person of ordinary skill in the art would understand that hub 814 is designed to receive a device, such as a guidewire, therethrough.<br><br><br><br>*Fig. 8 A*<br><br>A person of ordinary skill in the art would also understand that because hub 816 is attached to a suction tube 818, it would not be available for the passage of a diagnostic or access device. A person of ordinary skill in the art would know that the device would need to be passed through hub 814 and tube 806. |

APP.0029

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| [1.g] wherein the structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device immediately adjacent to the handle opening | Makower discloses a system including a structure of the handle that is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device immediately adjacent to the handle opening.[3]

A person of ordinary skill in the art would understand that Makower's handle has a structure that is configured to perform this claimed function. As explained above, Makower's handle has a structure that is configured to allow a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. A person of ordinary skill in the art would look at Makower's Figure 8A and understand that the proper way to hold that guide catheter would be with the pinky, ring, and middle fingers wrapped around the straight arm 810, with the pinky positioned more distally. A person of ordinary skill in the art would know that with this grip on the guide catheter, the thumb and index finger would remain free and be able to grasp a working device extending through the lumen. This can be seen in my illustration above depicting how a person of ordinary skill in the art would hold the disclosed guide catheter. |

---

[3] Acclarent contends that the construction of some or all of this element is governed by 35 U.S.C. § 112, ¶ 6, and pursuant to Miscellaneous Order 62 3-3(a)(3) has identified the prior art structure that performs the claimed function below.

9

APP.0030

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| |

*Fig. 8 A*

Makower's structures described above are the same as or equivalent to one or more of the corresponding structures disclosed in the specification of the '412 patent. *See, e.g.,* '412 patent at Figs. 2 (y-shaped structure); Figs 3-6 (pistol grip structure); 2:45-3:50; 4:61-5:33. |
| [1.h] and to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen. | Makower discloses a system including a structure of the handle that is adapted to permit the operator to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen.[4]

Makower teaches that hub 816 can comprise a rotating hemostasis valve such as a Tuohy-Borst adapter "to adjust the amount of suction." '973 App. ¶ [0167]. |

---

[4]  Acclarent contends that the construction of some or all of this element is governed by 35 U.S.C. § 112, ¶ 6, and pursuant to Miscellaneous Order 62 3-3(a)(3) has identified the prior art structure that performs the claimed function below.

10

APP.0031

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | Makower discloses the hemostasis valve on the handle in a position where it would be conveniently controlled by one of a thumb or finger. This can be seen in Makower Figure 8A.<br><br>_Fig. 8 A_<br><br>Another element that a person of ordinary skill in the art would have been familiar with is the use of a rotating union between connector components.<br><br>Makower also discloses an alternative way to control suction with a thumb or finger. Makower discloses hub 814 on the straight arm 810. A person of ordinary skill in the art would understand that this hub could be covered, by one of the thumb or index finger, to control the amount of suction coupled to the distal opening of the lumen. A person of ordinary skill in the art would understand that covering this hub 814 with a user's thumb would be a particularly practical way to control suction when no device was inserted through the guide. |

11

APP.0032

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | Makower's structures described above are the same as or equivalent to one or more of the corresponding structures disclosed in the specification of the '412 patent. *See, e.g.*, '412 patent at Figs. 2 (y-shaped structure); Figs 3-6 (pistol grip structure); 2:45-3:50; 4:61-5:33. |
| [4.a] The system of claim 1, wherein the opening is a first opening, | As explained above (*supra* at claim 1, which is incorporated here by reference) Makower discloses the system of claim 1. Makower disclosed system includes a handle that includes a first opening, 814. |
| [4.b] wherein the handle further comprises a second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen. | It would have been obvious to modify Makower in view of U.S. Patent No. 4,915,691 ("Jones") to include a second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen. |
| | The use of openings or vents on handles to control the amount of suction were well known to a person of ordinary skill in the art and routine in the field at the time of the '412 patent. Jones is an example of a reference that discloses a vent hole or opening located on the handle and intended to permit control of the amount of suction. As Jones explains in the "Background" section, "*[m]ost* of the diverse tools that are currently utilized for suctioning body fluids in conjunction with mechanically produced vacuum (wall suction) *use a thumb control or a finger tip control* as an add on to the plumbing . . . ." Jones at 2:5-8 (emphasis added). |
| | Jones discloses a medical aspiration device for use in surgical procedures that includes "a body member that has a pistol grip-like shape to conveniently fit and be held and operated in one hand of a clinician." *Id.* at 3:17-19. As shown in Figures 2 and 3 below (reproduced with markings), the handle includes a "thumb control hole 28 [that] may be partially closed off with one's thumb or fully closed off to vary the amount of suction that is applied through the catheter 11." *Id.* at 4:35-38. |

12

APP.0034

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | |
| | FIG. 2 |
| | FIG. 3 |
| | Jones also provides the reason for using the vent hole or opening in surgical procedures involving catheters and requiring suction. Jones teaches that "[o]ne hand is generally necessary to regulate the amount of suction being delivered and the other hand is usually used to manipulate the direction and placement of the catheter within the patient." *Id.* at 2:9-13. Jones solves this problem by providing a suctioning device that "can be held and operated with one hand," and that can "accurately vary the amount of suction through a catheter by means of a conveniently located thumb control port." *Id.* at 2:49-54. |
| | Jones also discloses that the hole provides control to "allow[] one to apply a large amount of suction when necessary or a small amount when that is all that is required," depending on the amount of bodily fluids in the surgical area. *Id.* at 4:20-40. |
| | A person of ordinary skill in the art would understand that Jones provides the required element (an opening on the handle) and the reason for the modification (to selectively control the suction with a single hand). From the disclosure of Jones, a person of ordinary skill in the art would be motivated to |

13

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | include a second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen, and could easily implement such a modification to Makower's device. |
| [5] The system of claim 4, wherein the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction. | As explained above (*supra* at claim 4, which is incorporated here by reference) the system of claim 4 would have been obvious in light of Makower and Jones. Makower further discloses a system wherein the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction.<br><br>A person of ordinary skill in the art would understand that the second opening in Makower's handle would necessarily be positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction, as required by claim 5. Such a configuration would be required in order to allow an amount of suction to be controlled. |
| [6] The system of claim 4, wherein the handle coupling is further adapted to allow movement of the source of suction relative to the handle. | As explained above (*supra* at claim 4, which is incorporated here by reference) the system of claim 4 would have been obvious in light of Makower and Jones. Makower further discloses a system wherein the handle coupling is further adapted to allow movement of the source of suction relative to the handle.<br><br>Makower discloses that hub 816 "comprises a rotating hemostasis valve." '973 App. ¶ [0167]. A person of ordinary skill in the art would understand that disclosure of Makower to provide a handle coupling "adapted to allow movement of the source of suction relative to the handle." |
| [7] The system of claim 1, wherein the handle is removably coupled to the guide catheter. | As explained above (*supra* at claim 1, which is incorporated here by reference) Makower discloses the system of claim 1. Makower further discloses a system wherein the handle is removably coupled to the guide catheter.<br><br>Makower discloses a handle that is removably coupled to the guide catheter. Makower explains that "the proximal end of guide catheter 800 comprises a branched or Y-connector 808." '973 App. ¶ [0167]. |

14

APP.0035

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| |

Fig. 8 A

A person of ordinary skill in the art would understand that the Y-connector is removably attached to the guide catheter. Y-connectors were well known in the art at the time of any invention in Albritton, and were commonly used to removably connect to a catheter. For example, U.S. Patent No. 5,478,331 of Heflin et al. teaches that a "conventional 'Y' connector" has a Luer lock on one arm and a Tuohy-Borst connector on the other arm. See U.S. Patent No. 5,478,331 at 2:16-20 & Fig. 1. |
| [8.a] A method comprising: inserting a guide catheter through an external body passage of a subject, wherein the guide catheter comprises a substantially | Makower discloses all of the elements of claim 8, with the exception of an explicit teaching for controlling suction using a thumb or finger. Makower discloses a method which includes inserting a guide catheter through an external body passage of a subject, wherein the guide catheter comprises a substantially rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening.

Makower discloses various methods "for treating sinusitis and other disorders of the ear, nose, throat and paranasal sinuses." '973 App. ¶ [0008]. |

15

APP.0036

APP.0037

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening; | Figure 27B (reproduced below) illustrates one device having a "guide catheter 2714" that is "introduced into a desired region of the anatomy." *Id.* ¶ [0222].<br><br><br><br>*Fig. 27 B*<br><br>Makower teaches that this guide catheter can be "inserted, distal end first, through a nostril of the subject's nose." *Id.* ¶ [0009]. Since the nostril of the nose is an external body passage of a subject, Makower teaches this limitation of claim 8. Makower discloses "endoscopic guide systems that generally comprise tubular guides (e.g., rigid, flexible and/or malleable guide catheters) that incorporate or are attachable to endoscopic apparatus." *Id.* ¶ [0009]. A person of ordinary skill in the art would have understood that the disclosed Makower catheter could be rigid, flexible, malleable (semi-rigid), or somewhere in-between those three, meeting the requirement of a guide catheter having a substantially rigid shaft.<br><br>A person of ordinary skill in the art would also have understood Makower to disclose guide catheters having "a proximal end, a distal end and a lumen that extends longitudinally therethrough." *Id.* Makower teaches that "guide catheter 2714 comprises an elongate tubular element 2716 ...." *Id.* ¶ [0222]. A person of ordinary skill in the art would have known that the elongate tubular element 2716 would have proximal and distal ends and a lumen extending between them. Moreover, Makower teaches that "[t]he guide catheter can be used to ... introduce one or more diagnostic or access devices |

16

APP.0038

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | into the anatomy." *Id.* ¶ [0167]. A lumen is required in order to introduce a device through the guide catheter. |
| [8.b] coupling a source of suction to the lumen through the handle; | Makower teaches a method which also includes coupling a source of suction to the lumen through the handle.

Makower explains that "[i]n embodiments where the catheter or other balloon equipped device has a lumen useable for passage of a guidewire or other device or substance, the inflator handpiece device may incorporate a port or passage to permit a guidewire or other device to be advanced through that lumen and/or to permit fluids to be infused or suction applied through that lumen." '973 App. ¶ [0016]. In other words, Makower teaches that any of the guide catheters can include an arrangement for suctioning an anatomical region and that the handpiece device may incorporate a coupling port/passage to add suction. Makower's teaching that suction could be added to any of the disclosed guide catheters would have included the embodiments discussed above. |
| [8.c] inserting a working device through a handle opening in a handle coupled to the guide catheter and into the lumen of the guide catheter; | Makower teaches a method which also includes inserting a working device through a handle opening in a handle coupled to the guide catheter and into the lumen of the guide catheter.

Makower explains that the surgical hand tool 2700 shown in Figures 27A-27D has a hollow proximal body (2702) including a handle (2724). *See* '973 App. ¶ [0224]. A person of ordinary skill in the art would have understood that this meets the requirement for the claimed handle. And since the body is hollow, a person of ordinary skill in the art would have known that Makower's handle included a handle opening. |

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| |  Makower also teaches introducing a guidewire (2710) through the surgical hand tool (2700), and also advancing a balloon catheter (2704) over the guidewire. This is shown in Figures 27C and 27D, above, disclosing a guidewire and balloon catheter being advanced through the handle and guide catheter. Makower also teaches that "[s]urgical hand tool 2700 is positioned such that the distal tip of surgical hand tool 2700 is located near an anatomical region to be accessed. Thereafter, a guidewire 2710 is introduced through surgical hand tool 2700 such that the distal tip of guidewire 2710 is located near an anatomical region to be accessed.… Thereafter, in FIG. 27D, balloon catheter 2704 is |

18

APP.0039

APP.0040

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
|  | advanced over guidewire 2710 into the anatomy.'" '973 App. ¶ [0223]. A person of ordinary skill in the art would have known that the guidewire and balloon catheter are both working devices inserted through a handle opening in the handle and through a lumen of the guide catheter coupled to the handle. |
| [8.d] controlling a position of the guide catheter using the handle that is formed to allow the position of the guide catheter to be controlled by some or all of three fingers of a hand, while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening; and | Makower teaches a method which also includes controlling a position of the guide catheter using the handle that is formed to allow the position of the guide catheter to be controlled by some or all of three fingers of a hand. |
|  | Makower teaches "[i]nflator handpiece devices that are … configured to be useable by a single hand, thereby freeing the operators other hand for handling of other instruments or performing other tasks." '973 App. ¶ [0016]. Makower also discloses guide catheters equipped with handles that are designed to be controlled and positioned by some or all of three fingers of a hand. By way of example, Makower's Figure 27C shows a guide catheter with a pistol-style configuration that is intended to be held by a single hand of a user, as taught by Makower. Pistol-grips are regularly designed for one-handed use. A person of ordinary skill in the art would have known that the pistol-grip style device shown in Makower Figure 27C could be operated with the pinky, ring, and middle fingers wrapped around the handle (2724) to control the position of the guide catheter (2714). In my many years of surgical experience, that would have been considered to be a common way to hold such a device. |

19

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | Fig. 27 C |
| | A person of ordinary skill in the art would have also appreciated that by employing this grip on the guide catheter, the thumb and index fingers would remain free and be available to grasp a working device extending through the lumen. In that way, the Makower handle is also "formed to allow" a user to control a working device with the thumb and index finger of the same hand holding the device. Makower confirms this by explaining that the inflation port (2706) on the balloon catheter (2704) emerges through a slit (2708) formed in a side of the body and that the port is pushed in a distal direction to advance the balloon catheter. *See* '973 App. ¶ [0223]. A person of ordinary skill in the art |

20

APP.0041

APP.0042

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | would have used one of the thumb or index finger of the hand holding the device to "provide oppositional support" to the handle, while the other one of the thumb or index finger could be used to push the inflation port (2706) on the balloon catheter (2704). *See* '973 App. ¶ [0222]. This would not have required anything more than an ordinary degree of dexterity and training on the part of a person of ordinary skill in the art and there is no reason why a person of ordinary skill in the art could not have handled the device in this way. In fact, it would have been impractical to use a second hand to move the inflation port (2706) since the second hand would have been holding an endoscope. Allowing a user to hold an endoscope in the free hand would have been one of the main benefits of Makower's one-handed teachings. To that end, it is clear that Makower's disclosed inflation port (2706) is positioned on the side of the handle to allow the user to move the port (2706) with their thumb or finger. Moreover, a person of ordinary skill in the art handling the Makower device this way would have been able to control the working device (balloon catheter) and the position of the guide catheter (2714) "substantially simultaneously" since both would have been operated with a single hand concurrently. |
| | Alternatively, a person of ordinary skill in the art could have manipulated the guide wire (working device) using the thumb and index finger of the hand holding the guide catheter. Makower's guidewire includes a torqueing device (2712) and Makower teaches that "[a] user can use torqueing device 2712 to rotate, advance, retract, or torque the guidewire 2710." '973 App. ¶ [0222]. A person of ordinary skill in the art utilizing Makower's device designed for single handed use could have used the thumb and index finger of the hand holding the device to manipulate the torqueing device (2712) by "rotat[ing], advanc[ing], retract[ing], or torqu[ing] the guidewire 2710" as taught by Makower. |
| | A comparison of Figure 27C of Makower, below to the Albritton device embodied in Figure 3 shows that Makower has a similar handle structure. A person of ordinary skill in the art would have appreciated that since Albritton's handle is purportedly "formed to allow" the guide catheter and working device to be controlled in the manner claimed, Makower's similar handle would have also been "formed to allow" the guide catheter and working device to be controlled in the same way. |

21

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | <br><br>**Albritton**<br>FIG. 3<br><br>**Makower**<br>Fig. 27 C |
| [8.e] controlling the position of the guide catheter using the handle, while substantially simultaneously controlling, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen. | Makower in view of U.S. Patent No. 4,915,691 ("Jones") teaches a method that includes controlling the position of the guide catheter using the handle, while substantially simultaneously controlling, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen.<br><br>A person of ordinary skill in the art would have found it obvious to modify Makower's disclosed handle to include a second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen. The use of openings or vents on handles to control the amount of suction were common and routine in the field at the time of Albritton. *See, e.g.,* Jones at 4:20-40 & fig. 3. Jones is an example of a reference that discloses a vent hole or opening located on the handle to permit control of the amount of suction. As Jones explains in the "Background" section, "[m]ost of the diverse tools that are currently utilized for suctioning body fluids in conjunction with mechanically produced vacuum (wall suction) use a thumb control or a finger tip control as an add on to the plumbing …" *Id.* at 2:5-8. Jones further explains that "[s]uctioning, or the aspiration of body fluids in medical surgicoclinical procedures, is a critical, but necessary, routine occurrence …." *Id.* at 1:26-27.<br><br>Jones also teaches that the reason "[o]ne hand is generally necessary to regulate the amount of suction being delivered" is because "[t]he other hand is usually used to manipulate the direction and |

22

APP.0043

APP.0044

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | placement of the catheter within the patient." *Id.* at 2:9-13. Jones provides a suctioning device that can be connected to a catheter and "held and operated with one hand," and that can "accurately vary the amount of suction through a catheter by means of a conveniently located thumb control port." *Id.* at 2:49-54.<br><br>Jones also discloses that the hole provides control to "allow[] one to apply a large amount of suction when necessary or a small amount when that is all that is required," depending on the amount of bodily fluids in the surgical area. *Id.* at 4:20-40. The addition of a thumb-hole in the handle of Makower would have necessarily resulted in the user controlling the guide catheter while simultaneously controlling, by the thumb, an amount of suction coupled to the distal opening of the lumen.<br><br>The addition of suction would have been routine. Adding a thumb port or vent, such as the one disclosed by Jones, to Figure 27C of Makower would have been routine and obvious. |
| [14.a] A guide catheter apparatus insertable through an external body passage of a subject, comprising:<br><br>a substantially rigid shaft with a proximal opening, a distal opening, and a lumen extending between the proximal opening and the distal opening; and | Makower discloses a guide catheter apparatus insertable through an external body passage of a subject, which includes a substantially rigid shaft with a proximal opening, a distal opening, and a lumen extending between the proximal opening and the distal opening.<br><br>Makower discloses various guide catheters "for treating sinusitis and other disorders of the ear, nose, throat and paranasal sinuses." '973 App. ¶ [0008]. Figure 8A (reproduced above with markings) illustrates one embodiment of a "guide catheter 806" (shown in red) that is "introduced in the anatomy." *Id.* ¶ [0167]. Makower describes Figure 8A as "a guide catheter 800 comprising an elongate tube 802 …." *Id.* |

23

APP.0045

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
| --- | --- |
| |

Fig. 8 A

Makower teaches that this guide catheter can be "inserted, distal end first, through a nostril of the subject's nose." *Id.* ¶ [0009]. Since the nostril of the nose is an external body passage of a subject, Makower teaches this limitation of claim 1.

Makower discloses "endoscopic guide systems that generally comprise tubular guides (e.g., rigid, flexible and/or malleable guide catheters) that incorporate or are attachable to endoscopic apparatus." *Id.* ¶ [0009]. A person of ordinary skill in the art would understand from this that Makower discloses a catheter having a substantially rigid shaft.

A person of ordinary skill in the art would understand that Makower's disclosed guides have "a proximal end, a distal end and a lumen that extends longitudinally therethrough." *Id.* "FIG. 8A shows a guide catheter 800 comprising an elongate tube 802 ...." *Id.* ¶ [0167]. A person of ordinary skill in the art would understand that the elongate tube 802 would have proximal and distal ends and a lumen extending therebetween. Makower further discloses that "[t]he guide catheter can be used to ... introduce one or more diagnostic or access devices into the anatomy." *Id.* ¶ [0167]. A person of ordinary skill in the art would know that to serve this purpose, the guide catheter shaft, highlighted in |

24

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | red, above, would have to have a substantially rigid shaft that includes a lumen extending between proximal and distal openings for receiving a device therethrough. |
| [14.b] a handle coupled to the shaft, | Makower discloses a guide catheter apparatus which includes a handle coupled to the guide catheter shaft.<br><br>Makower's Figure 8A illustrates a device 800 having a proximal end in the form of a branched or Y-connector 808 having a straight arm 810 and a side arm 812. *See* '973 App. ¶[0167]. A person of ordinary skill in the art would know that the Y-connector (shown in blue) forms a handle since that is the portion of the device that is held by a user. A person of ordinary skill in the art would know of no other way to handle the guide catheter disclosed in Figure 8A. Makower's disclosed handle in Figure 8A is coupled to the elongate tube 802, which forms the claimed guide catheter.<br><br>Fig. 8 A |

25

APP.0046

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| [14.c] the handle having a handle opening, a handle coupling and a structure, | As explained above (*supra* at 1.c, which is incorporated here by reference) Makower discloses the handle having a handle opening, a handle coupling and a structure.[5] |
| [14.d] wherein the structure is configured to allow a position of the guide catheter apparatus to be controlled by some or all of three fingers of one hand of an operator of the handle, | As explained above (*supra* at 1.d, which is incorporated here by reference) Makower discloses an apparatus wherein the structure is configured to allow a position of the guide catheter apparatus to be controlled by some or all of three fingers of one hand of an operator of the handle.[6] |
| [14.e] wherein the handle coupling is configured to couple a source of suction to the lumen, | As explained above (*supra* at 1.e, which is incorporated here by reference) Makower discloses an apparatus wherein the handle coupling is configured to couple a source of suction to the lumen. |
| [14.f] wherein the structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to | Makower discloses an apparatus that includes a structure of the handle that is adapted to permit the operator to position a thumb and index finger of the hand to manipulate a working device via a portion of the working device immediately adjacent to the handle opening when the working device is inserted through the handle opening into the lumen of the shaft.[7] |

---

[5]   Acclarent contends that the construction of some or all of this element is governed by 35 U.S.C. § 112, ¶ 6, and pursuant to Miscellaneous Order 62 3-3(a)(3) has identified the prior art structure that performs the claimed function.

[6]   Acclarent contends that the construction of some or all of this element is governed by 35 U.S.C. § 112, ¶ 6, and pursuant to Miscellaneous Order 62 3-3(a)(3) has identified the prior art structure that performs the claimed function.

[7]   Acclarent contends that the construction of some or all of this element is governed by 35 U.S.C. § 112, ¶ 6, and pursuant to Miscellaneous Order 62 3-3(a)(3) has identified the prior art structure that performs the claimed function.

26

APP.0047

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| manipulate a working device via a portion of the working device immediately adjacent to the handle opening when the working device is inserted through the handle opening into the lumen of the shaft, and | A person of ordinary skill in the art would understand that Makower teaches this limitation. Makower teaches that "[i]n one embodiment, hub 814 comprises a rotating hemostasis valve such as a Tuohy-Borst adapter." '973 App. ¶ [0167]. A person of ordinary skill in the art would have known that Tuohy-Borst adapters are specifically designed to allow small diameter instruments, such as guidewires, to be inserted therethrough. Makower's disclosure supports that by teaching that "[t]he guide catheter can be used to … introduce one or more diagnostic or access devices into the anatomy." *Id.* Tuohy-Borst adapters have a small port that will form a seal around a guidewire and prevent the backflow of fluids. Given Makower's disclosure, a person of ordinary skill in the art would understand that hub 814 is designed to receive a device, such as a guidewire, therethrough. |
| | A person of ordinary skill in the art would understand that Makower's handle has a structure that is configured to perform this claimed function. As explained above, Makower's handle has a structure that is configured to allow a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. A person of ordinary skill in the art would look at Makower's Figure 8A and understand that the proper way to hold that guide catheter would be with the pinky, ring, and middle fingers wrapped around the straight arm 810, with the pinky positioned more distally. A person of ordinary skill in the art would know that with this grip on the guide catheter, the thumb and index finger would remain free and be able to grasp a working device extending through the lumen. This can be seen in my illustration above depicting how a person of ordinary skill in the art would hold the disclosed guide catheter. |

27

APP.0048

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | *Fig. 8 A* |
| | Makower's structures described above are the same as or equivalent to one or more of the corresponding structures disclosed in the specification of the '412 patent. *See, e.g.*, '412 patent at Figs. 2 (y-shaped structure); Figs 3-6 (pistol grip structure); 2:45-3:50; 4:61-5:33. |
| [14.g] wherein the structure of the handle is configured to permit the operator to control, by one of the thumb or index finger, an amount of | Makower discloses an apparatus including a structure of the handle that is adapted to permit the operator to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen.[8]<br><br>Makower teaches that hub 816 can comprise a rotating hemostasis valve such as a Tuohy-Borst adapter "to adjust the amount of suction." '973 App. ¶ [0167]. |

---

[8]  Acclarent contends that the construction of some or all of this element is governed by 35 U.S.C. § 112, ¶ 6, and pursuant to Miscellaneous Order 62 3-3(a)(3) has identified the prior art structure that performs the claimed function.

APP.0049

Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| suction coupled to the distal opening of the lumen. | Makower discloses the hemostasis valve on the handle in a position where it would be conveniently controlled by one of a thumb or finger. This can be seen in Makower Figure 8A.<br><br><br><br>*Fig. 8 A*<br><br>Another element that a person of ordinary skill in the art would have been familiar with is the use of a rotating union between connector components.<br><br>Makower also discloses an alternative way to control suction with a thumb or finger. Makower discloses hub 814 on the straight arm 810. A person of ordinary skill in the art would understand that this hub could be covered, by one of the thumb or index finger, to control the amount of suction coupled to the distal opening of the lumen. A person of ordinary skill in the art would understand that covering this hub 814 with a user's thumb would be a particularly practical way to control suction when no device was inserted through the guide. |

29

APP.0050

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| | Makower's structures described above are the same as or equivalent to one or more of the corresponding structures disclosed in the specification of the '412 patent. *See, e.g.*, '412 patent at Figs. 2 (y-shaped structure); Figs 3-6 (pistol grip structure); 2:45-3:50; 4:61-5:33. |
| [17.a] The apparatus of claim 14, wherein the opening is a first opening, | As explained above (*supra* at claim 14, which is incorporated here by reference) Makower discloses the apparatus of claim 14.  As explained above (*supra* at claim 4.a, which is incorporated here by reference) Makower further discloses an apparatus with a handle that includes a first opening. |
| [17.b] wherein the handle further comprises a second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen. | As explained above (*supra* at claim 4.b, which is incorporated here by reference), an apparatus with a handle that includes a second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen is obvious in light of Makower and Jones. |
| [18] The apparatus of claim 17, wherein the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction. | As explained above (*supra* at claim 17, which is incorporated here by reference) the apparatus of claim 17 would have been obvious in light of Makower and Jones.  As explained above (*supra* at claim 5, which is incorporated here by reference) Makower further discloses an apparatus wherein the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction. |
| [19] The apparatus of claim 17, wherein the handle coupling is further adapted to allow movement of the source of | As explained above (*supra* at claim 17, which is incorporated here by reference) the apparatus of claim 17 would have been obvious in light of Makower and Jones.  As explained above (*supra* at claim 6, which is incorporated here by reference) Makower further discloses an apparatus wherein the handle coupling is further adapted to allow movement of the source of suction relative to the handle. |

30

**Exhibit 3 – Invalidity Claim Chart – U.S. Pub. No. 2006/0063973**

| Claim Limitation | U.S. Pub. No. 2006/0063973 ("Makower" or the "'973 App.") or Makower in view of U.S. Patent No. 4,915,691 ("Jones") (where applicable) |
|---|---|
| suction relative to the handle. | |
| [20] The apparatus of claim 14, wherein the handle is removably coupled to the shaft. | As explained above (*supra* at claim 14, which is incorporated here by reference) Makower discloses the apparatus of claim 14. As explained above (*supra* at claim 7, which is incorporated here by reference) Makower further discloses an apparatus wherein the handle is removably coupled to the shaft. |

APP.0052

**Filed Under Seal**

# EXHIBIT 1b

# EXHIBIT 2



US009011412B2

(12) **United States Patent**
   Albritton, IV et al.

(10) **Patent No.:** US 9,011,412 B2
(45) **Date of Patent:** Apr. 21, 2015

(54) **APPARATUS, SYSTEM AND METHOD FOR MANIPULATING A SURGICAL CATHETER AND WORKING DEVICE WITH A SINGLE HAND**

(76) Inventors: **Ford Albritton, IV**, Dallas, TX (US); **Bryan Lunsford**, Arlington, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1091 days.

(21) Appl. No.: **12/454,560**

(22) Filed: **May 18, 2009**

(65) **Prior Publication Data**
   US 2010/0057045 A1    Mar. 4, 2010

**Related U.S. Application Data**

(60) Provisional application No. 61/127,848, filed on May 16, 2008.

(51) **Int. Cl.**
   *A61M 25/00*      (2006.01)
   *A61M 25/01*      (2006.01)
   *A61B 17/00*      (2006.01)
   *A61B 17/34*      (2006.01)
   *A61B 17/22*      (2006.01)
   *A61M 1/00*      (2006.01)

(52) **U.S. Cl.**
   CPC ................ *A61M 25/01* (2013.01); *A61B 17/00* (2013.01); *A61B 17/00234* (2013.01); *A61B 17/3415* (2013.01); *A61B 2017/0042* (2013.01); *A61B 2017/00424* (2013.01); *A61B 2017/00469* (2013.01); *A61B 2017/22049* (2013.01); *A61B 2217/005* (2013.01); *A61M 1/008* (2013.01); *A61M 25/0097* (2013.01)

(58) **Field of Classification Search**
   CPC ............ A61B 17/24; A61B 17/32053; A61B 17/320725; A61B 17/320758; A61B 17/320783; A61B 17/3478; A61B 2017/22061; A61F 2250/0039; A61F 2/18; A61F 2/82
   USPC .............. 604/506, 96.01, 528; 600/114, 104, 600/146, 156
   See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,418,688 | A | * | 12/1983 | Loeb ............................... 600/108 |
| 4,607,620 | A | * | 8/1986 | Storz ............................... 600/101 |
| 5,088,819 | A | * | 2/1992 | Storz ......................... 356/241.1 |
| 5,470,328 | A | * | 11/1995 | Furnish et al. .................... 606/1 |
| 5,702,349 | A | * | 12/1997 | Morizumi ........................ 600/131 |
| 5,951,463 | A | * | 9/1999 | Lombardi et al. ............ 600/162 |
| 5,972,020 | A | * | 10/1999 | Carpentier et al. .......... 606/208 |
| 6,083,151 | A | * | 7/2000 | Renner et al. ................. 600/114 |
| 6,605,036 | B1 | * | 8/2003 | Wild ............................... 600/131 |
| 6,607,529 | B1 | * | 8/2003 | Jones et al. ...................... 606/47 |
| 2002/0029060 | A1 | * | 3/2002 | Hogendijk .................... 606/185 |
| 2006/0063973 | A1 | * | 3/2006 | Makower et al. ............ 600/114 |
| 2006/0252993 | A1 | * | 11/2006 | Freed et al. .................. 600/146 |
| 2008/0195041 | A1 | * | 8/2008 | Goldfarb et al. ........ 604/96.01 |
| 2009/0143645 | A1 | * | 6/2009 | Matthes ......................... 600/120 |
| 2011/0004057 | A1 | * | 1/2011 | Goldfarb et al. ............. 600/106 |

* cited by examiner

*Primary Examiner* — Kevin C Sirmons
*Assistant Examiner* — Deanna K Hall

(57) **ABSTRACT**

Systems and methods are disclosed that include a guide catheter apparatus insertable through a external body passage of a subject. The guide catheter apparatus includes a substantially rigid shaft and a handle. The shaft has a proximal opening, a distal opening, and a lumen extending between the proximal opening and the distal opening. The handle has a structure to allow a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. The structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate a working device inserted into the lumen of the guide catheter, where the working device is manipulable via a portion of the working device immediately adjacent to the handle.

**20 Claims, 3 Drawing Sheets**







FIG. 1

FIG. 2

U.S. Patent     Apr. 21, 2015     Sheet 2 of 3     US 9,011,412 B2



FIG. 3



FIG. 4

APP.0118

U.S. Patent    Apr. 21, 2015    Sheet 3 of 3    US 9,011,412 B2



FIG. 5



FIG. 6

APP.0119

US 9,011,412 B2

1

# APPARATUS, SYSTEM AND METHOD FOR MANIPULATING A SURGICAL CATHETER AND WORKING DEVICE WITH A SINGLE HAND

## CROSS-REFERENCE TO RELATED APPLICATION(S) AND CLAIM OF PRIORITY

The present application is related to U.S. Provisional Patent Application Ser. No. 61/127,848, filed May 16, 2008, entitled "APPARATUS, SYSTEM AND METHOD FOR CONTROLLING THE POSITION OF AND PROVIDING SUCTION IN A SURGICAL CATHETER OR GUIDE". Provisional Patent Application Ser. No. 61/127,848 is assigned to the assignee of the present application and is hereby incorporated by reference into the present application as if fully set forth herein. The present application hereby claims priority under 35 U.S.C. §119(e) to U.S. Provisional Patent Application Ser. No. 61/127,848.

## TECHNICAL FIELD

The present invention is generally directed to surgical devices and, in particular, to an apparatus, system and method for manipulating a surgical catheter and working device with a single hand.

## BACKGROUND

FIG. **1** presents a schematic diagram of a typical surgical catheter (or guide) **100** that may be used to perform a procedure in a nasal, sinonasal, or oral passage or other external body passage. The catheter **100** includes a tube **102** having therein a duct **104**. The tube **102** may be introduced into the body passage and a guidewire or other working device **35** inserted into the duct **104** via an opening **106** at a proximal end of the catheter **100**. The duct **104** then operates to guide the working device to an opening **108** at a distal end of the tube **102**. A handle **110** may be formed into or attached to the proximal end of the tube **102** to permit positioning of the catheter **100** by movement of the catheter **100** into and out of the body passage and rotation of the catheter **100** around a longitudinal axis with a first hand. Once a desired position is obtained, the catheter **100** with fingers of a second hand that also grasps an endoscope and held in position. The first hand may then be used to manipulate the working device inserted into the duct **104**.

## SUMMARY

This disclosure provides an apparatus, system and method for manipulating a surgical catheter and working device with a single hand.

In one embodiment, a system includes a guide catheter, a working device and a handle coupled to the guide catheter. The guide catheter is insertable through an external body passage of a subject, and includes a substantially rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening. The working device is adapted to be insertable through the lumen of the guide catheter. The handle has a structure that allows a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. The structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device that is immediately adjacent to the handle.

2

In another embodiment, a method includes inserting a guide catheter through an external body passage of a subject, inserting a working device through the lumen of the guide catheter, and controlling a position of the guide catheter using a handle affixed to the guide catheter while substantially simultaneously manipulating the working device. The position of the guide catheter is controlled by some or all of three fingers of a hand and a thumb and index finger of the hand manipulate the working device via a portion of the working device immediately adjacent to the handle.

In still another embodiment, a guide catheter apparatus insertable through a external body passage of a subject includes a substantially rigid shaft and a handle. The shaft has a proximal opening, a distal opening, and a lumen extending between the proximal opening and the distal opening. The handle has a structure to permit a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. The structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate a working device inserted into the lumen of the guide catheter, where the working device is manipulable via a portion of the working device immediately adjacent to the handle.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention and its advantages, reference is now made to the following description taken in conjunction with the accompanying drawings, in which:

FIG. **1** presents a schematic diagram of a surgical catheter;

FIG. **2** presents a schematic diagram of a surgical catheter according to this disclosure;

FIG. **3** presents a schematic diagram of another surgical catheter according to this disclosure;

FIG. **4** presents a schematic diagram of a surgical catheter according to this disclosure with working devices inserted;

FIG. **5** presents a schematic diagram of a surgical catheter according to this disclosure held by a user; and

FIG. **6** presents a schematic diagram of still another surgical catheter according to this disclosure.

## DETAILED DESCRIPTION

FIG. **2** depicts a schematic diagram of a surgical catheter **200** according to the present disclosure. The catheter **200** includes a tube **202** having therein a duct **204** with an opening **208** at a distal end. A handle **210** may be formed into or attached to the proximal end of the tube **202**. A Y-shaped section **212** is coupled to a proximal end of the tube **202** at a distal end of the section **212**. The section **212** includes a second handle **218** and an opening **216** at a proximal end of the section **212**. The section **212** includes a duct **214** that mates with the duct **204** of the tube **202**. As described for the catheter **100**, working devices may be inserted in the opening **216** and guided to the opening **208** at the distal end of the tube **202** by the duct **214** and the duct **204**.

The section **212** further includes a branch section **212A** having a branch duct **214A**. Suction may be applied to the catheter **200** via the branch section **212A**. Where both the opening **216** and the opening **208** are left uncovered, the suction will be conducted to the opening **216** via the ducts **214A** and **214** and to the opening **208** via the ducts **214A**, **214** and **204**. Because the tube **202** is inserted into a body passage and, possibly, through a hole in a membrane of the body, the opening **208** may be sealed off from the ambient air pressure outside the catheter **200**. In such a situation, the suction

US 9,011,412 B2

3

applied to the branch section 212A will primarily result in air being drawn through the opening 216 and into the duct 214A.

Partially or completely blocking the opening 216, however, will result in the suction drawing blood, mucous, and other materials into the opening 208 and along the ducts 204, 214 and 214A, resulting in removal of the materials from the vicinity of the distal end of the tube 202. An operator of the catheter 200 may vary the mount of blockage of the opening 216 with a finger or valve, in order to control the amount of suction delivered to the opening 208. In this way, materials produced by the body in response to operation of the working devices (or freed from the body by the operation of the working devices) may be removed from vicinity of the distal end of the tube 202 by way of a controlled amount of suction. Such removal may provide a clearer view for an endoscope inserted into the catheter 200, a clearer working area for a cutter, or other similar benefits.

A coupling 220 at a proximal end of the branch section 212A couples a tube 222 having a duct 224 to the branch section 212A and the duct 214A, respectively. The tube 222 may conduct the suction to the section 212 from a suction canister or other suction source. Where the tube 222 is stiff, the coupling 220 may permit rotation of the branch section 212A relative to the tube 222, to reduce interference by the tube 222 with an operator's positioning of the catheter 200.

In another embodiment, a coupling 226 at a proximal end of the tube 222 may couple a second tube 228 having a duct 230 to the tube 222 and the duct 224, respectively. The coupling 226 does not permit rotation of the tube 222 relative to the branch section 214A, nor does the coupling 226 permit rotation of the tube 228 relative to the tube 222. However, where the tube 228 is stiff, a flexible tube 222 may be employed to reduce interference by the tube 228 with an operator's positioning of the catheter 200.

While the section 212 is shown and described as separate from the tube 202, it will be understood that in other embodiments, the section 212 may be formed integrally with the tube 202. In still other embodiments, the coupling 220 may be mounted directly to a side of the section 212, rather than to the branch section 212A. While the section 212 is shown fixedly attached to the tube 202, in other embodiments the section 212 may move relative to the tube 202, in order to further free tethering and increase a user's free and unencumbered movements in space, while leaving the tube 202 in a substantially fixed position relative to the patient's body. In such embodiments, the section 212 may rotate freely or be moved to a desired position and then locked into place via a suitable locking mechanism.

FIG. 3 presents a schematic diagram of a second surgical catheter 300 according to the disclosure. The catheter 300 includes a body having a handle 350. At a distal end of the catheter 300 is a guide coupling 310, which may be a rotating 'female' luer lock. The guide coupling 310 accepts and locks a guide 302. The coupling also operates to permit the guide 302 to be rotated to a desired position relative to the handle 350 and locked in that position for use. The guide coupling 310 may include detents to allow the guide 302 to be positioned only at predetermined positions relative to the handle 350.

The handle 350 may include concavities 356 adapted to provide a secure grip on the handle 350 by some or all of the middle, ring and little fingers of a user's hand, as will be described in greater detail with reference to FIG. 5. The handle 350 may include a protrusion 352 adapted to a secure grip on the handle 350 by a user when the upper portion of the

4

handle 350 is positioned between the middle and ring fingers while grasping the lower portion of the handle 350 with the ring and little fingers.

The handle 350 includes a duct 314 that passes from the guide coupling 310 to an opening 318 at a distal end of the handle 350. The duct 314 is aligned with a duct in the guide 302 when the guide 302 is mounted in the guide coupling 310, so that an endoscope, guidewire or other working device may be inserted into the opening 318, pass through the duct 314 and the guide 302 to emerge from a distal end of the guide 302. A branch section 314a of the duct 314 extends through the handle 350 to a handle coupling 320. A source of suction may be attached to the handle 350 at the handle coupling 320 to provide suction at the distal end of the guide 302, as described with reference to FIG. 2.

Where the opening 318 is provided with a one-way valve to prevent air being drawn into the opening 318 by suction in the branch section 314a, an opening 354 may be provided between the branch section 314a and the exterior of the handle 350 to allow the user to control the amount of suction present at the distal end of the guide 302.

The handle 350 may be provided with a locking screw 358. Once a user has inserted a guide catheter through the duct 314 to a desired position within the patient, the user may operate the locking screw 358 to hold the guide wire in position while inserting another working device, such as a balloon catheter, along the guide wire. Once the second working device reaches the position of the locking screw 358, the locking screw 358 may be operated to withdraw it from the duct 314 and allow the second working device to continue along the duct 314.

With reference to FIG. 4, a balloon catheter 454 has been inserted into the opening 318 and through the guide 302. The balloon catheter 454 includes a tube 452 coupled to an inflation device. Operation of the inflation device causes an inflation segment 456 of the balloon catheter 454 to inflate. The handle 350 may be designed so that the distance between the opening 318 and the guide coupling 310 (indicated by the letter a), when added to the length of the guide 302 (indicated by the letter b), totals less than the distance between the attachment of the tube 452 at a proximal end of the balloon catheter 454 and the inflation segment 456 (indicated by the letter c).

Furthermore, the distance between the opening 318 and the guide coupling 310 may be selected based upon a distance between a shoulder feature of the proximal end of the balloon catheter 454 and the inflation segment 456. The distance may be selected to allow the shoulder feature to engage the opening 318 while the inflation segment 456 extends past the distal end of the guide 302 substantially only far enough to inflate without interference from the distal end of the guide 302. In this way, motion of the inflation segment 456 towards or away from the guide 302 during inflation may be minimized to reduce the likelihood that the inflation segment 456 will slip out of position when inflated.

A suction tube 428 may be attached to the handle coupling 320 by a tube coupling 422. Where the suction tube 428 is stiff, the tube coupling 422 (or the handle coupling 320) may be flexible and/or rotate to reduce interference by the stiff tube 428 with positioning the surgical catheter 300.

FIG. 5 illustrates the surgical catheter 300 in use. A surgeon or other user holds the handle 350 in a hand by some or all of the small finger, the ring finger and the middle finger. Gripped in this way, the surgeon may move the guide 302 in the direction of its longitudinal axis, may rotate the guide 302 about its longitudinal axis, or may rotate the guide 302 about an axis other than its longitudinal axis ('yaw'). The fore finger

US 9,011,412 B2

5

and thumb are left free to manipulate a working device inserted into the opening 318 or to cover the opening 318 to redirect suction to the distal end of the guide 302, as described with reference to FIG. 2. As described with reference to FIG. 4, flexibility and/or rotation of the couplings 320 and/or 422 may reduce the interference of a stiff suction tube 428 on such motion.

The lower portion of the handle 350, which is grasped by the fingers, makes an angle with the upper portion of the handle, and with the guide 302, that facilitates the user's manipulation of working devices with the thumb and forefinger of a hand while grasping the handle with some or all of the remaining fingers of the hand. That is, the angle may be selected to place the user's thumb and forefinger in comfortable proximity to the opening 318, and the handle shaped to permit easy motion of the thumb and forefinger towards and away from the opening 318 while securely grasping a working device inserted through the handle 350 into the guide 302. As shown in the figures, that angle may be approximately sixty (60) degrees, although other angles that are less than ninety (90) degrees and more than zero (0) degrees may be employed.

Using the handle 350, the user is enabled to control the position of the guide 302 by positioning the arm and wrist of the hand that is grasping the handle, while simultaneously controlling the position of a working device inserted into the guide 302 with the thumb and forefinger of the same hand. This leaves the user's other hand free for other activities, such as holding an endoscope in position to view the distal ends of the guide 302 and the working device. In this way, the user is able to simultaneously control the position of the distal end of the guide 302 adjacent to a desired region of the patient and manipulate the working device with one hand.

FIG. 6 illustrates a handle 650 according to the present disclosure wherein the upper portion of the handle 650 comprises a pivot 652. The upper portion includes an opening 618 and a main duct and guide coupling (not shown, but similar to the duct 314 and the guide coupling 310) are in a fixed position relative to each other and to the pivot 652. The duct branch in the handle 650 (not shown, but similar to the branch duct 314a) is pivotally coupled to the main duct, to allow suction applied to a handle coupling 620 to be applied to the opening 318 and a guide attached to the guide coupling. The pivot 652 allows the handle 650 to be rotated to a desired angular position relative to the upper portion and locked into the desired position.

Although the present invention and its advantages have been described in the foregoing detailed description and illustrated in the accompanying drawings, it will be understood by those skilled in the art that the invention is not limited to the embodiment(s) disclosed but is capable of numerous rearrangements, substitutions and modifications without departing from the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

1. A system, comprising:

a guide catheter insertable through an external body passage of a subject, said guide catheter having a substantially rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening;

a handle coupled to the guide catheter, the handle having a handle opening, a handle coupling and a structure, wherein the structure is configured to allow a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle, and

6

wherein the handle coupling is configured to couple a source of suction to the lumen; and

a working device adapted to be insertable through the handle opening into the lumen of the guide catheter,

wherein the structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device immediately adjacent to the handle opening and to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen.

2. The system of claim 1, wherein a longitudinal axis of the handle forms an angle with a longitudinal axis of the guide catheter of less than ninety degrees and more than zero degrees.

3. The system of claim 1, wherein the handle comprises a pivot configured to allow adjustment of an angle between a longitudinal axis of the handle and a longitudinal axis of the guide catheter to a desired value.

4. The system of claim 1, wherein the opening is a first opening, wherein the handle further comprises a second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen.

5. The system of claim 4, wherein the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction.

6. The system of claim 4, wherein the handle coupling is further adapted to allow movement of the source of suction relative to the handle.

7. The system of claim 1, wherein the handle is removably coupled to the guide catheter.

8. A method comprising:

inserting a guide catheter through an external body passage of a subject, wherein the guide catheter comprises a substantially rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening;

coupling a source of suction to the lumen through the handle;

inserting a working device through a handle opening in a handle coupled to the guide catheter and into the lumen of the guide catheter;

controlling a position of the guide catheter using the handle that is formed to allow the position of the guide catheter to be controlled by some or all of three fingers of a hand, while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening; and

controlling the position of the guide catheter using the handle, while substantially simultaneously controlling, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen.

9. The method of claim 8, wherein a longitudinal axis of the handle forms an angle with a longitudinal axis of the guide catheter of less than ninety degrees and more than zero degrees.

10. The method of claim 8, further comprising adjusting an angle between a longitudinal axis of the handle and a longitudinal axis of the guide catheter to a desired angle using a pivot on the handle.

11. The method of claim 8, wherein the opening is a first opening, and wherein controlling the amount of suction comprises controlling the amount of suction coupled to the distal opening of the lumen using a second opening in the opening.

APP.0122

US 9,011,412 B2

7

**12**. The method of claim **11**, wherein the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction.

**13**. The method of claim **11**, further comprising coupling the handle to the guide catheter.

**14**. A guide catheter apparatus insertable through an external body passage of a subject, comprising:

a substantially rigid shaft with a proximal opening, a distal opening, and a lumen extending between the proximal opening and the distal opening; and

a handle coupled to the shaft, the handle having a handle opening, a handle coupling and a structure, wherein the structure is configured to allow a position of the guide catheter apparatus to be controlled by some or all of three fingers of one hand of an operator of the handle, wherein the handle coupling is configured to couple a source of suction to the lumen, wherein the structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate a working device via a portion of the working device immediately adjacent to the handle opening when the working device is inserted through the handle opening into the lumen of the shaft, and wherein the structure of the handle is configured to permit the operator to control,

8

by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen.

**15**. The apparatus of claim **14**, wherein a longitudinal axis of the handle forms an angle with a longitudinal axis of the guide catheter of less than ninety degrees and more than zero degrees.

**16**. The apparatus of claim **14**, wherein the handle comprises a pivot configured to allow adjustment of an angle between a longitudinal axis of the handle and a longitudinal axis of the guide catheter to a desired value.

**17**. The apparatus of claim **14**, wherein the opening is a first opening, wherein the handle further comprises a second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen.

**18**. The apparatus of claim **17**, wherein the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction.

**19**. The apparatus of claim **17**, wherein the handle coupling is further adapted to allow movement of the source of suction relative to the handle.

**20**. The apparatus of claim **14**, wherein the handle is removably coupled to the shaft.

\*    \*    \*    \*    \*

APP.0123

# EXHIBIT 3

APP.0124

US 20070250105A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: US 2007/0250105 A1
Ressemann et al. (43) Pub. Date: **Oct. 25, 2007**

(54) **DEVICE AND METHOD FOR TREATMENT OF SINUSITUS**

(76) Inventors: **Thomas V. Ressemann**, St. Cloud, MN (US); **Peter T. Keith**, St. Paul, MN (US); **Theodore O. Truitt**, St. Cloud, MN (US)

Correspondence Address:
**Vista IP Law Group LLP**
**2040 MAIN STREET, 9TH FLOOR**
**IRVINE, CA 92614 (US)**

(21) Appl. No.: 11/379,691

(22) Filed: Apr. 21, 2006

**Publication Classification**

(51) Int. Cl.
*A61M 29/00* (2006.01)
(52) U.S. Cl. .................................................. 606/196

(57) **ABSTRACT**

A method of treating a constricted sinus passageway of a patient includes traversing the canine fossa region of the patient so as to form a passageway in the sinus cavity. An elongate member is inserted through the passageway, the elongate member having an inflation member such as a balloon disposed thereon. The inflation member is positioned within the constricted passageway. The inflation member is expanded so as to expand at least a portion of the constricted sinus passageway.





EXHIBIT 107
John Chang
11/13/2018
Reported by: Charlotte Lachty
RPR, CSR #14224

APP.0125



FIG. 1



FIG. 2

APP.0126

Patent Application Publication    Oct. 25, 2007  Sheet 2 of 40        US 2007/0250105 A1



FIG. 3A



FIG. 3B

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 67 of 274    PageID 4713



FIG. 3C

APP.0128



FIG. 4



FIG. 5A



FIG. 5B                     FIG. 5C



FIG. 5D

APP.0130

Patent Application Publication    Oct. 25, 2007    Sheet 6 of 40    US 2007/0250105 A1



FIG. 5E



FIG. 5F

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 71 of 274    PageID 4717



FIG. 6A



FIG. 6B

APP.0132



FIG. 7A



FIG. 7B



FIG. 6C



FIG. 7C

APP.0134



FIG. 8

APP.0135

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 75 of 274    PageID 4721



FIG. 9

APP.0136



**FIG. 10A**

APP.0137

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 77 of 274    PageID 4723



FIG. 10B

FIG. 10C



FIG. 10D

APP.0138



FIG. 11A



FIG. 11B



FIG. 11C



FIG. 11D



FIG. 12

APP.0141



FIG. 13



FIG. 14

Case 3:16-cv-03340-M     Document 161-1     Filed 03/19/19     Page 83 of 274     PageID 4729



FIG. 15

APP.0144

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 84 of 274    PageID 4730



FIG. 16A

APP.0145

Case 3:16-cv-03340-M     Document 161-1     Filed 03/19/19     Page 85 of 274     PageID 4731



FIG. 16B

Light In



FIG. 16C

APP.0146



FIG. 17A

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 87 of 274    PageID 4733



FIG. 17B

Light In



FIG. 17C

APP.0148

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 88 of 274    PageID 4734



FIG. 18A

APP.0149



FIG. 18B

APP.0150



FIG. 18C

Case 3:16-cv-03340-M     Document 161-1     Filed 03/19/19     Page 91 of 274     PageID 4737



FIG. 19A

FIG. 19B

FIG. 19C

APP.0152



FIG. 20

Case 3:16-cv-03340-M     Document 161-1     Filed 03/19/19     Page 93 of 274     PageID 4739



FIG. 21

APP.0154



FIG. 22

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 95 of 274    PageID 4741



FIG. 23A

APP.0156



FIG. 23B

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 97 of 274    PageID 4743



FIG. 24

APP.0158

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 98 of 274    PageID 4744



## FIG. 25A

APP.0159

Case 3:16-cv-03340-M    Document 161-1    Filed 03/19/19    Page 99 of 274    PageID 4745



FIG. 25B

APP.0160

Patent Application Publication    Oct. 25, 2007  Sheet 36 of 40      US 2007/0250105 A1



FIG. 26A

APP.0161



FIG. 26B

Case 3:16-cv-03340-M     Document 161-1     Filed 03/19/19     Page 102 of 274     PageID 4748



FIG. 27A



FIG. 27B



FIG. 28



FIG. 29

US 2007/0250105 A1

1

Oct. 25, 2007

# DEVICE AND METHOD FOR TREATMENT OF SINUSITUS

## FIELD OF THE INVENTION

[0001]    The field of the invention generally relates to devices and methods for the treatment or amelioration of sinusitis.

## BACKGROUND OF THE INVENTION

[0002]    Sinusitis is a condition affecting over 35 million Americans, and similarly large populations in the rest of the developed world. Sinusitis occurs when one or more of the four paired sinus cavities (i.e., maxillary, ethmoid, frontal, sphenoid) becomes obstructed. These paired cavities are located in the skull behind the face, as is depicted in FIGS. 1, 2, and 3A. Normally the sinus cavities, each of which are lined by mucosa, produce mucous which is then moved by beating cilia from the sinus cavity out to the nasal cavity and down the throat. The combined sinuses produce approximately one liter of mucous daily, so the effective transport of this mucous is important to sinus health.

[0003]    Each sinus cavity has an opening into the nasal passage called an ostium. When the mucosa of one or more of the ostia or regions near the ostia become inflamed, the egress of mucous is interrupted, setting the stage for an infection of the sinus cavity, i.e., sinusitis. Infections of the maxillary and/or ethmoid sinuses make up the vast majority of cases of sinusitis, with far fewer cases involving the sphenoids and frontals.

[0004]    Though many instances of sinusitis may be treatable with antibiotics, in some cases sinusitis persists for months, a condition called chronic sinusitis. Some patients are also prone to multiple episodes of sinusitis in a given period of time, a condition called recurrent sinusitis.

[0005]    Currently, patients experiencing chronic sinusitis are eligible to have a surgical procedure called functional endoscopic sinus surgery (FESS). In this procedure, which almost always done in an operating room setting with the patient under general anesthesia, surgical cutting instruments are guided with an endoscopic visualization tool to the various sinus ostia and adjacent regions. Inflamed mucosa and underlying bony tissue are cut away in an effort to widen the outlet of the sinuses of interest. Once opened, the infected sinuses are able to drain and return to a relatively normal state.

[0006]    While this procedure is generally effective, it is a relatively invasive procedure to the nasal cavity and sinuses. There can be significant post-operative pain for the patient, and sometimes there are bleeding complications that require packing to be placed in the nasal cavity. Subsequent removal of this packing can be quite painful. Also, since the nasal and sinus tissue are significantly traumatized, it may take several days to weeks to know whether the surgery was successful. This is especially true if various healing agents such as MeroGel® (Medtronic/Xomed) were placed at the surgical site, as these often block the sinus drainage until they are flushed away or degrade away after several days.

[0007]    Additionally, in certain patients, the ostial regions of the surgically-treated sinuses can become re-obstructed with excess growth of scar tissue as a result of the tissue trauma. When the advantages and disadvantages of the surgery are considered for a patient with sinusitis, there are many patients in whom the surgery may not be appropriate. For example, their condition may not be considered "chronic enough" or extensive enough to warrant FESS surgery. In other situations, the patient may be fearful of the pain or other aspects of having FESS performed. Alternatively, the FESS procedure may be too costly for a particular patient.

[0008]    For these and other reasons, there is a clear need for better methods and devices for the treatment of sinusitis.

## SUMMARY OF THE INVENTION

[0009]    In a first aspect of the invention, a method of treating a constricted sinus passageway of a patient includes traversing the canine fossa region of the patient so as to form a passageway to a sinus cavity. An elongate member having an inflation member thereon (e.g., a balloon) is inserted through the passageway. The inflation member is positioned within the constricted sinus passageway. The inflation member is then expanded so as to expand at least a portion of the constricted sinus passageway.

[0010]    In a second aspect of the invention, a method of accessing a constricted sinus passageway of a patient includes traversing the canine fossa region of the patient to as to form a passageway to a sinus cavity. A visualization tool is inserted through the passageway. A wire guide is also inserted through the passageway. The constricted sinus passageway is viewed with the visualization tool. The wire guide is positioned adjacent to or within the constricted sinus passageway.

[0011]    In another aspect of the invention, a method of accessing a constricted sinus passageway of a patient includes traversing the canine fossa region of the patient so as to form a first passageway to a sinus cavity. A visualization tool is inserted through the first passageway. The canine fossa region is traversed again to form a second passageway. This traversal may be performed at the same time that the first passageway is formed. A wire guide is then inserted through the second passageway. The constricted sinus passageway is then viewed with a visualization tool. The wire guide is then placed adjacent to or within the constricted sinus passageway. A balloon catheter may be advanced over the wire guide to expand or open the constricted sinus passageway.

[0012]    In yet another embodiment, a method of accessing a constricted sinus passageway of a patient includes traversing the canine fossa region of the patient so as to form a passageway to a sinus cavity. An illumination member is inserted into the sinus cavity. The sinus cavity is illuminated via the illumination member. A guide catheter is inserted through the nasal passageway, the guide catheter including a wire guide slidably disposed within a lumen contained therein. A visualization tool is inserted through the nasal passageway. A distal tip of the wire guide is placed across or adjacent to the constricted sinus passageway.

[0013]    In still another aspect of the invention, a method of confirming the location of a wire guide intended to be positioned within a patient's sinus cavity includes introducing a wire guide through a nasal passageway to place a distal tip of the wire guide in a test position. The elongate member is advanced over the wire guide to place a distal end at or adjacent to the distal tip of the wire guide. The elongate

member emits illuminating light via the distal end of the elongate member. The location of the light (e.g., the source) is viewed through the patient's skin to confirm the positioning (or confirm incorrect positioning) of the wire guide.

[0014]  In another embodiment of the invention, a method of confirming the location of the wire guide intended to be positioned within a patient's sinus cavity includes introducing a wire guide through a nasal passageway to place a distal tip of the wire guide in a test position, the wire guide including a detection element positioned at or adjacent to the distal tip of the wire guide. A detector device is then placed external to the patient's skin adjacent to the intended sinus cavity so as to detect the presence or absence of the detection element.

[0015]  In still another aspect of the invention, a system for accessing a sinus cavity of a patient includes a trocar having an outer cannula and a piercing member slidably disposed within a lumen of the cannula. The system includes an elongate member having an inflation member disposed thereon, the elongate member being slidably disposed within the lumen of the cannula.

[0016]  In yet another aspect of the invention, a device for accessing the sinus cavity of a patient includes an outer cannula having a lumen and a piercing member slidably disposed within the lumen of the cannula. An adjustable stop is secured to a distal portion of the piercing member.

[0017]  In still another aspect of the invention, a device for accessing the sinus cavity of a patient includes an outer cannula having a lumen and a piercing member slidably disposed within the lumen of the cannula. A stop is secured to one of the outer cannula and the piercing member.

[0018]  In another aspect of the invention, a device for accessing the sinus cavity of a patient includes an outer cannula having a lumen, a piercing member slidably disposed within the lumen of the cannula, the piercing member including a threaded portion on a proximal section of the piercing member. The device further includes a threaded hub configured to rotationally engage the threaded portion of the piercing member.

[0019]  In still another aspect of the invention, a device for accessing the sinus cavity of a patient includes an outer cannula having a lumen, a piercing member slidably disposed within the lumen of the cannula, the piercing member including a proximal section. The device further includes an advancement member frictionally engaged with the proximal section of the piercing member, wherein the advancement member controls the displacement of the piercing member relative to the outer cannula.

[0020]  In yet another embodiment of the invention, a balloon catheter for treating a constricted sinus passageway of a patient includes a flexible elongate member having a proximal end and a distal end and including first and second lumens passing therethrough. A hub is secured to a proximal end of the flexible elongate member, the hub including a first port in communication with the first lumen of the flexible elongate member and a second port in communication with the second lumen of the flexible elongate member. An inflation member is disposed on or adjacent to the distal end of the flexible elongate member, an interior of the inflation member being in communication with the first lumen of the flexible elongate member. An outer membrane surrounds the inflation member, an interior of the outer membrane being in communication with the second lumen of the flexible elongate member, the outer membrane including a plurality of perforations.

[0021]  In still another embodiment of the invention, a stabilizing device for securing one or more tools passing into a nasal or sinus cavity of a patient includes a base member fixedly secured to the face of the patient, an adjustable support arm secured at a first end to the base member, and a securing member fixed to a second end of the adjustable support arm, the securing member configured to releasable hold at least one tool passing into the nasal or sinus cavity of a patient.

[0022]  In another embodiment of the invention, a method of stabilizing one or more tools passing into the nasal passage of a patient includes inserting a tool into the nasal passage of the patient. A stabilizing element is then inserted into the nasal passage of the patient adjacent to the tool, the stabilizing element being inserted in a non expanded state. The stabilizing element is expanded to an expanded state to frictionally engage the tool within the nasal passage of the patient.

[0023]  In another embodiment of the invention, a stabilizing device for securing one or more tools passing into a sinus cavity of a patient includes a mouth piece fixedly secured to the mouth of the patient, an adjustable support arm secured at a first end to the mouth piece, and a securing member fixed to a second end of the adjustable support art, the securing member configured to releasably hold at least one tool passing into the sinus cavity of a patient.

[0024]  In still another aspect of the invention, a system for manipulating a guide catheter within a patient's nasal passages or sinus cavities is provided. The system includes a guide catheter formed from an elongate flexible member having a lumen passing therethrough and a wire guide slidably disposed within the lumen of the guide catheter. The system includes a steering member fixedly secured to a proximal end of the wire guide and a proximal hub secured to a proximal end of the guide catheter. The system further includes a recessed handle having a first recess for fixedly receiving the proximal hub of the guide catheter and a second recess for receiving the steering member, the second recess being dimensioned to permit axial and rotational movement of the steering member while disposed in the second recess.

[0025]  In yet another aspect of the invention, a system for manipulating a guide catheter within a patient's nasal passages or sinus cavities is provided. The system includes a guide catheter formed from an elongate flexible member having a lumen passing therethrough, the guide catheter including a proximal handle including a recess therein. A wire guide is slidably disposed within the lumen of the guide catheter. The system includes a steering member fixedly secured to a proximal end of the wire guide and disposed in the recess of the handle, the recess being dimensioned to permit axial and rotational movement of the steering member while disposed in the recess.

[0026]  In another embodiment of the invention, a guide catheter for accessing a sinus cavity of a patient includes an elongate member having a proximal end and distal end and at least one lumen passing therethrough, the distal end

APP.0167

3

including a flexible tip portion, the elongate member being formed from a polymeric material containing a wire braid. The guide catheter further includes a hub connected to the proximal end of the elongate member.

[0027]   In still another aspect of the invention, a balloon catheter for treating a constricted sinus passageway of a patient includes an elongate flexible shaft comprising an inner tube and an outer tube, the elongate flexible shaft having a proximal end and distal region, wherein at least one of the inner tube and outer tube is formed with a kink-resistant coil in the distal region. A hub is affixed to a proximal end of the elongate flexible shaft, the hub including a port in communication with a lumen formed between the inner tube and the outer tube. An expandable member is disposed on a distal region of the elongate flexible shaft, an interior of the expandable member being in communication with the lumen formed between the inner tube and the outer tube.

[0028]   In another embodiment of the invention, a guide catheter for guiding one or more devices into an ostium of a paranasal sinus includes an elongate shaft defining a proximal region and a distal region, the elongate shaft including a lumen passing from the proximal region to the distal region. The elongate shaft includes a curved portion in the distal region, the curved portion having a radius of curvature of between about 1 mm and about 5 mm and an angle of between about 120° and about 180°.

[0029]   In still another aspect of the invention, a method of placing a wire guide into the ostium of a paranasal sinus includes introducing a directable endoscope into the nasal cavity. A guide catheter is inserted into the nasal cavity to position a distal tip near the sinus ostium. The endoscope is manipulated to move the viewing field toward the sinus ostium. A wire guide is inserted through a lumen in the guide catheter and the wire guide is manipulated to place the same at least partially within or adjacent to the sinus ostium.

[0030]   In another embodiment of the invention, a method of placing a wire guide into the ostium of a paranasal sinus includes introducing a retrograde rigid endoscope into the nasal cavity and introducing a guide catheter into the nasal cavity to position a distal tip near the sinus ostium. The endoscope is oriented to move the viewing field toward the sinus ostium. A wire guide is inserted through a lumen in the guide catheter and the wire guide is manipulated to place the wire guide at least partially within or adjacent to the sinus ostium.

[0031]   In yet another embodiment of the invention, a method of placing a wire guide into the ostium of a paranasal sinus includes introducing a guide catheter into the nasal cavity to position a distal tip near the sinus ostium. A wire guide is inserted through a lumen in the guide catheter and the wire guide is manipulated to place the wire guide at least partially beyond a distal tip of the guide catheter. A flexible visualization scope is introduced over the wire guide to position a viewing field toward the sinus ostium. The wire guide is manipulated to place the wire guide at least partially within the sinus ostium.

[0032]   In still another aspect of the invention, a method of placing a wire guide into the ostium of a paranasal sinus includes introducing a directable endoscope sheath into the nasal cavity, the endoscope sheath including at least one

working lumen therein. The endoscope is manipulated to move the viewing field toward the sinus ostium. A wire guide is inserted through the lumen in the endoscope sheath. The wire guide is manipulated to place the wire guide at least partially within or adjacent to the sinus ostium.

[0033]   In yet another aspect of the invention, a method of remodeling the uncinate process associated with a paranasal sinus includes positioning at least one shim member in the infundibulum, the shim member deforming the uncinate process and widening at least a portion of the infundibulum. The shim member may be permanent or biodegradable. In addition, multiple shims may be positioned within the infundibulum. The at least one shim members may be delivered using a delivery tool. For example, the at least one shim member may be inserted into the infundibulum in a first orientation and then rotated into position. The at least one shim member may include a gripping member (e.g., teeth) on an exterior surface thereof.

[0034]   In another aspect of the invention, a device for remodeling the uncinate process associated with a paranasal sinus includes an elongate delivery tool and at least one shim member detachably mounted to a distal end of the elongate delivery tool. The elongate delivery tool may include a torque driver to transmit rotational movement of a proximal end to rotational movement of a distal end. In one aspect, the at least one shim member and the elongate delivery tool are slidably disposed within a guide catheter.

[0035]   In another embodiment of the invention, a method of treating a constricted sinus passageway of a patient includes traversing the external skull wall of the patient so as to form a passageway to the frontal sinus cavity and inserting an inflation member through the passageway, the elongate member having an inflation member disposed thereon. The inflation member is positioned within the constricted sinus passageway and the inflation member is expanded so as to expand at least a portion of the constricted sinus passageway.

[0036]   In still another embodiment of the invention, a device for accessing the sinus cavity of a patient includes an outer cannula having a lumen, the outer cannula having a flexible curved tip. The device further includes a piercing member slidably disposed within the lumen of the cannula, the piercing member including a proximal section. An advancement member is frictionally engaged with the proximal section of the piercing member.

[0037]   Further features and advantages will become apparent upon review of the following drawings and description of the preferred embodiments.

BRIEF DESCRIPTION OF THE DRAWINGS

[0038]   FIG. 1 illustrates is a schematic view illustrating the paranasal sinuses in relation to the face.

[0039]   FIG. 2 is a coronal section of the human skull, showing the paranasal sinuses.

[0040]   FIGS. 3A-3C are of a sagittal view of the lateral nasal wall, illustrating various anatomical features thereof.

[0041]   FIG. 4 illustrates one embodiment of the current invention showing a balloon dilation catheter in the ostial region of a paranasal sinus.

APP.0168

[0042]  FIG. 5A illustrates one embodiment of a guide catheter according to the invention.

[0043]  FIG. 5B is a cross-sectional view of the embodiment shown in FIG. 5A.

[0044]  FIG. 5C is a cross-sectional view of an alternative embodiment of a guide catheter.

[0045]  FIG. 5D is an alternative embodiment of a guide catheter.

[0046]  FIG. 5E shows the guide catheter of the embodiment illustrated in FIG. 5D being positioned within the nasal cavity.

[0047]  FIG. 5F is a cross-sectional view of an alternative embodiment of a guide catheter.

[0048]  FIG. 6A illustrates an embodiment of a balloon dilation catheter according to one embodiment of the invention.

[0049]  FIG. 6B is a longitudinal sectional view of a portion of the distal shaft of the embodiment of FIG. 6A.

[0050]  FIG. 6C is a cross-section of the distal shaft of the embodiment of FIG. 6A.

[0051]  FIG. 7A illustrates an alternative embodiment of a balloon dilation catheter according to one embodiment.

[0052]  FIG. 7B is a longitudinal sectional view of a portion of the distal shaft of the embodiment of FIG. 7A.

[0053]  FIG. 7C is a cross-sectional view of the distal shaft of the embodiment of FIG. 7A.

[0054]  FIG. 8 illustrates an embodiment of a stabilization device according to one aspect of the invention.

[0055]  FIG. 9 illustrates an alternative embodiment of a stabilization device according to another aspect of the invention.

[0056]  FIG. 10A illustrates a further alternative embodiment of a stabilization device according to another aspect of the invention.

[0057]  FIG. 10B is a partially exploded top view of the stabilization device of FIG. 10A.

[0058]  FIG. 10C is a partially exploded front view of the stabilization device of FIG. 10A.

[0059]  FIG. 10D is an assembled front view of the stabilization device of FIG. 10A.

[0060]  FIG. 11A illustrates an embodiment of a wire movement guide according to one aspect of the invention.

[0061]  FIG. 11B is a cross-sectional view of the wire movement guide of FIG. 11A.

[0062]  FIG. 11C is an assembly drawing of the wire movement guide of FIG. 11A attached to a guide catheter.

[0063]  FIG. 11D illustrates a method for placement of a wire guide in a sinus ostium according to one aspect of the invention.

[0064]  FIG. 12 illustrates a method and device for confirming the placement of a wire guide in a sinus according to one aspect of the invention.

[0065]  FIG. 13 illustrates an alternative method and device for confirming the placement of a wire guide, according to another aspect of the invention.

[0066]  FIG. 14 illustrates methods and devices for accessing a sinus according to one aspect of the invention.

[0067]  FIG. 15 shows additional methods and devices for accessing a sinus, according to another aspect of the invention.

[0068]  FIG. 16A shows additional methods and devices for accessing a sinus according to another aspect of the invention.

[0069]  FIG. 16B shows a flexible visualization scope as used in connection with FIG. 16A.

[0070]  FIG. 16C is a cross-sectional view of the flexible visualization scope of FIG. 16B.

[0071]  FIG. 17A shows additional methods and devices for accessing a sinus according to one of the invention.

[0072]  FIG. 17B shows an embodiment of a directable endoscope sheath as used in connection with FIG. 17A.

[0073]  FIG. 17C is a cross-sectional view of the directable endoscope sheath of FIG. 17B.

[0074]  FIG. 18A illustrates methods and devices for accessing a sinus from an external location according to one aspect of the invention.

[0075]  FIG. 18B illustrates additional methods and devices for accessing a sinus ostium from an external location according to one aspect of the invention.

[0076]  FIG. 18C illustrates further additional methods and devices for accessing a sinus ostium from an external location according to another aspect of the invention.

[0077]  FIGS. 19A-19C are cross-sectional images depicting various arrangements of devices used in accessing a sinus ostium in connection with FIG. 18B.

[0078]  FIG. 20 illustrates methods and devices for treating a sinus ostium in one aspect of the invention.

[0079]  FIG. 21 shows an embodiment of a trocar in accordance with one aspect of the invention.

[0080]  FIG. 22 shows another embodiment of a trocar according to another aspect of the invention.

[0081]  FIGS. 23A and 23B show additional methods and devices for accessing a sinus ostium from an external location according to one aspect of the invention.

[0082]  FIG. 24 shows additional methods and devices for accessing a sinus ostium from an external location according to another aspect of the invention.

[0083]  FIG. 25A is a coronal view showing anatomical features of the maxillary sinus.

[0084]  FIG. 25B is a sagittal view showing the anatomical features of FIG. 25A.

[0085]  FIG. 26A is a coronal view illustrating methods and devices for the treatment of the uncinate process in accordance with one aspect of the invention.

US 2007/0250105 A1

Oct. 25, 2007

5

[0086] FIG. 26B is a sagittal view illustrating methods and devices for the treatment of the uncinate process in accordance with one aspect of the invention.

[0087] FIG. 27A is a top view of an embodiment of a shim member in accordance with one aspect of the invention.

[0088] FIG. 27B is an isometric view of the shim member of FIG. 27A.

[0089] FIG. 28 is an embodiment of a shim member delivery device in accordance with one aspect of the invention.

[0090] FIG. 29 illustrates a method and device for widening the infundibulum in accordance with another aspect of the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0091] FIG. 1 illustrates a frontal anatomical representation (parallel to the coronal plane) showing the sinuses FS, ES, MS located within a patient's head H. Above and behind the eyebrows are the frontal sinuses FS. Between the eyes are the ethmoid sinuses ES. Note that unlike the other sinuses, the ethmoids are typically formed as a "honeycombed" structure consisting of several individual air cells. Located behind the cheeks are the maxillary sinuses MS. The sphenoid sinuses are not shown in FIG. 1, but are located further posterior to the ethmoid sinuses.

[0092] FIG. 2 is another frontal view of the sinuses located within the skull bone SK showing additional features. The nasal septum NS divides the nasal cavity into left and right sides. Because the following described structures are generally symmetrical bilaterally, only one of the paired structures is illustrated for sake of convenience. Within the nasal cavity are the middle turbinate MT and the inferior turbinate IT. The middle turbinate MT is connected to the base of the skull SK, while the inferior turbinate IT is connected to the lateral wall of the sinus cavity. The turbinates MT, IT have an underlying bony structure, but are covered with a thick mucosa lining. When this lining swells (rhinitis), it can inhibit breathing through the nose, particularly the inferior turbinate IT. The ethmoid sinuses ES are depicted by a single air cell in FIG. 2. The uncinate process UP is a complex three-dimensional structure, projecting off of the lateral wall like a crescent shaped leaf (better seen in FIGS. 3B and 25B) The curved aspect of the medial bone defining the ethmoid sinuses ES is called the ethmoid bulla EB. The passageway between the ethmoid bulla EB and the uncinate process UP is referred to as the infundibulum I. The drainage path of the maxillary MS, frontal FS, and some of the ethmoid ES air cells runs into the infundibulum I. At the most inferior part of the maxillary sinus is a thin portion of skull bone referred to as the canine fossa CF. Though this is not a true opening, it is a relatively thin bone region, just above the root of the outer aspect of the canine teeth, inside the mouth. The relationship of the sinuses to the orbit O of the eye can also be seen. Note also that all of the sinus cavities have a mucosa lining (ML) disposed over the bone.

[0093] FIG. 3A is a side view parallel to the sagittal plane, looking at the right lateral nasal wall. The right nostril N is seen. The sphenoid sinus SS and frontal sinus FS may also be seen in this view. The flap-like structures illustrated in FIG. 3A are the inferior turbinate IT and middle turbinate MT. Other structures of the nasal cavity have been left out for clarification, e.g., the superior turbinate. Located underneath the middle turbinate MT (shown in a "lifted" state in FIG. 3B and removed in FIG. 25B) are the structures of the lateral nasal wall. As seen in FIG. 3A, the ethmoid bulla EB is a rounded projection of the bony wall of the nasal cavity. Behind the wall of the ethmoid bulla EB are one or more of the individual air cells of the ethmoid sinus ES (not shown in FIGS. 3B and 25B). Anterior and inferior of the ethmoid bulla is the uncinate process UP. The uncinate process UP has essentially two edges to it including a free edge FE and a connected edge CE. The free edge FE stands out from the nasal wall, while the connected edge CE connects the structure to the nasal wall. The narrow space between the ethmoid bulla EB and the uncinate process UP is the infundibulum I. Thus, it can be appreciated the complexity of the anatomy involving the maxillary and ethmoid sinus structures MS, ES.

[0094] FIG. 3C illustrates the structure beneath or underneath the uncinate process UP. In FIG. 3C, the uncinate process UP has been removed for clarity purposes, leaving only the connected edge CE. Two ostia can be seen including the maxillary sinus ostium MO, and the frontal sinus ostium FO. Drainage from the frontal sinuses FS and maxillary sinuses MS emerges into the infundibulum I through the maxillary sinus ostium MO and the frontal sinus ostium FO. Also, some of the ethmoid air cells ES drain into the infundibulum I, but they are not shown as they are substantially smaller than the frontal and maxillary ostia FO, MO. Drainage problems can arise and/or extend from the ostia of one or more of these sinuses to the infundibulum I or vise versa. Consequently, conventional FESS surgical treatment of sinusitis typically involves widening one or more of the ostia FO, MO, as well as complete removal of the uncinate process UP. Incidentally, removal of the uncinate process UP is usually required even to just allow visualization of these sinus ostia FO, MO for the proper placement of the various surgical cutting instruments. Ethmoids are often treated with the FESS procedure by removing some of the wall of the ethmoid bulla EB and some of the "honeycomb" structure between the individual air cells.

[0095] FIG. 4 illustrates a generic therapeutic approach contemplated by one embodiment of the invention. Rather than remove obstructing tissue associated with the sinus ostia FO, MO, a dilation balloon 10 is positioned in the narrowed region to dilate open the structure. Generally, the dilation balloon is carried on a distal end or region of elongate member 12 such as a balloon catheter. The balloon catheter 12 may include a proximal hub 14 that includes an inflation port 16 that is used inflate (and deflate) the dilation balloon 10. For example, the inflation port 16 may connect to a syringe or the like (not shown) using, for instance, a Leur lock connection. The balloon catheter 12 may be disposed within a central lumen of a guide catheter 18. The guide catheter 18 may include a flexible tip portion 18b as well as a curved portion 20 that is used to navigate the tortuous pathway around the uncinate process UP. The proximal end of the guide catheter 18 may include a hub 22.

[0096] Still referring to FIG. 4, a wire guide 24 is located within a central lumen in the balloon catheter 12. The wire guide 24 in FIG. 4 is introduced into the maxillary sinus MS with the aid of the guide catheter 18 and a steering device 26. The wire guide 24 preferably has a curved tip 24b such as

US 2007/0250105 A1

6

Oct. 25, 2007

a "J" bend located at or adjacent to a distal tip 24a of the wire guide 24. The steering device 26 connects to a proximal end of the wire guide 24 to allow rotation of the wire guide 24, and subsequent rotation of the curved tip 24b to steer and direct the wire guide 24. As can be seen in FIG. 4, there is a relatively sharp bend that the wire guide 24 and balloon catheter 12 must traverse to enter into the maxillary ostial MO region. It is contemplated that a guide catheter 18 may not be utilized at the time that the balloon catheter 12 is positioned in the ostium of interest, but rather the guide catheter 18 would be utilized just for placement of the wire guide 24. In this case, the balloon catheter 12 would be advanced over the wire guide 24. This helps to minimize the size of the "hardware" that is present in the nasal cavity at any one time by allowing use of a smaller diameter guide catheter 18, and minimizes the amount of distortion required on various structures in the nasal cavity, such as the middle turbinate MT.

[0097] Still referring to FIG. 4, dilation of the maxillary ostial MO region is accomplished by inflation of the balloon 19 via the inflation port 16 with an inflation apparatus (not shown) which may included, for example, a syringe. It is contemplated that a combination of remodeling the soft tissues as well as fracturing/crushing bony tissues will result in a more open drainage path for the sinus(es) being treated. While FIG. 4 shows a balloon catheter 12 positioned in the maxillary sinus ostium (MO), it is contemplated that the balloon 10 could be positioned in any of the sinus ostia, either naturally occurring ostia, or ostia created intra-procedurally. In particular, treatment of the ethmoid air cells ES may be accomplished by creating one or more small passageways in the walls surrounding the air cells, for example with a needle, followed up by a dilation process using the dilation balloon catheter 12. Moreover, reference to a particular ostium does not necessarily mean an opening or passageway per se. Rather, reference to ostium may include the general region or anatomical area surrounding or adjacent to the ostium of interest, and is not limited to a single, discrete structure or location.

[0098] Access to the maxillary sinus ostium MO from within the nasal cavity is particularly challenging due in part to the anatomy of the uncinate process UP and infundibulum I. FIGS. 5A and 5B illustrate various embodiments of a guide catheter 18 used to facilitate access to the maxillary sinus from the nasal cavity. In FIG. 5A, the guide catheter 18 has a relatively tight curved portion 20 near the tip 18b, with a preferred inside radius of curvature between about 0.5 mm and about 10 mm, and more preferably between about 1 mm and about 5 mm. Such a radius of curvature will assist in the tip 18b of the guide catheter "hooking" around the uncinate process UP, to help direct the wire guide 24 and subsequently the balloon catheter 12 into the maxillary sinus ostium MO. The degree of bend of the curved portion of the guide catheter 18 is preferably between 90 degrees and 180 degrees from the longitudinal axis of the hub 22, and more preferably between 120 and 160 degrees.

[0099] In one preferred aspect of the invention, the guide catheter 18 includes a shaft portion 18a and a flexible tip portion 18b. The tip portion 18b is preferably of a softer material than the shaft portion 18a. Tip portion 18b may formed of a polymer such as PEBAX (Arkema), polyurethane, NYLON (DuPont), HYTREL (DuPont), or silicone. FIG. 5B illustrates a cross-sectional view of one preferred

embodiment of the shaft portion 18b. As seen in FIG. 5B, a liner 34 of a lubricious material such as PTFE defines a central lumen 36. The liner 34 is surrounded by a wire braid 32. The wire braid 32 is encased in a polymeric material such as PEBAX (Arkema), polyurethane (DuPont), NYLON (DuPont), HYTREL (DuPont), or silicone. The wire braid 32 adds torsional strength to the shaft 18b, allowing the curved tip portion 18b to be controlled and directed by manipulations near the hub 22. The tip portion 18b may be pre-formed by a suitable process such as heat forming.

[0100] Alternatively, as shown in 5C, the guide catheter 18 shaft portion 18a and/or tip portion 18b may incorporate a shaping element 38, such as a removable wire. The wire 38 is preferably axially slidable within a lumen 40 formed in the guide catheter 18. For example, different pre-shaped wires 38 may be axially slid within the lumen 40 to impart the desired shape or bend in the guide catheter 18. Alternatively, shaping element 38 could be a ductile non-removable wire that could be shaped and re-shaped to fit to a particular patient's anatomy. This feature advantageously allows the tip curvature or the curvature of any portion of the guide catheter 18 to be customized by the user prior to or during a procedure.

[0101] Alternatively, the shaft portion 18b of the guide catheter 18 can be formed of a metallic tube rather than the braid and jacket construction. This embodiment is illustrated in FIG. 5F. Preferably a liner 34 is inside the metallic tube. Such a construction would allow the shaft portion 18b to be shaped and reshaped to suit any particular anatomy.

[0102] The diameter of the guide catheter 18 is determined by the size of the devices that might pass through it. For example, if the guide catheter 18 is used only for the placement of a wire guide 24 of 0.014 inch diameter, then the guide catheter 18 may have an inner diameter of between 0.016 and 0.025 inches, and a total wall thickness of between 0.004 and 0.020 inches. However if the guide catheter 18 is used to assist in placement of a dilation balloon catheter 12, the inner diameter is preferably between 0.040 and 0.100 inches, with a total wall thickness of between 0.005 and 0.030 inches. The outer diameter of the guide catheter shaft 18a and tip 18b is preferably uniform in diameter. The length of the guide catheter 18 is preferably between about 8 and about 25 cm, and more preferably between about 10 and about 20 cm.

[0103] FIG. 5D illustrates another embodiment of a guide catheter 18 that is particularly useful for cannulating the maxillary sinus ostium MO. In this embodiment, the curved portion 42 is of a substantially larger radius of curvature compared to the embodiment shown in FIG. 5A. Rather than take a "direct" path up to and around the uncinate process UP, the embodiment shown in FIG. 5D makes use of the significant anterior-posterior space in the nasal passage NP. The curvature 42 of the guide catheter 18 may be formed using a shaping element 38 of the type disclosed in FIG. 5C.

[0104] FIG. 5E illustrates how the guide catheter 18 shown in FIG. 5D makes a more gradual sweeping turn in the nasal cavity to reach towards the maxillary sinus ostium MO. By possessing a larger radius of curvature, any devices used inside this guide catheter 18 are not forced to negotiate such a tight bend. In a preferred embodiment, the inside radius of curvature is preferably between about 1 cm and about 3 cm, and more preferably between about 1.5 and about 2.5 cm.

US 2007/0250105 A1                                                                    Oct. 25, 2007

7

[0105] FIGS. 6A, 6B, and 6C show a preferred embodiment of a dilation balloon catheter 12 for dilation of a sinus ostium, particularly a maxillary sinus ostium MO. The balloon catheter 12 includes a balloon 10, distal shaft portion 12a, proximal shaft portion 12b, and a hub 14 with an inflation port 16 for inflation of the balloon 10. The balloon catheter 12 is formed using an inner tube 50 coaxially arranged within an outer tube 52 (described in more detail below). An inflation lumen 56 is formed between the inner tube 50 and the outer tube 52. The balloon catheter 12 terminates at a distal tip 12c that projects distally from the balloon 10. The balloon catheter 12 may be formed as an "over the wire" design (as shown in FIGS. 6A-6C), but it is contemplated that it could be a "fixed wire" design or a "monorail" design, as is known in the balloon catheter art, particularly the coronary angioplasty art. However, the length of the balloon catheter 12 shown is relatively short in comparison, preferably from about 10 to about 30 cm. and more preferably between about 15 and about 25 cm. The expanded diameter of the balloon 10 would depend on the initial and final desired size of the sinus ostium to be dilated. Preferred diameters would be from about 2 mm to about 10 mm, and most preferably from about 3 to about 7 mm. A preferred "set" of balloon catheters 12 would include a series of catheters having inflated balloon diameters of 2, 4, 6, and 8 mm. Alternatively, a series of catheters 12 having 3, 5, and, 7 mm expanded balloon diameters could be provided. The balloon 10 is preferably from about 5 mm to 40 mm in length (not including the conical portions), and more preferably from about 10 mm to about 20 mm in length.

[0106] With particular reference to FIG. 6B, the distal shaft portion 12a of the balloon catheter 12 is preferably of a coaxial construction, with an inner tube 50 located inside of an outer tube 52. The inner tube defines the wire guide lumen 54 for passage of the wire guide 24 (not shown in FIG. 6B). The annular space formed between the inner and outer tubes 50, 52 defines an inflation lumen 56. The inflation lumen 56 may hold a fluid which is used to inflate the balloon 10. In the embodiment of FIG. 6B, lumens 54, 56 are coaxially arranged. However it is contemplated that a single tube with two side-by-side lumens 54, 46 could be utilized as well.

[0107] Because of the anatomic challenge of accessing the maxillary sinus ostium MO, a preferred embodiment of the balloon catheter 12 includes a kink-resisting structure in the shaft, particularly in the distal shaft portion 12a, as this is the portion of the catheter 12 that may be exposed to a particularly tight bend as it is advanced around the uncinate process UP. The kink resisting structure is preferably a coil 58, 60 or braid (not shown) that is incorporated into the inner tube 50 and/or the outer tube 52. FIG. 6B illustrates coils 58, 60 incorporated in both the inner and outer tubes 50, 52, respectively. If a coil 58 is incorporated in the inner tube 50, it is preferably included in the entire distal portion 12a, including that portion that traverses the balloon 10. It is contemplated that for other constructions such as "fixed wire" or "rapid exchange" that the kink resisting structure could also be incorporated.

[0108] Inner and outer tubes 50, 52 are preferably formed of a suitable material such as polyethylene, PEBAX (Arkema), PTFE, NYLON (DuPont), HYTREL (DuPont), or a combination thereof. Proximal shaft portion 12b may be more rigid than distal portion 12b, and may further incorporate a metallic tube (not shown) for either the inner tube 50 or the outer tube 52 of the proximal shaft region.

[0109] To assist in positioning of the balloon catheter 12 to a target site, one or more shaft markers 62 may be provided at one or more locations along the shaft of the balloon catheter. Preferably, the markers 62 are positioned in uniform increments (e.g., 1 cm increments) along the full length of the shaft (proximal region 12b and distal region 12a). Additionally, one or more markers 64 on the balloon 10 may be provided. Both the shaft markers 62 and the balloon markers 64 are useful in positioning the balloon 10 relative to the wire guide 24 and/or guide catheter 18, together with prior or continuous optical visualization using a visualization tool such as an endoscope. Although not shown, the wire guide 24 could also include markers spaced at predefined increments. Balloon markers 64, shaft markers 62, and/or wire guide markers (not shown) could make use of a color-coding system or some other recognizable pattern to facilitate endoscopic imaging. For instance, a certain color of marker could pertain to a certain distance from a particular location, such as the tip of the wire guide 24 or the center of the dilation balloon 10. Alternatively, one or more radiopaque markers (not shown) could be provided on the shaft underneath the balloon 10 if fluoroscopic imaging is utilized.

[0110] FIGS. 7A, 7B, and 7C show an alternative embodiment for a sinus ostium dilation balloon catheter 12. In addition to the structures associated with the catheter shown in FIGS. 6A and 6B, this embodiment further incorporates structure to facilitate the infusion and delivery of one or more therapeutic and/or diagnostic agents at the site of the dilation balloon 10. In a preferred embodiment, a portion of the balloon catheter 12 that extends proximally and distally with respect to the balloon 10 includes an outer membrane 70 with one or more perforations 72 in the membrane wall. The space between the balloon 10 and the membrane 70 is in fluid communication with an infusion lumen 74 (shown in FIG. 7B) formed in the shaft of the balloon catheter 12. The infusion lumen 74 could be formed by the addition of an infusion tube 76 located on the outside of the outer tube 52. An infusion port 76 located in the proximal hub 14 is in fluid communication with the infusion lumen 74.

[0111] The balloon catheter 12 illustrated in FIGS. 7A-7C may be particularly useful for the delivery of an adhesion preventing substance such as MeroGel (Medtronic/Xomed) or Sepragel® (Genzyme Biosurgical/Gyrus ENT) prior to, during, or following the dilation process. This would result in a coating or "sleeve" of the agent being disposed on the contacted tissue region. The fact that the coating or "sleeve" would have an open passageway would provide for immediate ventilation and drainage of the treated sinus.

[0112] FIGS. 8, 9, and 10 shows various embodiments of a stabilizing device 80 for use with the device and methods disclosed herein. The stabilizing device 80 is used to assist in holding and stabilizing one or more of the various tools used in the treatment of a sinus ostium. Since at times many devices may be in use, it may be difficult for the physician to manage all such devices. Use of a stabilizing device can free the hands to manage fewer devices at any given time. For example, the stabilizing device 80 may be used to stabilize a guide catheter 18 (as shown in FIG. 8), a balloon catheter 12, and/or an endoscope 82.

APP.0172

US 2007/0250105 A1

Oct. 25, 2007

8

[0113] The embodiment shown in FIG. 8 utilizes a base member 84 which secures to various portions of the head H, such as the ears and/or top of the nose. Preferably, four ear hooks 86 wrap around the ear in a similar way as eyeglasses. The base member 84 also rests on the nose with a nose bridge 88. A support arm 90 is secured to the base member 84. In one aspect of the invention, the support arm 90, can preferably be manipulated or formed into any desired shape. For example, the support arm 90 may be formed from a flexible material. A securing member 92 such as a clamp is located on the free end of the support arm 90. The securing member 92 may be removable and/or interchangeable via a tightening member. Support arm 90 and securing member 92 are held fast by a tightening member 94 such as a tightening nut. In this figure, a clamp 92 is shown stabilizing a guide catheter 18, which allows the physician to use his or her hands on the endoscope 82 and the wire guide 24, while the position of the guide catheter 18 is maintained. This may be helpful while the physician tries to advance the wire guide 24 into the nasal cavity. It is contemplated that more than one securing member 92 and/or more than one support arm 90 could be mounted to the base member 84 to stabilize more than one device.

[0114] The embodiment illustrated in FIG. 9, the stabilizing element 100 stabilizes a device against an interior surface of the nostril. As shown in FIG. 9, the stabilizing element is stabilizing a guide catheter 18. In one preferred embodiment, the stabilizing element 100 is formed as an expandable tubular structure, such as a self-expanding tubular braid. In the expanded state, the tubular structure includes a lumen or passageway through which one or more devices may be placed. The expandable tube 100 is positioned in the nostril next to the device(s) to be stabilized. Friction holds the device(s) in place, while maintaining a passageway for additional devices such as an endoscope (not shown in FIG. 9) to be introduced into the nasal cavity. More than one expandable tube 100 could be used, either next to another, or in a nesting relationship.

[0115] With reference now to FIGS. 10A, 10B, 10C, and 10D, a stabilizing device 110 makes use of the patient's mouth M. A mouth piece 112 is connected coupled to a support arm 114, which is connected to a securing member 116 such as a clamp to stabilize the position of a device such as a guide catheter 18. The support arm 114 and clamp 116 can be positioned, e.g. by rotating around pivot points, to bring the mouth piece 116 to any desired position. FIG.10B shows a top view of the stabilizing device 110 in a partially exploded view. The mouth piece 112 is configured to engage the upper and/or lower jaw of the patient. The support arm 114 is connected to the mouth piece 112, preferably by a lockable pivot point 118. The clamp 116 is likewise connected to the support arm 114. A series of securing members 120 such as locking screws or nuts locks the clamp 116 position relative to the mouth M.

[0116] FIG. 10C is a partially exploded frontal view of the stabilizing device 110 of FIG. 10B. FIG. 10D shows the stabilizing 110 device in the fully assembled state. Again, one or more support arms and/or one or more clamps 116 could be used to stabilize multiple devices such as guide catheters 18, wire guides 24, endoscopes 82, or other instruments used by the physician.

[0117] FIGS. 11A, 11B, and 11C illustrate a wire movement guide 130 that is used to facilitate one-handed move-

ment of both the wire guide 24 and guide catheter 18. The wire movement guide 130 may be formed as a recessed handle or the like. As seen in FIG. 11C, during operation of the guide catheter 18, a steering device 26 is secured to the wire guide 24. The steering device 26 is able to slide axially and rotate in the movement path (as shown by arrows A and B in FIG. 11C). In a preferred embodiment, the recessed handle 130 includes a hub recess 132 that is sized to receive the hub 22 of the guide catheter 18. For example, the hub recess 132 may be sized to frictionally secure the hub 22 within the same. Alternatively, one or more detents, tabs, or the like may be positioned on the hub recess 132 and/or hub 22 to releasably secure wire movement guide to the hub 22 of the guide catheter 18. The wire movement guide 130 also includes a recess 134 for receiving the steering device 26. The recess 134 is dimensioned to permit axial and rotational movement of the steering device 26 as is shown in FIG. 11C. The wire movement guide 130 may also include a wire recess 136 for receiving the wire guide 24. The wire recess 136 may be interposed between the two recesses 132, 134. In addition, a wire recess 136 may be located at a proximal end of the wire movement guide 130 to permit the wire guide 24 to exit the proximal end of the wire movement guide 130. FIG. 11B illustrates a cross-sectional view of the wire movement guide 130.

[0118] In an alternative aspect of the invention, the wire movement guide 130 could be formed integrally with the hub 22 or simply formed integrally on the proximal end of the guide catheter 18.

[0119] With the use of a wire movement guide 130, the physician can move the guide catheter 18 into a desired position (preferably with the use of endoscopic imaging, as depicted in FIG. 11D), while simultaneously advancing and/or rotating the wire guide 24 with a single hand. For example, the fingers could be manipulating the wire movement guide 130 and therefore the guide catheter 18, while the thumb is able to manipulate the wire guide 24 to a desired position in the nasal cavity or sinus. A portion of the exterior surface of the steering device 26 may be scored, roughened, or otherwise textured to aid the physician in manipulating the steering device 26. The wire movement guide 130 advantageously permits the physician to use his or her other hand to independently manipulate another tool such as, for example, an endoscope 82.

[0120] One preferred embodiment for positioning a wire guide 24 into the maxillary sinus ostium MO is depicted in FIG. 11D. In this embodiment, the guide catheter 18, wire movement guide 130, and wire guide 24 are manipulated under endoscopic visualization. Here, the endoscope 82 is a "rigid" endoscope, a standard tool in nasal surgery. The rigid endoscope generally has a forward looking viewing field a which may or may not be offset, a light port 82a, and a viewing port 82b through which an image is obtained (indicated with an eyeball symbol). The endoscope 82 is used to help identify the uncinate process UP, and the guide catheter 18 is "hooked" around the uncinate process UP. Additional tools such as a sinus "seeker" (not shown) can be utilized to help pull the uncinate process UP away from the opposite wall and make room for the tip 18b of the guide catheter 18. Once the guide catheter tip 18b is positioned, the wire guide 24 is manipulated by tactile feedback until it is felt to have passed into the maxillary sinus ostium MO and into the maxillary sinus MS. FIG. 11D illustrates a simpli-

US 2007/0250105 A1

9

Oct. 25, 2007

fied obstruction **138** located adjacent the uncinate process UP and maxillary sinus ostium MO. This obstruction **138** may include mucous, inflamed mucosa, scar tissue, abnormal bony structure, or other substances. In this manner, only conventional endoscopic imaging is utilized —without the need for fluoroscopic imaging and/or other specialized "image guidance" technology. This same technique could be utilized for the other sinuses and their ostia as well. In addition, one or more of the stabilization devices **80**, **100**, **110** previously described could be utilized as would be useful in this or any of the subsequently described methods.

[0121] During operation of the device, it may be desirable to have a way to independently confirm that the distal tip **24**a of the wire guide **24** has been positioned in the desired sinus, and not inadvertently passed through some other structure, such as the orbital wall. Since the sinuses are difficult if not impossible to image with the standard rigid endoscopes, endoscopic imaging is not readily amenable for this confirmation. One such confirmation approach is illustrated in FIG. 12. As seen in FIG. 12, after the wire guide **24** has been positioned in what is believed to be the desired location (maxillary sinus MS), a fiber optic catheter **140** is positioned over the wire guide **24** and advanced distally towards the tip of the wire guide **24**. The fiber optic catheter **140** may be positioned using a guide catheter **18** of the type illustrated in FIG. 12. The distal tip **140**a of the fiber optic catheter **140** emits light **142** that is input into the fiber optic catheter **140** via a light port **144**. In one aspect of the invention, the emitted light **142** is bright enough such that it lights up or illuminates the sinus cavity and can be visualized externally. In this regard, the surrounding environment (e.g., physicians office) may need to have the level of ambient light reduced or turned off completely to aid in the visualization process.

[0122] If a structure other than the desired sinus is illuminated, the physician or other operator knows that the wire guide **24** has been improperly positioned and can subsequently be repositioned into the proper location. Once the position of the wire guide **24** has been confirmed to be in the desired position, a balloon catheter **12** can then be confidently placed into the sinus ostium (e.g., MO) and dilated.

[0123] FIG. 13 illustrates an alternative embodiment for confirming the position of a wire guide **24**. In this embodiment, the wire guide **24** is fitted with a detection element **150** at or near the distal tip **24**a. In one aspect, the detection element **150** can be made of a magnetic material. A magnetic detection device (not shown) which could be as simple as a floating magnetic needle such as a compass needle may then be positioned outside the patient's face near the sinus to confirm the position of the wire tip **24**a. For example, in this case, the deflection of the magnetic needle would indicate the presence of the detection element **150** (and thus the distal tip **24**a of the wire guide **24**) within the desired sinus cavity.

[0124] Alternatively, the detection element **150** could be formed from a dense metallic material that can be detected with a metal detector device (not shown). For example, the metal detector device may include a probe or the like that can be manipulated near to patient's face near the sinus cavity of interest to detect the presence (or absence) of the metallic detection element **150**. In yet another aspect, the detection element **150** may emit a signal (e.g., radiofrequency pulse or the like) that can then be detected externally to confirm the presence or absence of the distal tip **24**a of the wire guide **24** within the sinus cavity of interest.

[0125] Independent confirmation methods and devices as described above may not be necessary if more versatile optical imaging techniques and devices are utilized in the placement of the various devices such as wire guides **24**, guide catheters **18**, and/or balloon catheters **12**. For instance, FIG. 14 illustrates a method for placing a wire guide **24** across a sinus ostium (e.g., maxillary sinus MO) with the aid of a directable or steerable endoscope **152**. Directable endoscopes **152** make use of flexible fiber optic bundles which can be bent or curved to alter the direction of the viewing field **154**. A typical construction of a directable endoscope **152** includes multiple control wires (not shown) connected near the distal tip **152**a and to a deflection knob **155**. In this method, the directable endoscope **152** is positioned superior to the uncinate process UP and then directed retrograde to allow direct viewing of the viewing field **154** where the guide catheter **18** and wire guide **24** are being manipulated. To further aid in the identification of the maxillary sinus ostium MO, particularly in the case of occlusion **156** associated with sinusitis, the maxillary sinus MO is illuminated with the placement of a small illumination member **158** into the sinus. The illumination member **158** may be formed as an elongate member having a light-emitting distal end **158**a and a proximal end **158**b that is typically connected or otherwise coupled to a light source **160**. In one aspect, the illumination member **158** is formed as a fiber optic light based device.

[0126] The illumination member **158** can be placed into the sinus cavity of interest (e.g., maxillary sinus MS) by using a piercing member **162** such as, for example, an introducer needle **162** that is introduced through the canine fossa CF region. It should be understood that reference to the canine fossa CF refers to the general region or anatomical area surrounding or adjacent to the canine fossa CF and is not limited to a single, discrete structure or location. The introducer needle **162** may include a hollow lumen or the like to permit the passage of the illumination member **158**. The canine fossa CF is a thin portion of the maxillary sinus wall located adjacent the root of the canine teeth. The canine fossa CF has been utilized for other intrasinus procedures. After the formation of a passageway **164** through the canine fossa CF, the illumination member **158** is advanced distally such that the distal tip **158**a of the illumination member **158** is disposed inside the sinus cavity. The emitted light **162** in the maxillary sinus MS (or other sinus cavity) will be visible through the blockage **156** of the ostium MO using the directable endoscope **152**. This aids the physician or other user to direct the wire guide **24**.

[0127] FIG. 15 illustrates a similar method to FIG. 14, the difference being the use of a rigid retrograde endoscope **170**. A rigid retrograde endoscope **170** is similar to a normal rigid endoscope, but the direction of viewing field **172** is in a retrograde direction. The rigid retrograde endoscope **170** has a substantially rigid shaft portion **173** and a retrograde viewing window **174** located at or near the distal tip **170**a. Retrograde visualization is accomplished through the use of one or more mirrors and/or lenses located at or adjacent to the viewing window **174** to deflect the viewing field **172**. Since the viewing field **172** is retrograde, this endoscope **170** can assist in accessing the sinus ostium in a similar manner as described with respect to the method shown in FIG. 14. One difficulty with a rigid retrograde endoscope **170** is that it can be awkward to initially position it, since it cannot be used to see straight ahead. However, this difficulty is over-

come by utilizing a normal rigid endoscope (not shown) alongside the retrograde rigid endoscope **170** to get it positioned initially in the nasal cavity. Again, an illumination member **158** in the sinus, placed via the canine fossa CF, can be further utilized to aid in accessing the sinus ostium.

[0128]   Still other alternative methods for accessing the sinus ostium are illustrated in FIGS. 16A, 16B, and 16C. In these embodiments, a flexible visualization scope **180** is utilized. The flexible visualization scope **180** includes an elongate flexible body **182** that contains a flexible fiber optic bundle **183** (as shown in FIG. 16C) for viewing around bends. Although not shown in the figures, the fiber optic bundle **183** includes both "imaging" fibers and "illumination" fibers for lighting up the viewing field **184**. The flexible visualization scope **180** is not directable like the endoscope **152** of FIG. 14. Rather, the flexible visualization scope **180** includes a lumen or passageway **185** for the wire guide **24** and follows the wire guide **24** around bends as illustrated in FIG. 16A. Consequently, in this method, particularly for a maxillary sinus ostium MO, a guide catheter **18** having a curved distal portion **20** is positioned near or around the uncinate process UP. A conventional rigid endoscope (not shown) may be used to assist in this positioning. Next, the wire guide **24** is positioned near the tip **18b** of the guide catheter **18**. Then the flexible visualization scope **180** is advanced over the wire guide **24**, curving back in a retrograde fashion, allowing the viewing field **184** to be directed towards the sinus ostium (MO in this case). A blockage is shown **186** positioned within the maxillary ostium MO. The wire guide **24** and guide catheter **18** may then be manipulated under visual observation to access the ostium MO. Again, as has been mentioned previously, additional tools or the use of a "seeker" can be used in addition to the visualization scope **180**, guide catheter **18** and wire guide **24**. In addition, the sinus cavity of interest may be illuminated using the canine fossa CF access method described above with respect to FIGS. 14 and 15.

[0129]   Another alternative device and method for accessing a sinus ostium is illustrated in FIGS. 17A, 17B, and 17C. In this embodiment, a directable endoscope sheath **190** is provided that has a deflectable tip **190a**. The directable endoscope sheath **190** is similar to the directable endoscope **152** of FIG. 14, but further includes a working channel or lumen **192**, as best seen in FIG. 16C, together with the deflection wires **194** and optical fibers **196** (which contain both imaging and illuminating fibers). In use, the directable endoscope sheath **190** can be introduced into the nasal cavity relatively straight, so as to see straight ahead. When the directable endoscope sheath **192** is near the uncinate process UP, the tip **190a** is deflected retrograde using, for instance, a deflection knob **197**, so that the viewing field **198** is directed towards the sinus ostium MO which contains an obstruction **200**. At this point, a wire guide **24** is positioned in the working lumen **192** and the ostium MO is accessed under visual observation.

[0130]   In one preferred embodiment, the directable endoscope sheath **190** has a large enough working channel **192** that a balloon catheter **12** can be advanced into the sheath **190** over the wire **24**. In this manner, a separate guide catheter **18** is not necessary. In yet another preferred embodiment, the working channel **192** is only large enough to accommodate the wire guide **24**. This allows for the sheath **190** to have a reasonably small outer diameter. Once

the wire **24** is positioned in the sinus, the directable endoscope sheath **190** is removed from the wire **24**, leaving the wire **24** in position. Thereafter, a balloon catheter **12** can be installed over the wire **24** and into the sinus ostium MO for dilation.

[0131]   FIGS. 18A and 18B illustrate a device **210** and method for accessing and dilating a sinus ostium (e.g., maxillary sinus ostium MO) via a direct sinus puncture technique, in contrast to a transnasal technique. This approach can generally be done with the frontal sinus FS and the maxillary sinus MS. While a description of the device **210** and process is provided for the maxillary sinus MS, it should be understood that similar access devices **210** can be used with the frontal sinus FS.

[0132]   In FIG. 18A, a trocar **212** is shown being advanced into the maxillary sinus MS via the canine fossa CF approach. The trocar **212** includes a hollow cannula **214** and a needle **216** contained within the lumen **218** of the cannula **214**. The needle **216** has a sharp tip **220** for penetrating the thin bone surrounding the sinus. The needle **216** may be a solid piece or having one or more lumens therein. Once the cannula **214** is inside the sinus, the needle **216** is then removed and the cannula **214** serves as a guide catheter for subsequent devices. As an alternative to a needle-cannula type of trocar **212**, a hollow sharpened needle could be used as well.

[0133]   Referring now to FIG. 18B, once the cannula **214** is in place, a wire guide **24** and an endoscope **222** can be introduced into the sinus. The cannula **214** is pointed towards the ostium MO, which points the viewing field **224** to the ostium MO. Manipulation of the wire guide **24** through use of a steering device **26** then delivers the wire guide **24** across the ostium MO which may contain a blockage **200** as is shown in FIG. 18B. Optionally, an illumination member **226** can be placed in the nasal cavity to "back-light" the ostium MO and enhance the ability for the ostium MO to be seen, further aiding the ability to direct the wire guide **24** across the ostium MO. Alternatively, a bright light placed at the nostril may be adequate to perform this back-lighting.

[0134]   With the above-described "direct sinus puncture" technique such as through the canine fossa CF, various stabilization devices can be utilized to stabilize one or more of the various tools used for accessing and/or treating the ostium. For example, as shown in FIG. 18C, a stabilization device **110** is shown stabilizing the cannula **214**. The stabilization device **110** could also be used to stabilize the wire guide **24**, the endoscope **222**, trocar **212**, and/or the balloon catheter **12**. Similarly, any of the previously described stabilization devices can be utilized with the direct sinus puncture techniques.

[0135]   FIGS. 19A, 19B, and 19C illustrate various arrangements and types of endoscopes **222a**, **222b**, **222c** that can be used with this canine fossa CF approach. In FIG. 19A, the endoscope **222a** is a flexible visualization scope having a bundle of optical fibers **228**. The endoscope **222a** further includes a lumen **230** through which the wire guide **24** is fed. FIG. 19B shows a rigid endoscope **222b** used next to the wire guide **24**, inside cannula **214**. FIG. 19C illustrates a similar arrangement to that shown in FIG. 19B, but with an additional dual lumen catheter **232** to better manage the positioning of the wire guide **24** relative to the rigid endo-

scope **222***c*. In all these approaches, the diameter of the endoscope **222***a*, **222***b*, **222***c* used is preferably small, about 0.5 mm to about 4 mm, and most preferably about 1 mm to about 2 mm. This allows for the use of a relatively small trocar and relatively small puncture size. Preferred trocar diameters are from 0.7 mm to 4.2 mm (depending on the size of the devices used with them), and more preferably from about 1 mm to 2.5 mm, and most preferably 1.2 to 2.0 mm.

[0136]  FIG. 20 illustrates the introduction of a balloon dilation catheter **12** into the cannula **214** and into the sinus ostium MO, dilating the ostium MO, and deforming and/or remodeling the uncinate process UP. To aid in the positioning of the balloon **10**, an optional endoscope **240** is placed in the nasal cavity may be used to visualize the catheter tip **12***c* relative to the uncinate process UP.

[0137]  Alternatively, the position of the balloon **10** may not require "real time" visualization with an endoscope, if various markers on the wire guide and/or balloon catheter shaft as described earlier are utilized. For example, if the wire guide **24** includes markers, the marker that is seen at or near the ostium can be noted. Markers on the proximal portion of the wire guide **24** can then be used to determine the "depth" that the wire guide **24** has been advanced to reach the ostium. The balloon catheter **12** can then be advanced a distance over the wire guide **24** a predetermined distance on the wire guide **24**, such that the balloon **10** is positioned at a desired position relative to the noted marker on the wire guide **24**. Markers **62** on the shaft of the balloon catheter **12** can aid in this positioning. With this use of markers **62**, the balloon **10** can be confidently positioned in the desired region of the sinus ostium. The desired length of the balloon can be selected by viewing the computed tomography (CT) scans of the patient, which are part of a standard diagnostic workup of the patient prior to any intervention.

[0138]  Though not shown, once the maxillary ostium MO has been treated, the ethmoids and/or frontal sinuses ES, FS can also be treated by this same canine fossa access. The wire guide **24** can be manipulated into the ethmoids and/or frontals, with subsequent dilation of the ostia of these sinuses. Similar endoscopic visualization techniques as described above can also be utilized to assist in placement of the various devices such as the wire guide **24** to these locations. In the case of the ethmoids, it may be desirable to use a sharpened wire in lieu of a wire guide **24** to puncture into the wall of the ethmoid sinus air cells, followed by balloon dilation of the puncture.

[0139]  As mentioned above, the frontal sinus FS can also be accessed directly from outside the skull, through the wall of the frontal sinus FS to facilitate treatment of the frontal sinus ostium FO. Rather than a trocar, the frontal sinus FS can be directly accessed through a mini trephination through the skin and the sinus wall, as is known in the art. With a mini-trephination, the access is performed with a drill tool. Once accessed, the frontal sinus ostium FO may be directly accessed with a wire guide **24**. A preferred location for accessing the frontal sinus FS is through the floor of the frontal sinus FS. Since the frontal sinus FS is relatively small, and there is only one outflow tract and its position can be approximated relative to the nose, visualization may not be required to pass the wire guide **24** through the frontal sinus ostium FO and into the nasal cavity. Standard endoscopic visualization could be performed in the nasal cavity via the nostrils to observe the wire guide **24** after it passes into the nasal cavity. Subsequent to passing the wire guide **24** into the frontal ostium FO, a balloon dilation catheter **12** can be positioned in the ostium FO to dilate it.

[0140]  Although the maxillary sinus MS is easily accessible via the canine fossa CF, it is important to control the depth of the initial puncture so as to not inadvertently advance the needle **216** too far and potentially into the orbit **0** or elsewhere. FIG. 21 illustrates a trocar **212** with a stop **250** secured to a portion of the trocar **212**. The stop **250** prevents the needle **216** from advancing too far into the sinus cavity. In one aspect, the stop **250** is clamped on to either the needle **216** or the cannula **214** at a predetermined position. In a preferred embodiment of the invention, the stop **250** is adjustable and/or removable with respect to the fixation point (e.g., needle **216** or cannula **214**). For example, the stop **250** may include one or more tightening members **252** such as screws or the like that can be selectively tightened or loosen the stop **250**. Once the trocar **212** is inserted up to the stop **250**, the stop **250** is removed. The cannula **214** can then be advanced with little force, as the puncture site has already been made.

[0141]  FIG. 22 shows an alternative trocar **212** arrangement for improving the control of the puncturing into the canine fossa CF. Here, the needle **216** includes needle threads **216***a* located on an exterior surface thereof. The threads **216***a* of the needle **216** engage with a threaded hub **254** in a threaded interface. The threaded hub **254** may be in the form of a "clamshell" of two treaded pieces or halves **254***a*, **254***b* that surround and engage the needle threads **216***a*. The position of the threaded hub **254** may be held fast by attachment to a stabilizing device such as the stabilizing devices **80**, **110** shown in FIGS. **8** and **10**. The needle **216** is then advanced into the canine fossa CF by controlled rotation of the needle **216**. Once the needle **216** has penetrated or traveled the desired amount, the threaded hub **254** is removed, and the cannula **214** is advanced to a desired position within the sinus. Alternatively, the threaded hub **254** could be attached to a stabilizing device **80**,**110** in a manner that allows rotation of the threaded hub **254** about the needle threads **216***a*, by utilizing a bearing surface (not shown) with the stabilizing device **80**,**110**. The threaded hub **254** when rotated would controllably advance the needle **216** into the sinus. In this manner, the needle **216** is not rotated.

[0142]  Sometimes the desired direction and positioning for placing the trocar **212** in the canine fossa CF does not provide good alignment with the location of the sinus ostium. In this case, a trocar **212** having a flexible tip **260** can be used, as shown in FIGS. 23A and 23B. In FIG. 23A, the cannula **214** has a somewhat flexible curved tip **260**, that, in FIG. 23A, is maintained straight by the presence of the needle **216**. This trocar **212** is advanced into the sinus. Upon removal of the needle **216**, the flexible tip **260** takes on its curved shape, more oriented to the ostium MO. Thereafter a wire guide **24** is advanced across the ostium MO, preferably under the visual guidance of a flexible visualization scope **262** as shown in FIG. 23B. The visualization scope **262** is preferably dimensioned such that it can be slidably passed through the cannula **214**. The flexible visualization scope **262** includes a lumen or passageway **264** for the wire guide **24**. The flexible visualization scope **262** is able to be oriented to place the visualization field **266** within the vicinity of the ostium MO. Manipulation of the curved tip **260** of the

cannula 214 can assist in directing the wire guide 24 to and through the ostium MO. Also as shown, the nasal cavity can be back-lit using an illumination member 268 to aid in seeing the ostium. Also, other tools and methods may be used as desired, such as, for example, the trocar 212 modifications illustrated in FIGS. 21 and 22.

[0143]   FIG. 24 illustrates another device and method for accessing the maxillary sinus ostium MO via the canine fossa CF. In this embodiment, two small punctures 270, 272 are made, side-by-side in the canine fossa CF region. A puncture device 210 like that disclosed in FIG. 18A may be used. For example, a rigid endoscope 274 is positioned in the cannula 214 of the first puncture site 270. A wire guide 24 is then positioned in the cannula 214 of the second puncture site 272. One or more of the cannulas 212 may have a curved tip 260 to better access the maxillary sinus ostium MO. The wire guide 24 may then be positioned across the ostium MO under the visualization of the rigid endoscope 274. A balloon dilation catheter (not shown in FIG. 24) may then be advanced over the wire 24 to dilate the sinus. The ostial region may be back-lit using an illumination member 276.

[0144]   FIGS. 25A and 25B illustrate a common anatomical characteristic present in patients with sinusitis associated with the maxillaries, ethmoids, and frontals. The uncinate process UP is shown in close association with the opposite wall, typically on the ethmoid bulla EB. This condition creates a narrow slit-like space called the infundibulum I. The maxillary sinus ostium MO is actually located below (i.e., inferior to) the infundibulum I. FIG. 25B more clearly shows the "topography" of the structures of the uncinate process UP and ethmoid bulla EB. It is believed that a narrowed infundibulum I may be part of the condition leading to the patient's sinusitis, as well as one or more narrowed ostia. In some patents, a narrowed infundibulum I may be the sole anatomical cause leading to sinusitis.

[0145]   The previously described approaches to dilating the maxillary sinus ostium MO may result in a widening of the infundibulum I by deforming or remodeling the uncinate process UP, as well as the widening of the ostium MO itself. However, in some patients, the uncinate process UP may not stay permanently deformed following removal of the dilation catheter 12.

[0146]   An alternative approach to widening the infundibulum I is illustrated in FIGS. 26A and 26B. One or more shim members 280 are placed in the gap of the infundibulum I to forcibly spread it away from the ethmoid bulla EB and improve drainage for the maxillary, frontal and portions of the ethmoid sinus. In one preferred aspect of the invention, the one or more shim members 280 are left in place after implantation. The shim members 280 may remain in place for a temporary period of time or permanently. The sinus ostium may still be dilated with the use of a balloon dilation catheter 12. FIG. 26B illustrates three such shim members 280 secured in the infundibulum I. As seen in FIG. 26B, the gap is widened to expose the maxillary sinus ostium MO.

[0147]   FIGS. 27A and 27B illustrate one preferred embodiment of a shim member 280. The shim members 280 may be dimensioned such that one or more sides are longer than the remaining sides. For example, the shim member 280 may be longer than it is wide, with a length dimension preferably about 1 mm to about 6 mm in length, and more preferably about 2 mm to about 4 mm in length. The shim

members 280 may include one or more gripping members 282 on all or a portion of an exterior surface. The gripping members 282 may be formed as a serrated surface or even a plurality of teeth or similar projections. As seen in FIGS. 27A and 27B, the gripping members 282 are located on opposing sides of the shim member 280 to allow for the shim member 280 to be rotated into position and held in place.

[0148]   The shim member 280 may include one or more engagement holes 284 that are used for the delivery of the shim member 280. For example, the engagement holes 284 may be dimensioned to fit on the distal end of a tool as shown in FIG. 28. The shim member 280 may be a permanent implant, or more preferably a degradable bioabsorbable implant. Suitable materials for a degradable shim member 280 include poly-lactic acid, poly-glycolic acid, poly-L-lactic acid or other materials such as those used in degradable sutures. It is believed that after the shim members 280 are implanted in the infundibulum I, the uncinate process UP will remodel over time to maintain a widened infundibulum.

[0149]   FIG. 28 illustrates a delivery tool 290 for use in the delivery of the shim member(s) 280. The delivery tool 290 includes an elongate torque driver 292 constructed of a multi-layer, multi-filar drive shaft similar to that used in speedometer cables. The torque driver 292 is dimensioned to be positionable within a guide catheter 18 or the like. The shim member 280 is connected to the torque driver 292 at its distal end 292a. The proximal end 292b of the torque driver 292 is coupled to a handle 294 or the like that is used to rotate the torque driver 292 (and attached shim member 280) in the direction of the arrows shown in FIG. 28.

[0150]   The guide catheter 18 is used to place the shim member 280 over the uncinate process UP and in the narrowed infundibulum I, initially in a narrow or "sideways" orientation. The torque driver 292 is then rotated by rotation of the handle 294. Rotation of about 60 to about 90 degrees will widen the infundibulum I as shown in FIG. 26B. The connection between the torque driver 292 and the shim member 280 is disconnected. This could be done, for example, by reversing the rotational direction of the torque handle 294 and causing a weakened portion of the connection to break. Alternatively, the torque driver 292 may be frictionally engaged with the holes 284 of the shim member 280. Retraction of the torque driver 292 in the proximal direction may disengage the torque driver 292 from the shim member 280. Once place, the one or more shim members 280 will maintain the infundibulum I in a widened condition, while minimizing the interruption of the mucosa by the presence of the shim member(s) 280.

[0151]   Alternatively, as shown in FIG. 29, the infundibulum I can be widened by delivery of an expandable stent 300, oriented more or less in the infundibulum I. This stent 300 can be similar to that used in coronary stenting procedures, and can be either "self-expanding" or "balloon expandable." The geometry of the stent 300 may be tubular as is shown in FIG. 29. The stent 300 can be placed in the infundibulum I using a balloon catheter 12 and a wire guide 24. As one example, the stent 300 may be positioned via a transnasal approach wherein the wire guide 24 is directed along the infundibulum I up towards the frontal sinus ostium FO (as shown in FIG. 3C) and then deployed between the uncinate process UP and the ethmoid bulla EB.

[0152]   While embodiments of the present invention have been shown and described, various modifications may be

made without departing from the scope of the present invention. The invention, therefore, should not be limited, except to the following claims, and their equivalents.

1. A method of treating a constricted sinus passageway of a patient comprising:

traversing the canine fossa region of the patient so as to form a passageway to a sinus cavity;

inserting an elongate member through the passageway, the elongate member having an inflation member disposed thereon;

positioning the inflation member within the constricted sinus passageway; and

expanding the inflation member so as to expand at least a portion of the constricted sinus passageway.

2. The method of claim 1, wherein canine fossa region is traversed by piercing canine fossa region with a sharpened tool.

3. The method of claim 2, wherein the sharpened tool includes a stop to limit advancement of the tool within the sinus cavity.

4. The method of claim 2, wherein the sharpened tool is threadingly engaged to a proximal hub.

5. The method of claim 1, further comprising the step of cannulating the passageway prior to insertion of the elongate member through the passageway.

6. The method of claim 1, wherein the inflation member is positioned within the constricted sinus passageway by advancing the elongate member over a wire guide passing through the passageway.

7. The method of claim 1, wherein the inflation member is positioned using one or markers contained thereon.

8. The method of claim 1, wherein the elongate member comprises a balloon catheter.

9. A method of accessing a constricted sinus passageway of a patient comprising:

traversing the canine fossa region of the patient so as to form a passageway to a sinus cavity;

inserting a visualization tool through the passageway;

inserting a wire guide through the passageway;

viewing the constricted sinus passageway with the visualization tool; and

positioning the wire guide adjacent to or within the constricted sinus passageway.

10. The method of claim 9, further comprising the step of cannulating the passageway prior to insertion of the visualization tool and the wire guide through the passageway.

11. The method of claim 10, wherein the visualization tool and wire guide are inserted through the cannulated passageway at the same time.

12. The method of claim 9, wherein the visualization tool comprises an endoscope.

13. A system for accessing a sinus cavity of a patient comprising:

a trocar including an outer cannula and a piercing member slidably disposed within a lumen of the cannula; and

an elongate member having an inflation member disposed thereon, the elongate member being slidably disposed within the lumen of the cannula.

14. The system of claim 13, further comprising a wire guide axially slidable within the lumen of the cannula, and wherein the elongate member includes a lumen for receiving the wire guide, the elongate member being slidable along a length of the wire guide.

15. The system of claim 13, wherein the piercing member includes a lumen.

16. The system of claim 13, further comprising an advancement member coupled to a proximal end of the piercing member, wherein the advancement member controls the displacement of the piercing member relative to the outer cannula.

17. The system of claim 13, further comprising a stabilizing device for fixedly securing the trocar.

18. The system of claim 17, wherein the stabilizing device comprises a mouthpiece, an adjustable support arm secured at a first end to the mouth piece, and a securing member fixed to a second end of the adjustable support arm.

19. The system of claim 13, further comprising a stop secured to the piercing member.

20. The system of claim 13, wherein a distal tip of the outer cannula is formed from a flexible material.

21-107. (canceled)

108. The method of claim 1, further comprising positioning a visualization tool adjacent to the constricted sinus passageway so as to view one or more of: traversing the canine fossa, insertion of the elongate member through the passageway, positioning the inflation member within the constricted sinus passageway, and expansion of the inflation member.

109. The method of claim 108, wherein the visualization tool is positioned transnasally.

110. The method of claim 108, wherein the visualization tool is positioned through the canine fossa region.

111. A method of accessing a constricted sinus passageway of a patient comprising:

traversing the canine fossa region of the patient so as to form a first passageway to a sinus cavity;

inserting a visualization tool through the first passageway;

traversing the canine fossa region of the patient so as to form a second passageway to a sinus cavity;

inserting an elongate device through the second passageway;

viewing the constricted sinus passageway with the visualization tool; and

positioning the elongate device adjacent to or within the constricted sinus passageway.

112. The method of claim 1, wherein the elongate device comprises a wire guide.

113. The method of claim 1, wherein the elongate device is positioned while being visualized with the visualization tool.

\* \* \* \* \*

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **DR. FORD ALBRITTON IV**, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § **Civil Action No. 3:16-cv-03340-M** |
| | § |
| **ACCLARENT, INC.,** | § |
| | § |
| Defendant. | § |
| | § |
| | § |

**DEFENDANT ACCLARENT INC.'S**
**FINAL INVALIDITY CONTENTIONS**

In accordance with Paragraphs 3-3 and 3-6 of Miscellaneous Order No. 62, and the Court's Amended Patent Scheduling Order (Doc. 95), Defendant Acclarent, Inc. ("Acclarent") hereby discloses its final invalidity contentions ("invalidity contentions") for U.S. Patent No. 9,011,412 ("the '412 patent").

**I. INTRODUCTION**

Acclarent's invalidity contentions are based on its present understanding of the asserted claims as stated in Plaintiff's infringement contentions, *i.e.*, Plaintiff's disclosures under Paragraph 3-1 of Miscellaneous Order No. 62, or as stated in the Plaintiff's expert report regarding infringement, served on March 1, 2019. In its infringement contentions and expert report, Plaintiff alleges that Acclarent infringes Claims 1, 4-8, 14, and 17-20 of the '412 patent. Acclarent reserves the right to amend or modify its disclosures under Paragraphs 3-3 and 3-6 of Miscellaneous Order No. 62 should Plaintiff seek to allege infringement of any additional claims or otherwise modify its infringement allegations.

Acclarent's invalidity contentions are based on the Court's two claim construction orders in this case. Acclarent's invalidity contentions also take into account, however, Plaintiff's apparent claim constructions to the extent they can be gleaned from Plaintiff's infringement contentions and/or expert report regarding infringement. By including prior art that would anticipate or render obvious the asserted claims of the '412 patent based on Plaintiff's apparent claim constructions, Acclarent is neither adopting Plaintiff's claim constructions nor admitting to the accuracy of any constructions other than those of determined by the Court. Acclarent objects to any attempt to imply claim constructions from any identification of potential prior art. By providing these disclosures under Paragraphs 3-3 and 3-6 of Miscellaneous Order No. 62, Acclarent does not waive, relinquish, or preclude any arguments with respect to the proper scope of the asserted claims or claim terms nor does it waive, relinquish, or preclude any arguments regarding the noninfringement of Acclarent's accused product or the invalidity of the asserted claims on any ground. Acclarent reserves all rights to amend these invalidity contentions, as permitted by the Court, Local Rules, or agreement by the parties.

Additional obviousness combinations of the references identified in this response are possible, and Acclarent reserves the right to use any such combinations in this litigation. In particular, Acclarent is currently unaware of the extent, if any, to which Plaintiff will contend that limitations of the asserted claims are not disclosed in the art identified by Acclarent as anticipatory. To the extent that an issue arises with any such limitation, Acclarent reserves the right to identify other references that would have made obvious the addition of the allegedly missing limitation to the disclosed device or method of operation.

Acclarent's invalidity contentions are based upon the priority dates claimed on the face of the '412 patent, but Acclarent does not admit or concede that any of the asserted claims are

entitled to any priority date claimed on the face of the '412 patent. For example, as explained below, at least claims 4-6 and 17-19 are not entitled to the filing date of provisional application No. 61/127,848 for the purposes of establishing their priority date. Acclarent reserves the right to contest Plaintiff's alleged priority dates.

## II. PARAGRAPH 3-3(a)(1) OF MISCELLANEOUS ORDER NO. 62

Acclarent identifies the following patents and/or patent applications as prior art to the '412 patent. Acclarent contends that the references in the table below anticipate or render obvious, either alone or in combination with other identified prior art, all of the asserted claims of the '412 patent, as set forth in the claim charts attached hereto. To the extent that the claim charts attached hereto can be argued to not set forth where in the prior art certain claim limitations may be found, Acclarent contends that meeting such claim limitations would have been obvious to one of ordinary skill in the art. Acclarent's contentions that the references render obvious asserted claims of the '412 patent are in no way admissions or suggestions that the references do not independently anticipate the asserted claims.

| Prior Art Reference and Inventor(s) | Country of Origin | Publication or Issue Date |
|---|---|---|
| U.S. Patent No. 5,562,640 to McCabe et al. ("McCabe") | United States | 10/8/1996 |
| U.S. Patent Pub. No. 2006/0063973 to Makower et al. ("Makower") | United States | 3/23/2006 |
| U.S. Patent Pub. No. 2007/0250105 to Ressemann et al. ("Ressemann") | United States | 10/25/2007 |
| U.S. Patent No. 7,520,876 to Ressemann et al. ("Ressemann")[1] | United States | 04/21/2009 |
| U.S. Patent Pub. No. 2008/0195041 to Goldfarb et al. ("Goldfarb") | United States | 8/14/2008 |

---

[1] U.S. Publication No. 2007/0250105 and U.S. Patent No. 7,520,876 originate from the same patent application and have substantively identical disclosures. They are referred to collectively herein as "Ressemann."

| Prior Art Reference and Inventor(s) | Country of Origin | Publication or Issue Date |
|---|---|---|
| U.S. Patent No. 8,747,389 to Goldfarb et al. ("Goldfarb")[2] | United States | 6/10/2014 |

In addition, Acclarent identifies the prior art system in the table below as anticipating or rendering obvious, either alone or in combination with other identified prior art, all of the asserted claims of the '412 patent, as set forth in the claim charts attached hereto. To the extent that the claim charts attached hereto can be argued to not set forth where in the prior art certain claim limitations may be found, Acclarent contends that meeting such claim limitations would have been obvious to one of ordinary skill in the art. Acclarent's contentions that the system and/or references render obvious asserted claims of the '412 patent are in no way admissions or suggestions that the system and/or references do not independently anticipate the asserted claims. This system was invented and not abandoned, suppressed, or concealed prior to the alleged invention of the '412 patent and thus is prior art pursuant to at least 35 U.S.C. § 102(g).

| Prior Art System/Invention | Persons Involved | Priority Date |
|---|---|---|
| Morriss System | John Morriss | The Morriss System was invented at least by November 3, 2006. |

In addition, the '412 patent is invalid under 35 U.S.C. § 102(f) because the alleged invention in at least some of the claims was derived from Acclarent. Claims 4-6 and 17-19 require a "second opening adapted to permit control of the amount of suction coupled to the distal opening of the lumen" wherein "the structure of the handle" allows the operator "to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen." As explained below, the provisional application the named inventors filed on

---

[2]  U.S. Publication No. 2008/0195041 and U.S. Patent No. 8,747,389 originate from the same patent application and have substantively identical disclosures. They are referred to collectively herein as "Goldfarb."

May 16, 2008 does not describe such a "second opening."  Instead, the named inventors of the '412 patent derived the idea for this "second opening" from information disclosed to them by Acclarent.  For example, Serena Swei, an Acclarent employee, disclosed Acclarent's plans to integrate a second opening into the structure of the handle to control suction through the inner lumen of the guide catheter in a May 19, 2008 conversation with Dr. Albritton and documented that disclosure in writing in an email she sent to Dr. Albritton shortly thereafter.  In addition, another Acclarent employee, Greg Garfield, sent Dr. Albritton certain Acclarent patent applications describing the "second opening" feature on March 31, 2009.  There may also be additional discussions and correspondence between the named inventors and Acclarent relating to these communications and Plaintiff's subsequent decision to incorporate Acclarent's idea for a "second opening" into Plaintiff's subsequent non-provisional patent filing.

### III. PARAGRAPH 3-3(a)(2) OF MISCELLANEOUS ORDER NO. 62

Acclarent contends that the following references anticipate the following asserted claims, as set forth in the claim charts attached hereto:

| Prior Art | '412 Patent Claims Anticipated |
|---|---|
| McCabe | 1, 4-8, 14, 17-20 |
| Morriss System | 1, 4-8, 14, 17-20 |

To the extent that the claim charts attached hereto do not set forth where in the prior art certain claim elements may be found, Acclarent contends that such claim elements are inherent in the reference.

If, and to the extent that Plaintiff asserts that one or more of the identified prior art fails to disclose one or more specific elements of an asserted claim, Acclarent reserves the right to use one or more of these contentions to invalidate claims of the '412 patent under 35 U.S.C. § 103. Acclarent's contentions that the references in this section, in various combinations, render the

asserted claims of the '412 patent obvious under 35 U.S.C. § 103 are in no way an admission or suggestion that each reference does not independently anticipate the asserted claims under 35 U.S.C. § 102.

Prior art or prior art combinations presently known to Acclarent that render the asserted claims obvious under 35 U.S.C. § 103 are set forth below.

| Reference/Combination | '412 Patent Claims Rendered Obvious |
|---|---|
| McCabe | 1, 4-8, 14, 17-20 |
| Morriss System | 1, 4-8, 14, 17-20 |
| Ressemann in view of the Morriss System | 1, 4-8, 14, 17-20 |
| Makower | 1, 7, 14, 20 |
| Makower in view of Goldfarb | 1, 4-6, 8, 14, 17-19 |

In the claim charts accompanying this disclosure, Acclarent identifies where each element of each asserted claim of the '412 patent can be found in the prior art. To the extent that any item of prior art is deemed not to satisfy, explicitly or inherently, any limitation of an asserted claim, Acclarent reserves the right to contend that any difference between that item of prior art and the corresponding asserted claim would have been obvious to one of ordinary skill in the art, including as indicated in the below and in the attached claim charts. Further, the prior art cited in the attached claim charts may be combined to meet the limitations of the corresponding claims.

A person of ordinary skill in the art would have been motivated to combine the references identified above for several reasons, and the reasons articulated in the claim charts. For example, each of these references relates to methods and apparatuses for treating conditions, including sinusitis, by, for example, using a guide catheter to guide a working device into a body passage. These references concern the same field of technology and often reference directly competing products within the same industry. Further, the references may refer to one another, be written by one or more of the same authors, or refer to the same prior art system. Thus, a person of

ordinary skill in the art would be motivated to combine the teachings of any of the above references with the system and apparatus disclosed in the other references and would have a reasonable expectation that combination would be successful.

In addition to the motivations set forth above and in the claim charts themselves, motivation to combine any of the prior art references discussed herein is found, explicitly or implicitly, for example, in one or more of the following:

1. a person of ordinary skill in the art's own knowledge or common sense;

2. the prior art references themselves;

3. the subject matter acknowledged as prior art in the '412 patent;

4. the interrelated teachings of multiple prior art references identified herein;

5. the nature of the problem to be purportedly solved by the '412 patent and the existence of similar improvements in similar applications;

6. design incentives and other market forces, including the advantages of creating a superior and more desirable product and the effects of demands known to the design community or present in the marketplace;

7. the ability to implement the alleged invention as a predictable variation of the prior art;

8. improvements in similar devices;

9. any needs or problems known in the field and purportedly addressed by the '412 patent; and

10. the number of identified, predictable solutions to the problem(s) purportedly addressed by the '412 patent.

Moreover, it would have been obvious to combine any prior art references discussed herein dealing with tools or methods for sinusitis treatment or similar procedures based on, for example, at least a person of ordinary skill in the art's own knowledge or common sense, the teachings of such references, and the nature of the problems to be purportedly solved by asserted claims of the '412 patent. Those looking to design such systems would look to analogous art for features that would be useful in those products.

It would have been obvious to combine any prior art references discussed herein assigned to the same or an overlapping set of inventors based on, for example, at least a person of ordinary skill in the art's own knowledge or common sense, the teachings of such references, and the nature of the problems to be purportedly solved by the '412 patent. Those looking to design such systems would look to analogous art for features that would be useful in those products, and inventions by the same inventor would naturally represent art that should be considered and grouped together.

## IV. PARAGRAPH 3-3(a)(3) OF MISCELLANEOUS ORDER NO. 62

The claim charts, attached as Exhibits 1 through 4 to these contentions, identify where, in each alleged item of prior art, each element of each asserted claim is found. Acclarent may produce supplemented claim charts as new information becomes available consistent with the Federal Rules of Civil Procedure and the Rules and Orders of this Court.

Acclarent cites representative portions of identified references, even where a reference may contain additional disclosure for a particular claim element, upon which Acclarent may rely for support for such particular claim element. Acclarent has endeavored to identify relevant portions of the references. The references, however, may contain other or additional support for particular claim limitations. Acclarent may rely on these uncited portions of the prior art

references, other documents including statements in the cited references and file history of the '412 patent, and fact and expert testimony and documents not yet discovered, to provide context or to aid in understanding the cited portions of the references. Furthermore, where Acclarent cites to a particular figure in a reference, the citation should be understood to encompass the caption and description of the figure and any text relating to the figure. Similarly, where Acclarent cites to particular text referring to a figure, the citation should be understood to include the corresponding figure as well.

The accompanying claim charts are identified as follows:

- Exhibit 1 is an invalidity claim chart for the Morriss System.

- Exhibit 2 is an invalidity claim chart for Ressemann in view of the Morriss System.

- Exhibit 3 is an invalidity claim chart for Makower, including Makower in view of Goldfarb.[3]

- Exhibit 4 is an invalidity claim chart for McCabe.

## V. PARAGRAPH 3-4 OF MISCELLANEOUS ORDER NO. 62

In accordance with Paragraph 3-4 of Miscellaneous Order No. 62, Acclarent previously produced the prior art references and supporting materials specifically identified in these invalidity contentions.

---

[3] Acclarent understands that the estoppel provisions of 35 U.S.C. § 315(e) provide that, after a final written decision is issued in an *inter pates* review ("IPR"), an IPR petitioner may not assert in a civil action invalidity grounds that the petitioner raised or reasonably could have raised during that IPR, and that, as a consequence, Acclarent is not currently entitled to rely on the invalidity contentions set forth in Exhibits 3 and 4 relating to Claims 1, 4-7, 14, and 17-20 of the '412 patent.

Acclarent is currently appealing, however, the final written decision as to Claims 1, 4-7, 14, and 17-20 of the '412 patent in the Federal Circuit. Acclarent's invalidity contentions as to Claims 1, 4-7, 14, and 17-20 of the '412 patent in Exhibits 3 and 4 are intended only to preserve its invalidity arguments regarding Makower and McCabe during the pendency of the appeal.

**DEFENDANT ACCLARENT'S FINAL INVALIDITY CONTENTIONS - Page 9**

DATE: March 8, 2019

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *William C. Rooklidge*
       William B. Dawson
       TX State Bar No. 05606300
       wdawson@gibsondunn.com
       Tracey B. Davies
       TX State Bar No. 24001858
       tdavies@gibsondunn.com
       Betty X. Yang
       TX State Bar No. 24088690
       byang@gibsondunn.com
       GIBSON DUNN & CRUTCHER, LLP
       2100 McKinney Ave, Suite 1100
       Dallas, Texas  75201
       Telephone:  214.698.3100
       Facsimile:  214.571.2900

       William C. Rooklidge, (pro hac vice)
       CA State Bar No. 134483
       wrooklidge@gibsondunn.com
       Frank P. Cote
       CA State Bar No. 204529
       fcote@gibsondunn.com
       GIBSON, DUNN & CRUTCHER LLP
       3161 Michelson Drive, Suite 1200
       Irvine, California  92612
       Telephone:  949.451.3800
       Facsimile:  949.451.4220

**DEFENDANT ACCLARENT'S FINAL INVALIDITY CONTENTIONS - Page 10**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 8, 2019, the aforementioned document was served on all counsel of record via e-mail.

/s/  *William C. Rooklidge*
William C. Rooklidge

**NOTICE REGARDING SUBPOENA – PROTHERA, INC.**                                                     **Page 1**

Filed Under Seal

# EXHIBIT 4a

APP.0191

**Filed Under Seal**

# EXHIBIT 4b

# EXHIBIT 5

APP.0328

| | |
|---|---|
| **From:** | Holman, Gaya |
| **To:** | Albritton_Acclarent |
| **Cc:** | *** GDC-Acclarent |
| **Subject:** | Acclarent v Albritton; Cause No. 3:16-cv-03340-M |
| **Date:** | Friday, March 8, 2019 10:09:12 AM |
| **Attachments:** | 2019-03-08 Acclarent"s Invalidity Contentions.pdf |
| | Exhibit 3 (Makower).pdf |
| | Exhibit 4 (McCabe).pdf |
| | Exhibit 1 (Morriss).pdf |
| | Exhibit 2 (Morriss + Ressemann).pdf |

Counsel –

Attached please find **_Defendant Acclarent Inc.'s Final Invalidity Contentions_** and supporting exhibits.

**Gaya Holman, CP**
NALA Certified Paralegal

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Dallas, TX 75201-6912
Tel +1 214.698.3158 • Fax +1 214.571.2946
GHolman@gibsondunn.com • www.gibsondunn.com

# EXHIBIT 6

APP.0330

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF TEXAS

 3                      DALLAS DIVISION

 4   DR. FORD ALBRITTON, IV,          )
                                      )
 5                 Plaintiff,         )
                                      )
 6   V.                               )   NO. 3:16-CR-3340-M
                                      )
 7   ACCLARENT, INC.,                 )
                                      )
 8                 Defendants.        )

 9

            TRANSCRIPT OF CLAIM CONSTRUCTION HEARING
10        BEFORE THE HONORABLE BARBARA M. G. LYNN,
                 UNITED STATES DISTRICT JUDGE
11              WEDNESDAY, JUNE 27, 2018
                      DALLAS, TEXAS
12
     APPEARANCES:
13

14   FOR THE PLAINTIFFS:   MS. MEREDITH ELKINS
                           MCKOOL SMITH, PC
15                         300 CRESCENT COURT
                           SUITE 1500
16                         DALLAS, TEXAS  75201
                           (214) 978-6337
17                         melkins@mckoolsmith.com

18                         MS. ASHLEY N. MOORE
                           MCKOOL SMITH, PC
19                         300 CRESCENT COURT
                           SUITE 1500
20                         DALLAS, TEXAS  75201
                           (214) 978-6337
21                         amoore@mckoolsmith.com

22                         MS. ALEXANDRA EASLEY
                           MCKOOL SMITH, PC
23                         300 CRESCENT COURT
                           SUITE 1500
24                         DALLAS, TEXAS  75201
                           (214) 978-6337
25                         aeasley@mckoolsmith.com
```

```
 1   FOR THE DEFENDANT:      MR. WILLIAM C. ROOKLIDGE
                             GIBSON DUNN & CRUTCHER, LLP
 2                           3161 MICHELSON DRIVE
                             SUITE 1200
 3                           IRVINE, CALIFORNIA  92612-4412
                             (949) 451-4009
 4                           wrooklidge@gibsondunn.com

 5                           MR. THEODORE KWONG
                             GIBSON DUNN & CRUTCHER, LLP
 6                           2100 MCKINNEY AVENUE
                             SUITE 1100
 7                           DALLAS, TEXAS  75201
                             (214) 698-3133
 8                           tkwong@gibsondunn.com

 9

10

11

12   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
13
     _____
14

15                   D. KEITH JOHNSON, RDR, CRR
                   FEDERAL OFFICIAL COURT REPORTER
16                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF TEXAS
17              1100 COMMERCE STREET, ROOM 1572
                      DALLAS, TEXAS  75242
18                       (214) 753-2325
                keith_johnson@txnd.uscourts.gov
19

20

21

22

23

24

25
```

1    to at the top of Page 20 in the Responsive Claim Construction

2    Brief as an example of what would be excluded by our last

3    construction of the claim limitation.

4          So let me go now to that last disputed claim

5    limitation "manipulating the working device."  Now, this

6    limitation requires manipulating the working device.  And they

7    said it would exclude an embodiment where you manipulate the

8    locking screw.  And what they've said to the Court is "We've

9    never argued that a locking screw is a working device."

10          Well, if they're arguing that -- that our

11    construction of manipulating a working device with a thumb and

12    index finger would exclude the embodiment of manipulating the

13    working device, it sounds like they have at least

14    inferentially argued that the locking device, the locking

15    screw that's shown in the patent, is a working device.  And

16    that locking screw is inserted into a threaded hole in the

17    handle, or should I say threaded opening in the handle.  Is

18    that the opening that the second occasion of "the handle

19    opening" refers to?  That's the mischief that Mr. Kwong was

20    referring to.

21          So let's dive into "manipulating."  This limitation

22    is a separate step to be performed in the method rather than a

23    modification of what the handle is formed to allow.  Why am I

24    saying that?

25          The method -- this method comprises a series of

1    steps laid out in paragraph form.  We identified in our

2    opening brief the MPEP section and the CFR section that tell

3    patent applicants if you're going to write a method claim,

4    that you separate your methods -- your method steps in the

5    claim and you do so clearly.  And the traditional way that's

6    done is you put the method steps in separate paragraphs,

7    Method Step A, B, C, D, E.

8                Now, this is an unusual form, because we've got

9    this paragraph, that's up on the screen, about controlling the

10   position of the guide catheter using a handle that is formed

11   to allow something.

12                Now, when I first read this, because I'm a patent

13   lawyer and I'm burdened with the background of a registration

14   number and knew the CFR and I knew the MPEP and I knew this

15   was to be written as to be a single step, I went and I looked

16   at this and I said, okay, this handle has to be formed to

17   allow two things:  Controlling the position of the guide

18   catheter by some or all three fingers of the hand, while

19   substantially manipulating the working device with the thumb

20   and index finger of the hand.

21                So the handle was laid out as having two inherent

22   characteristics.  That's the way it first appeared to me.  And

23   that's the way it could appear to a member of the jury reading

24   this.

25                But there's other reasons why it becomes clear that

1    no, the "substantially simultaneously manipulating the working

2    device with the thumb and index finger" is actually a method

3    step that needs to be performed.

4              Now, Dr. Albritton agrees that the manipulating

5    limitation is a step that must be performed in Claim 8.  They

6    did so expressly in their responsive brief at Page 10.

7              So what's the dispute about?  The dispute about --

8    is about the word "separate."  Dr. Albritton says at Page 18

9    of its responsive brief, "As a practical matter it's unclear

10   how the manipulating step would be separate from the

11   controlling step when the claim requires them to be performed

12   substantially simultaneously."

13             So if we go back to our construction, the problem

14   is not that the limitation is a step to be performed in a

15   method rather than a modification of what the handle is formed

16   to allow; the dispute is over the word "separate."

17             Your Honor, I'm going to make a concession.  Let

18   the record reflect that I admit that I'm wrong.  We don't need

19   the word "separate."  The Court can take our construction and

20   delete the word "separate," and that will clarify to the jury

21   that this limitation, manipulating and so forth, is a step

22   that must be performed in Claim 8.  Albritton agrees with

23   that, and so we say that should be part of the construction.

24   And we would concede -- I would graciously concede that the

25   word "separate" can be removed from our construction.  And I

1    does the manipulation and not the index finger?

2         MS. MOORE:  Your Honor, as it relates to Claim 8,

3    our infringement contentions are clear that both the thumb and

4    the index finger are doing something to manipulate the working

5    device.

6         MR. ROOKLIDGE:  Okay.  Now we've got -- now we're

7    getting into the mischief that I'm talking about.  You've just

8    heard what was said.  The thumb and forefinger are doing

9    something to manipulating the working device.  Only the thumb

10   is touching the working device in the accused device.  But

11   what they're saying is, well, if -- if the finger, the index

12   finger, is doing something that is -- if it's resting on the

13   handle and providing oppositional force, then there is

14   infringement.  That is exactly why this Court needs to

15   construed this, is to avoid this type --

16        THE COURT:  Is that right, if the index finger --

17   let's be clear.  If the index finger is not touching the

18   working device, but only the thumb is, are you claiming that

19   that satisfies Claim 8?

20        MS. MOORE:  Your Honor, I wish I had the

21   infringement contentions and could show you.  The laundry list

22   of descriptions require the thumb to be doing something with

23   the working device, whether it is pushing a button or

24   something of that nature, and the index finger as well,

25   rotating something, sliding something.  If I had them here, I

```
 1   would show you.

 2              THE COURT:  Okay.  Well, the argument is that the

 3   implication of the infringement contentions is that merely

 4   providing stability is sufficient to be part of manipulation.

 5              Is that your contention?

 6              MS. MOORE:  Not for Claim 8.  Claims 1 and 14 are

 7   different, and we do make the oppositional force arguments for

 8   1 and 14.

 9              THE COURT:  Okay.  All right.

10              MR. ROOKLIDGE:  Our belief is that the infringement

11   allegations are clear.

12              But let's move on to "working device."  The only

13   working devices that are at issue in this case are the balloon

14   catheter and the guidewire.

15              So one could indeed imagine all kinds of working

16   devices.  But the issue this case are whether the balloon

17   catheter and the guidewire are manipulated as required by the

18   plain language of the claims, which is with both the thumb and

19   forefinger via a portion of the working device.

20              Turning to "grasping."  It was said that grasping

21   excludes preferred embodiments.  The only embodiment is

22   disclosed in the specification, and that explains that

23   manipulating is using the thumb and forefingers to move the

24   working device back and forth with respect to the handle

25   opening and grasping that handle opening.
```

1          The issue is not what an imaginary working device

2     could be used or how an imaginary working device could be

3     manipulated, but what the -- the plain claim language means in

4     the context of these devices, balloon catheters and

5     guidewires.

6          Now, let me just take a second to talk about the

7     role of the accused devices in claim construction.  One of the

8     Federal Circuit's first claim construction cases, Chief Judge

9     Markey -- then Chief Judge Markey said claims have to be

10    construed in a vacuum.  You can't refer to the accused device.

11    And it wasn't until three chief judges later that the Federal

12    Circuit said, wait a minute.  That's a bunch of nonsense.  You

13    can look at the accused device to see what's at issue between

14    the parties, and see what's at issue between the parties

15    informs what the Court has to do in claim construction to

16    avoid the kind of jury confusion that can result.  And

17    conjuring up imaginary working devices is not going to be

18    helping, where only the balloon catheter or guidewire are at

19    issue here.

20         Let me talk about the Wild patent.  This was an

21    argument that was raised at Slide 30.

22         Indeed, Albritton listed an entire list of

23    arguments why the Wild patent wasn't effective as prior art to

24    eliminate these claims.  But the sentence that starts "even if

25    arguendo" and then includes the emphasized language "via a

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3          I, D. Keith Johnson, RDR, CRR, Federal Official

4   Realtime Court Reporter, in and for the United States District

5   Court for the Northern District of Texas, do hereby certify

6   that pursuant to Sections 753, Title 28, United States Code,

7   that the foregoing is a true and correct transcript of the

8   stenographically reported proceedings held in the

9   above-entitled matter and that the transcript format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                    Dated this 5th day of September, 2018.

13

14              /s/ D. KEITH JOHNSON_____
                D. KEITH JOHNSON, RDR, CRR
15              TEXAS CSR NO. 3781
                FEDERAL OFFICIAL COURT REPORTER
16              1100 COMMERCE STREET, ROOM 1572
                DALLAS, TEXAS  75242
17              214.753.2325

18

19

20

21

22

23

24

25
```

# EXHIBIT 7

APP.0340

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF TEXAS

 3                        DALLAS DIVISION

 4  DR. FORD ALBRITTON, IV,          )
                                     )
 5                  Plaintiff,       )
                                     )
 6  V.                               )   NO. 3:16-CR-3340-M
                                     )
 7  ACCLARENT, INC.,                 )
                                     )
 8                  Defendants.      )

 9

              TRANSCRIPT OF CLAIM CONSTRUCTION HEARING
10          BEFORE THE HONORABLE BARBARA M. G. LYNN,
                 UNITED STATES DISTRICT JUDGE
11               THURSDAY, NOVEMBER 8, 2018
                        DALLAS, TEXAS
12
    APPEARANCES:
13

14  FOR THE PLAINTIFFS:    MS. MEREDITH ELKINS
                           MCKOOL SMITH, PC
15                         300 CRESCENT COURT
                           SUITE 1500
16                         DALLAS, TEXAS  75201
                           (214) 978-6337
17                         melkins@mckoolsmith.com

18                         MS. ASHLEY N. MOORE
                           MCKOOL SMITH, PC
19                         300 CRESCENT COURT
                           SUITE 1500
20                         DALLAS, TEXAS  75201
                           (214) 978-6337
21                         amoore@mckoolsmith.com

22                         MS. ALEXANDRA EASLEY
                           MCKOOL SMITH, PC
23                         300 CRESCENT COURT
                           SUITE 1500
24                         DALLAS, TEXAS  75201
                           (214) 978-6337
25                         aeasley@mckoolsmith.com
```

```
1   FOR THE DEFENDANT:      MR. WILLIAM C. ROOKLIDGE
                            GIBSON DUNN & CRUTCHER, LLP
2                           3161 MICHELSON DRIVE
                            SUITE 1200
3                           IRVINE, CALIFORNIA  92612-4412
                            (949) 451-4009
4                           wrooklidge@gibsondunn.com

5                           MR. THEODORE KWONG
                            GIBSON DUNN & CRUTCHER, LLP
6                           2100 MCKINNEY AVENUE
                            SUITE 1100
7                           DALLAS, TEXAS  75201
                            (214) 698-3133
8                           tkwong@gibsondunn.com

9

10

11

12  PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
13
    _____
14
15                   D. KEITH JOHNSON, RDR, CRR
                   FEDERAL OFFICIAL COURT REPORTER
16                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
17               1100 COMMERCE STREET, ROOM 1572
                       DALLAS, TEXAS  75242
18                        (214) 753-2325
                  keith_johnson@txnd.uscourts.gov
19

20

21

22

23

24

25
```

1    proposing clarifying this word "structure."

2            The system and apparatus claims recite a structure

3    and various functional limitations associated with that

4    structure of the handle.  And what we are proposing to do is

5    to focus that inquiry by explaining that the term "structure,"

6    in and of itself, separate from all the other language,

7    doesn't by itself connote any particular structure.

8            Dr. Albritton appears to be arguing that all the

9    claim language surrounding the word "structure" and the

10   examples in the specification give that structure of the

11   handle meaning.  And we're pleased to argue with them about

12   that.  But what the jury shouldn't do is say, where instructed

13   that they have to look for a particular structure, that they

14   simply look in the claim and see the word "structure" and that

15   it's satisfied.

16           Now, we've addressed the word "handle" at Pages 8

17   through 11 of our responsive brief.  This issue about

18   structure that we're raising is not about the word "handle."

19   It's purely about the word "structure."

20           So if we look at what the jury is going to be

21   presented with in the jury instructions at the end of this,

22   you're going to see that the case law is replete with

23   references to the word "structure."  And, for example, the

24   model jury instructions of the Federal Circuit Bar Association

25   contain 57 references to the word "structure," including

1   instructions for Section 112, Paragraph 6, doctrine of

2   equivalents and written description.

3                Our construction would help the jury understand

4   that the term "structure," in and of itself, doesn't identify

5   any particular structure.  This is a very limited instruction

6   that we are seeking, a construction that would aid the jury

7   and will prevent confusion.  That's our sole goal.

8                So if I could turn, then, to the second issue,

9   "adapted to permit."  "The structure of the handle is adapted

10  to permit the operator to position a thumb and index finger of

11  the hand to manipulate the working device via a portion of the

12  working device immediately adjacent to the handle opening."

13                Yes, our proposed construction is complicated.  And

14  it is complicated because of the particular format and the

15  claim language and the written description in this particular

16  patent.  I've never proposed to a court constructions this

17  complicated before, but this patent is such a mess, it's

18  required.

19                So why do I say that?  The parties agree on the

20  meaning of the term "adapted to."  It's the narrow limitation

21  that the Federal Circuit has identified in cases like Man

22  Machine.  But what the Federal Circuit hasn't delved into is

23  how do you identify whether something is made to, designed to

24  or configured to.  It goes back to your question at the motion

25  to dismiss hearing, where you said, if a device could be used

1    in some strange way that wasn't intended by the manufacturer,

2    does that mean it was made to, designed to or configured to do

3    that?  How in the world do we figure that out?

4          So what we've tried to do is look at all of the

5    Federal Circuit case law on that.  We argued last time before

6    you that the Federal Circuit seems to be moving in a way that

7    treats these, if they are entirely functional, as if they were

8    112(6) limitations.

9          Now, there are cases where these "made to, designed

10   to or configured to" limitations aren't entirely functional,

11   where, for example, they have structure in the limitation

12   itself that shows how to, in that pre-112(6) analysis, where

13   the Court said to achieve the recited objective.  So the one

14   is where there is structure in the claim limitation itself to

15   achieve the desired objective.

16         Another example where it doesn't implicate 112(6)

17   is where it simply identifies a functional relationship

18   between two components of the device.  We saw a case where one

19   of the components was a -- like a rod and the other component

20   where it was a sleeve, and the sleeve was adapted to fit over

21   the rod.  That doesn't implicate 112(6), even though that

22   language is functional, because one of ordinary skill in the

23   art would know how to do that.

24         But here we've got an interesting situation that's

25   different than that.  And it's different from that because

```
1    that if I need to.

2              MS. MOORE:  All right.  Thank you, Your Honor.

3              THE COURT:  Y'all may be excused.  Thank you.

4

5

6                    (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, D. Keith Johnson, RDR, CRR, Federal Official

4   Realtime Court Reporter, in and for the United States District

5   Court for the Northern District of Texas, do hereby certify

6   that pursuant to Sections 753, Title 28, United States Code,

7   that the foregoing is a true and correct transcript of the

8   stenographically reported proceedings held in the

9   above-entitled matter and that the transcript format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                    Dated this 26th day of November, 2018.

13

14               /s/ D. KEITH JOHNSON_____
                 D. KEITH JOHNSON, RDR, CRR
15               TEXAS CSR NO. 3781
                 FEDERAL OFFICIAL COURT REPORTER
16               1100 COMMERCE STREET, ROOM 1572
                 DALLAS, TEXAS  75242
17               214.753.2325

18

19

20

21

22

23

24

25

# EXHIBIT 8

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3   DR. FORD ALBRITTON, IV,           )
                                       )
 4                   Plaintiff,        )
                                       )
 5   V.                                )   NO. 3:16-CR-3340-M
                                       )
 6   ACCLARENT, INC.,                  )
                                       )
 7                   Defendants.       )


 8            TRANSCRIPT OF HEARING ON MOTION TO DISMISS
 9          BEFORE THE HONORABLE BARBARA M. G. LYNN,
                   UNITED STATES DISTRICT JUDGE
10               TUESDAY, OCTOBER 24, 2017
                        DALLAS, TEXAS
11
     APPEARANCES:
12

13   FOR THE PLAINTIFFS:    MR. TRAVIS DeARMAN
                            MCKOOL SMITH, PC
14                          300 CRESCENT COURT
                            SUITE 1500
15                          DALLAS, TEXAS  75201
                            (214) 978-6337
16                          tdearman@mckoolsmith.com

17                          MS. MEREDITH ELKINS
                            MCKOOL SMITH, PC
18                          300 CRESCENT COURT
                            SUITE 1500
19                          DALLAS, TEXAS  75201
                            (214) 978-6337
20                          melkins@mckoolsmith.com

21                          MS. ASHLEY N. MOORE
                            MCKOOL SMITH, PC
22                          300 CRESCENT COURT
                            SUITE 1500
23                          DALLAS, TEXAS  75201
                            (214) 978-6337
24                          amoore@mckoolsmith.com

25
```

Acclarent Ex. 1013
APP.0349

```
 1   FOR THE DEFENDANT:     MR. WILLIAM C. ROOKLIDGE
                            GIBSON DUNN & CRUTCHER, LLP
 2                          3161 MICHELSON DRIVE
                            SUITE 1200
 3                          IRVINE, CALIFORNIA  92612-4412
                            (949) 451-4009
 4                          wrooklidge@gibsondunn.com

 5                          MS. BETTY YANG
                            GIBSON DUNN & CRUTCHER, LLP
 6                          2100 MCKINNEY AVENUE
                            SUITE 1100
 7                          DALLAS, TEXAS  75201
                            (214) 698-3226
 8                          byang@gibsondunn.com

 9                          MR. WILLIAM B. DAWSON
                            GIBSON DUNN & CRUTCHER, LLP
10                          2100 MCKINNEY AVENUE
                            SUITE 1100
11                          DALLAS, TEXAS  75201
                            (214) 698-3100
12                          wdawson@gibsondunn.com

13

14

     PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
15   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

16   _____

17
                      D. KEITH JOHNSON, RDR, CRR
18                 FEDERAL OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
19                  NORTHERN DISTRICT OF TEXAS
                   1100 COMMERCE STREET, ROOM 1572
20                      DALLAS, TEXAS  75242
                         (214) 753-2325
21                 keith_johnson@txnd.uscourts.gov

22

23

24

25
```

**APP.0350**

1          THE COURT:  I'm sorry?

2          MS. YANG:  It's thumb and index finger.

3          THE COURT:  Yes.  But in your device -- in your

4   device.

5          MS. YANG:  Yes, Your Honor.  In our device, it's

6   thumb only.

7          THE COURT:  Okay.

8          MR. DeARMAN:  Your Honor, Travis DeArman from

9   McKool Smith for the plaintiff.

10          I will address only those arguments that were

11   raised by Ms. Yang in the hearing as well as reply briefing.

12   I will not raise the arguments that were originally briefed

13   and then abandoned in the reply or in the hearing today.

14          And it is simply this debate over whether or not

15   there is a limitation in the claims of the patent that

16   requires a direct finger and thumb, precluding any other kind

17   of manipulation of the working device.

18          And that's not true for three reasons.  The first,

19   if you'll look at the motion that was actually filed, on

20   Page 16, as Acclarent acknowledges, these are apparatus claims

21   in part, and a device infringes an apparatus claim if it is

22   adapted to allow for the use described in the claims.  And the

23   device, which I have brought a demonstrative example of, is

24   adapted to allow for direct manipulation by the --

25          THE COURT:  I always like to see the devices,

```
1    except when someone came close to me with a device that

2    assisted in conducting a root canal.

3              MR. DeARMAN:  I am petrified of dentists.

4              THE COURT:  I've had many arguments that reminded

5    me of a root canal, but that one literally was about to give

6    me a root canal.  So I'm good with this.

7              MR. DeARMAN:  Well, I have to say, I almost didn't

8    make it through security.  They had a few questions.

9              As Your Honor can see, this device --

10             THE COURT:  If I'm going to be put out of my misery

11   with that device, go ahead.

12             MR. DeARMAN:  Just so I may demonstrate for the

13   Court.  The device is adapted to allow for the direct

14   manipulation by both a thumb and a forefinger at the same

15   time.  And while admittedly I am not a surgeon licensed to

16   practice with this device or any other ENT device, our client

17   is and, in fact, does.  And in his daily practice, he uses

18   devices, including this one and others.  And this device is,

19   in fact, manipulated directly by a thumb and a forefinger.

20             That may not be disclosed in the instructional

21   material that's provided by Acclarent; however, we use those

22   materials because it shows -- because they are Acclarent's

23   materials.  It shows every element of the device.  It's a

24   helpful demonstrative.

25             THE COURT:  Let me ask you a question about that.
```

```
 1   And I don't think I've ever had this issue presented.

 2            MR. DeARMAN:  Uh-huh.

 3            THE COURT:  Assume that the instructions by the

 4   defendant clearly describe using the device in a way different

 5   from the patent, using it only with your index finger, and

 6   creative people use it differently than was intended.  Does

 7   that create an infringement claim if a device that is intended

 8   to be used otherwise is used in a creative way by users that

 9   would infringe?  And if so, what kind of claim does that

10   present?

11            MR. DeARMAN:  I would say first, Your Honor, that

12   there is no evidence before the Court that the --

13            THE COURT:  Yeah.  I'm asking you a theoretical

14   question.

15            MR. DeARMAN:  In the theoretical world, my

16   understanding is that the device, if it is adapted to allow

17   for infringement for an apparatus claim, that even if it is

18   not disclosed that it was used in particular that manner, but

19   if it is adapted to allow that use, that it is sufficient

20   for -- for infringement of an apparatus claim as opposed to a

21   method claim.  That is my understanding.

22            THE COURT:  Okay.  All right.

23            MR. DeARMAN:  But to move from the hypothetical

24   into the real world, Your Honor, the secondary -- the primary

25   argument is that, in fact, the suggestion that it is a
```

1   non-infringing use if the device is held such that the thumb

2   is manipulating the working device while the index finger is

3   used to provide directional or oppositional force, is a red

4   herring.  It is not true.

5           In fact, the promotional materials provided in the

6   complaint provide certain ways of gripping the device.

7   However, the -- and while we would dispute that it's proper to

8   import limitations from the specification into a claim,

9   especially at the stage of a motion to dismiss, Ms. Yang

10  presented Slide Number 25 noting Figure 5 of Dr. Albritton's

11  patent.  As Your Honor can see, the hand positioning indicated

12  in Figure 5 provides for a thumb that is positioned

13  immediately adjacent to the portion of the working device

14  extruding from the handle, and an index finger that is used to

15  provide oppositional and directional force.

16          And so the argument that such a reading -- such a

17  limitation should be read into the claims of a motion to

18  dismiss is, one, simply inappropriate at this stage.  We've

19  not undergone claim construction, for example.  What a person

20  of ordinary skill in the art would understand these terms to

21  mean has not been explored.  Expert testimony has not been

22  presented.  However, even if one refers to the specification

23  itself, you can see evidence right there for the -- for the

24  claim language encompassing the provision of oppositional

25  force using the index finger.

1          And then lastly, Your Honor, in addition to, you

2    know, the fact that we are at a Rule 12 stage, that Iqbal and

3    Twombly, although cited often, is not a magic wand that

4    reverses the standard of pleading or the presumptions in favor

5    of the defendants.  I'd also like to point out that Acclarent

6    argues we should not be allowed to amend because there was a

7    prior amendment of the complaint, cites a number of cases.

8          In this case, as Your Honor is aware, TC Heartland

9    issued during the pendency of the case, and the order from the

10   Court was to amend in light of TC Heartland and the changing

11   venue allegations.  It was not that we received direction in

12   the form of a motion to dismiss and any ruling from the Court

13   indicating that our patent claims were somehow insufficient.

14         So I think all of the cases cited by Acclarent are

15   distinguishable.  And, in fact, were the Court to conclude for

16   whatever reason that additional facts needed to be alleged,

17   that Dr. Albritton be allowed to provide that amendment based

18   on the facts available, including his own expertise in this

19   area.

20         And unless Your Honor has questions, those are the

21   arguments I have for you.

22              THE COURT:  All right.  Thank you.

23              MR. DeARMAN:  Thank you.

24              MR. ROOKLIDGE:  On the statute of limitations

25   regarding the claim of fraudulent concealment, plaintiff's

1          MR. DeARMAN:  Your Honor, may I ask just a

2     clarifying question?

3          On the issue of the statute of limitations and the

4     defendants will be submitting a brief on, will plaintiffs have

5     an opportunity to respond?

6          THE COURT:  If I want it, I'll ask you for it.

7          MR. DeARMAN:  Thank you, Your Honor.

8          THE COURT:  All right.  Now, I'm going to just tell

9     you-all, without saying how I'm going to rule, if I deny the

10    motion to dismiss or I grant leave to amend, I'm going to be

11    sending out shortly information for a scheduling order.  If I

12    don't dismiss the case, we're going to get moving.

13          Okay.  Thank y'all very much.

14

15               (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3           I, D. Keith Johnson, RDR, CRR, Federal Official

 4    Realtime Court Reporter, in and for the United States District

 5    Court for the Northern District of Texas, do hereby certify

 6    that pursuant to Sections 753, Title 28, United States Code,

 7    that the foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12                    Dated this 1st day of November, 2017.

13

14                    /s/ D. KEITH JOHNSON_____
                      D. KEITH JOHNSON, RDR, CRR
15                    TEXAS CSR NO. 3781
                      FEDERAL OFFICIAL COURT REPORTER
16                    1100 COMMERCE STREET, ROOM 1572
                      DALLAS, TEXAS  75242
17                    214.753.2325

18

19

20

21

22

23

24

25
```

# EXHIBIT 9

APP.0358

CONFIDENTIAL

## Attachment A to Plaintiff's Preliminary Infringement Contentions:
## Claim Chart for U.S. Patent No. 9,001,412

The Accused Instrumentalities and Methods in these infringement contentions for U.S. Patent No. 9,011,412 include, without limitation, Acclarent's Relieva Spin Balloon Sinuplasty System and Relieva SpinPlus Balloon Sinuplasty System, regardless of additional product details, such as tip shape, balloon diameter, or anatomical system. For example, Dr. Albritton accuses the Relieva Spin Balloon Sinuplasty System products for the maxillary, frontal, and sphenoid systems with the M-110C, F-70, M-110, and S-0 tip shapes, and for use with balloon diameters of 5 x 16 and 6 x 16, and any and all further anatomical systems, tip shapes, and balloon diameters. As another example, Dr. Albritton accuses the Relieva SpinPlus Balloon Sinuplasty System products for the maxillary, frontal, and sphenoid systems with any tip shape configuration, and for use with balloon diameters of 5 x 16 and 6 x 16, and any and all further anatomical systems, tip shapes, and balloon diameters. It should be understood that this is an example of functionality/products that meets the limitations of the claims, and is not limited to the implementation described below.

1

APP.0360

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
| A system comprising:<br><br>a guide catheter insertable through an external body passage of a subject, said guide catheter having a substantially rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening; | Acclarent provides a system comprising a guide catheter. The guide catheter is insertable through an external body passage of a subject. The guide catheter has a substantially rigid shaft, a proximal opening, a distal opening, and a lumen extending between the proximal opening and the distal opening.<br><br>Acclarent provides a Relieva Spin Balloon Sinuplasty System ("Relieva Spin") that includes a guide catheter. The Relieva Spin includes a "Sinus Guide Catheter Tip" for accessing various sinus anatomies. The Sinus Guide Catheter Tip is insertable through an external body passage to access, for example, the sinus anatomies. The Sinus Guide Catheter Tip has a substantially rigid shaft. The Sinus Guide Catheter Tip also has a proximal opening and a distal opening as shown below. The Sinus Guide Catheter Tip also includes a lumen extending between the proximal opening and distal opening. The lumen is the interior space of the Sinus Guide Catheter Tip's tubular structure through which a device, such as a balloon catheter, may travel. |

---

[1] This infringement analysis is preliminary and Dr. Albritton's investigation into Defendants' infringement is ongoing. In addition, Dr. Albritton reserves the right to amend or supplement these charts after further investigation and discovery. Dr. Albritton further reserves the right to accuse different products, or find alternative literal and/or equivalent infringing elements in the accused products, based on further investigation and discovery, the claim construction process before the Court, or other circumstances so meriting. Such supplemental information may include, but is not limited to, design specifications, deposition testimony, testing information, reference designs, implementation and utilization information, and/or schematics.

2

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
|  | Acclarent instructional and promotional video re: Relieva Spin, available at https://www.youtube.com/watch?v=d0IsfOuVbC8; Ex. 10 [ABRITTON000231] Acclarent instructional and promotional videos re: Relieva SpinPlus, available at https://www.youtube.com/watch?v=GsXIOueeTUI |
| wherein the structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device immediately adjacent to the handle opening | Acclarent provides a system comprising a handle wherein the structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device immediately adjacent to the handle opening.<br><br>Acclarent provides a Relieva Spin that includes a handle structure adapted to permit the operator to position his/her thumb and index finger of the hand holding the Relieva Spin to manipulate the working device via a portion of the working device immediately adjacent to the handle opening.<br><br>In a first example, the user may position the thumb on the Wire Spinner and the index finger on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a second example, the user may position the thumb on the Wire Slider and the index finger on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a third example, the user may position the thumb on the Balloon Slider and the index finger on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening.<br><br>In a fourth example, the user may position the thumb and index finger on the Wire Spinner to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a fifth example, the user may position the thumb and index finger on the Wire Slider to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a sixth example, the user may position the thumb and index finger on the Balloon Slider to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. |

41

APP.0361

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
| | In a seventh example, the user may position the index finger on the Wire Spinner and the thumb on the Wire Slider to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. |
| | In an eight example, the user may position the index finger on the Wire Spinner and the thumb on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a ninth example, the user may position the index finger on the Wire Slider and the thumb on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a tenth example, the user may position the index finger on the Balloon Slider and the thumb on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. |
| | In an eleventh example, the user may position the thumb and index finger on the guidewire to manipulate the working device via a portion of the working device immediately adjacent to the handle opening.[9] |

[9] The example finger placements noted here are not meant to be exhaustive of all ways to "position a thumb and index finger . . . to manipulate the working device via a portion of the working device immediately adjacent to the handle opening." The contentions are meant to be inclusive of each handle structure configuration capable of positioning the thumb and index finger to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. These contentions are meant to include the subset of scenarios noted above where the index finger provides directional or oppositional force to the thumb and where the thumb provides directional or oppositional force to the index finger.

42

APP.0363

CONFIDENTIAL

Acclarent's Infringing Instrumentalities and Methods[1]

Claim 1



Ex. 1 at 1 (Relieva Spin Brochure) (handle, structure, handle opening, and thumb and index finger).

Examples of the position of the thumb and index finger of the hand to manipulate the working device are further illustrated in the photograph below and Acclarent's instruction video for the Relieva Spin.

43

APP.0364

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
| |  Ex. 18 [ABRITTON00004410] (showing the thumb and index finger positioned on the Balloon Slider). |

44

APP.0365



Ex. 9 (available at https://www.youtube.com/watch?v=d0JsfOuW0C8) **(thumb and index finger)**.

CONFIDENTIAL

Acclarent's Infringing Instrumentalities and Methods[1]

Claim 1

45

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---------|--------------------------------------------------------|
| | The Relieva Spin IFU and promotional and instructional videos developed by Acclarent for the Relieva Spin further illustrate how the handle is adapted to permit the user to position his/her thumb and index finger to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. For example, the thumb and index finger are positioned such that the Sinus Balloon Catheter is inserted into the Sinus Guide Catheter Tip and advanced into the sinus anatomy via the Balloon Slider, which is immediately adjacent to the handle opening. Other working devices are positioned in a similar manner using the Balloon Slider, the Wire Spinner and Wire Slider, and/or the catheter or guidewire as enumerated in the examples above. |
| | **9. Placement of the *Relieva* Sinus Balloon Catheter** |
| | a.  Advance the Sinus Balloon Catheter over the Sinus Guidewire, through the Sinus Guide Catheter, and across the targeted sinus ostium. |
| | **Note:**  For the Integrated Guidewire Configuration Sinus Balloon Catheter, advance the Sinus Balloon Catheter through the Sinus Guide Catheter and across the targeted sinus ostium. |
| | b.  Position the sinus balloon across the area to be dilated and confirm its position using fluoroscopic and / or endoscopic visualization. |
| | Ex. 3 at 9. |
| | In addition, Acclarent provides a Relieva SpinPlus that includes a handle structure adapted to permit the operator to position his/her thumb and index finger of the hand holding the Relieva SpinPlus to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. |
| | In a first example, the user may position the thumb on the Wire Spinner and the index finger on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a second example, the user may position the thumb on the Wire Slider and the index finger on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a third example, the user may position the thumb on the Balloon Slider and the index finger on the handle to manipulate the working device via a portion of the working device |

46

APP.0366

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---------|--------------------------------------------------------|
|         | immediately adjacent to the handle opening. |
|         | In a fourth example, the user may position the thumb and index finger on the Wire Spinner to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a fifth example, the user may position the thumb and index finger on the Wire Slider to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a sixth example, the user may position the thumb and index finger on the Balloon Slider to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. |
|         | In a seventh example, the user may position the index finger on the Wire Spinner and the thumb on the Wire Slider to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. |
|         | In an eight example, the user may position the index finger on the Wire Spinner and the thumb on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a ninth example, the user may position the index finger on the Wire Slider and the thumb on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. In a tenth example, the user may position the index finger on the Balloon Slider and the thumb on the handle to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. |
|         | In an eleventh example, the user may position the thumb and index finger on the guidewire to manipulate the working device via a portion of the working device immediately adjacent to the handle opening.[10] |

[10] The example finger placements noted here are not meant to be exhaustive of all ways to "position a thumb and index finger . . . to manipulate the working device via a portion of the working device immediately adjacent to the handle opening." The contentions are meant to be inclusive of each handle structure configuration capable of positioning the thumb and index finger to manipulate the working device via a portion of the working device immediately adjacent to

APP.0367

APP.0368

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
|  | Further examples of the positioning of the thumb and index finger are illustrated in the Relieva SpinPlus brochure.  Ex. 4 at 1 (Relieva SpinPlus Brochure) (structure, handle opening, and thumb and index finger). Examples of the positioning of the thumb and index finger of the hand to manipulate the working device |

the handle opening. These contentions are meant to include the subset of scenarios noted above where the index finger provides directional or oppositional force to the thumb and where the thumb provides directional or oppositional force to the index finger.

APP.0369

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
| | are further illustrated in the photograph below and Acclarent's instruction video for the Relieva SpinPlus.  Ex. 19 [ABRITTON0000406]. |

49

APP.0370

CONFIDENTIAL

Acclarent's Infringing Instrumentalities and Methods[1]

Claim 1

Ex. 20 [ABRITTON0000407].

50

APP.0371

CONFIDENTIAL

Acclarent's Infringing Instrumentalities and Methods[1]

Claim 1



Ex. 21 [ABRITTON000408].

51

CONFIDENTIAL

APP.0372

| Acclarent's Infringing Instrumentalities and Methods[1] |
|---|
|  |

Ex. 22 [ABRITTON0000405].

The Relieva SpinPlus IFU and promotional and instructional video developed by Acclarent for the Relieva SpinPlus further illustrate how the handle is adapted to permit the user to position his/her thumb

Claim 1

52

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
| | and index finger to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. For example, the thumb and index finger are positioned such that the Sinus Balloon Catheter is inserted into the Sinus Guide Catheter Tip and advanced into the sinus anatomy via the Balloon Slider, which is immediately adjacent to the handle opening. Other working devices are positioned in a similar manner using the Balloon Slider, the Wire Spinner and Wire Slider, and/or the catheter or guidewire as enumerated in the examples above. |
| | **C.  Sinus Dilation and Irrigation:** |
| | 1.  Once proper placement of the Sinus Illumination System is confirmed, gently advance the Balloon Slider distally. The Sinus Balloon Catheter will advance over the Sinus Illumination System and through the Sinus Guide Catheter Tip. |
| | 2.  Visually confirm that the Sinus Balloon has fully exited the blue distal end of the guide tip.  The proximal end of the Sinus Balloon is marked with a yellow-green marker. |
| | Ex. 5 at 7. |

53

APP.0373

APP.0374

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
| |  Relieva SpinPlus™ Balloon Sinuplasty System Animation — Relieva SpinPlus™ Balloon Sinuplasty System Animation<br><br>Ex. 10 (available at https://www.youtube.com/watch?v=GsXIOuceTUI) **(thumb and index finger)**.<br><br>To the extent the "structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device immediately adjacent to the handle opening" element is not literally infringed as described above, it |

CONFIDENTIAL

| Claim 1 | Acclarent's Infringing Instrumentalities and Methods[1] |
|---|---|
| | is infringed under the doctrine of equivalents.<br><br>*See also* Ex. 6 [ABRITTON0000225-30] (510(k) Summary submitted by Acclarent to the U.S. Food and Drug Administration (FDA) for the Relieva Spin Sinus Dilation System); Ex. 7 [ABRITTON0000258-61] (Acclarent Website https://www.acclarent.com/solutions/products/balloon-simplasty-system/relieva-spin-balloon-simplasty-system); Ex. 8 [ABRITTON0000254-7] (Acclarent Website https://www.acclarent.com/solutions/products/balloon-simplasty-system/relieva-spinplus-balloon-simplasty-system); Ex. 1 [ABRITTON0000262-4] (Relieva Spin Brochure); Ex. 3 [ABRITTON0000232-44] (Relieva Spin IFU); Ex. 4 [ABRITTON0000266-8] (Relieva SpinPlus Brochure); Ex. 5 [ABRITTON0000245-53] (Relieva SpinPlus IFU); Ex. 9 [ABRITTON0000265] Acclarent instructional and promotional video re: Relieva Spin, available at https://www.youtube.com/watch?v=d0lsfOuWbC8; Ex. 10 [ABRITTON0000231] Acclarent instructional and promotional videos re: Relieva SpinPlus, available at https://www.youtube.com/watch?v=GsXIOuceTUI. |
| and to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen. | Acclarent provides a system comprising a handle wherein the structure of the handle is adapted to permit the operator to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen.<br><br>Acclarent provides a Relieva Spin that includes a handle structure adapted to permit the operator to control, using the thumb or index finger, an amount of suction. For example, the Spin handle includes a "suction port" that allows the user to control the amount of suction using the thumb or index finger. Controlling suction with the thumb is depicted in the promotional and instructional video, shown below, developed by Acclarent for the Relieva Spin. The suction is coupled to the lumen as suctioning capability is delivered to the lumen. |

55

APP.0375

APP.0376

CONFIDENTIAL

| Acclarent's Infringing Instrumentalities and Methods[1] |
|---|
| Claim 1 |



ACCLARENT RELIEVA Spin and Vortex Animation

Ex. 16.[11]

The Relieva Spin brochure further illustrates that the thumb or index finger may be used for "suction control" using the suction control port, which is "[c]over[ed] to increase [the] suction flow rate."

---

[11] A screenshot is attached as Ex. 16. The source video was previously available at www.youtube.com, but has been removed.

APP.0377

CONFIDENTIAL

| Claim 8 | Acclarent's Infringing Instrumentalities and Methods |
|---|---|
| | Drug Administration (FDA) for the Relieva Spin Sinus Dilation System); Ex. 7 [ABRITTON0000258-61] (Acclarent Website https://www.acclarent.com/solutions/products/balloon-sinuplasty-system/relieva-spin-balloon-sinuplasty-system); Ex. 8 [ABRITTON0000254-7] (Acclarent Website https://www.acclarent.com/solutions/products/balloon-sinuplasty-system/relieva-spinplus-balloon-sinuplasty-system); Ex. 1 [ABRITTON0000262-4] (Relieva Spin Brochure); Ex. 3 [ABRITTON0000232-44] (Relieva Spin IFU); Ex. 4 [ABRITTON0000266-8] (Relieva SpinPlus Brochure); Ex. 5 [ABRITTON0000245-53] (Relieva SpinPlus IFU); Ex. 9 [ABRITTON0000265] Acclarent instructional and promotional video re: Relieva Spin, available at https://www.youtube.com/watch?v=d0IsfOuWbC8; Ex. 10 [ABRITTON0000231] Acclarent instructional and promotional videos re: Relieva SpinPlus, available at https://www.youtube.com/watch?v=GsXIOnceTUI. |
| while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening; and | Acclarent and/or other users of Acclarent's Infringing Instrumentalities (e.g. Acclarent's customers) practice a method comprising the step of controlling, while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening.

Acclarent and/or other users of Acclarent's Infringing Instrumentalities (e.g. Acclarent's customers) use the Relieva Spin to substantially simultaneously manipulate the working device with a thumb and index finger via a portion of the working device immediately adjacent to the handle opening.

In a first example, the user positions the thumb and index finger on the Wire Spinner and manipulates the working device via a portion of the working device immediately adjacent to the handle opening. In a second example, the user positions the thumb and index finger on the Wire Slider and manipulates the working device via a portion of the working device immediately adjacent to the handle opening. In a third example, the user positions the thumb and index finger on the Balloon Slider and manipulates the working device via a portion of the working device immediately adjacent to the handle opening.

In a fourth example, the user positions the index finger on the Wire Spinner and the thumb on the Wire |

113

CONFIDENTIAL

| Claim 8 | Acclarent's Infringing Instrumentalities and Methods |
|---------|------------------------------------------------------|
| | Slider and manipulates the working device via a portion of the working device immediately adjacent to the handle opening. |
| | In a fifth example, the user positions the thumb and index finger on the guidewire and manipulates the working device via a portion of the working device immediately adjacent to the handle opening.[19] |

---

[19] The example finger placements noted here are not meant to be exhaustive of all ways to "manipulat[e] the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening." The contentions are meant to be inclusive of each thumb and index finger placement where the thumb and index finger manipulate the working device via a portion of the working device immediately adjacent to the handle opening.

114

CONFIDENTIAL

APP.0379

| Claim 8 | Acclarent's Infringing Instrumentalities and Methods |
|---------|------------------------------------------------------|
|  | <br><br>*See, e.g.*, Ex. 18 (showing the thumb and index finger positioned on the Balloon Slider to manipulate the working device with a thumb and index finger of the hand).<br><br>In addition, Acclarent and/or other users of Acclarent's Infringing Instrumentalities (*e.g.* Acclarent's customers) use the Relieva SpinPlus to substantially simultaneously manipulate the working device with |

115

CONFIDENTIAL

| Claim 8 | Acclarent's Infringing Instrumentalities and Methods |
|---|---|
| | a thumb and index finger via a portion of the working device immediately adjacent to the handle opening.<br><br>In a first example, the user positions the thumb and index finger on the Wire Spinner and manipulates the working device via a portion of the working device immediately adjacent to the handle opening. In a second example, the user positions the thumb and index finger on the Wire Slider and manipulates the working device via a portion of the working device immediately adjacent to the handle opening. In a third example, the user positions the thumb and index finger on the Balloon Slider and manipulates the working device via a portion of the working device immediately adjacent to the handle opening.<br><br>In a fourth example, the user positions the index finger on the Wire Spinner and the thumb on the Wire Slider and manipulates the working device via a portion of the working device immediately adjacent to the handle opening.<br><br>In a fifth example, the user positions the thumb and index finger on the guidewire and manipulates the working device via a portion of the working device immediately adjacent to the handle opening.[20]<br><br>Examples of the substantially simultaneous manipulation of the working device with a thumb and index finger via a portion of the working device immediately adjacent to the handle opening are further show in the photographs below. |

---

[20] The example finger placements noted here are not meant to be exhaustive of all ways to "manipulat[e] the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening." The contentions are meant to be inclusive of each thumb and index finger placement where the thumb and index finger manipulate the working device via a portion of the working device immediately adjacent to the handle opening.

116

APP.0381

CONFIDENTIAL

Acclarent's Infringing Instrumentalities and Methods

Claim 8



Ex. 20.

117

APP.0382

CONFIDENTIAL

| Claim 8 | Acclarent's Infringing Instrumentalities and Methods |
|---|---|
| | <br><br>Ex. 22.<br><br>To the extent the "while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening" |

118

CONFIDENTIAL

| Claim 8 | Acclarent's Infringing Instrumentalities and Methods |
|---|---|
| | element is not literally infringed as described above, it is infringed under the doctrine of equivalents. |
| | *See also* Ex. 6 [ABRITTON000225-30] (510(k) Summary submitted by Acclarent to the U.S. Food and Drug Administration (FDA) for the Relieva Spin Sinus Dilation System); Ex. 7 [ABRITTON000258-61] (Acclarent Website https://www.acclarent.com/solutions/products/balloon-sinuplasty-system/relieva-spin-balloon-sinuplasty-system); Ex. 8 [ABRITTON000254-7] (Acclarent Website https://www.acclarent.com/solutions/products/balloon-sinuplasty-system/relieva-spinplus-balloon-sinuplasty-system); Ex. 1 [ABRITTON000262-4] (Relieva Spin Brochure); Ex. 3 [ABRITTON000232-44] (Relieva Spin IFU); Ex. 4 [ABRITTON000266-8] (Relieva SpinPlus Brochure); Ex. 5 [ABRITTON000245-53] (Relieva SpinPlus IFU); Ex. 9 [ABRITTON000265] (Acclarent instructional and promotional video re: Relieva Spin, available at https://www.youtube.com/watch?v=d0IsfOuWbC8; Ex. 10 [ABRITTON000231] Acclarent instructional and promotional videos re: Relieva SpinPlus, available at https://www.youtube.com/watch?v=GsXIOuceTUI. |
| controlling the position of the guide catheter using the handle, while substantially simultaneously controlling, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen. | Acclarent and/or other users of Acclarent's Infringing Instrumentalities (*e.g.* Acclarent's customers) practice a method comprising the step of controlling the position of the guide catheter using the handle, while substantially simultaneously controlling, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen.<br><br>Acclarent and/or other users of Acclarent's Infringing Instrumentalities (*e.g.* Acclarent's customers) use the Relieva Spin to control the position of the guide catheter, while substantially simultaneously controlling the amount of suction using the thumb or index finger via a "suction port" or "suction control." Controlling suction with the thumb is depicted in the promotional and instructional video, shown below, developed by Acclarent for the Relieva Spin. |

119

APP.0383

APP.0384

CONFIDENTIAL

| Claim 8 | Acclarent's Infringing Instrumentalities and Methods |
|---------|------------------------------------------------------|
|         |  ACCLARENT RELIEVA Spin and Vortex Animation<br><br>Ex. 16.[21]<br><br>The Relieva Spin brochure further illustrates that the thumb or index finger may be used for "suction control" using the suction control port, which is "[c]over[ed] to increase [the] suction flow rate." |

---

[21] A screenshot is attached as Ex. 16. The source video was previously available at www.youtube.com, but has been removed.

120

# EXHIBIT 10

APP.0385

UNITED STATES PATENT AND TRADEMARK OFFICE

——————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

——————

ACCLARENT, INC.,
Petitioner,

v.

FORD ALBRITTON, IV,
Patent Owner.

——————

Case IPR2017-00498
Patent 9,011,412

——————

Record of Oral Hearing
Held: April 24, 2018

——————

Before JOSIAH C. COCKS, BEVERLY M. BUNTING, and RICHARD H. MARSCHALL, *Administrative Patent Judges.*

Case IPR2017-00498
Patent 9,011,412


APPEARANCES:

ON BEHALF OF THE PETITIONER:

    LISA ADAMS, ESQ.
    Mintz Levin
    One Financial Center
    Boston, Massachusetts 02111
    617-348-3054
    ladams@mintz.com


ON BEHALF OF THE PATENT OWNER:

    ASHLEY MOORE, ESQ.
    McKool Smith
    300 Crescent Court, Suite 1500
    Dallas, Texas 75201
    214-978-6337
    amoore@mckoolsmith.com


       The above-entitled matter came on for hearing on Tuesday, April 24, 2018, commencing at 10:00 a.m. at the U.S. Patent and Trademark Office, 600 Dulany Street, Alexandria, Virginia.

APP.0387

Case IPR2017-00498
Patent 9,011,412

P R O C E E D I N G S

1                              -  -  -  -  -

2                JUDGE MARSCHALL:    Good morning, everyone, be seated.

3        Good morning, everyone.    This is a hearing in IPR2017-00498 between

4        Petitioner Acclarent, Inc. and Patent Owner Ford Albritton, IV, reviewing

5        Patent Number 9011412.    I'm Judge Marschall.    With me is Judge Cocks

6        and Judge Bunting is appearing remotely.    Let's get the parties'

7        appearances, please.    Counsel for Petitioner?

8                MS. ADAMS:    Good morning, Your Honors.    I'm Lisa Adams

9        with Mintz Levin and here with me today is my colleague, Pete Cuomo.

10               MR. CUOMO:    Good morning.

11               MS. ADAMS:    We represent Acclarent, Inc., the Petitioner in this

12       case.

13               JUDGE MARSCHALL:    And Counsel for Patent Owner?

14               MS. MOORE:    Yes, Your Honor.    Ashley Moore representing the

15       Patent Owner.    I'm with McKool Smith and with me today is Meredith

16       Elkins, also from McKool Smith.

17               JUDGE MARSCHALL:    Thank you and welcome.    We appreciate

18       your being here today and helping us understand your arguments.    We look

19       forward to your presentations.

20               Please keep in mind that Judge Bunting will not be able to see what

21       you project on the screen but has a copy of the materials, so please clearly

22       reference your materials when speaking.    Each party will have 60 minutes

3

Case IPR2017-00498
Patent 9,011,412

1    requires certain physical characteristics, characteristics like size, weight, a

2    hand grip, something that makes it actually the ability to be used and held by

3    the hand, "to facilitate being handheld" was their words.    They held that

4    this claim element, even though it was in the preamble, it was used to

5    differentiate over prior art and it was not anticipated even where the prior

6    art, to some extent, was capable of being held by the hand.    I think that's

7    important here because if we're looking at a handle and handheld, it's very

8    similar in terms of the concepts we're talking about, the physical size of the

9    device, the dimensions, the weight, the physical characteristics that make it

10   handheld by one hand.

11        JUDGE MARSCHALL:    Does the 412 patent anywhere expressly

12   distinguish between one-handed and two-handed use?

13        MS. MOORE:    Yes, Your Honor.    Yes, it does.    So if we look at

14   the specification, we can look at the title.    It's "An Apparatus System and

15   Method for Manipulating a Surgical Catheter and Working Device with a

16   Single Hand."    We can look at the technical field at lines 1 -- column 1,

17   lines 23 through 26, it repeats this language verbatim.    We can look at the

18   detailed description where it talks about the two-handed current state of the

19   art, and then the summary of the invention moves on to say that this is

20   overcome by his one-handed feature.    We have --

21        JUDGE MARSCHALL:    Sorry, where does it refer to the two-

22   handed state of the art?

35

Case IPR2017-00498
Patent 9,011,412

1          MS. MOORE:    It is at the bottom of column one and I will get back

2     to you on the cite on that, but it's -- I believe it's around line 40 --

3          JUDGE MARSHALL:    I just wanted to have a reference, right.

4     Okay.

5          JUDGE COCKS:    Counsel, did the claims of the 412 patent

6     preclude use with two hands?

7          MS. MOORE:    Your Honor, I would say that they do.    I would say

8     that the entire intent, if you look at the specification and you read the

9     specification and look at the claims and what they were intended to cover,

10     it's a one-handed device.    Three of the fingers are used to hold the handle

11     and the thumb and index finger are free to perform other functions, they're

12     free for suction, they're free for positioning to control the working device,

13     and all of those fingers are of one hand and that is the important portion of

14     this patent as described in the specification.    So it certainly is a defining

15     feature of it.

16          And just to get back to you on the cite, it is column 1, about lines 38

17     through 48, and that's the description of the two-handed technique, and the

18     single-handed device is at column 1, lines 50 through 53.

19          And to continue with the descriptions in the specification, we were

20     told that there aren't any descriptions about the handle structure.    That's

21     false.    The detailed description says that the handle may be shaped to

22     enhance the grip by the middle, ring, and little fingers of the user's hand;

23     that's at column 3, lines 62 through 65.    We have the description of the grip

36

Case IPR2017-00498
Patent 9,011,412

1    of the handle with specific fingers; that's at column 4, line 61 through

2    column 5, line 4.    We have a handle configuration explanation discussing

3    the placement of the user's thumb and forefinger in comfortable proximity to

4    the opening; that's at lines 5 -- column 5, lines 14 through 15.    And then we

5    have the explanation of a handle that is shaped to permit easy motion of the

6    thumb and forefinger toward and away from the opening; that's at column 5,

7    lines 15 through 18.

8        And all of these descriptions, they really align with the *Aspex* case

9    that was brought out in the decision that was referenced in the decision and

10   also in our response that says the specification shows that the claimed

11   apparatus and system was meant to be used with a single hand, not simply

12   that it's capable of doing so.    So this is the intent behind the specification

13   and the claims, and that is meant to be used in that particular narrow -- more

14   narrow definition of configured to or designed to as opposed to being

15   capable of.

16       I'd also like to point out the *Man Machine Interface* case.    The

17   specification in that case was used to expressly distinguish between the prior

18   art and what was meant to be encompassed by the claims, and just like that

19   case, as I've just mentioned, we expressly distinguish between this two-

20   handed use in the prior art at column 1, lines 50 through 54 and the single-

21   handed nature of the invention as claimed; that was around lines 55.    So

22   like *Man Machine Interface*, similarly here, we should have the narrower

37

Case IPR2017-00498
Patent 9,011,412

1    construction applied to the structure claims, should be configured to,

2    designed to, not the broader capable of construction.

3         JUDGE MARSCHALL:    I know we'll get to the prior art on that

4    but in your view, does that require an intent element where you have to look

5    at the prior art with the idea of what do they intend for those structures?

6         MS. MOORE:    No, Your Honor.    No, I don't believe it requires

7    an intent, but it does require something more than capable of. The device

8    must be designed such that it is to be held one-handed and operated in the

9    manner claimed.    That's very similar to the *Aspex Eyewear* case that I

10   mentioned a moment ago.    It's also very similar to the *In re Gold* case I

11   mentioned a moment ago.    There's not an intent element but handheld and

12   handle, for example, do imply certain physical characteristics that are

13   structural in nature and, therefore, although an intent is not implied, the

14   narrower definition is more appropriate.

15        So we also heard from petitioner that the claim language, the

16   structure terms, it's permissive and not mandatory.    The -- we obviously

17   disagree.    First of all, this was raised for the first time in the Reply but in

18   any event, the handle structure, the terms themselves, they don't say "may be

19   used" or "may be configured" or "may be adapted to."    They say the handle

20   "is configured."    The handle "is configured."    It's not a permissive act.    It

21   is a mandatory act for it to be used one-handed.

38

Case IPR2017-00498
Patent 9,011,412

1          MS. MOORE:   I believe it is.

2          JUDGE COCKS:   -- covered by the claim, claim 1?

3          MS. MOORE:   Yes, Your Honor.

4          JUDGE COCKS:   If I were to use this device with two hands, it

5     would not be covered then, the same device but if I were to operate it with

6     two hands or -- I'm not a physician or a surgeon -- so a surgeon were to

7     operate it with two hands, is that unusual?

8          MS. MOORE:   To operate this --

9          JUDGE COCKS:   Would that be the -- operating figure 3, the

10    device shown on figure 3, with two hands would take it outside the scope of

11    the claim?

12         MS. MOORE:   I think it would depend on if you were talking about

13    infringement or validity.

14         JUDGE COCKS:   I don't know that I want to talk about either.   I

15    just want -- the question would be if a surgeon was operating the device

16    shown in figure 3 with two hands, that's not within the scope of the claim 1?

17         MS. MOORE:   So if we were talking -- I think, unfortunately, it's

18    hard to answer without discussing whether it's validity or infringement,

19    because if it is validity that we're talking about and there's an operation

20    being performed with two hands, again, it would be exactly what we're

21    talking about with this prior art.   It's a two-handed operation if there's

22    nothing in the operator's manual that describes using this with two hands

23    versus one hand.

43

Case IPR2017-00498
Patent 9,011,412

1          It's a different question than infringement, which is what was being

2     discussed at this hearing that was referenced by petitioner.  Infringement of

3     an apparatus claim is a capable of standard.  The apparatus needs to be

4     capable, and so at that point, if we're talking about infringement, if it had

5     been used with one hand or two, it just depends on whether it was capable of

6     being used with one hand or two, but that's infringement.

7          So validity -- unfortunately, the way that we're trying to mix these

8     two concepts, I don't think that we can.  Infringement is a separate standard.

9     It's a separate issue with a separate set of case law than validity, which is

10    obviously, that's what we're here to talk about today, and the validity issues

11    of inherent anticipation kind of all come back to this necessarily and always.

12    So I think the answers are different.

13         JUDGE COCKS:   Okay.   Let me take a slightly different approach

14    and I think you've already answered this before but just -- so claim 1 does

15    not encompass a device that's used with two hands?   I think you've already

16    said that.   I just --

17         MS. MOORE:   Yes, Your Honor.

18         JUDGE COCKS:   Okay.   All right.   Move on, go ahead.

19         MS. MOORE:   So I would like to briefly address that the arguments

20    that petitioner raised in their Reply relating to this capability, capable of

21    construction, they argue that the *Schaffer* case suggests that capability is

22    enough for functional claiming.   That's not correct in my opinion.   That

23    particular case did not address inherent anticipation and more critically, in

44

Case IPR2017-00498
Patent 9,011,412

1    that case, both parties agreed that the term "adapted to" should be construed

2    as "capable of."   So the very thing we're arguing about was agreed to as a

3    base premise in that case.   So it's very different than what we're talking

4    about here, which is whether that's even a correct presumption.   The fact

5    that they agreed to that and then applied the standard from there doesn't

6    make it any more relevant to our case.   It doesn't overrule the decades of

7    case law that I've got here on slides 9 and 10 talking about inherent

8    anticipation and the necessary and always.

9        And then they also tried to distinguish *Bettcher* saying that it doesn't

10    apply to functional claim elements, and that's wrong.   If you actually look at

11    Bettcher at 661 F.3d 640, it says that the claim language at issue, quote,

12    "may have both structural and functional limitations but the functional

13    limitation requires more than the ability to bear for a short period of time at

14    unusually slow speeds."   What they're talking about there is, again, and

15    inherent anticipation argument was made and the fact that they created a

16    prototype that was able to perform the claim elements for a very short period

17    of time, that's not enough for inherent anticipation.   Again, it's this

18    necessary and always, so the fact that they were able to      recreate a

19    prototype that was able to perform for a very short period of time the

20    element of the claims, that was not enough even when it was, quote,

21    unquote, "functional claiming."   So again, that case, the *Bettcher* case says

22    that inherency can be established when prior art necessarily functions in

23    accordance with or includes the claim limitations.   Inherency, however,

45

Case IPR2017-00498
Patent 9,011,412

1    because they were affirming a judgment as a matter of law, and they were

2    looking at jury instructions.   So also, there in that case, the question was

3    whether or not these chamfers of the prior art could be considered to be

4    bearing rises.   It was a different structure.   Again, that's not the situation

5    here.

6          So in conclusion, you know, Patent Owner is asking you to treat

7    device claims as method claims.   I think this is really contrary to the law as

8    it stands, and these claims cannot be read to require that use always happens.

9    I think the key question here is going to be, "Would it be impossible to use

10   the prior art in the claimed manner," and I think the evidence establishes that

11   it's not only possible but in some cases was actually used as claimed.

12   Thank you.

13          JUDGE MARSCHALL:   Any further questions from the panel?

14          JUDGE COCKS:   Not from me.   Thank you.

15          MS. ADAMS:   No.

16          JUDGE MARSCHALL:   Okay.   That concludes our hearing.

17   Thank you both for your time.   It's been very helpful.   The case is

18   submitted.

19          (Whereupon, the above-entitled matter was concluded at 12:00 p.m.)

76

Case IPR2017-00498
Patent 9,011,412


PETITIONER:

Lisa Adams
Peter Cuomo
MINTZ LEVIN
ladams@mintz.com
pjcuomo@mintz.com

PATENT OWNER:

Ashley Moore
Meredith Elkins
Travis DeArman
MCKOOL SMITH
amoore@mckoolsmith.com
melkins@mckoolsmith.com
tdearman@mckoolsmith.com

77

APP.0397

# EXHIBIT 11

APP.0398

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4

5    DR. FORD ALBRITTON IV,

6           Plaintiff,           Civil Action

7    vs.                         No. 3:16-cv-03340-M

8    ACCLARENT, INC.,

9           Defendant.

10                              /

11

12

13

14

15              DEPOSITION OF JOHN MORRISS

16                Palo Alto, California

17             Wednesday, July 11, 2018

18

19

20

21

22

23   Reported by:

24   JANIS JENNINGS, CSR, CLR, CCRR

25   Job No. 144432

APP.0399

Page 2

1

2

3

4

5

6

7

8

9            DEPOSITION OF JOHN MORRISS, taken on

10   behalf of the Plaintiff, at Gibson Dunn & Crutcher LLP,

11   1881 Page Mill Road, Palo Alto, California, beginning

12   at 9:07 a.m. on Wednesday, July 11, 2018, before

13   Janis Jennings, Certified Shorthand Reporter No. 3942,

14   CLR, CCRR.

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    APPEARANCES:

2

3        ON BEHALF OF PLAINTIFF:

4            McKOOL SMITH

5            300 Crescent Court

6            Dallas, Texas  75201

7            BY:  ALEXANDRA EASLEY, ESQ.

8

9

10       ON BEHALF OF DEFENDANT AND THE WITNESS:

11           GIBSON, DUNN & CRUTCHER

12           3161 Michelson Drive

13           Irvine, California  92612

14           BY:  WILLIAM ROOKLIDGE, ESQ.

15

16

17       ALSO PRESENT:

18           FELISSA CAGAN, ESQ., J&J

19

20

21

22

23

24

25

APP.0401

Page 42

1    have to be done on those materials to qualify that

2    product for commercial release.

3         Q.   These documents that we have looked at

4    today, did you turn these documents over to the team

5    that was charged with developing your idea of a

6    suction guide catheter into a commercial product?

7         A.   Yes.

8         Q.   And did you provide those documents to

9    Serena Swei Loh?

10        A.   Yes.

11             (Exhibit 32 marked for identification.)

12   BY MR. ROOKLIDGE:

13        Q.   I am handing you a document that has been

14   marked for identification as Exhibit 32.  Have you

15   ever seen this document before?

16        A.   Yes.

17        Q.   This document shows a commercial product

18   called a Relieva Flex Sinus Guide Catheter; is that

19   right?

20        A.   Correct.

21        Q.   Is this Relieva Flex Sinus Guide Catheter

22   the commercial embodiment of your idea for a sinus

23   guide catheter with suction?

24        A.   Yes.

25        Q.   And so this is the product that Acclarent

Page 43

1    developed and introduced as a result of your R&D

2    work on that sinus guide catheter with suction?

3        A.   Yes.

4            MR. ROOKLIDGE:  No further questions.

5            MS. EASLEY:  Okay.  I just have a few

6    followup questions.

7

8                 FURTHER EXAMINATION

9    BY MS. EASLEY:

10        Q.   Did all of the exhibits you just reviewed

11    with Mr. Rooklidge, which were marked as Exhibits 20

12    through 32, relate to your suction adapter system we

13    discussed earlier?

14        A.   Yes.

15        Q.   And that's the suction adapter system

16    described in the July 2006 invention disclosure

17    form; correct?

18        A.   Correct.

19        Q.   And your suction adapter system was

20    incorporated into the Relieva Flex; correct?

21        A.   Yes.

22        Q.   Was the Relieva Flex released when you were

23    at Acclarent?

24        A.   I don't recall.

25        Q.   You stated earlier that the -- your suction

Page 44

1    adapter system was also incorporated into a patent;

2    correct?

3        A.   Yes.

4        Q.   Was that patent released before or after the

5    Relieva Flex?

6            MR. ROOKLIDGE:  Objection.  Vague as to

7    "released."

8    BY MS. EASLEY:

9        Q.   Was that patent issued before or after the

10   Relieva Flex was released?

11       A.   I don't know.

12       Q.   Earlier you mentioned Eb Bright, who was a

13   patent attorney for Acclarent; correct?

14       A.   Correct.

15       Q.   Were there any other patent attorneys at

16   Acclarent when you worked there?

17       A.   Yes.

18       Q.   What were their names?

19       A.   Scott Smith.

20       Q.   Were there any other -- any others?

21       A.   I believe Scott was the only one.

22       Q.   Who at Acclarent was primarily responsible

23   for submitting patent applications?

24            MR. ROOKLIDGE:  Objection.  Lacks

25   foundation.  Calls for speculation.

# EXHIBIT 12

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

ACCLARENT, INC.
Petitioner,

v.

Ford Albritton, IV
Patent Owner

———————

CASE IPR: UNASSIGNED
U.S. Patent No. 9,011,412

———————

**PETITION FOR *INTER PARTES* REVIEW**

Mail Stop Patent Board
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

**TABLE OF CONTENTS**

**List of Exhibits** ................................................................................1

I.    INTRODUCTION ......................................................................2

II.   GROUNDS FOR STANDING......................................................5

III.  MANDATORY NOTICES ..........................................................5

     A.   Real Party-In-Interest ......................................................5

     B.   Related Matters..............................................................5

     C.   Notice of Lead and Backup Counsel....................................6

     D.   Notice of Service Information for Petitioner ..........................6

     E.   Service On The Patent Owner .............................................6

IV.  THRESHOLD REQUIREMENT FOR *INTER PARTES* REVIEW ..............7

V.   SUMMARY OF THE ALBRITTON PATENT ..................................7

     A.   Overview of Albritton .......................................................7

     B.   Summary of the Prosecution History .................................10

VI.  PERSON OF ORDINARY SKILL IN THE ART ..........................13

VII. CLAIM CONSTRUCTION .......................................................14

     A.   Applicable Legal Standards ..............................................14

     B.   Proposed Constructions....................................................15

APP.0407

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

1.    "formed to allow"........................................................15

2.    "manipulating the working device with a thumb and

index finger" ......................................................20

VIII.  PRIOR ART REFERENCES RELIED ON BY PETITIONER ..................21

IX.    STATEMENT OF NON-REDUNDANCY ...................................................22

X.     STATEMENT OF PRECISE RELIEF REQUESTED ................................23

XI.    CLAIM-BY-CLAIM EXPLANATION OF GROUNDS FOR

UNPATENTABILITY ................................................................24

A.    Ground I - Claims 8 and 11-13 Are Obvious Over Ressemann in view

of Goldfarb ........................................................24

1.    Independent Claim 8 ..............................................24

2.    Dependent Claims 11-13........................................39

B.    Ground II – Claims 8-13 Are Obvious Over Makower in view of

Jones .................................................................42

1.    Independent Claim 8 ..............................................42

2.    Dependent Claims 9-13..........................................53

XII.   CONCLUSION................................................................60

APP.0408

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

## List of Exhibits

Ex. 1001    U.S. Patent No. 9,011,412 to Albritton, IV *et al.*

Ex. 1002    U.S. Provisional Application No. 61/127,848

Ex. 1003    File History of U.S. Patent No. 9,011,412 to Albritton, IV *et al.*

Ex. 1004    Declaration of Dr. Howard L. Levine, M.D.

Ex. 1005    Declaration of Randy J. Kesten

Ex. 1006    U.S. Publication No. 2007/0250105 of Ressemann *et al.*

Ex. 1007    U.S. Patent No. 8,747,389 of Goldfarb *et al.*

Ex. 1008    U.S. Patent Pub. No. 2006/0063973 of Makower *et al.*

Ex. 1009    U.S. Patent No. 4,915,691 of Jones *et al.*

Ex. 1010    U.S. Patent Pub. No. 2006/0252993 of Freed *et al.*

Ex. 1011    U.S. Patent No. 5,697,159 of Linden

Ex. 1012    First Amended Complaint, Albritton v. Acclarent, Inc., Case No. 3:16-cv-03340-M, Docket Entry No. 25 filed Jun. 13, 2017 (N.D. Tex.).

Ex. 1013    Transcript of Motion Hearing held on Oct. 24, 2017 Re Acclarent's Motion to Dismiss First Amended Complaint, Albritton v. Acclarent, Inc., Case No. 3:16-cv-03340-M (N.D. Tex.).

Ex. 1014    U.S. Patent No. 7,654,997 of Makower *et al.*

Ex. 1015    Definition of "allow" from Webster's Third New International Dictionary (2002).

1

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

## I.    INTRODUCTION

U.S. Patent No. 9,011,412 ("Albritton") is directed to systems and methods that include a guide catheter apparatus that is insertable through an external body passage of a subject.  *See* Ex. 1001.  Surgical catheters or guides and methods for using the same are nothing new and have been around since the 1920s.  *See* Ex. 1004, ¶ 18, and Ex. 1005, ¶¶ 44-45.  In fact, Albritton acknowledges that many of the claimed components used to perform a procedure in an external body passage - including the guide catheter having proximal and distal openings with a lumen extending therebetween, the handle coupled to the guide catheter for positioning the catheter in an external body passage, and a working device insertable through the handle and into the lumen of the guide catheter - were "typical" and well known in the art at the time of Albritton.  *See* Albritton, 1:30-43; *see also* Ex. 1004, ¶ 18, and Ex. 1005, ¶ 47.  Other elements such as the shaft of the guide catheter being substantially *rigid* were also well known and commonplace in the art.  *See* Ex. 1004, ¶ 19, and Ex. 1005, ¶ 50.  It was also common to include a source of suction for suctioning fluid and debris from a surgical site.  *See* Ex. 1004, ¶ 21, and Ex. 1005, ¶ 51.

The purported novelty of the method claims of Albritton is the ability to manipulate a working device extending through the handle and the guide catheter

APP.0410

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

with a thumb and index finger of the same hand holding the device via a portion of the working device immediately adjacent to a handle opening, and to also use the thumb or index finger to control an amount of suction. *See e.g.,* Ex. 1001, 1:51-67 ("This disclosure provides an apparatus, system and method for manipulating a surgical catheter and working device with a single hand. …The handle has a structure that allows a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. The structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device that is immediately adjacent to the handle.").

During prosecution, Albritton distinguished a reference to Wild on the basis that "Wild does not disclose that the an operator is permitted to position a ***thumb and index finger*** of the hand to manipulate the working device ***via a portion of the working device immediately adjacent to the handle opening*** as recited in Claim 1." Ex. 1003. (Amendment and Response filed on April 23, 2012, pp. 10-11) (emphasis in original). Albritton also distinguished a reference to Freed by adding the limitation "to control, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen," arguing that this element was absent from the cited references. *See id.* (Amendment and Response filed on

3

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

October 29, 2012, pp. 10-11).

The Examiner failed to consider numerous prior art references that teach all of the limitations of the claimed method. Ressemann was not cited during prosecution, and is far more relevant than any reference relied on by the Examiner. As we explain below, Ressemann teaches all of the elements of the claimed method with the exception of suction, which was well-known at the time. Goldfarb is an example of a reference that taught that suction was commonly used on devices of the type disclosed in Ressemann. Goldfarb was cited during prosecution, however it was never relied on as part of the basis for a rejection. Makower is another reference that teaches all of the elements of claimed method, but was only relied on as a secondary reference to teach certain dependent claim features. While Makower discloses the use of a thumb/finger port for suction, Makower does not explicitly teach using the thumb or finger of the same hand to control suction. Jones is yet another reference that was not cited that eliminates any doubt that it was well known at the time of Albritton to use a thumb or finger to control suction. When these prior art references are properly considered, it is clear that Albritton's method claims should not have issued as these references teach the claimed method.

APP.0412

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

## II.    GROUNDS FOR STANDING

Petitioner hereby certifies that the patent for which review is sought is available for *inter partes* review and that Petitioner is not barred or estopped from requesting an *inter partes* review challenging the patent claims on the grounds identified in this Petition.

## III.    MANDATORY NOTICES

### A.    Real Party-In-Interest

Acclarent, Inc., 33 Technology Drive, Irvine, CA 92618, is a wholly owned subsidiary of Johnson & Johnson, One Johnson & Johnson Plaza, New Brunswick, N.J. 08933.  Both entities are real parties-in-interest for this petition to institute *inter partes* review.

### B.    Related Matters

"System" claims 1-7 and 14-20 of the Albritton Patent are the subject of pending *Inter Partes* Review No. 2017-00498.

Both the system and method claims of the Albritton Patent are the subject of a patent infringement lawsuit brought by the Patent Owner against Acclarent in *Dr. Ford Albritton IV v. Acclarent, Inc.*, Civil Action No. 3:16-cv-03340-D, filed in the United States District Court for the Northern District of Texas Dallas Division on December 1, 2016 (hereinafter "the Litigation").

APP.0413

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

### C.    Notice of Lead and Backup Counsel

| Lead Counsel | Backup Counsel |
|---|---|
| Lisa Adams | Peter Cuomo |
| Reg. No. 44,238 | Reg. No. 58,481 |
| Mintz Levin Cohn Ferris Glovsky and Popeo PC | Mintz Levin Cohn Ferris Glovsky and Popeo PC |
| One Financial Center | One Financial Center |
| Boston, MA 02111 | Boston, MA 02111 |
| T:  (617) 348-3054 | T:  (617) 348-1854 |
| F:  (617) 542-2241 | F:  (617) 542-2241 |

Pursuant to 37 C.F.R. § 42.10(b), a Power of Attorney accompanies this

Petition.

### D.    Notice of Service Information for Petitioner

Please address all correspondence to Lead Counsel at the address shown

above.  Petitioner also consents to electronic service by email to:

ladams@mintz.com and pjcuomo@mintz.com.

### E.    Service On The Patent Owner

Dr. Ford Albritton, IV is the inventor and, by virtue of an assignment from

Bryan Lunsford to Dr. Fold Albritton, IV, as recorded at Reel 035665, Frame 0801

at the USPTO's assignment database, is the current owner of record of the

Albritton patent.  Pursuant to 37 C.F.R. § 105(a), service of this Petition has been

made simultaneously with this filing to the current correspondence address for the

Albritton patent and Dr. Albritton's current counsel in the Litigation and IPR No.

6

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

2017-00498, as shown in the Certificate of Service.

## IV.    THRESHOLD REQUIREMENT FOR *INTER PARTES* REVIEW

A petition for *inter partes* review must demonstrate "a reasonable likelihood that the Petitioner would prevail with respect to at least one of the claims challenged in the petition." 35 U.S.C. § 314(a). This Petition meets that threshold. All of the elements of claims 8-13 of Albritton are taught and/or disclosed in the prior art as explained below, and reasons to combine the prior art teachings and/or disclosures, where necessary, are established for each proposed ground under 35 U.S.C. § 103(a).

## V.    SUMMARY OF THE ALBRITTON PATENT

### A.    Overview of Albritton

Albritton is directed to systems and methods that include a guide catheter apparatus that is insertable through an external body passage of a subject. As shown in Figure 3 (reproduced below with markings), the apparatus has a guide catheter (302, red) with a substantially rigid shaft and proximal and distal openings with a lumen extending therebetween. The guide catheter is coupled to a handle (350, blue) having an opening (318) for receiving a working device. The handle (blue) includes a coupling (310 and 320, orange) configured to couple the lumen in the guide catheter (red) to a suction source.

7

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412



Figure 4 (reproduced below with markings) illustrates a working device (green) inserted through the handle opening (318) and into the lumen in the guide catheter.



The handle is purportedly formed to allow the position of the guide catheter to be controlled by some or all of three fingers of a hand, while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle

8

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

opening.  *See* Albritton, claim 8.  The handle is also purportedly formed to allow

the position of the guide catheter to be controlled while substantially

simultaneously controlling, by one of the thumb or index finger, an amount of

suction coupled to the distal opening of the lumen.  *See id.*  While the method of

manipulating the working device adjacent to the handle opening is not shown in

the drawings of the issued Albritton patent, Figure 5 (reproduced below) illustrates

the device being held by a user.



FIG. 5

Moreover, the original Figure 5 from the provisional (reproduced below) appears

to show a thumb and forefinger manipulating a portion of the device in the vicinity

of the opening at the distal end of the handle, which is consistent with the Albritton

specification describing the claimed method.  *See* Albritton, 4:67-5:4 ("The fore

finger and thumb are left free to manipulate a working device inserted into the

opening 318 or to cover the opening 318 to redirect suction to the distal end of the

guide 302, as described with reference to FIG. 2."); *see also,* Albritton, Figure 3

(above).

9

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412



FIGURE 5

Albritton has a total of 20 claims, with claims 1, 8, and 14 being independent. Claims 1 and 14 each define the basic guide catheter system or apparatus, while claim 8 defines a method of inserting the guide catheter through an external body passage of a subject.

### B.    Summary of the Prosecution History

Albritton was filed on May 18, 2009 and claims priority from a provisional patent application filed on May 16, 2008, attached hereto as Ex. 1002. Albritton was filed with 20 claims, of which claims 1, 8, and 14 were independent.

In a first Office Action mailed December 22, 2011, claims 1-4, 7-11, 13-17, and 19-20 were rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent No. 6,605,036 to Wild ("Wild"), and claims 5, 12, and 18 were rejected under 35 U.S.C. § 103(a) for obviousness over Wild in view of Makower. *See* Ex.

10

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

1003 (Dec. 22, 2011 Office Action, pp. 2-5).

In a response filed on April 23, 2012, independent claim 8 was amended to recite inserting the working device "through a handle opening in a handle coupled to the guide catheter and into" the lumen of the guide catheter. Ex. 1003 (Apr. 23, 2012 Amendment and Response, p. 5). Amendments were also made to independent claims 1 and 14. The applicants argued that Wild does not teach a working device adapted to be insertable through the handle opening into the lumen of the guide catheter, or that the structure of the handle is adapted to permit the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device immediately adjacent to the handle opening. *See id.*, p. 11. The applicants asserted that the thumb and index finger of an operator "would not be able to reach a portion of the working device *immediately adjacent to the handle opening* utilizing the handle top by Wild." *Id.* (emphasis in original). As to the rejection of claims 5, 12, and 18 under 35 U.S.C. § 103(a) as being unpatentable over Wild in view of Makower, the applicants did not address Makower on any of the merits.

In a final Office Action mailed August 27, 2012, claims 1-20 were rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent Pub. No. 2006/0252993 of Freed (hereafter "Freed"). *See* Ex. 1003 (Aug. 27, 2012 Office

11

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

Action, pp. 2-6).  In response, the applicants amended claim 8 to recite "coupling a source of suction to the lumen through the handle," and to recite "controlling the position of the guide catheter using the handle, while substantially simultaneously controlling, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen."  *See id.* (Oct. 29, 2012 Amendment and Response, p. 5).  Similar amendments were made to claims 1 and 14.  The applicants argued that Freed discloses "a catheter handle 132 with an irrigation/suction port 230 that has luer style fittings 258" which define port 230, as seen in Figure 3 of Freed (partially reproduced below) (*see* Ex. 1010, Fig. 3), and fails to disclose that "the structure of the handle permits an operator to use a thumb or index finger to control the amount of suction."  *Id.*, p. 11.



*Fig.3.*

APP.0420

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

In a further non-final Office Action mailed June 10, 2014, claims 1-20 were rejected pursuant to 35 U.S.C. § 102(b) as being anticipated by U.S. Patent Publication No. 2009/0143645 of Matthes ("Matthes"). *See* Ex. 1003 (Jun. 10, 2014 non-final Office Action, pp. 2-7). The applicants responded by arguing that Matthes did not qualify as prior art. *See id.* (Nov. 10, 2014 Request for Reconsideration, pp. 8-9).

Albritton issued on April 21, 2015.

## VI.    PERSON OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art is a hypothetical person presumed to know the relevant prior art. *See Gnosis S.p.A. v. South Alabama Med. Sci. Found.*, IPR2013-00116, Paper No. 68, p. 9 (PTAB Jun. 20, 2014). Such a person is of ordinary creativity, not merely an automaton, and is capable of combining teachings of the prior art. *See id.* (*citing KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421-21 (2007)). A person of ordinary skill in the art as of May 16, 2008 (hereinafter a "POSA") would have had at least a bachelor's degree in either electrical engineering or mechanical engineering, or equivalent, with at least four years' experience designing surgical instruments, or a doctor of medicine (M.D.) and at least 2 years of experience with laparoscopic or endoscopic surgical procedures. *See* Ex. 1004, ¶¶ 16-17, and Ex. 1005, ¶ 42.

13

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

## VII.  CLAIM CONSTRUCTION

### A.  Applicable Legal Standards

Solely for purposes of this review, Petitioner construes the claim language such that the claim terms are given their broadest reasonable interpretation in light the Albritton specification.  *See* 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 2016 U.S. LEXIS 3927 at *24 (U.S. June 20, 2016); *see also, Office Patent Trial Practice Guide*, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012).  Also, the claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure.  *See In re Translogic Technology, Inc*., 504 F.3d 1249, 1257 (Fed. Cir. 2007).

For terms not specifically construed below, Petitioner interprets them for purposes of this review in accordance with their plain and ordinary meaning under the required broadest reasonable construction in light of the patent specification. 37 C.F.R. § 42.100(b).  Because that legal standard for claim construction differs from the one applied in U.S. District Court litigation, *see In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1364, 1369 (Fed. Cir. 2004), Petitioner expressly reserves the right to advocate a different construction in any subsequent litigation for any term found in Albritton.

APP.0422

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

## B.    Proposed Constructions

### 1.    "formed to allow"

**Proposed Construction**:  capable of.

The construction of this term comes from the plain and ordinary meaning in light of its use in the patent specification.  The plain language of claim 8 states that the handle is "formed to allow" the position of the guide catheter to be controlled by some or all of three fingers of a hand, while substantially simultaneously manipulating the working device with a thumb and index of the hand.  The term "formed to allow" is a functional limitation that should be construed broadly and analogously with "configured to allow" and adapted to permit" which are used by Albritton in the same manner to describe purely functional and allowable (or permissive) language in independent claims 1 and 8 (*see* below):

> Claim 1: "…the structure is ***configured to allow*** a position of the guide catheter ***to be controlled by some or all of three fingers of one hand*** of an operator of the handle…wherein the structure of the handle is ***adapted to permit*** the operator to ***<u>position a thumb and index finger of the hand to manipulate</u> the working device*** …"

> Claim 8 "…controlling a position of the guide catheter using the ***handle that is formed to allow*** the position of the guide catheter to be ***controlled by some or all of***

15

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

> ***three fingers of a hand***, while substantially
> simultaneously ***manipulating the working device with a***
> ***thumb and index finger of the hand***..."
>
> Claim 14: "…the structure is ***configured to allow*** a
> position of the guide catheter apparatus to be controlled
> by some or all of three fingers of one hand of an operator
> of the handle…wherein the structure of the handle is
> ***adapted to permit*** the operator to ***position a thumb and***
> ***index finger of the hand to manipulate*** a working
> device…"

Albritton claims 1, 8, and 14 (emphasis added to each).  The terms "configured to"

and "adapted to" can either have a narrow meaning (e.g., "made to," "designed to")

or a broad meaning (e.g., "capable of" or "suitable for").  *See, e.g., Ex. Parte*

*Hanni,* Appeal No. 2015-002410, 2016 Pat. App. LEXIS 12392, at *11-12 (PTAB

Dec. 19, 2016); *In re Man Machine Interface Techs. LLC*, 822 F.3d 1282, 1286

(Fed. Cir. 2016).  One should look to the claims and the written description of the

patent to determine whether the claim scope should be broad or narrow.  *Id.*  In

particular, one should look for language imposing particular structural features

required for performing the claimed function or other language expressly

disclaiming a particular configuration.  *Id*.; *see also*, *Ex. Parte Warren,* Appeal

2015-003359; 2016 Pat. App. LEXIS 11253, at *13-15 (PTAB Nov. 23, 2016)

16

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

(holding "configured to" meant "capable of" because "configured to" was not defined by the patent specification nor was there "any particular configuration required by the Specification other than that the device function."). As addressed in the Kesten Declaration, the Albritton patent does not disclose any features required to perform the claimed functions. *See* Ex. 1005, ¶ 69. Indeed, the terms "configured to allow" and "formed to allow" appear nowhere but the claims where neither is linked to any specific structural distinctions. Albritton uses the term "adapted to permit" in two places in the specification but not in relation to any particular structures.

> The handle has a structure *that allows* a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. The structure of the handle is *adapted to permit* the operator to position a thumb and index finger of the hand to manipulate the working device via a portion of the working device that is immediately adjacent to the handle.
>
> ***
>
> The handle has a structure *to allow* a position of the guide catheter to be controlled by some or all of three fingers of one hand of an operator of the handle. The structure of the handle is *adapted to permit* the operator

APP.0425

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

> to position a thumb and index finger of the hand to
> manipulate a working device inserted into the lumen of
> the guide catheter, where the working device is
> manipulable via a portion of the working device
> immediately adjacent to the handle.

Albritton, 1:61-67 and 2:15-23 (emphasis added). As can be seen above, Albritton does not require any particular configuration and only describes the function of the handle structure. Further, the plain meaning of the modifier "allow" which means "to make possible" (not mandatory) dictates the broader construction. *See* Ex. 1015 (Webster's Third New International Dictionary, at 58 ("allow" means "to make a possibility; provide opportunity or basis.")).

Moreover, the Albritton specification contains language that demonstrates that no particular configuration is required other than that the device function:

> Although the present invention and its advantages have
> been described in the foregoing detailed description and
> illustrated in the accompanying drawings, it will be
> understood by those skilled in the art that the invention is
> not limited to the embodiment(s) disclosed but is capable
> of numerous rearrangements, substitutions and
> modifications without departing from the spirit and scope
> of the invention as defined by the appended claims.

Albritton, 5:47-54; compare with *Warren*, 2016 Pat. App. LEXIS 11253, at *14 (noting similar language while concluding that the broader "capable of"

18

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

interpretation should apply to the claim term "configured to".).  While the Albritton specification does state that "the [handle] angle may be selected to place the user's thumb and forefinger in comfortable proximity to the opening 318, and the handle shaped to permit easy motion of the thumb and forefinger towards and away from the opening 318 while securely grasping a working device inserted through the handle 350 into the guide 302," it goes on to say that any angle between 0-90 degrees, including 60, may be used.  *See* Albritton, 6:19-22. Albritton's disclosure of any angle from 0-90 degrees provides no direction or guidance and instead leaves one of ordinary skill confronted with virtually every possible angular option.  *See* Ex. 1005, ¶ 69.

Accordingly, the term "formed to allow" should be given the broader "capable of" or "suitable for" interpretation, and thus the claimed handle merely needs to be *capable of* allowing the guide catheter to be being controlled by some or all of three fingers of one hand, while substantially simultaneously controlling the working device with a thumb and index finger.  *See* Ex. 1005, ¶¶ 67-72.

APP.0427

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

### 2. "manipulating the working device with a thumb and index finger"

**Proposed Construction**:    using one of the thumb and index finger to move the working device while the other one of the thumb and index finger provides oppositional force and stabilizing force.

In a First Amended Complaint filed in the Litigation by Dr. Albritton, it was asserted that "even when an operator uses the thumb (as advertised) to manipulate the Balloon Slider or the Wire Slider, the operator also uses his or her forefinger to apply ***oppositional force and stabilizing force*** that is part of the manipulation of the working device …." *See* Ex. 1012 (emphasis added.)  In other words, Albritton asserts that "manipulating the working device with a thumb and index finger of the hand," as recited in claim 8, includes applying oppositional force to the handle with one of the thumb and index finger and using the other of the thumb and index finger to advance the working device.

This was reiterated by counsel for Dr. Albritton during a hearing on a motion to dismiss in the Litigation.  *See* Ex. 1013.  In particular, Patent Owner's counsel pointed to Figure 5 of Albritton, and argued that "the hand positioning indicated in Figure 5 provides for a thumb that is positioned immediately adjacent to the portion of the working device extruding from the handle, and an index finger that is used to provide oppositional and directional force." *See id*., p. 45.

20

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

The Patent Owner's interpretation, as set forth in the complaint in the Litigation, constitutes a binding judicial admission. *See Gordon Kruse Constr. Co. v. United States*, Appeal No. 92-5093, 1992 U.S. App. LEXIS 32832 at *5 (Fed. Cir. Dec. 14, 1992). ("This court has held that pleadings are judicial admissions which render the facts therein indisputable.") (citations omitted). Accordingly, while we believe that claim 8 requires *both* the thumb and index finger to engage the working device, for purposes of this IPR only, we apply Patent Owner's claim interpretation herein.

## VIII. PRIOR ART REFERENCES RELIED ON BY PETITIONER

1.     U.S. Patent No. Publication No. 2007/0250105 of Ressemann et al., entitled "Device and Method for Treatment of Sinusitus" (Ex. 1006) ("Ressemann") was published on October 25, 2007.  It is prior art under pre-AIA 35 U.S.C. § 102(b).

2.     U.S. Patent No. 8,747,389 of Goldfarb et al., entitled "Systems for Treating Disorders of the Ear, Nose, and Throat" (Ex. 1007) ("Goldfarb") was filed on August 24, 2007 and issued on June 10, 2014.  It is pre-AIA 35 U.S.C. § 102(e) prior art for claims entitled to the benefit of the May 16, 2008 provisional filing date, and § 102(b) prior art for claims that are not so entitled.

3.     U.S. Patent No. Publication No. 2006/0063973 of Makower et al.,

21

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

entitled "Methods and Apparatus for Treating Disorders of the Ear Nose and Throat" (Ex. 1008) ("Makower") was published on March 23, 2006. It is prior art under pre-AIA 35 U.S.C. § 102(b).

4.    U.S. Patent No. 4,915,691 of Jones entitled "Aspirator" (Ex. 1009) ("Jones") issued on April 10, 1990. It is prior art under pre-AIA 35 U.S.C. § 102(b).

## IX.    STATEMENT OF NON-REDUNDANCY

At the outset, we note that ongoing IPR2017-00498 only addresses Albritton device claims 1-7 and 14-20, whereas the present petition addresses method claims 8-13. This Petition thus involves a different group of claims.

The grounds in this Petition also rely upon different references and combinations of references.

Ground 1 relies on Ressemann and Goldfarb to render claims 8 and 11-13 unpatentable for obviousness under 103(a). Ressemann, a prior art reference that was <u>not</u> cited during prosecution of the Albritton patent, teaches the claimed method, and in particular teaches grasping a handle and simultaneously advancing a working device with a single hand. Ressemann, however, does not teach the use of suction. Goldfarb is a 102(e) prior art reference (for claims entitled to the benefit of the May 16, 2008 provisional filing date) that discloses a device similar

22

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

to Ressemann, but that includes a thumb/finger port for controlling suction. Goldfarb was cited during prosecution, however it was never relied on as the basis for a rejection.

Ground 2 relies on Makower and Jones to render obvious claims 8-13. Makower teaches a method that includes use of a guide catheter having a handle that is formed to allow a working device to be controlled in the claimed manner, and that includes a thumb/finger port for controlling suction. Makower, however, does not explicitly state that the thumb or index finger of the same hand are used to control an amount of suction coupled to the distal opening of the lumen. Jones, a 102(b) prior art reference that was <u>not</u> cited, teaches using the thumb to cover a thumb port in the handle for controlling suction.

Thus the references disclose certain different elements with proposed invalidity grounds presented in different ways. The grounds are also directed to different groups of claims and contain different teachings regarding use of different guide catheter systems and thus, could not be considered redundant.

## X.    STATEMENT OF PRECISE RELIEF REQUESTED

Petitioner respectfully requests that claims 8-13 of Albritton (Ex. 1001) be held invalid based on the following grounds of unpatentability:

APP.0431

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

| Ground | Relied-on Reference | Statutory Basis | Claims |
|--------|--------------------|-----------------|--------|
| 1 | Ressemann and Goldfarb | 35 U.S.C. § 103 | 8 and 11-13 |
| 2 | Makower and Jones | 35 U.S.C. § 103 | 8-13 |

## XI.   CLAIM-BY-CLAIM EXPLANATION OF GROUNDS FOR UNPATENTABILITY

### A.   Ground I - Claims 8 and 11-13 Are Obvious Over Ressemann in view of Goldfarb

#### 1.   Independent Claim 8

As demonstrated below, claim 8 should be found to be invalid pursuant to 35 U.S.C. § 103(a) as being obvious over Ressemann in view of Goldfarb.  *See also*, Ex. 1004, ¶ 51, and Ex. 1005, ¶ 81.

#### a.   Limitation:  *"A method, comprising:"*

| 8. A method comprising: | *See, e.g.*, Ressemann, Abstract ("[a] method of treating a constricted sinus passageway of a patient …."). |
|-------------------------|--------------------------------------------------------------------------------------------------------------|

To the extent the preamble is considered to be a limitation of the claim, Ressemann discloses a method.  *See also*, Ex. 1004, ¶ 52, and Ex. 1005, ¶ 84.

#### b.   Limitation:  *"inserting a guide catheter …"*

| inserting a guide catheter through an external body passage of a subject, wherein the guide catheter comprises a substantially rigid shaft, a | "A guide catheter is inserted through the nasal passageway, the guide catheter including a wire guide slidably disposed within a lumen contained therein."  Ressemann, ¶ [0012]; s*ee also id.,* Figure 11D (reproduced below showing the guide catheter |
|---|---|

24

APP.0432

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

| proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening; | 18 inserted through a sinus passage).  FIG. 11D<br><br>"[T]he guide catheter 18 includes a shaft portion 18a and a flexible tip portion 18b. The tip portion 18b is preferably of a softer material than the shaft portion 18a." Ressemann, ¶ [0099].<br>"Alternatively, the shaft portion 18b of the guide catheter 18 can be formed of a metallic tube." *Id.*, ¶ [0101]. |
|---|---|

As shown in Figure 11D above, Ressemann teaches inserting a guide catheter 18 through an external body passage (the maxillary sinus ostium MO) of a subject. Since the tip portion 18b is more flexible than the shaft portion 18a, and can be made from a metallic tube, the guide catheter 18 is substantially rigid. Ressemann, ¶ [0101]. As further shown in Figure 11D above, a wire guide 24

25

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

extends from both ends of the guide catheter 18, and thus the guide catheter 18 has a lumen extending between a proximal opening and a distal opening.  Ex. 1004, ¶ 54, and Ex. 1005, ¶ 86; *see also id*., ¶ [0028] ("a guide catheter for guiding one or more devices … includes an elongate shaft … including a lumen passing from the proximal region to the distal region ….").

Accordingly, Ressemann teaches the guide catheter inserting step of claim 8. *See also*, Ex. 1004, ¶ 55, and Ex. 1005, ¶ 87.

> c.    Limitation:  *"coupling a source of suction to the lumen through the handle"*

| coupling a source of suction to the lumen through the handle; | Goldfarb explains that "[a]n irrigation and/or suction tube 54 may be attached to the handle member 48a to infuse fluid through or suction fluid and debris through the fluid channel 52." Goldfarb, 11:19-22. |
|---|---|

At the outset, this limitation refers to "the handle," however there is no antecedent basis for the handle.  For purposes of this Petition, we assume that claim 8 should read "a handle."

While Ressemann does not teach the use of suction, it would have been obvious to modify Ressemann in view of Goldfarb to couple a source of suction to the lumen through the handle for suctioning fluid through the lumen of the guide catheter.

26

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

At the outset, Ressemann explains that the devices can be configured to "facilitate the infusion and delivery of one or more therapeutic and/or diagnostic agents at the site of the dilation balloon 10." Ressemann, ¶ [0110]. As explained in the attached Levine Declaration, saline can be considered to be an adjunct to a diagnostic agent, and any delivery of saline would require suction to remove the saline and maintain a dry field. *See* Ex. 1004, ¶¶ 56-57. Accordingly, Ressemann's teaching to deliver a diagnostic agent as a fluid would require suction.

Goldfarb, like Ressemann, discloses various devices and methods for treating sinusitis. *See, e.g.*, Ressemann, ¶ [0001] ("The field of the invention generally relates to devices and methods for the treatment or amelioration of sinusitis."); *see also* Goldfarb, 1:25-28 ("The present invention relates generally to medical devices and methods and particularly to balloon catheters [or] other devices that may be inserted through the nose and used to dilate the ostia of paranasal sinuses for treatment of sinusitis."). In particular, Ressemann and Goldfarb both disclose guide catheters that receive a guide wire for guiding a balloon catheter into a body passage. *Compare, e.g.*, Ressemann, ¶ [0024] ("[A] system for manipulating a guide catheter within a patient's nasal passages or sinus cavities is provided…. The system include a guide catheter … having a lumen

27

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

passing therethrough and a wire guide slidably disposed within the lumen …."); *with* Goldfarb, 2:32-33 and 46-47 ("[T]here is provided a dilation catheter device and system … [having] a guide catheter through which the dilation catheter is inserted …."). Accordingly, Ressemann and Goldfarb are analogous and in the same field of endeavor.

While Ressemann and Goldfarb disclose similar methods and devices, Goldfarb further discloses the use of suction. In discussing a guide catheter having an optional handle, Goldfarb explains that "a pinch valve or hole can be strategically placed in handle 48 to actuate/allow control of suction or fluid delivery via handle device (e.g., the user may pinch the handle with fingers to restrict flow through handle) or the handle 48 may have a suction hole where the user must cover the suction hole to actuate suction through the optional handle 42." Goldfarb, 11:6-12. Goldfarb further explains that "[a]n irrigation and/or suction tube 54 may be attached to the handle member 48a to infuse fluid through or suction fluid and debris through the fluid channel 52." *Id.*, 11:19-22. Goldfarb therefore discloses coupling a source of suction to the lumen through a handle.

It would have been obvious to a POSA to modify Ressemann in view of Goldfarb to couple a source of suction to the lumen through the handle because such a modification is merely a use of known technique to improve a similar

28

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

device or method in the same way. *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."); Ex. 1004, ¶ 57.  As explained in the attached declarations, the use of suction was well known in the art at the time of any invention in Albritton, and Goldfarb is just one example of a prior art reference that teaches the use of suction.  *See* Ex. 1004, ¶¶ 20-24, and Ex. 1005, ¶ 88.

A POSA would have been motivated to make the proposed modification because the prior art makes it clear that suction was often required in order to improve visibility and maintain a dry field.  Ex. 1004, ¶ 57.  Visibility is important since sinus surgery is performed using a very small endoscope (2.7-4 mm).  *See Id.*, ¶ 22.  As Dr. Levine testified, any blood, mucus, or fluid in the sinuses will hinder visibility and even small amounts of blood and fluid can interfere with visibility.  *See id.*  Suction is used to enable the surgeon to clearly view the normal anatomy being operated upon and pathology to be removed.  *See id.*  Ressemann recognized the importance of visibility as demonstrated by the disclosed use of an illumination member (158) designed to improve visibility.  *See* Ressemann, ¶ [0125] ("To further aid in the identification of the maxillary sinus ostium MO,

29

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

particularly in the case of occlusion (156) associated with sinusitis, the maxillary sinus MO is illuminated with the placement of a small illumination member (158) into the sinus."); *see also* Ex. 1004, ¶ 57.  Further, as explained in the Kesten Declaration, "rhinologists realize the vital ***necessity*** of a clean field in which to work."  Ex. 1005, ¶ 88, citing Putney (Kesten Declaration Ex. AB) at 206 (emphasis added); *see also, e.g.,* U.S. Patent No. 7,654,997 of Makower et al., 20:44-50 (attached hereto as Ex. 1014) (explaining that a suction tube can be used during sinus surgery "for maintenance of a substantially dry environment …."); Ex. 1004, ¶¶ 22, 27 and 69.

Given a POSA's knowledge that suction was well known and often required, especially in the field of sinus surgery, there were only a finite number of identified, predictable solutions with a reasonable expectation of success.  While a separate suction apparatus could be used, we explain in more detail below in Section XI.A.1.f that both Ressemann and Goldfarb tout devices operable with a single-hand.  As such, a POSA would *not* have been motivated to use a separate suction device that would require use of an additional hand, especially considering that the other hand is already in use holding an endoscope.  Ex. 1004, ¶ 24. Instead, a POSA would have been motivated to add suction in a manner that continued to allow for single-handed operation of the device.  *Id.*  The addition of a

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

suction hole, as taught by Goldfarb, to the handle of Ressemann would allow the

user to simply position the thumb or finger of the hand holding the device over the

hole to control suction, while simultaneously controlling the position of the guide

catheter. A POSA would understand that this would simplify the procedure, and

allow for improved visibility. Ex. 1004, ¶ 57.

Accordingly, Ressemann and Goldfarb teach this limitation of claim 8 and

provide the requisite motivation to combine. *See also*, Ex. 1004, ¶ 57, and Ex.

1005, ¶ 88.

> d.    Limitation: *"inserting a working device through a handle opening in a handle coupled to the guide catheter and into the lumen of the guide catheter,"*

| | |
|---|---|
| inserting a working device through a handle opening in a handle coupled to the guide catheter and into the lumen of the guide catheter; | "[W]ire movement guide 130 may be formed as a recessed handle" that has a "hub recess 132 that is sized to receive the hub 22 of the guide catheter 18 …." Ressemann, ¶ [0117]; *see also* Figure 11D (reproduced below showing working device (wire guide 24) inserted through a handle opening (134) in the handle (wire movement guide 130) coupled to the guide catheter 18 and into the lumen of the guide catheter 18). |

31

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412



FIG. 11D

Ressemann teaches a "wire movement guide 130 [that] may be formed as a recessed handle or the like." Ressemann, ¶ [0117], Ex. 1004, ¶58, Ex. 1005, ¶89. The handle (wire movement guide 130) has a "hub recess 132 that is sized to receive the hub 22 of the guide catheter 18," thereby coupling the handle 130 to the guide catheter 18. *Id.* The handle (wire movement guide 130) "also includes a recess 134 for receiving the steering device 26" that "is secured to the wire guide 24." *Id.* The recess 134 thus forms the claimed handle opening and the wire guide 24 forms the claimed working device. As shown in Figure 11D, the working

32

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

device (wire guide 24) is inserted through the handle opening (recess 134) in the

handle 130 coupled to the guide catheter 18 and into the lumen of the guide

catheter 18.  The distal tip of the working device (wire guide 24) is shown exiting

the distal end of the guide catheter 18.

Ressemann therefore teaches this limitation of claim 8.  *See also*, Ex. 1004,

¶ 59, and Ex. 1005, ¶¶ 89-90.

> e.    Limitation:  *"controlling a position of the guide catheter
> ... while substantially simultaneously manipulating the
> working device ..."*

| controlling a position of the guide catheter using the handle that is formed to allow the position of the guide catheter to be controlled by some or all of three fingers of a hand, while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening; and | "With the use of a wire movement guide 130, the physician can move the guide catheter 18 into a desired position (preferably with the use of endoscopic imaging, as depicted in FIG. 11D), while ***simultaneously*** advancing and/or rotating the wire guide 24 with a ***single hand***. For example, the fingers could be manipulating the wire movement guide 130 and therefore the guide catheter 18, while the thumb is able to manipulate the wire guide 24 to a desired position in the nasal cavity or sinus."  Ressemann, ¶ [0119] (emphasis added). |
|---|---|

Ressemann teaches controlling the guide catheter 18 using the handle (wire

movement guide 130).  Ressemann, ¶ [0119] ("With the use of a wire movement

guide 130, the physician can move the guide catheter 18 into a desired

position[.]").  Ex. 1004, ¶ 60, Ex. 1004, ¶ 91.

33

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

While the remainder of this limitation of Albritton merely recites functional language, Ressemann is not only capable of performing the claimed function, but Ressemann explicitly teaches performing the claimed function.  In particular, Ressemann teaches a handle (wire movement guide 130) that is grasped such that the position of the guide catheter 18 is controlled by some or all of three fingers of a hand, and the working device (wire guide 24) is simultaneously manipulated with the thumb of the hand via a portion of the working device (wire guide 24) immediately adjacent to the handle opening (recess 134).  *See* Ex. 1004, ¶ 62, Ex. 1004, ¶ 93.  Thus, Ressemann would disclose this element under any construction applied to claim 8.  Moreover, since the index finger would have supported the handle by applying oppositional force while the thumb would have been manipulating the working device (wire guide 24), under Patent Owner's claim interpretation which Petitioner adopts herein, Ressemann teaches "manipulating the working device with a thumb and index finger of the hand."  Ex. 1004, ¶¶ 63-64.

Accordingly, Ressemann teaches this limitation of claim 8 of Albritton.  *See also*, Ex. 1004, ¶ 65, and Ex. 1005, ¶¶ 91-95.

f.    Limitation:  *"controlling the position of the guide catheter … while substantially simultaneously controlling … an amount of suction"*

34

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

| | |
|---|---|
| controlling the position of the guide catheter using the handle, while substantially simultaneously controlling, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen. | "[S]ome embodiments may have just a valve and a thumb/finger hole to control the suction force as described above." Goldfarb, 11:33-35; *see also id.* 11:6-12 ("a pinch valve or hole can be strategically placed in handle 48 to actuate/allow control of suction or fluid delivery via handle device (e.g., the user may pinch the handle with fingers to restrict flow through handle) or the handle 48 may have a suction hole where the user must cover the suction hole to actuate suction through the optional handle 42.") |

As explained above, Ressemann does not teach the use of suction, but Goldfarb is an analogous device and provides just one example of a prior art reference that teaches the use of suction. A POSA would have found it obvious to add a suction vent or hole in the handle (wire movement guide 130) of Ressemann, as taught by Goldfarb. *See* Ex. 1004, ¶¶ 66-67; Ex. 1005, ¶¶ 96-97. Such a POSA would have controlled the guide catheter and simultaneously controlled suction with the thumb or index finger of the same hand. *See* Ex. 1004, ¶ 68.

At the outset, both Ressemann and Goldfarb make it clear that single-handed use of the device is desirable. Ressemann explains that "[t]he wire movement guide 130 advantageously permits the physician to use his or her other hand to independently manipulate another tool …[.]" Ressemann, ¶ [0119]. Ressemann further explains that the "wire movement guide 130 . . . is used to facilitate *one-handed* movement of both the wire guide 24 and the guide catheter 18." *Id.* at ¶

35

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

[0117] (emphasis added).  Goldfarb similarly explains that "an optional handle may be attached to the dilation catheter or to a guide catheter through which the dilation catheter is inserted and such handle may be graspable along with another device (e.g., an endoscope) by a ***single hand***.  In this manner, the operator may control the dilation catheter and another device (e.g., an endoscope) with ***one hand*** while being free to use his other hand for other purposes."  Goldfarb, 2:45-51 (emphasis added); *see also, id*., 9:34-37 ("Because the exteriorized portion of the system is substantially rigid and is typically less than 15 cm in length, the operator may use a single hand to hold the endoscope as well as the dilation catheter/guide catheter system.").  In discussing one embodiment of the handle, Goldfarb explains that "[t]he handle 48 serves to facilitate grip and control to manipulate the dilation catheter along with a separate device (e.g., an endoscope or other tool) ***without having to use second hand***.  In this manner, the user may adjust rotation of a guide catheter while observing under endoscope (***all with one hand***) and use other hand to advance and place the guidewire or other device."  *Id.*, 10:63-11:2 (emphasis added).

Goldfarb further teaches that "a ***pinch valve or hole*** can be strategically placed in handle 48 to actuate/allow control of suction or fluid delivery via handle device (e.g., the user may pinch the handle with fingers to restrict flow through

36

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

handle) or the handle 48 may have a suction hole where the user must cover the

suction hole to actuate suction through the optional handle 42." Goldfarb, 11:6-12

(emphasis added). Goldfarb additionally states that "some embodiments may have

just a valve and a thumb/finger hole to control the suction force as described

above." *Id.*, 11:32-34. Thus, Goldfarb provides ample motivation for adding

suction to a balloon catheter. Taking into consideration Goldfarb's desire to grasp

and control the guide catheter device using a single hand, in combination with

Goldfarb's teaching of a thumb/finger hole for controlling suction, a POSA would

have recognized that Goldfarb teaches a device that allows for *simultaneous*

manipulation of the guide catheter while controlling suction using a thumb or

finger of the same hand. *See* Ex. 1004, ¶ 68.

A POSA would have found it obvious to modify Ressemann in view of

Goldfarb to include a thumb/finger hole in the handle for controlling suction

through the lumen of the guide catheter for all of the same reasons set forth above

in Section XI.A.1.c. *See also*, Ex. 1004 ¶ 57, and Ex. 1005, ¶ 88. In particular,

control of suction using a thumb/finger of a hand holding a device equipped with

suction was well known in the art at the time of any invention in Albritton, as

explained in the Levine and Kesten Declarations. *See* Ex. 1004, ¶¶ 21-24, and Ex.

1005, ¶¶ 51-53. These types of ports or vents were commonly applied in the field

37

APP.0445

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

and described extensively in the prior art. Numerous references, collectively referred to in the Levine and Kesten Declarations as the "suction port references," disclosed such openings or vents. *See* Ex. 1004, ¶ 69, and Ex. 1005, ¶ 53.

A POSA would have been motivated to add suction to the Ressemann device at least because the use of suction was standard, especially in the field of sinus surgery. *See supra section* XI.A.1.c; *see also* Ex. 1004, ¶ 21. Moreover, Goldfarb suggested the use of suction in a device used for the same type of procedure as Ressemann.

Given a POSA's knowledge that suction was well known and required, there were only a finite number of identified, predictable solutions with a reasonable expectation of success. Since both Ressemann and Goldfarb disclose similar devices designed to be operated using a single hand, and Goldfarb makes it clear that a thumb/finger hole can be used on such devices for controlling suction, the addition of such a feature to Ressemann would have been obvious and predictable. Ex. 1004, ¶¶ 57 and 66-67; Ex. 1005, ¶ 97. Moreover, the addition of such a suction port would result in substantially simultaneous control of the guide catheter and suction, as required by claim 8. *See* Ex. 1004, ¶ 68.

Accordingly, for all of these reasons as discussed above, claim 8 is invalid under 35 U.S.C. § 103(a) as being obvious over Ressemann in view of Goldfarb.

APP.0446

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

*See also*, Ex. 1004, ¶ 70, and Ex. 1005, ¶ 98.

## 2.  Dependent Claims 11-13

### a.  *Dependent Claim 11*

Claim 11 depends from claim 8 and recites that the opening is a first opening, and wherein controlling the amount of suction comprises controlling the amount of suction coupled to the distal opening of the lumen using a second opening in the opening.

At the outset, Petitioner notes that claim 11 recites a feature (namely, a second opening) that was not disclosed in the provisional application filed on May 16, 2008, and therefore claim 11 has an earliest priority date of May 18, 2009. Goldfarb is thus prior art pursuant to 35 U.S.C. § 102(b) with respect to claim 11, as well as claims 12-13 which depend therefrom.

Petitioner also notes that claim 11 recites "a second opening in the opening." Petitioner assumes this is a typographical error, and that Albritton intended to recite a second opening *in the handle*, similar to claim 4.  To the extent that the Patent Owner asserts otherwise, Petitioner reserves the right to rebut any contrary interpretations.

Petitioner further notes that it is unclear which "opening" of claim 8 the present claim is referring to – the proximal opening, the distal opening, or the

39

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

handle opening.

Regardless, as explained above Ressemann discloses a proximal opening, a distal opening, and a handle opening. Any one of these forms a first opening, as required by claim 11. As further explained above with respect to claim 8, it would have been obvious to modify Ressemann to add a "thumb/finger hole to control the suction force," as taught by Goldfarb. Goldfarb, 11:33-34. The thumb/finger hole would form a second opening used to control suction. *See* Ex. 1004, ¶ 73, and Ex. 1005, ¶ 101.

Accordingly, Ressemann and Goldfarb teach a first opening and a second opening ("thumb/finger hole") in the handle for controlling an amount of suction using a thumb or finger, as required by claim 11.

Claim 11 is therefore invalid under 35 U.S.C. § 103(a) as being obvious over Ressemann in view of Goldfarb. *See also*, Ex. 1004, ¶ 74, and Ex. 1005, ¶ 102.

> b. *Dependent Claim 12*

Claim 12 depends from claim 11 and recites that the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction.

The second opening, i.e., the thumb port, in Ressemann (as modified in view of Goldfarb) would have had to be positioned in a path of a flow of suction

40

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

between the distal opening of the guide catheter and the source of suction, as required by claim 12. Such a configuration would have been required in order to allow an amount of suction to be controlled. *See also*, Ex. 1004, ¶ 76, and Ex. 1005, ¶ 104.

Claim 12 is therefore invalid under 35 U.S.C. § 103(a) as being obvious over Ressemann in view of Goldfarb. Ex. 1004, ¶ 77, and Ex. 1005, ¶ 105.

### c. Dependent Claim 13

Claim 13 depends from claim 11 and recites coupling the handle to the guide catheter.

Resseman teaches a hub recess 132 for seating the hub on the guide catheter. Ressemann, ¶ [0117] ("In a preferred embodiment, the recessed handle 130 includes a hub recess 132 that is sized to receive the hub 22 of the guide catheter 18. For example, the hub recess 132 may be sized to frictionally secure the hub 22 within the same. Alternatively, one or more detents, tabs, or the like may be positioned on the hub recess 132 and/or hub 22 to releasably secure wire movement guide to the hub 22 of the guide catheter 18."). Since the hub on the guide catheter is *releasably secured* within the hub recess in the handle 130, Ressemann teaches coupling the handle to the guide catheter. Ex. 1004, ¶ 79; Ex. 1005, ¶ 107.

41

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

Claim 13 is therefore invalid under 35 U.S.C. § 103(a) as being obvious over Ressemann in view of Goldfarb. *See also*, Ex. 1004, ¶ 80, and Ex. 1005, ¶ 108.

In sum, claims 8 and 11-13 should be found to be invalid pursuant to 35 U.S.C. § 103(a) as being obvious over Ressemann in view of Goldfarb.

## B.    Ground II – Claims 8-13 Are Obvious Over Makower in view of Jones

### 1.    Independent Claim 8

As demonstrated below, Makower in view of Jones provides another example of prior art that renders invalid claim 8 of Albritton. *See also*, Ex. 1004, ¶¶ 81-84 and 105, and Ex. 1005, ¶¶ 109-112.

#### a.    Limitation:  *"A method, comprising:"*

| 8. A method comprising: | *See, e.g.*, Makower, Abstract ("Methods and apparatus for treating disorders of the ear, nose, throat or paranasal sinuses.").  "FIGS. 27C through 27D show various steps of a method of dilating an anatomical region using the surgical hand tool shown in FIGS. 27A and 27B." *Id.* at ¶ [0222]. |
|---|---|

To the extent the preamble is considered to be a limitation of the claim, Makower discloses a method. *See also*, Ex. 1004, ¶ 85, and Ex. 1005, ¶ 113.

#### b.    Limitation:  *"inserting a guide catheter ..."*

| inserting a guide catheter through an external body passage of a subject, wherein the guide catheter | "Surgical hand tool 2700 is positioned such that the distal tip of surgical hand tool 2700 is located near an anatomical region to be accessed."  Makower, ¶ [0223]; *see also*, Fig. 27B (reproduced below). |
|---|---|

42

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

| comprises a substantially rigid shaft, a proximal opening, a distal opening and a lumen extending between the proximal opening and the distal opening; | |
|---|---|
| | "[G]uide catheter 2714 comprises an elongate tubular element 2716 …. The proximal region of tubular element 2716 may be covered by a hypotube 2718 made of … metals …." Makower, ¶ [0222]. |

Fig. 27 B

Makower discloses "endoscopic guide systems that generally comprise tubular guides (e.g., rigid, flexible and/or malleable guide catheters) …." Makower, ¶ [0009]. "[S]uch guide systems are used to facilitate trans-nasal advancement of a guidewire, catheter, instrument or other device to a position within or near an opening or a paranasal sinus (e.g., any transnasally accessible opening …)." *Id.* Makower therefore discloses a substantially rigid guide catheter that is inserted through an external body passage of a subject. Ex. 1004, ¶¶ 87-88, Ex. 1005, ¶¶ 114-16. Since the guide catheter is an elongate tubular element, and receives a guidewire and balloon catheter therethrough, as shown in Figure 27B, the guide catheter 2714 has a proximal opening, a distal opening, and a lumen extending between the proximal opening and the distal opening. Ex. 1004, ¶ 89, and Ex. 1005, ¶ 117.

Accordingly, Makower teaches the guide catheter inserting step of claim 8.

43

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

*See also*, Ex. 1004, ¶ 90, and Ex. 1005, ¶ 118.

> c.    Limitation:  *"coupling a source of suction to the lumen
>       through the handle"*

| coupling a source of suction to the lumen through the handle; | "Any of the guide catheters or other luminal devices disclosed herein may comprise an arrangement for suctioning an anatomical region through the distal end of the guide catheter or device unless to do so would render the device unuseable for its intended purpose."  Makower, ¶ [0167]. |
|---|---|

At the outset, this limitation refers to "the handle," however there is no antecedent basis for the handle.  For purposes of this Petition, we assume that claim 8 should read "a handle."

Figure 27B of Makower illustrates a surgical hand tool that includes an elongate body 2702 and a handle 2724, which together form the claimed handle. Makower explains that "[i]n embodiments where the catheter or other balloon equipped device has a lumen useable for passage of a guidewire or other device or substance, the inflator handpiece device may incorporate a port or passage to permit a guidewire or other device to be advanced through that lumen and/or to permit fluids to be infused or suction applied through that lumen."  Makower, ¶ [0016].  Since Makower teaches that any of the guide catheters can include an arrangement for suctioning an anatomical region, and that the handpiece device

44

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

may incorporate a port for suction, Makower therefore teaches coupling a source of

suction to lumen through the handle.  Ex. 1004, ¶ 91, Ex. 1005, ¶ 120.

Accordingly, Makower teaches this limitation of claim 8.  *See also*, Ex.

1004, ¶ 91, and Ex. 1005, ¶ 121.

> d.    Limitation:  *"inserting a working device through a handle opening in a handle coupled to the guide catheter and into the lumen of the guide catheter,"*

| inserting a working device through a handle opening in a handle coupled to the guide catheter and into the lumen of the guide catheter; | "Surgical hand tool 2700 is positioned such that the distal tip of surgical hand tool 2700 is located near an anatomical region to be accessed.  Thereafter, a guidewire 2710 is introduced through surgical hand tool 2700 such that the distal tip of guidewire 2710 is located near an anatomical region to be accessed…. Thereafter, in FIG. 27D, balloon catheter 2704 is advanced over guidewire 2710 into the anatomy." Makower, ¶ [0223]; s*ee also*, Figures 27C and 27D, reproduced below.<br><br>Fig. 27 C    Fig. 27 D |

APP.0453

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

Makower explains that the surgical hand tool 2700 shown in Figure 27A-27D comprises a hollow proximal body 2702 having a handle 2724. *See* Makower, ¶ [0224]. As previously explained herein, the body 2702 and handle 2724 form the claimed handle. Since the body 2702 is hollow, Makower discloses a handle having a handle opening. Ex. 1004, ¶ 92, Ex. 1005, ¶ 123.

As noted above, Makower further teaches introducing a guidewire 2710 through the surgical hand tool 2700, and also advancing a balloon catheter 2704 over the guidewire. This is illustrated in Figures 27C and 27D above, which show both the guidewire and the balloon catheter being advanced through the handle and guide catheter. Accordingly, the guidewire and the balloon catheter are both working devices that are inserted through a handle opening in the handle and through a lumen of the guide catheter coupled to the handle. Ex. 1004, ¶ 93, Ex. 1005, ¶ 124.

Makower therefore teaches this limitation of claim 8. *See also*, Ex. 1004, ¶ 94, and Ex. 1005, ¶ 124.

> e.    Limitation: *"controlling a position of the guide catheter … while substantially simultaneously manipulating the working device …"*

| controlling a position of the guide catheter using the handle that is formed to allow the position of the guide catheter to be controlled by some or all | "[T]here are provided inflator handpiece devices that are … configured to be ***useable by a single hand***, thereby freeing the operators other hand for |
|---|---|

46

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

| | |
|---|---|
| of three fingers of a hand, while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening; and | handling of other instruments or performing other tasks." Makower, ¶ [0016]. "[I]n FIG. 27D, balloon catheter 2704 is advanced over guidewire 2710 into the anatomy. This is done by pushing balloon inflation port 2706 in the distal direction." *Id*. ¶ [0223]. |

Since Makower teaches a hand piece, e.g., hand tool 2700, formed in the shape of a pistol that is intended to be used by a single hand, and Makower teaches that surgical hand tool 2700 (and thus the guide catheter 2714 of the hand tool) is "positioned such that the distal tip of surgical hand tool 2700 is located near an anatomical region to be accessed," Makower therefore teaches controlling a position of the guide catheter 2714 using the handle. Makower, ¶ [0223].

While the remainder of this limitation is merely functional language, Makower teaches that the handle is "formed to allow" the position of the guide catheter to be controlled by some or all of three fingers of a hand, while substantially simultaneously manipulating the working device with a thumb and index finger of the hand via a portion of the working device immediately adjacent to the handle opening. In fact, not only is Makower's pistol-grip handle *capable* of performing the claimed function, Makower's handle has the same structure as the one disclosed by Albritton and was designed to perform the claimed function. Ex. 1004, ¶¶ 96-99, Ex. 1005, ¶ 109. Thus, Makower would disclose this element even

47

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

if a narrower interpretation is applied.

Since hand tool 2700 has a pistol-style configuration and is intended to be held by a single hand of a user, a POSA would have positioned some or all of three fingers of a hand around the handle 2724 to control the position of the guide catheter 2714. *See* Ex. 1004, ¶ 96, Ex. 1005, ¶ 126. A POSA would have also substantially simultaneously controlled a working device with the thumb and index finger of the same hand holding the device. *See* Ex. 1004, ¶ 97, Ex. 1005, ¶ 127. For example, Makower explains that the inflation port 2706 on the balloon catheter 2704 emerges through a slit 2708 formed in a side of the body, and is pushed in a distal direction to advance the balloon catheter. *See* Makower, ¶ [0223]. A POSA would have used one of the thumb or index finger of the hand holding the device to provide oppositional support to the handle, while the other one of the thumb or index finger is used to push the inflation port 2706 on the balloon catheter 2704. *See id.*, ¶ [0222]; *see also* Ex. 1004, ¶ 97, Ex. 1005, ¶ 127. Such control of the working device (balloon catheter) would have been done while holding and controlling the position of the guide catheter 2714, and thus would be done "substantially simultaneously." *See* Ex. 1004, ¶ 97, Ex. 1005, ¶ 128. Moreover, since the inflation port 2706 extends from the handle opening in the hollow proximal body 2702, the user would have manipulated the working device (balloon

48

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

catheter) "immediately adjacent to the handle opening," as further required by claim 8.

Similarly, a user could have manipulated the guide wire using the thumb and index finger of the hand holding the device. Makower explains that the guidewire includes a torqueing device 2712 and that "[a] user can use torqueing device 2712 to rotate, advance, retract, or torque the guidewire 2710." Makower, ¶ [0222]. Since Makower's handpieces are designed for single handed use, as noted above, a POSA could have used the thumb and index finger of the hand holding the device to grasp and control the torqueing device 2712 on the guidewire. Ex. 1004, ¶ 98; Ex. 1004, ¶ 129. This is especially evident when comparing the Makower device to the Albritton device, as follows:



As shown in Figure 27C of Makower, reproduced above, Makower's pistol-grip handle has a structure that is similar to the structure of Albritton's handle, shown in Figure 3 of Albritton (both reproduced above). To the extent that

49

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

Albritton's handle is "formed to allow" the guide catheter and working device to be controlled as claimed, then Makower's similar handle must likewise be "formed to allow" the guide catheter and working device to be controlled in the claimed manner. *See* Ex. 1004, ¶ 99; Ex. 1004, ¶ 130.

Accordingly, Makower teaches this limitation of claim 8 of Albritton. *See also*, Ex. 1004, ¶ 100, and Ex. 1005, ¶ 131.

> f.    Limitation: *"controlling the position of the guide catheter … while substantially simultaneously controlling … an amount of suction"*

| | |
|---|---|
| controlling the position of the guide catheter using the handle, while substantially simultaneously controlling, by one of the thumb or index finger, an amount of suction coupled to the distal opening of the lumen. | Jones discloses a "thumb control hole 28 [that] may be partially closed off with one's thumb or fully closed off to vary the amount of suction that is applied through the catheter 11." Jones, 4:35-38. |

As noted above, Makower explains that any of the guide catheters can include an arrangement for suctioning an anatomical region through the distal end of the guide catheter. *See* Makower, ¶ [0167] and ¶ [0170]. Thus, Makower itself provides a suggestion or reason for adding suction. Jones provides one example of a prior art reference that teaches a well-known method for controlling suction. In particular, Jones discloses a medical aspiration device for use in surgical procedures that includes "a body member that has a pistol grip-like shape to

50

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

conveniently fit and be held and operated in one hand of a clinician." Jones, 3:17-19. As shown in Figures 2 and 3 below (reproduced with markings), the handle includes a "thumb control hole 28 [that] may be partially closed off with one's thumb or fully closed off to vary the amount of suction that is applied through the catheter 11." *Id*., 4:35-38.



Jones explains in the "Background" section that "suctioning, or the aspiration of body fluids in medical surgico-clinical procedures, is a critical, but necessary, routine occurrence …." Jones, 1:26-28. "Most of the diverse tools that are currently utilized for suctioning body fluids in conjunction with mechanically produced vacuum (wall suction) use a thumb control or a finger-tip control as an add on to the plumbing …." Jones, 2:5-8. Jones further explains that "[o]ne hand is generally necessary to regulate the amount of suction being delivered and the

51

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

other hand is usually used to manipulate the direction and placement of the catheter within the patient." *Id.*, 2:9-13. Jones solves this problem by providing a suctioning device that "can be held and operated with one hand," and that can "accurately vary the amount of suction through a catheter by means of a conveniently located thumb control port." *Id.*, 2:49-50 and 2:52-54.

While Makower does not explicitly teach controlling suction with the thumb or index finger of the same hand holding and controlling the guide catheter, it would have been obvious to a POSA at the time of Albritton to include a suction hole in the handle at a location that would allow for control using the thumb, as taught by Jones. *See* Ex. 1004, ¶ 104, Ex. 1005, ¶ 132. The addition of a thumb hole in the handle would have necessarily resulted in the user controlling the guide catheter while simultaneously controlling, by the thumb, an amount of suction coupled to the distal opening of the lumen. *See* Ex. 1004, ¶ 103.

Jones provides both the missing element and method (an opening controlled using the thumb of a single hand) and an additional reason for a POSA to have made the modification to Makower (to remove fluids), which would have been routine. *See* Ex. 1004, ¶ 102, Ex. 1005, ¶ 134.

Any control of suction using a thumb/finger of a hand holding a device while simultaneously manipulating the device was also well known in the art at the

52

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

time of any invention in Albritton.  As explained in the Levine and Kesten

Declarations, the use of ports or vents to control suction would have been well

known to a POSA long before the time of the purported invention in Albritton.  *See*

Ex. 1004, ¶¶ 23-24, and Ex. 1005, ¶ 53.  Suction ports or vents were commonly

applied in the field and well described in the prior art.  Numerous references,

collectively referred to in the Levine and Kesten Declarations as the "suction port

references," disclosed such openings or vents.  *See* Ex. 1004, ¶ 69, and Ex. 1005,

¶¶ 53-61.

     In conclusion, for all of these reasons discussed above, claim 8 is invalid

under 35 U.S.C. § 103(a) as being obvious over Makower in view of Jones.  *See*

Ex. 1004, ¶ 105, and Ex. 1005, ¶ 137.

## 2.     Dependent Claims 9-13

### a.     *Dependent Claim 9*

     Claim 9 depends from claim 8 and recites that a longitudinal axis of the

handle forms an angle with a longitudinal axis of the guide catheter of less than

ninety degrees and more than zero degrees.

     Makower's handle has a longitudinal axis that forms an angle with a

longitudinal axis of the guide catheter of less than ninety degrees and more than

zero degrees, as required by claim 9.  *See* Ex. 1004, ¶ 106, and Ex. 1005, ¶ 138.

APP.0461

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

Figure 27C, reproduced below with markings, illustrates the angle.



Claim 9 is therefore invalid under 35 U.S.C. § 103(a) as being obvious over Makower in view of Jones. *See* Ex. 1004, ¶ 107, and Ex. 1005, ¶ 140.

> b.    *Dependent Claim 10*

Claim 10 depends from claim 8 and recites adjusting an angle between a longitudinal axis of the handle and a longitudinal axis of the guide catheter to a desired angle using a pivot on the handle.

As shown in Figure 6, reproduced below, Albritton discloses a lower portion of the handle and a "pivot 652 [that] allows the handle 650 to be rotated to a desired angular position relative to the upper portion and locked into a desired position." Ex. 1001, 5:44-46.

54

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412



**FIG. 6**

Figure 6 thus illustrates a lower portion of the handle having a longitudinal axis that can be adjusted relative to a longitudinal axis of a guide catheter (not shown).  Accordingly, when read in light of the specification, it is clear that the "longitudinal axis" of the handle is not the central longitudinal axis extending from the proximal end to the distal end, i.e., along the lumen, but instead can be any longitudinal axis of the handle.

Figure 27E of Makower illustrates a further embodiment of the surgical hand tool.  As shown in Figure 27E, reproduced below with markings, the trigger 2732 defines a longitudinal axis of the handle that is adjustable about a pivot.  *See* Makower, ¶ [0224] ("Trigger 2732 is pivoted on elongate body 2727 ….").

55

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

Makower also states that "[a]ny of the handle assemblies of the tools described herein … may comprise a rotatable handle," citing to U.S. Patent No. 5,697,159 of Linden (attached hereto as Ex. 1011), which teaches pivotable joints for movement of a handle. *See* Ex. 1011, Abstract.



Accordingly, Makower teaches moving the trigger, which will adjust an angle between the longitudinal axis of the handle (i.e., of the trigger 2732 of the handle) and a longitudinal axis of the guide catheter to a desired angle using the pivot on the handle. Ex. 1005, ¶ 142.

Claim 10 is therefore invalid under 35 U.S.C. § 103(a) as being obvious over Makower in view of Jones. *See* Ex. 1004, ¶ 110, and Ex. 1005, ¶ 144.

   *c.* *Dependent Claim 11*

Claim 11 depends from claim 8 and recites that the opening is a first

56

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

opening, and wherein controlling the amount of suction comprises controlling the amount of suction coupled to the distal opening of the lumen using a second opening in the opening.

At the outset, Petitioner again notes that claim 11 recites a feature (namely, a second opening) that was not disclosed in the provisional application filed on May 16, 2008, and therefore claim 11 has an earliest priority date of May 18, 2009. Goldfarb is thus prior art pursuant to 35 U.S.C. § 102(b) with respect to claim 11, as well as claims 12-13 which depend therefrom.

Petitioner also again notes that claim 11 recites "a second opening in the opening." As previously discussed, Petitioner assumes this is a typographical error, and that Albritton intended to recite a second opening *in the handle*, similar to claim 4. To the extent that the Patent Owner asserts otherwise, Petitioner reserves the right to rebut any contrary interpretations.

As also discussed previously, Petitioner notes that it is unclear which "opening" of claim 8 the present claim is referring to – the proximal opening, the distal opening, or the handle opening.

Regardless, as explained above Makower discloses a proximal opening, a distal opening, and a handle opening. Any one of these forms a first opening, as required by claim 11. As further explained above with respect to claim 8, it would

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

have been obvious to modify Makower to add a "thumb control hole 28 [that] may be partially closed off with one's thumb or fully closed off to vary the amount of suction that is applied through the catheter 11," as taught by Jones. Jones, 4:35-38. The thumb/finger hole would form a second opening used to control suction. *See* Ex. 1004, ¶ 112, and Ex. 1005, ¶ 146.

Accordingly, Makower and Jones therefore teach a first opening, and a second opening ("thumb control hole") in the handle for controlling an amount of suction using a thumb or finger, as required by claim 11.

Claim 11 is therefore invalid under 35 U.S.C. § 103(a) as being obvious over Makower in view of Jones. *See* Ex. 1004, ¶ 113, and Ex. 1005, ¶ 147.

>    d.    *Dependent Claim 12*

Claim 12 depends from claim 11 and recites that the second opening is positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction.

The second opening, i.e., the thumb port, in Makower (as modified in view of Jones) would necessarily have been positioned in a path of a flow of suction between the distal opening of the guide catheter and the source of suction, as required by claim 12. Such a configuration would have been required in order to allow an amount of suction to be controlled. *See* Ex. 1004, ¶ 115, and Ex. 1005, ¶

58

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

149.

Claim 12 is therefore invalid under 35 U.S.C. § 103(a) as being obvious over Makower in view of Jones.  Ex. 1004, ¶ 116, and Ex. 1005, ¶ 150.

> e.    *Dependent Claim 13*

Claim 13 depends from claim 11 and recites coupling the handle to the guide catheter.

Makower explains that the "distal region of proximal body 2702 comprises a suitable hub that allows a guide catheter 2714 to attach to proximal body 2702." Makower, ¶ [0222].  Makower further explains that "[h]ub 2720 allows the reversible attachment of guide catheter 2714 to proximal body 2702.  In one embodiment, hub 2720 is a female luer lock that [is] attached to a suitable hub on proximal body 2702.  Thus, various guide catheters can be attached to the distal region of proximal body 2702 to provide access to various anatomical regions." *Id*.  Accordingly, Makower discloses coupling the handle to the guide catheter. Ex. 1004, ¶ 118, and Ex. 1005, ¶ 152.

Claim 13 is therefore invalid under 35 U.S.C. § 103(a) as being obvious over Makower in view of Jones.  Ex. 1004, ¶ 119, and Ex. 1005, ¶ 153.

APP.0467

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

## XII. CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that Trial be

instituted and that claims 8-13 of Albritton be canceled.

December 1, 2017                         Respectfully submitted,

                                         By: / Lisa Adams/
                                         Lisa Adams, Reg. No. 44,238

                                         Back-up Counsel
                                         Peter Cuomo, Reg. No. 58,481
                                         Mintz, Levin, Cohn, Ferris, Glovsky and
                                         Popeo, P.C.
                                         One Financial Center
                                         Boston, MA 02111
                                         617-348-3054
                                         617-542-2241 fax

APP.0468

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

## CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. §42.24(d), Petitioner hereby certifies, in reliance on the word count of the word-processing system (Microsoft Office Word 2010) used to prepare this this petition, that the number of words in this paper is 11,871. This word count excludes the tables of contents, tables of authorities, grounds for standing, mandatory notices, certificate of word count, certificate of service, and list of exhibits.

Dated: December 1, 2017          _____/Lisa Adams/_____
                                  Lisa Adams, Reg. No. 44,238

Petition for *Inter Partes Review* of U.S. Patent No. 9,011,412

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Petition for

*Inter Partes* Review and all accompanying exhibits were served on December 1,

2017 by sending a copy by overnight courier, and electronic service by email

where indicated, to:

> Ashley N. Moore, Esq.
> McKool Smith, P.C.
> 300 Crescent Court, Suite 1500
> Dallas, TX 75201
> Telephone: (214) 978-4000
> Facsimile: (214) 978-4044
> amoore@mckoolsmith.com
>
>
> Robert D. McCutcheon, Esq.
> Munck Wilson Mandala
> 600 Banner Place Tower
> Dallas, TX 75251
> Tel.: (972) 628-3600
> Fax.: (646) 628-3616
> rmccutcheon@munckwilson.com

                                        /Lisa Adams/
                                        Lisa Adams, Reg. No. 44,238