# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| DR. FORD ALBRITTON, IV, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:16-cv-03340-M |
| | § | |
| ACCLARENT, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER[1]

Before the Court are the parties' various Motions to Exclude Expert Opinions [ECF Nos.

174, 198, 201, 204, 207, 212, 215], Motion to Reconsider Claim Construction [ECF No. 290],

and Cross-Motions for Summary Judgment.  [ECF Nos. 176, 180].

For the reasons explained below, Plaintiff's *Daubert* motions to exclude Dr. Brodner's

opinions regarding Defendant's late-disclosed invalidity theories, Dr. Brodner's analysis of

Claim 8 of the '412 Patent in ¶¶ 111–32 of his expert report, Matlock and Eghbal's rebuttal

testimony that was not already disclosed in their opening reports, and Inglish's cost-based

apportionment analysis are **GRANTED**.  Furthermore, Plaintiff's Motion to Compel

communications between Defendant's counsel and Matlock or Eghbal is **GRANTED**.

Defendant's Motion to Strike Dr. Holmes' "supplemental" expert report as untimely and

Defendant's *Daubert* motions to exclude Dr. Holmes' testimony related to that "supplemental"

expert report, Benoit's assessment of the applicability of punitive damages, and Benoit's

---

[1] Because this Order cites to Appendices that were filed under seal, this Order will be initially filed under seal.  If a party believes that any portion of this Order should be permanently sealed, the party should file, by March 13, 2020, a motion to seal those portions of this Order, identifying the portions to be sealed and explaining why those portions should be sealed.  The opposing party may file a response to any motion to seal by March 27, 2020.  If no motions to seal are filed by March 13, 2020, the Court will unseal this Order.

consideration of the sale of Defendant to Johnson and Johnson and Ethicon for $790.5 million are **GRANTED**.

In addition, Plaintiff's Motion for Summary Judgment of no invalidity for obviousness and to dismiss Defendant's affirmative defense of failure to state a claim is **GRANTED**. Defendant's Motion for Summary Judgment of no direct infringement of Claims 6 and 19 and no induced infringement is also **GRANTED**. In all other respects and as explained below, the parties' Motions are **DENIED**.

## I. Factual and Procedural Background

Plaintiff Dr. Ford Albritton brings this action against Defendant Acclarent, Inc., alleging patent infringement of U.S. Patent No. 9,011,412 (the "'412 Patent") and common law contract and tort claims. Plaintiff is an ear, nose, and throat surgeon who invented a surgical catheter for balloon sinuplasty procedures that a doctor could hold and operate in one hand, which he patented as the '412 Patent. Defendant is a medical device company that sells balloon sinuplasty devices, including the Relieva Spin and Relieva Spin Plus (the "Accused Devices").



[ECF No. 183-3 at ACCLAR_APP.000012].

After Plaintiff began development of his one-handed catheter device, Defendant contacted Plaintiff to discuss hiring him as a consultant. The parties entered into a nondisclosure agreement (the "NDA") to facilitate discussions, and Defendant's employees began meeting with Plaintiff to discuss each other's work. The parties eventually negotiated a consulting agreement, under which the parties continued to share information and Plaintiff tested a number of Defendant's products, including the Accused Devices.

On May 16, 2008, Plaintiff filed a provisional patent application that would eventually issue on April 21, 2015 as the '412 Patent. On September 18, 2008, Accelerant filed a provisional patent application that would eventually issue on April 9, 2013 as U.S. Patent No. 8,414,473 (the "'473 Patent"). Defendant did not disclose its patent to Plaintiff nor list him as an

inventor.  Beginning on April 23, 2015, Plaintiff attempted to license his patent to Defendant, but Defendant responded that it was not interested.

In his Amended Complaint [ECF No. 25], Plaintiff alleges that Defendant has directly infringed, induced infringement, and contributed to infringement of Plaintiff's patent, and that Defendant also breached the NDA and consulting agreement and defrauded Plaintiff.  Defendant filed a Motion to Dismiss, which the Court granted in part and denied in part, dismissing Plaintiff's contributory negligence claim.  [ECF No. 43].  Defendant also filed a petition for inter partes review ("IPR") of Claims 1–7 and 14–20 of the '412 Patent.  The petition was granted, and the Patent Trial and Appeal Board ("PTAB") instituted IPR on those claims.  Defendant then filed a second petition for IPR on Claim 8 and also sought a stay of this action pending the resolution of the IPR.  Following the filing of these petitions, Plaintiff served preliminary infringement contentions and Defendant responded with preliminary invalidity contentions.

On March 29, 2018, the PTAB denied Defendant's request to institute IPR on Claim 8, and the Court granted a stay with respect to the other Claims, but did not stay the deadlines related to Claim 8 and Plaintiff's non-patent claims.  [ECF No. 61].  The Court then conducted a claim construction of Claim 8.  [ECF No. 105].  Following the PTAB's denial of Defendant's petition for Claims 1–7 and 14–20, the Court lifted the stay and conducted claim construction for the remaining claims.  [ECF No. 147].  Following both claim constructions, Defendant served amended invalidity contentions, but the Court struck the new theories and evidence in the amended invalidity contentions as untimely.  [ECF No. 171].  The parties then filed the current Motions and have stipulated that Plaintiff will only be pursuing claims of infringement of independent Claims 1 and 14 and dependent Claims 4–7 and 17–20 of the '412 Patent.  [ECF No. 196].

## II. Legal Standard

### a. *Daubert*

Under Federal Rule of Evidence 702, a witness who is qualified as an expert may testify in the form of an opinion or otherwise if (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue, (2) the testimony is based on sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the expert has reliably applied the principles and methods to the facts of the case. When evaluating a party's challenge to an opponent's expert witness, the Court assumes the role of gatekeeper to ensure the relevance and reliability of the expert's testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Reliable testimony must be grounded "in the methods and procedures of science" and signify knowledge beyond "subjective belief or unsupported speculation." *Id.* at 590. The proponent of expert testimony must establish its reliability by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 174–76 (1987). However, the question of whether the expert is credible, or the opinion is correct, is generally a question for the fact finder, not the court. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

### b. Summary Judgment

Summary judgment is proper when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant meets its initial burden to show that there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce competent evidence showing the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A court must view all evidence in the light most favorable to the party opposing the motion. *Applied Med. Res. Corp. v. U.S. Surgical*

*Corp.*, 448 F.3d 1324, 1331 (Fed. Cir. 2006). The substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.    Motion to Exclude Portions of the Expert Report and Testimony of Dr. David Brodner

Plaintiff moves to exclude the opinions and testimony of Dr. David Brodner, Defendant's technical expert, as unhelpful and unsupported. [ECF No. 204]. Plaintiff complains of four portions of Dr. Brodner's expert report: 1) analysis of invalidity claims that the Court previously struck; 2) infringement analysis for Claim 8, which Plaintiff stipulated it would not be pursuing; 3) analysis based on a "grasping" theory of the "adapted to" limitation; and 4) analysis based on the expert reports of Matlock and Eghbal.

#### a.    Defendant's Previously Struck Invalidity Contentions

The Court previously struck multiple invalidity theories as untimely disclosed. [ECF No. 171]. Plaintiff seeks to exclude the portions of Dr. Brodner's expert report that relate to those stricken invalidity theories, including ¶¶ 38, 40, 91–102 and Exhibits C–F, because they are irrelevant and no longer helpful. Defendant agrees to the exclusions, except for Exhibit C, which relates to the Morriss System. Exhibit C is the same chart that Defendant previously disclosed in its amended invalidity contentions, and while the Court struck certain portions of those contentions, it did not strike all of Defendant's arguments regarding the Morriss System because Defendant had previously timely disclosed portions of the chart in its preliminary invalidity contentions. [ECF No. 171 at 2]. Nevertheless, Defendant argues that the portions of Exhibit C that were stricken in its invalidity contentions may nonetheless be included in Dr. Brodner's expert report to support his invalidity conclusions regarding the Morriss System.

An invalidity expert's report may include evidence and reasoning not included in the party's invalidity contentions because "contentions and expert reports [are] not coextensive."

*Mobile Telecommunications Techs., LLC v. Blackberry Corp.*, No. 3:12-CV-1652-M, 2016 WL
2907735, at *1 (N.D. Tex. May 17, 2016) (Lynn, C.J.).  In the related context of infringement
theories, this Court has noted that "[e]xpert reports may include information obtained during
discovery, including information outside the specific confines of the infringement contentions,
without altering the disclosed theory of infringement." *Id.* at *3.  Accordingly, this Court has
allowed the inclusion of infringement reasoning and analysis in a plaintiff's expert report that the
plaintiff did not include in its infringement contentions but was based on information it
subsequently obtained through discovery. *Id.*  However, the opposite has occurred here.
Defendant is not seeking to include new information in its expert report that it failed to disclose
in its invalidity contentions.  Instead, Defendant seeks to include information in its expert report
which it attempted, unsuccessfully, to include in its invalidity contentions.  Defendant may not
use its expert report to introduce the same evidence and reasoning already stricken from its
invalidity contentions.  Dr. Brodner's opinions relating to the stricken late-disclosed invalidity
contentions, including the stricken portions of Exhibit C of Dr. Brodner's expert report, are no
longer relevant or helpful, and accordingly, Plaintiff's motion to exclude them is **GRANTED**.
Dr. Brodner may testify regarding Exhibit C of his report only to the extent, if at all, that its
contents were disclosed in Defendant's timely preliminary invalidity contentions.

### b.  Dr. Brodner's Infringement Analysis

Plaintiff seeks to exclude the opinions in  ¶¶ 51 and 111–32 of Dr. Brodner's expert
report because they relate to infringement of Claim 8 of the '412 Patent, which Plaintiff will not
be pursuing.  [ECF No. 186].  Plaintiff also seeks to exclude the opinions in ¶¶ 83–86 of the
expert report, because they contain an analysis under the doctrine of equivalents that incorrectly

compares the Accused Devices with another one of Defendant's products not agreed to be covered by the '412 Patent, making the analysis unreliable and unhelpful.

Defendant agrees that the analysis in ¶¶ 111–32 relates only to Claim 8 and can be excluded. However, Defendant argues that ¶ 51 refers to the "formed to" language in Claim 8 because the Court's claim construction analyzed Claim 1 with reference to its analysis of Claim 8. [ECF No. 258 at ACCLAR_APP.0006]. While the construction of Claim 8 was not the determinative factor in the Court's construction of Claim 1, the Court interpreted "adapted to" in Claim 1 to be in harmony with "formed to" in Claim 8. [ECF No. 147 at 12]. Accordingly, Dr. Brodner's analysis of Claim 8 in ¶ 51 remains relevant. At trial, the Court will clarify that Claim 8 is not being pursued.

Dr. Brodner compares the Accused Devices with Defendant's other products to analyze the function-way-result test under the doctrine of equivalents. He compares the Accused Devices, which he claims do not perform the same function as a device that satisfies limitation 1(h), with one of Defendant's other devices that he argues does perform the same function as that limitation. [ECF No. 203-2 at APPX0227–30]. That analysis is not irrelevant to the comparison of the function of the Accused Devices with that of a device covered by the '412 Patent. Therefore, Plaintiff's motion to exclude portions of Dr. Brodner's infringement analysis is **GRANTED** as to the opinions and analyses contained in ¶¶ 111–32 of his expert report but is **DENIED** as to ¶¶ 51 and 83–86.

### c. Dr. Brodner's Analysis Based on a Grasping Theory

Plaintiff seeks to exclude portions of Dr. Brodner's infringement analysis that are premised on an allegedly improper interpretation of the Second Claim Construction Order, where the Court interpreted the "adapted to" limitation in Claims 1 and 14 to encompass a device that is

"made to, designed to, or configured to permit the operator to position a thumb and index finger of the hand to manipulate [the/a] working device at a portion of the working device immediately adjacent to the handle opening." [ECF No. 147 at 10]. The Court rejected Defendant's attempt to limit the construction to require that the thumb and index finger "grasp" the working device. [*Id.* at 13]. Dr. Brodner opines that a device that only allows either the thumb or index finger to touch the working device does not satisfy the limitation because both the thumb and index finger are required to touch the working device. [ECF No. 203-2 at APPX0247]. However, Plaintiff contests that the only way the thumb and index finger could both touch the working device is by grasping it, a construction which the Court already rejected.

As described below, Defendant seeks summary judgment of non-infringement as to Plaintiff's Single-Digit Theories of infringement, in which only the thumb or index finger, but not both, touch the working device, citing Dr. Brodner's analysis and conclusion that both the thumb and index finger have to touch the working device to satisfy the "adapted to" limitation. However, for reasons discussed below, the Court denies that Motion for Summary Judgment and finds that a reasonable jury could find that a device that only allows the thumb or the index finger, but not both, to touch the working device satisfies the "adapted to" limitation. However, a reasonable jury could also find that only a device that allows both the thumb and index finger to touch the working device satisfies the "adapted to" limitation. Accordingly, Dr. Brodner's analysis remains relevant as a competing application of the Court's claim construction to the Accused Devices.

Furthermore, Dr. Brodner's analysis does not improperly interpret the Court's claim construction. As described more fully below in the discussion of the parties' Motions for Summary Judgment, the Second Claim Construction Order does not necessarily state that both

the index finger and thumb need to directly touch the working device simultaneously. Accordingly, Dr. Brodner's infringement analysis opining that the Accused Devices do not satisfy the "adapted to" limitation when only the thumb or index finger, but not both, touch the working device is not irrelevant or unreliable, and Plaintiff's motion to exclude those opinions is **DENIED**.

### d.  Analysis Based on the Expert Reports of Matlock and Eghbal

Plaintiff has separately moved to exclude the analysis of Defendant's experts, Matlock and Eghbal, and Plaintiff seeks to exclude the portions of Dr. Brodner's analysis that rely on the excluded conclusions of those experts.  As described below, the Court does not exclude Matlock and Eghbal's analyses and conclusions, and accordingly, Plaintiff's motion to exclude the analysis in Dr. Brodner's expert report that cites Matlock and Eghbal's opinions is also **DENIED**.

### IV.  Motion to Exclude Portions of the Expert Report and Testimony of Dr. Howard Levine

Plaintiff moves to exclude certain opinions and testimony of Dr. Howard Levine, Defendant's responsive technical expert.  [ECF No. 198].

### a.  Late-Disclosed Invalidity Contentions

Plaintiff seeks to exclude the contents of ¶¶ 36–39, 42–44, 53, 56, 111, 153–56, and 189 of Dr. Levine's expert report, claiming that they contain late-disclosed invalidity contentions. Notably, none of the paragraphs involve an explicit invalidity analysis.  Only in his Reply does Plaintiff clarify that the basis of his motion to exclude those paragraphs is because they analyze prior art that was the subject of invalidity theories that the Court has stricken.  However, these paragraphs consider the prior art for purposes unrelated to arguing invalidity.

Plaintiff argues ¶¶ 43 and 44 discuss the fact that Dr. Levine had not previously seen a device similar to Figures 3–6 of the '412 Patent, which actually would support the validity of the '412 Patent.  [ECF No. 281-1 at APPX0012].  Similarly, ¶ 111 also would support the validity of the '412 Patent because, in analyzing the contribution of other patents to the balloon sinuplasty field, Dr. Levine opines that he "know[s] of no current or past product on the market that embodies the technology that the '412 Patent claims."  [ECF No. 281-1 at APPX0035].

Paragraphs 36–38, 42, 153–56, and 189 contain Dr. Levine's analysis of confidential information.  In ¶¶ 153–56, Dr. Levine analyzes whether "using a 'lever' to manipulate a guidewire is not confidential [under the NDA or consulting agreement] because it was already well known to Acclarent and the public" and he notes the inclusion of similar mechanisms in the Morriss and Ressemann Systems.  [*Id.* at APPX0050–51].  Several paragraphs discuss whether the information in the '412 Patent was confidential under the NDA or consulting agreement. Paragraphs 36–38 discuss the similarity of the information in the '412 Patent to the Morriss System, which was previously "publicly disclosed."  [*Id.* at APPX0009–10].  Similarly, ¶ 42 states that the suction control feature of the '412 Patent "was something well understood and utilized in countless surgical tools."  [*Id.* at APPX0011].  These points are reinforced in ¶ 189, in which Dr. Levine concludes that "Fig. 2 of the '412 Patent . . . cannot be confidential because, in my opinion, it is substantially the same as the design from a 2005 lab notebook entry by Acclarent engineer, John Morriss."  [*Id.* at APPX0067].  These parts of Dr. Levine's conclusions are unrelated to invalidity of the '412 Patent.

Finally, ¶¶ 53 and 56 relate to the contribution of the '412 Patent to the Accused Devices. While those paragraphs discuss what new technologies the '412 Patent may include, they also determine whether "any such new technologies from the '412 Patent are embodied in the

[Accused Devices]." [*Id.* at APPX0014]. Dr. Levine is not opining to what extent the '412 Patent is valid. Instead, he is identifying what features to focus on when comparing the '412 Patent to the Accused Devices. He determined that the configuration of the handle, to allow the thumb and index finger to manipulate the working device via a portion of the working device, was the relevant feature of the '412 Patent. He then concluded that there is not "a connection between the '412 Patent's technology and that of the Accused Devices." [*Id.* at APPX0014, 17–18].

Although the Court struck the prior art referenced in ¶¶ 36–39, 42–44, 53, 56, 111, 153–56, and 189 of Dr. Levine's report from Defendant's invalidity contentions, that does not preclude Defendant from analyzing that art for other purposes. *See United States v. Abel*, 469 U.S. 45, 56 (1984) ("[T]here is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible."). Accordingly, Defendant may use the conclusions in the listed paragraphs of Dr. Levine's report for purposes other than establishing invalidity. If Defendant attempts to use this evidence to make invalidity arguments, Plaintiff should object at trial. The motion to exclude these paragraphs of Dr. Levine's report for non-invalidity purposes is **DENIED**.

### b. Contribution of the '412 Patent to the Accused Devices

Plaintiff seeks to exclude the contents of ¶¶ 51–73 of Dr. Levine's expert report, arguing that they employ unreliable principles and methodologies. Dr. Levine opines that the contribution of the '412 Patent to the technological and clinical values of the Accused Devices is less than 5%. [ECF No. 242 at APPX0028]. He explains that there are five key benefits to balloon sinuplasty products, with safety and efficacy being the most important, and that the wire spinner is the defining feature of the Accused Devices. [*Id.* at APPX0014–16]. Plaintiff argues,

however, that Dr. Levine cited no evidence to support these opinions, did not make any efforts to confirm these findings, such as by polls of physicians, and did not explain how he reached the 5% figure.

Dr. Levine cited Defendant's marketing and business plan as a source for his determination of the key benefits of balloon sinuplasty devices [*Id.* at APPX0014], which he claims confirmed his own knowledge from his review of products, professional experience, and interactions with doctors who used the Accused Devices.  [ECF No. 261 at ACCLAR_APP.00005–06].  Furthermore, Dr. Levine claims he arrived at the 5% figure based on his analysis of the Accused Devices, their features, the practice of physicians in the field, and his conclusions about the most important features.  [*Id.* at ACCLAR_APP.00079–80].

In the application of an "apportionment principle, 'there may be more than one reliable method for estimating a reasonable royalty.'"  *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).  Although subject to cross-examination, Dr. Levine's analysis is not unreliable as a matter of law.  Dr. Levine did not explain in detail how he determined 5% to be the contribution of the '412 Patent to the Accused Devices, but rather used that value as a representation of a minimal contribution.  Defendant's counsel took a similar position at oral argument.  [Hearing Transcript, ECF No. 300 at 82:18–83:25].  Plaintiff may challenge Dr. Levine's 5% conclusion at trial, but Plaintiff's motion to exclude that opinion is **DENIED**.

### c.  Contract Interpretation

Plaintiff moves to strike certain of Dr. Levine's opinions claimed to involve contract interpretation of the NDA and consulting agreement.  If a party breaches the NDA by using the other party's confidential information in a non-permissible way, "any inventions, improvements,

or other intellectual property resulting from such non-permissible use will be the property of the non-breaching party."  [ECF No. 242 at APPX0058].  In ¶ 89 of his expert report, Dr. Levine opines that the confidential information Plaintiff claims Defendant allegedly misused was not in any of the claims in Defendant's '473 Patent.  [*Id.* at APPX0030–31].  Accordingly, he concludes that the '473 Patent is not an "invention" that "resulted from" the use of that confidential information under the NDA.  [*Id.*]

The consulting agreement states that "all materials, notes, records, drawings, designs, inventions, improvements, developments, discoveries, and trade secrets conceived, discovered, developed, or reduced to practice by [Plaintiff], solely or in collaboration with others" during the term of the agreement and that relate to Defendant's confidential information "are the sole property of [Defendant]."  [ECF No. 199-2 at APPX0043].  In ¶¶ 188–91 of his expert report, Dr. Levine analyzes the Accused Devices and concludes that any confidential information provided to Defendant had already been "reduced to practice" and thus belongs to Defendant under the terms of the consulting agreement.  [ECF No. 242 at APPX0037–39].

Generally, experts cannot provide "legal opinions as to the meaning of contract terms." *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977).  However, experts can provide analysis when the meaning depends on trade practices that can inform the context of the parties' agreement.  *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 8 (Ct. Fed. Cl. 2007).  "The admission of expert testimony to provide context on an industry practice and interpret contractual provisions specific to such an industry falls within a district court's discretion, so long as the explanation provided by the expert is needed to more accurately comprehend the meaning of technical terms used within that industry or trade."  *Dickson v. Sklarco L.L.C.*, No. 5:11-CV-0352, 2014 WL 4443423, at *3 (W.D. La. Sept. 9, 2014) (citing *Phillips Oil Co. v.*

*OKC Corp.*, 812 F.2d 265, 281 (5th Cir. 1987)).  Dr. Levine's expert report conducts a technical

analysis that parallels the terms in the contracts.  He is analyzing the scope of the '473 Patent to

determine whether it was an "invention[], improvement[], or other intellectual property resulting

from such non-permissible use" of confidential information and whether any confidential

information was "reduced to practice" in the Accused Devices.  [ECF No. 242 at APPX0030–31,

37–39].  Dr. Levine is not drawing legal conclusions about contract terms, but rather is providing

admissible technical testimony.  Accordingly, Plaintiff's motion to exclude his analysis is

**DENIED**.

V. **Motion to Exclude the Expert Reports and Testimony of George Matlock and Darius Eghbal**

Plaintiff moves to exclude the expert reports and testimony of George Matlock and

Darius Eghbal.  [ECF No. 207].  Plaintiff argues that both reports should be entirely excluded

because they were ghostwritten by Defendant's counsel.  Plaintiff also claims that the reports

contain inappropriate conclusions that non-retained experts cannot make and that alternatively, if

they are retained experts, their reports do not comply with the disclosure requirements of Federal

Rule of Civil Procedure 26(a)(2)(B).  Additionally, Plaintiff seeks to exclude portions of Matlock

and Eghbal's testimony that he alleges they have disclaimed.  Finally, Plaintiff moves to compel

additional discovery of Matlock and Eghbal.

a. **Ghostwriting**

Plaintiff argues that Defendant's counsel ghostwrote Matlock and Eghbal's expert

disclosures.  Matlock spent only two hours reviewing "his" sixteen-page expert report and thirty

minutes reading portions of the materials cited, and Plaintiff identifies specific examples where

the language and citations in his report were provided by Defendant's counsel.  [ECF No. 241 at

APPX0073, 84–85].  Plaintiff similarly argues that Eghbal spent only one or two hours

reviewing "his" twenty-five-page report and that Defendant's counsel provided certain language used in the report. [*Id.* at APPX0007, 18–19].

"The party seeking to strike an expert's testimony has the burden of proving that the report was 'ghost-written.'" *Quintel Tech. Ltd. v. Huawei Techs. USA, Inc.,* No. 4:15-CV-00307, 2018 WL 626355, at *9 (E.D. Tex. Jan. 30, 2018), *order clarified*, No. 4:15-CV-00307, 2018 WL 6930270 (E.D. Tex. Feb. 27, 2018). "[A] ghost-written expert report fails to comply with the disclosure requirements of Rule 26 and calls into question the reliability of the proposed testimony." *Batiste v. Lewis*, No. CV 17-4435, 2019 WL 1552843, at *2 (E.D. La. Apr. 10, 2019). A court can exclude an expert report if counsel provided the substantive content and the expert merely gave "editorial assistance." *Batiste v. Lewis*, No. CV 17-4435, 2019 WL 1552843, at *2 (E.D. La. Apr. 10, 2019). An expert "may receive some assistance in preparing his or her report," but "the expert must 'substantially participate'" in its creation. *Id.* However, when the expert generates the concepts within the report, discusses those concepts with the attorney drafting the report, and testifies that it accurately reflects his or her opinions, the "substance of the opinions is from the expert," and "the attorney's involvement in the written expression of those opinions does not make them inadmissible." *Zoch v. Daimler, A.G.*, No. 4:17-CV-578, 2018 WL 4610569, at *8–9 (E.D. Tex. Sept. 25, 2018).

While there are several examples where the exact language and related citations and source materials in Matlock and Eghbal's expert reports were provided by counsel, the efforts of Defendant's counsel do not definitively reflect imposition of Defendant's counsels' conclusions upon Matlock and Eghbal. Instead, both of their reports appear to have resulted from collaboration with counsel. Matlock testified that he spent several hours and participated in several phone calls discussing his analysis and opinions with counsel, which he claims he used to

guide counsel as to the substance of his disclosure.  [ECF No. 272 at ACCLAR_APP.000023, 33–34].  While Matlock did not recognize certain documents cited in his expert report when they were first presented to him at his deposition, he recalled them when they were used to refresh his recollection.  [*Compare id.* at ACCLAR_APP.000022 *with id.* at ACCLAR_APP.000035].  Eghbal similarly testified that he provided to counsel the contents of his expert report.  [*Id.* at ACCLAR_APP.000007–08].  He met with counsel for eight hours to review documents and dictate the substance of his expert disclosure.  [*Id.* at ACCLAR_APP.000008].  He testified that he then spent several hours studying the expert report and providing feedback.  [*Id.* at ACCLAR_APP.000008–09].  Both Eghbal and Matlock substantially participated in the creation of their export reports and the substance of the opinions within them.  Accordingly, Plaintiff's motion to exclude their expert reports as ghostwritten is **DENIED**.

### b.  Status as Non-Retained Experts

Plaintiff argues that Matlock and Eghbal's expert reports should be excluded because they include opinions that cannot be given by non-retained experts, and alternatively, that if Matlock and Eghbal are retained experts, their expert reports do not comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B).  Defendant responds that Matlock and Eghbal are retained experts whose expert reports satisfy Rule 26(a)(2)(B).

A retained expert witness is "one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  Fed. R. Civ. P. 26(a)(2)(B).  Matlock and Eghbal were employees of Defendant or its affiliate when their expert reports were disclosed.  [ECF No. 271-1 at ACCLAR_APP.000048–49, 69; *see also* ECF No. 238 at ACCLAR_APP.00018 (Eghbal's employer, Ethicon, is Defendant's parent company)].  However, a party's employee may serve as

a retained expert for the employer. *See Lee v. Valdez*, No. CIV.A.3:07-CV-1298-D, 2008 WL 4287730, at *2 (N.D. Tex. Sept. 18, 2008) ("Experts 'called solely or principally to offer expert testimony'-regardless whether they are employees-must provide a written report."). Though Matlock and Eghbal are not being paid specifically for their expert services, "a 'specially employed' expert need not be compensated but his services can be engaged for a particular activity." *Tolan v. Cotton*, No. CIV.A. H-09-1324, 2015 WL 5332171, at *1 (S.D. Tex. Sept. 14, 2015).

Matlock and Eghbal's expert reports were titled as disclosures "pursuant to Fed. R. Civ. P. 26(A)(2)(C)," which governs non-retained expert reports. [ECF No. 288-2 at APPX0047, 58]. Even so, courts focus on the nature of opinions and testimony, rather than the relationship between the party and the expert, to determine whether they are retained or non-retained. *See Tolan*, 2015 WL 5332171, at *6 ("[W]hether a witness falls within the expert report requirement of Rule 26(a)(2)(B) 'is determined primarily by the scope, substance and source of the intended testimony-not by whether he is being paid for his testimony.'")

Non-retained experts may not give opinions based on information or facts obtained outside the witness' personal knowledge. *See Huffman v. City of Conroe*, Texas, No. CV H-07-1964, 2008 WL 11391360, at *1 (S.D. Tex. July 10, 2008). Matlock and Eghbal are doing so, and so the Court concludes that Matlock and Eghbal are retained experts in this matter.

Plaintiff argues that Matlock and Eghbal's expert reports do not comply with Rule 26(a)(2)(B), but only in his Reply does Plaintiff allege that their expert reports do not offer a complete statement of their opinions and reasoning, fail to identify the exhibits used to summarize or support those opinions, and omit a statement of compensation.[2]  In fact, their

---

[2] In his Reply, Plaintiff also appears to introduce a *Daubert* challenge, arguing that both expert reports contain conclusory statements without citation or an explanation of the underlying methodology.  However, Plaintiff's

expert reports reference the documents and physical objects that Matlock and Eghbal rely upon in reaching their conclusions and state that neither are receiving any compensation specifically for their expert testimony.  [ECF No. 271-1 at ACCLAR_APP.000048–49, 69].  Accordingly, Plaintiff's motion to exclude Matlock and Eghbal's reports for failing to meet the disclosure requirements for retained experts under Rule 26(a)(2)(B) is **DENIED**.

### c.  Disclaimed Testimony

Plaintiff argues that Matlock and Eghbal have disclaimed substantive opinions that were not in their opening reports.  While Matlock and Eghbal purported to reserve the right to testify in rebuttal, Plaintiff urges that they can only do so with opinions and analyses given in their opening expert reports, and Defendant apparently agrees.  [ECF No. 270 at 12].  Plaintiff's motion to exclude additional opinions is therefore **GRANTED**, and Matlock and Eghbal may only provide in rebuttal opinions and analyses already disclosed in their opening expert reports.

### d.  Motion to Compel

Plaintiff also moves to compel certain documents related to Matlock and Eghbal. Plaintiff seeks: 1) any emails or other communications between Matlock or Eghbal and Defendant's counsel; 2) draft reports authored in the first instance by Defendant's counsel; and 3) a PowerPoint presentation made by Defendant's counsel and shown to Matlock prior to his deposition.

Federal Rule of Civil Procedure 26(b) provides work-product protection for documents related to experts.  *Dresser-Rand Co. v. Schutte & Koerting Acquisition Co.*, 242 F. Supp. 3d 576, 577 (S.D. Tex. 2017).  Rule 26(b)(4)(B) protects the disclosure of drafts of expert reports. Rule 26(b)(4)(C) also protects communications between counsel and retained experts as

---

Motion does not seek to exclude the opinions of Matlock or Eghbal under *Daubert*, and the Court will not consider these arguments first raised in his Reply.

privileged unless the communications relate to compensation or communicate to the expert facts, data, or assumptions to consider in forming the expert's opinions.

Because Matlock and Eghbal are retained witnesses, Defendant's counsel's communications with Matlock and Eghbal would normally be privileged under Rule 26(b)(4)(C). However, Defendant's counsel previously agreed to produce "all communications with counsel (internal and external) since the beginning of this litigation" involving Eghbal and Matlock. [ECF 288-2 at APPX0077–82, 85]. Accordingly, the Defendant has waived its privilege with respect to these communications. *See Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*, No. CIV.A. 11-2777, 2013 WL 3367137, at *4 (E.D. La. July 5, 2013) ("[T]he voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives work-product protection for that material.") (emphasis omitted). Except to the extent described in the next paragraph, Defendant shall produce all communications between Defendant's counsel and Eghbal or Matlock by March 9, 2020, in accordance with Defendant's counsel's April 15, 2019 representation to Plaintiff's counsel that it would do so. This shall include the PowerPoint presentation shown to Matlock prior to his deposition.

Defendant's counsel reserved the privilege as to draft expert reports under Rule 26(b)(4)(B). [ECF 288-2 at APPX0084]. However, to the extent initial draft reports prepared by attorneys communicate facts, data, or assumptions to Matlock and Eghbal for them to consider in forming their opinions, those draft reports do not fall within Defendant's counsel's reservation of its privilege under Rule 26(b)(4)(B) and shall be produced by March 9, 2020. To the extent that Defendant withholds draft reports under Rule 26(b)(4)(B), Defendant shall provide Plaintiff a privilege log of such documents by March 16, 2020. To the extent stated above, Plaintiff's Motion to Compel is **GRANTED**.

VI.    **Motion to Exclude Certain Opinions of Blake Inglish**

Plaintiff seeks to exclude certain opinions of Blake Inglish, Defendant's damages expert. Plaintiff challenges: 1) Inglish's analysis of the apportionment of revenue attributable to improvements that the Accused Devices made to classic products; 2) the use of Dr. Levine's opinion that the '412 Patent improved the Accused Devices by 5%; 3) Inglish's use of cost-based apportionment; and 4) his consideration of the assignment of the '412 Patent to Plaintiff from Bryan Lunsford for $500.

a.    **Apportionment of Revenue of the Accused Devices to Improvements over Classic Products**

Plaintiff seeks to exclude as unreliable Inglish's determination that 24% of the revenue of the Accused Devices should be apportioned to improvements made by those devices.  Prior to the sales of Accused Devices, Defendant sold several other balloon sinuplasty devices (the "classic products").  [ECF No. 255 at ACCLAR_APP.000239].  Following the introduction of the Accused Devices in 2012, Defendant's sales of all balloon sinuplasty products increased. [*Id.*]  Inglish calculated the increase in total sales revenue of all of Defendant's balloon sinuplasty products.  [*Id.*]  He attributed that entire increase to improvements the Accused Devices made over classic products.  [*Id.*]  He then determined that the increase in total sales revenue of all of Defendant's balloon sinuplasty products equaled 24% of the total sales revenue of the Accused Devices.  [*Id.*]  He thus calculated that 24% of the sales revenue of the Accused Devices represented revenue that Defendant would not have generated had the Accused Devices not been introduced and thus represented the portion of the sales revenue of the Accused Devices attributable to improvements they made over classic products.  [*Id.*]  Inglish opines that the remaining 76% of the sales of the Accused Devices did not contribute to an increase in the

overall sales of balloon sinuplasty devices and would have been generated even if the Accused Devices had not been introduced.  [*Id.*]

Plaintiff considers this analysis flawed, because it assumes that, had the Accused Devices not been introduced, sales of classic products would have remained the same, and not decreased. Plaintiff faults Inglish's analysis for not fully justifying the 24% apportionment and why the portion of revenue attributable to improvements in the Accused Devices would not be a larger number when considering the potential that sales of classic products would have decreased in light of the '412 Patent.

Inglish's expert report does not attempt to establish a definitive apportionment figure. Inglish acknowledges as much when he admits that sales trends "rarely provide[] dispositive results."  [*Id.* at ACCLAR_APP.000238].  Instead, his analysis is focused on testing the reliability of Plaintiff's damages expert, Paul Benoit.  [ECF No. 240 at APPX0007–08].  Benoit determined that the appropriate revenue apportionment is that 67.2% of sales of the Accused Devices was attributable to improvements over classic products.  [*Id.* at APPX0010].  Inglish disagrees with Benoit's focus on revenue for only the years following the introduction of the Accused Devices.  [ECF No. 255 at ACCLAR_APP.000238–39].   Instead, Inglish says he conducted a "reasonableness check," by considering Defendant's historic revenues.  [*Id.*]  As a result, Inglish's analysis assumes that sales of the classic products would not have decreased if the Accused Devices were not introduced.  Benoit's analysis, in contrast, assumes that sales of the classic products would have necessarily decreased if the Accused Devices were not introduced.  [ECF No. 240 at APPX0008].  These different assumptions are for the jury to consider and evaluate.  The motion to exclude Inglish's opinions regarding revenue apportionment is **DENIED**.

### b.  Use of Dr. Levine's 5% Finding

Plaintiff challenges Inglish's analysis because it cites the findings of Dr. Levine, Defendant's technical expert.  Plaintiff has separately moved to exclude Dr. Levine's conclusion that the '412 Patent contributed less than 5% to the Accused Devices, and Plaintiff correspondingly seeks to exclude any of Inglish's analysis that relies on this 5% value.  Because the motion to exclude Dr. Levine's 5% determination was denied, Inglish is free to use Dr. Levine's conclusions at he sees fit.

Plaintiff further argues that consideration of the 5% figure would be "double-counting." Inglish allegedly apportions twice, by determining the extent the Accused Devices increased revenue over the classic products (24%) and then by analyzing the extent to which that increase can be attributed to the allegedly patented improvements (5%).  [ECF No. 255 at ACCLAR_APP.000290].  Plaintiff argues that the two steps are redundant and inaccurately double the impact of the apportionment analysis.  Whether there is overlap in Inglish's two apportionment steps is for the jury to determine.  Plaintiff's motion to exclude Inglish's two-step apportionment analysis is **DENIED**.

### c.  Cost-Based Apportionment

Plaintiff argues that Inglish's cost-based apportionment analysis should be excluded as unreliable.  Inglish determines the portion of the Accused Devices that is comprised of components related to the '412 Patent, based on the relative costs of those components.  [ECF No. 256 at ACCLAR_APP.000287–91].  Plaintiff argues that Inglish uses the costs of the raw materials of the components when he should use the market value of those components.  Plaintiff further argues that Inglish's analysis improperly emphasizes the value of the handle, even though

the handle alone does not perform the patented function and does not reflect the value of the invention.

Proper apportionment requires that "a royalty should reflect the *value* of [the] patented technology." *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019) (emphasis added). In assessing the appropriate reasonable royalty, "all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features." *Commonwealth Sci. & Indus. Research Organisation*, 809 F.3d at 1301. Although Dr. Levine considers cost-based apportionment, his apportionment opinions appear tied to average selling prices, which clearly relate to market value. [ECF No. 253 at ACCLAR_APP.000288–89, 301]. Defendant notes that Inglish "considered cost information . . . but he ultimately used market price." [Response, ECF No. 253 at 6].

Defendant still defends the appropriateness of using the cost of the handle as a metric for the value of the patented functionality. When multiple components operate together, any individual component is not necessarily valuable in and of itself. Instead, it is the component's function and contribution to the larger operation of the device as a whole from which the component derives value. There is little, if any, connection between that function and the pure cost of the component. The Accused Devices have a handle configured to allow a user to manipulate the balloon sinuplasty device in various ways. The handle's value is the functionality of how the handle is configured to allow the user to operate the device. While the cost of the handle may reflect the value of having a handle in general, it does not accurately reflect the value of a handle configured for a specific purpose and function. Given the limited relationship between the cost of the handle of the Accused Devices and its value, and that Defendant agrees

that Inglish ultimately used market prices in his apportionment analysis, Plaintiff's motion to exclude Inglish's cost-based apportionment analysis is **GRANTED**.

### d. Assignment of the '412 Patent from Bryan Lunsford

Plaintiff also seeks to exclude Inglish's analysis and opinion regarding the assignment to Plaintiff of Bryan Lunsford's rights in the '412 Patent for $500. Lunsford was the co-inventor of the '412 Patent. [ECF No. 202-2 at APPX0025]. Lunsford has since been deposed in this action, during which he testified that he has suffered a brain injury that impairs his memory, provided inconsistent testimony, and made negative statements about Plaintiff. [*Id.* at APPX0021–23, 25].

Inglish uses the $500 payment for the assignment in his analysis of *Georgia-Pacific* factors 1, 2, and 15 to determine a reasonable royalty rate. [ECF No. 255 at ACCLAR_APP.000260, 299–300]. The *Georgia-Pacific* factors are a non-exhaustive list of considerations that affect the reasonable royalty rate and include: "1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty. 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit. . . . 15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement." *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971). Plaintiff argues that the Lunsford assignment is irrelevant under factors 1 and 2 because these factors relate to licenses, not assignments. Even if it were relevant, Plaintiff further urges that Inglish did not conduct an analysis comparing the circumstances of the assignment to the circumstances of a hypothetical

negotiation between the parties that would result in a reasonable royalty for the '412 Patent. Plaintiff urges that the reference to factors 1, 2, and 15 is just an attempt to introduce prejudicial evidence about Lunsford.

Defendant responds that while *Georgia-Pacific* factors 1 and 2 relate to licenses, the rights Lunsford had affect what a potential licensee would pay. Specifically, Lunsford's rights in the '412 Patent may have given him a seat at the hypothetical negotiating table. Furthermore, the purchase of patent rights can shed light on the value of a patent, which will likely impact what a reasonable royalty should be. *See Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003) (finding that a $15,000,000 total royalty award seemed "unbalanced" when compared to the purchase of multiple patents, including the patent at issue, in a corporate acquisition for $20,000,000), *vacated on other grounds*, 545 U.S. 193 (2005). Defendant also argues that the assignment affects the parties' relative bargaining positions because the Defendant could have attempted to obtain Lunsford's rights to the '412 Patent. Defendant's ability to obtain an interest in the '412 Patent from someone other than Plaintiff would impact Defendant's bargaining position in a hypothetical negotiation. While the assignment may not technically fall within the scope of *Georgia-Pacific* factors 1 and 2, they are nevertheless relevant to the results of a hypothetical negotiation under factor 15, and Defendant has pointed to legitimate uses of the Lunsford assignment.

The use of past licenses, settlements, and negotiations can inform a hypothetical negotiation, but they need to be "'sufficiently comparable' for evidentiary purposes and any differences in circumstances must be soundly accounted for." *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019). However, Inglish is not arguing that the Lunsford assignment is comparable to a license that would result from a

hypothetical negotiation.  He explains that the "$500 transaction should not be considered a benchmark for the royalty between Acclarent and Dr. Albritton."  [ECF No. 255 at ACCLAR_APP.000300].  Instead, Inglish argues that the $500 assignment demonstrates the limited value of the '412 Patent, which would make it difficult for Plaintiff to obtain millions of dollars in royalties in a hypothetical negotiation.  [*Id.*]  Given that Inglish is not offering or characterizing the $500 assignment as a comparable license, he is not required to make an analysis of the circumstances of the assignment and those of a hypothetical negotiation.  Accordingly, the motion to exclude Inglish's opinions and analysis related to the assignment is **DENIED**.  To the extent that other evidence related to Lunsford's testimony may unreasonably prejudice Plaintiff, Plaintiff may object or seek to exclude that evidence in a motion in limine.

### VII.    Motion to Strike the Untimely Supplemental Expert Report of Dr. Douglas Holmes

Defendant seeks to strike the supplemental expert report of Dr. Douglas Holmes, Plaintiff's technical expert, arguing that his report presents late disclosed infringement analyses related to Defendant's claimed non-infringing alternatives ("NIAs").  [ECF No. 174].  Defendant disclosed its proposed NIAs on December 10, 2018, in response to an interrogatory request. [ECF No. 196-2 at APPX0006].  On March 1, 2019, Dr. Holmes then served his opening expert report, in which he opines that "there is no evidence showing that the [alleged NIAs are] not the subject of patents such that Acclarent would need a patent license to it as well."  [ECF No. 194-2 at APPX0011–12].  The April 9, 2019 responsive report of Defendant's rebuttal expert, Dr. Levine, attacked Dr. Holmes' report because he did not conduct an infringement analysis for Defendant's proposed NIAs.  [*Id.* at APPX0021].  Defendant then deposed Dr. Holmes on May 10, 2019, and he confirmed that he did not conduct an infringement analysis of the NIAs.  [*Id.* at APPX0044].  On June 3, 2019, Plaintiff served Dr. Holmes' supplemental report, reflecting an

infringement analysis of Defendant's NIAs, and an errata for Dr. Holmes' deposition testimony which states that he had conducted an infringement analysis but that it was not included in his opening report.[3]  Defendant now moves to strike Dr. Holmes' supplemental expert report as untimely.[4]

### a.  Timeliness of the Expert Report

 "In its discretion, the district court may exclude the testimony of experts who have not been properly designated."  *AHF Cmty. Dev., LLC v. City of Dallas*, No. CIV.A. 3:06-CV-1035-, 2008 WL 5083103, at *2 (N.D. Tex. Dec. 2, 2008).  The parties were required to disclose opening expert reports by March 1, 2019, and responsive expert reports by April 11, 2019.  [ECF No. 149].  Plaintiff argues that Dr. Holmes' supplemental expert report, disclosed on June 3, 2019, was nevertheless a timely supplement under Federal Rule of Civil Procedure 26(e).

Under Rule 26(e), a party must supplement or correct an expert report upon learning the report is "incomplete or incorrect" in some material respect.  "The purpose of rebuttal and supplementary disclosures is just that—to rebut and to supplement. These disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information."  *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996).  When "the analysis and opinions in the second report [are] largely new rather than supplementary," they cannot qualify as a supplemental expert report under Rule 26(e).  *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 372 (5th Cir. 2016).  Dr. Holmes' initial expert report made no infringement analysis for the NIAs.  Dr. Holmes' new conclusions about a topic he did not previously discuss do not constitute a supplement or correction.

---

[3] Dr. Holmes' errata does not specify when he conducted his infringement analysis of the NIAs, but the Court assumes it was performed after his deposition.

[4] The Court notes that, while Defendant questions the validity of the errata to Dr. Holmes' deposition testimony, it has not moved for relief with respect to the errata.

Plaintiff further argues that a new report is justified because Plaintiff did not have information about the details of Defendant's proposed NIAs until Defendant served Dr. Levine's responsive report. However, Plaintiff knew of the proposed NIAs when Defendant disclosed its interrogatory answers on December 20, 2018, and could have fully analyzed them. Dr. Holmes' supplemental expert report of June 3, 2019 does not qualify as a supplement or correction to his original expert report under Rule 26(e).

### b.  Harmless or Substantially Justified Delay

When a party fails to make a required disclosure, he is prohibited from using that evidence at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). A court considers: 1) the reason provided; 2) the importance of the thing excluded; 3) potential prejudice in allowing the excluded item; and 4) the availability of a continuance to cure any prejudice. *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990).

First, Plaintiff explains that Dr. Holmes' supplemental expert report was necessary because Defendant had not provided any details about its proposed NIAs, on which Plaintiff claims that Defendant bears the burden of proof. Plaintiff states that Defendant provided inadequate interrogatory responses, which "fail[ed] to identify or describe the technical details of the alleged NIAs," and did not analyze NIAs in its opening expert reports. Plaintiff claims that it was only after Defendant served Dr. Levine's responsive expert report that Plaintiff knew that Defendant was pursuing NIAs and provided details about them.

When calculating damages based on a reasonable royalty rate, one must determine, "[w]hether the accused infringer had acceptable non-infringing alternatives available to it at the time of the hypothetical negotiation [because that] may be probative of a reasonable royalty for the patented technology." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348,

2011 WL 197869, at *2 (E.D. Tex. Jan. 20, 2011), *objections overruled*, No. 2:06-CV-348, 2011 WL 13196509 (E.D. Tex. Jan. 28, 2011). The parties disagree as to who bears the burden of proving or disproving the non-infringing nature of NIAs in a reasonable royalty analysis.

Regardless of who has that final burden, on December 20, 2018, Defendant put Plaintiff on notice of potential NIAs. [ECF No. 196-2 at APPX0006–07]. If Plaintiff believed that Defendant's interrogatory responses were inadequate or unresponsive, as he claims, he should have pursued a Motion to Compel. Plaintiff cannot fairly use the lack of detail in Defendant's responses to allow his untimely report, because he could have obtained the factual details to which he alleges he was entitled. *See Smith v. Chrysler Grp.*, L.L.C., 909 F.3d 744, 748 (5th Cir. 2018) (finding that the lower court did not abuse its discretion by excluding an untimely supplemental expert report when the new conclusions were based on "evidence that was available to him at the time he filed his initial report"). Furthermore, even upon learning specifics of Defendant's NIAs, Plaintiff failed to seek an extension of the expert designation and disclosure deadline, which further undermines the validity of his justification. *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d at 373.

To the extent that Defendant bears the burden to prove that its NIAs are non-infringing and has failed to disclose an expert report on that issue, that may affect its ability to provide such expert evidence at trial. It does not, however, justify Dr. Holmes' failure to include, in his opening report, an analysis that Dr. Holmes claims in his deposition errata he had conducted, but did not timely disclose. Accordingly, Plaintiff's explanation does not support allowing Dr. Holmes' supplemental expert report.

The second issue in evaluating the harm of delay is the matter's importance. Here, the matter sought to be excluded is of limited importance. Plaintiff argues that his damages expert,

Benoit, bases his damages analysis on his understanding from discussions with Dr. Holmes that Defendant's non-infringing alternatives infringe the '412 Patent. In conducting his damages analysis, Benoit may make appropriate assumptions, including assuming as correct things he learned from Dr. Holmes. At trial, Defendant can challenge Benoit regarding those underlying assumptions and the weight to be given to his testimony, but it has not sought to exclude Benoit's testimony that is predicated on Dr. Holmes' allegedly untimely conclusions.

Furthermore, Plaintiff still has available Dr. Holmes' opinions that Defendant's alleged NIAs are not acceptable. [ECF No. 194-2 at APPX0012]. A reasonable royalty analysis "consider[s] the *next-best* available alternative, which is not necessarily [the same as] an 'acceptable' alternative that precludes recovery of lost profits." *Id.* (emphasis present); *see also Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571 (Fed. Cir. 1996) (finding that an NIA was relevant to the parties' bargaining power in a hypothetical negotiation for a reasonable royalty even if the NIA was not "acceptable").

Nevertheless, there is "no bright-line rules for deciding 'acceptability.'" *Salazar*, 2018 WL 2033709, at *3. Acceptability analyses are still relevant in a reasonable royalty analysis. *See LaserDynamics, Inc.*, 2011 WL 197869, at *2. Plaintiff may, in any case, use Dr. Holmes' analysis as to the drawbacks of Defendant's NIAs that he believes supports the conclusion that the NIAs would not be considered in a hypothetical negotiation. Dr. Holmes' additional conclusions that the NIAs are in fact also not non-infringing are helpful to Plaintiff, but not critically so, which weighs in favor of striking Dr. Holmes' supplemental expert report.

Third, Defendant would suffer some prejudice from allowing the supplement. "The timing of the disclosure results in prejudice when, for instance, the opposing party must incur unreasonable additional costs that could have been avoided by an earlier disclosure, or the party

is precluded under the scheduling order from developing and presenting rebuttal evidence."
*Hoffman*, 2013 WL 81578, at *2. Defendant argues that had the supplemental expert report been
timely disclosed, it would have offered rebuttal expert opinions or deposed Dr. Holmes on the
details of his infringement analysis. Defendant is currently foreclosed from doing so because the
discovery period has ended.

However, Defendant already provided expert opinions explaining why its proposed NIAs
do not infringe Plaintiff's patents. While Defendant may be unable to specifically rebut Dr.
Holmes' supplemental expert report, it has nevertheless been able to present its position on the
issue. Furthermore, Plaintiff offered Defendant the opportunity to conduct a one-hour deposition
of Dr. Holmes and Defendant refused. Accordingly, Defendant will suffer only minimal
prejudice, so this factor is effectively neutral.

Fourth, the trial is only months away, and a continuance is unavailable. This weighs in
favor of granting the Motion to Strike.

Based on these four factors, Plaintiff's untimeliness was neither substantially justified nor
harmless. Furthermore, Dr. Holmes' report states that it seeks to "respond to certain opinions
related to non-infringing alternatives that were raised in the April 11, 2019 rebuttal report of Dr.
Howard Levine." [ECF No. 192 at APP.085]. Dr. Holmes' report is, in effect, a sur-rebuttal
report, and "a party wishing to provide a sur-rebuttal [expert report] must first seek leave of
Court." *BCC Merch. Sols., Inc. v. JetPay, LLC*, No. 3:12-CV-5185-B, 2016 WL 3264283, at *2
(N.D. Tex. Feb. 19, 2016). Plaintiff failed to seek such leave from the Court. Accordingly,
Defendant's Motion to strike Dr. Holmes' supplemental expert report as untimely is
**GRANTED**.

**VIII.    Motion to Exclude Testimony of Dr. Douglas Holmes**

Defendant seeks to exclude certain opinions and testimony of Dr. Holmes in his original report.  [ECF No. 212].  Defendant argues: 1) Dr. Holmes' analysis conflicts with the Court's claim construction; 2) portions of Dr. Holmes' analysis are unsupported, because they rely on a large, unclear footnote; 3) Dr. Holmes' conclusion about confidential information is not properly supported with analysis; and 4) Dr. Holmes disclaimed certain opinions in his expert report.

**a.  Application of the Court's Claim Construction**

Defendant argues that Dr. Holmes' infringement analysis improperly applies the Court's claim construction of the "adapted to" limitation.  Specifically, Defendant argues that while Dr. Holmes' analysis concludes that the Accused Devices satisfy the "adapted to" limitation because they "can" be used in various manners, the construction requires that the Accused Devices are "made to, designed to, or configured to" satisfy the limitation.  Furthermore, Defendant argues that Dr. Holmes' infringement examples do not satisfy independent Claims 1 and 14.  Defendant has moved for summary judgment of non-infringement, raising similar arguments about the inadequacies of Dr. Holmes' analyses and infringement examples.  As explained below, that Motion for Summary Judgment is denied, based on the Court's conclusion that Dr. Holmes did not improperly apply the Court's claim construction, so Defendant's motion to exclude Dr. Holmes' infringement analysis is similarly **DENIED**.

**b.  Use of a Single Footnote**

In concluding that the Accused Devices meet the limitations of the '412 Patent, Dr. Holmes repeatedly cites a multi-page footnote containing 140 citations.  [ECF No. 239 at ACCLAR_APP.000048–50].  Defendant argues that Dr. Holmes does not explain or summarize

these citations or state how they support his conclusions, and that they should therefore be excluded as unsupported.

Rule 26 requires that an expert include the "basis and reasons" of the expert's opinion. *Mobile Telecommunications Techs., LLC v. Blackberry Corp.*, No. 3:12-CV-1652-M, 2016 WL 2907735, at *1 (N.D. Tex. May 17, 2016) (Lynn, C.J.). It is questionable that merely opining that a claim element is met, and listing a number of documents, provides sufficient basis and reasoning. *Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, 61 F. Supp. 3d 437, 441–42 (D. Del. 2014), *aff'd*, 599 F. App'x 960 (Fed. Cir. 2015). But, Dr. Holmes does more than that. He includes a detailed analysis over multiple paragraphs explaining and analyzing the Accused Devices. [ECF No. 239 at ACCLAR_APP.000048–65]. While Dr. Holmes does not specifically identify how each citation supports his conclusions, he nevertheless includes sufficient analysis to articulate the basis and reasoning for his opinions. *See Norris v. United States*, No. 3:11-CV-1351-D, 2012 WL 1231804, at *2 (N.D. Tex. Apr. 12, 2012) (noting that even if a "report is brief and lacks certain detail that plaintiffs might have preferred to have obtained without taking his deposition, the court cannot say that the report fails to satisfy the requirement that it contain 'a complete statement of all opinions the witness will express and the basis and reasons for them.'"). Accordingly, Defendant's motion to exclude Dr. Holmes' infringement analysis is **DENIED**.

### c. Confidential Information

Defendant seeks to exclude Dr. Holmes' opinions about the confidentiality of the information Defendant allegedly misused. Confidential information under the NDA and the consulting agreement does not include any information Plaintiff disclosed in his '412 Patent. Several paragraphs of Dr. Holmes' report state that Plaintiff's alleged confidential information

was not disclosed in the '412 Patent.  [ECF No. 239 at ACCLAR_APP.000199–207].  Defendant argues that Dr. Holmes should not be allowed to opine on confidentiality, because he does not also consider whether Defendant already possessed the information, which would also make the information not confidential under the NDA and consulting agreement.

Actually, Dr. Holmes does not opine on the ultimate issue of what is confidential information.  He merely analyzes the '412 Patent to conclude that it does not disclose Plaintiff's allegedly confidential information.  He is not making any assessments as to whether the information is not confidential because the Defendant already possessed it.  Defendant essentially criticizes Dr. Holmes for not conducting an analysis to support a conclusion he has not reached, so the motion to exclude his limited confidentiality analysis is **DENIED**.

### d.  Dr. Holmes' Supplemental Report

Defendant seeks to exclude any testimony related to Dr. Holmes' supplemental expert report.  Given that the Court has stricken the supplemental report, Defendant's motion to exclude any related testimony is **GRANTED**.

### e.  Dr. Holmes' Disavowed Opinions

Defendant seeks to exclude opinions that Dr. Holmes allegedly disavowed.  In his report, Dr. Holmes opines that the Accused Devices satisfy Claim 1 of the '473 Patent, which requires an "elongated shaft" with a "proximal end coupled with the handle" and "a longitudinal opening."  [ECF No. 239 at ACCLAR_APP.000193].  Dr. Holmes' expert report identifies the guide catheter as the elongated shaft, with the proximal end attached to the handle, but later in his report he defines the elongated shaft with the longitudinal opening as the handle.  [*Id.* at ACCLAR_APP.000194–97].  Defendant argues that Dr. Holmes inconsistently referenced two different elongated shafts to satisfy Claim 1, when it should be the same shaft.  Defendant

confronted Dr. Holmes about this inconsistency during his deposition, and he testified that the elongated shaft is both the handle and the guide catheter. [*Id.* at ACCLAR_APP.000369]. Defendant urges the Court to exclude Dr. Holmes' entire infringement analysis of Claim 1 of the '473 Patent, arguing that it was disavowed during his deposition. Dr. Holmes admitted during his deposition that paragraph 255 of his expert report was not correct and modified his identification of the elongated shaft in the Accused Devices. [*Id.*] This inconsistency does not warrant exclusion of Dr. Holmes' entire infringement analysis of Claim 1 of the '473 Patent, and Defendant's motion to exclude those opinions is **DENIED**. However, to the extent that Dr. Holmes has since corrected his analysis in his deposition, he may only testify consistently with that analysis corrected in his deposition.

## IX.    Motion to Exclude the Testimony of Paul Benoit

Defendant seeks to exclude the opinions and testimony of Paul Benoit, Plaintiff's damages expert. [ECF No. 215].

### a.    Non-Infringement Claims

Defendant contests four aspects of Benoit's analysis of damages for Plaintiff's non-infringement claims. Defendant argues that: 1) Benoit's disgorgement analysis is unhelpful, because disgorgement is not available in this action; 2) his analysis is unreliable, because it is falsely premised on an assignment of Defendant's '473 Patent and its family; 3) his analysis of design around time is unreliable, because he is not a qualified expert in product design; and 4) Benoit came to an inappropriate legal conclusion that Texas law allows for an award of punitive damages.

### i. Disgorgement

Defendant argues that Benoit's disgorgement analysis should be excluded because disgorgement is not allowed under Texas law as a remedy for fraud claims, except when a fiduciary relationship is present. The Fifth Circuit has stated that "it is questionable whether disgorgement is an appropriate measure of damages in an action alleging Texas common law fraud." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 412 (5th Cir. 2007). An intermediate state case has held that "disgorgement of profits has long been recognized as an appropriate remedy for fraud." *Robertson v. ADJ P'ship, Ltd.*, 204 S.W.3d 484, 494 (Tex. App.–Austin 2006, pet. denied); *see also Allstate Ins. Co.*, 501 F.3d at 412 (5th Cir. 2007) (citing *Robertson*, 204 S.W.3d at 494). The Texas Supreme Court "ha[s] not expressly limited the remedy to fiduciary relationships." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 729 (Tex. 2016). The Court will therefore assume that a disgorgement remedy is available.

Subject to its argument that disgorgement is unavailable, Defendant further argues that, when calculating disgorgement, Benoit failed to properly apportion the profits derived from the alleged use of Plaintiff's confidential information. "[T]he party seeking disgorgement must distinguish between that which has been legally and illegally obtained." *Allstate Ins. Co.*, 501 F.3d at 413. Plaintiff may attempt to prove that at trial through cross-examination, but it is not a basis for exclusion of Benoit's opinions. Accordingly, Benoit's disgorgement analysis remains relevant and the motion to exclude it is **DENIED**.

### ii. Assignment of the '473 Patent

Defendant argues that Benoit's disgorgement analysis should be excluded as unreliable because it is premised on the incorrect assumption that if Defendant misused Plaintiff's confidential information, the '473 Patent and its family would be assigned to Plaintiff under the

terms of the NDA.  Defendant has similarly moved for summary judgment that an assignment of the '473 Patent and its family could not occur in this case.  However, as described below, the Motion for Summary Judgment on that issue is being denied.  For the same reasons, Defendant's motion to exclude Benoit's analysis is also **DENIED**.

### iii.    Design Around Time

Defendant seeks to exclude Benoit's analysis regarding the time and cost it would take for Defendant to design around its '473 Patent and its family, because he is not a product design expert and thus cannot opine on design issues.  Plaintiff responds that Benoit did not conduct his own analysis, but instead extrapolated from discovery provided by Defendant regarding the time and cost to design similar products.  To the extent that Benoit testifies as to his understanding of Defendant's historic design times and costs and extrapolates from that to other products, the motion to exclude is **DENIED**, but Benoit may not give other testimony about product design because Benoit is not a product design expert.  *See Winzer v. Kaufman Cty.*, No. 3:15-CV-01284-N, 2016 WL 11472367, at *4 (N.D. Tex. Aug. 10, 2016), *aff'd*, 916 F.3d 464 (5th Cir. 2019) (excluding opinions of an expert that fell outside of the witness' expertise and as to which he was not qualified to opine).

### iv.    Punitive Damages

Defendant seeks to exclude the analysis in ¶¶ 161 and 165 of Benoit's expert report because it refers to doubling the damages award through punitive damages for fraud.  The appropriateness of punitive damages is a question of Texas law, which is a legal conclusion on which Benoit cannot opine.  *See Advanced Tech. Incubator, Inc. v. Sharp Corp.*, No. 2:07-CV-468, 2009 WL 4669854, at *7 (E.D. Tex. Sept. 15, 2009) ("[T]he expert's opinions on law . . . are improper.").  Plaintiff agrees that Benoit cannot testify as to the appropriateness of punitive

damages but reserves the right to use Benoit to assist in conducting any mathematical calculation necessary to determine the amount of punitive damages, if they are found by the jury to be appropriate.  The motion to exclude ¶¶ 161 and 165 of Benoit's expert report is **GRANTED**, but at trial Benoit may conduct any purely mathematical calculations to assist the jury in determining the amount of punitive damages, if any.

### b.  Patent Infringement Damages

Defendant also seeks to exclude Benoit's analysis and opinions on damages for Plaintiff's patent claims.  Defendant urges that: 1) his reasonable royalty analysis is unreliable; 2) his analysis does not properly apportion the benefits provided by the '412 Patent; 3) the even splitting of hypothetical profits is unreliable and not supported by facts; and 4) consideration of the purchase of Defendant by Johnson and Johnson and Ethicon is irrelevant.

### i.    Method of Determining the Reasonable Royalty

Defendant seeks to exclude as unreliable Benoit's analysis and opinions on the reasonable royalty Defendant would agree in the hypothetical negotiation to pay Plaintiff, because of what factors Benoit considered.  Defendant mentions that Benoit's analysis did not include Lunsford at the hypothetical negotiating table.  Plaintiff argues, in response, that Lunsford should not be included in the negotiation because Lunsford admitted that he was required to assign his rights to Plaintiff and thus would have never been at the hypothetical negotiating table.  [ECF No. 262-1 at APPX0086].  Above, the Court denied Plaintiff's related motion to exclude Inglish's expert report for considering the Lunsford assignment, in part because the assignment and Lunsford's prior ownership rights may affect whether Lunsford should be present at the hypothetical negotiating table.  However, the Court does not find that Lunsford would necessarily be at the hypothetical negotiating table, and Plaintiff provides a

reasonable argument as to why Benoit assumed Lunsford would not be present there. To what extent Lunsford would have been present at the hypothetical negotiating table, and what impact that would have on the resulting reasonable royalty, are questions for the jury.

Defendant also claims that Benoit improperly extrapolates from a Deutsche Bank document from a year after the hypothetical negotiation would have happened and inflates the market for balloon sinuplasty by including a pediatric market. Plaintiff argues that the 2016 Deutsche Bank report is relevant because it includes historic data that covers the period of the negotiations. [*Id.* at APPX0023]. Plaintiff further contends that there is evidence that supports the existence of a market for pediatric balloon sinuplasty procedures. [*Id.* at APPX0184].

Plaintiff has identified viable reasons for Benoit's analytical choices in determining the reasonable royalty rate. "Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). Defendant believes Benoit's analysis is ultimately incorrect, and it may challenge the accuracy and weight of his analysis at trial. Defendant's motion to exclude his opinions on that royalty is **DENIED**.

### ii. Apportionment

Defendant argues that Benoit's analysis does not properly apportion the value of the Accused Devices with respect to the '412 Patent. Specifically, Defendant argues that Benoit failed to take out of his analysis components of the Accused Devices that do not infringe the '412 Patent, and failed to consider the demand for balloon sinuplasty products that would have existed even without the introduction of the Accused Devices. In fact, Benoit does conduct an apportionment analysis. [ECF No. 262-1 at APPX0053–54]. Defendant's expert has provided a competing apportionment analysis, and the jury can decide at trial which, if either, is correct.

Defendant's motion to exclude Benoit's reasonable royalty analysis for not properly apportioning is **DENIED**.

### iii. 50/50 Split of Profits

Defendant seeks to exclude Benoit's analysis as unreliable because he asserts the parties at the hypothetical negotiation would agree to evenly split the profits from the Accused Devices. In so concluding, Benoit invoked a Nash Bargaining Solution ("NBS"), which results from a mathematical theorem that finds that when certain preconditions are met, the desirable result of a negotiation between two parties is that each party obtains the same profit. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1325 (Fed. Cir. 2014). Courts have rejected the application of an NBS when it is not "sufficiently establish[ed] that the premises of the theorem actually apply to the facts of the case at hand." *Id.* at 1332 (Fed. Cir. 2014) (collecting cases). Defendant objects that a 50/50 split of profits is not tied to any facts of this case. However, Benoit first determined the amount of risk and intrinsic benefit both parties would have incurred at a hypothetical negotiation, and concluded that both had an equal bargaining position, which warranted application of a 50/50 split of incremental profits, consistent with an NBS. [ECF No. 238 at ACCLAR_APP.00076]. Benoit premises this conclusion of even negotiating power of the parties on the specific facts of this case, so exclusion is unwarranted. *See Realtime Data LLC v. EchoStar Corp.*, No. 6:17-CV-00084-JDL, 2018 WL 6266301, at *11 (E.D. Tex. Nov. 15, 2018) (allowing expert testimony about a 50/50 split of profits because the expert "consider[ed] specific facts of the case and the respective Parties' bargaining positions"). Accordingly, the motion to exclude Benoit's 50/50 analysis is **DENIED**.

### iv.    Purchase Price for Defendant

Defendant seeks to exclude as irrelevant and unhelpful Benoit's references to the purchase of Defendant by Johnson and Johnson and Ethicon, for $790.5 million.  Plaintiff claims that price demonstrates a high value that Johnson and Johnson and Ethicon were willing to pay for the Accused Devices and their related technology.  Benoit only states, however, that it is "presumable that Acclarent shared products and projects containing Dr. Albritton's confidential information with Ethicon, which may have encouraged Ethicon to purchase Acclarent" and that the purchase price "would have reasonably included the value associated with the anticipated launch of the then under-development Relieva Spin."  ECF No. 238 at ACCLAR_APP.00018.  This "presumption" is based on speculation.  Further, there is only a tenuous connection between the Johnson and Johnson and Ethicon purchase price and the value of the '412 Patent's technology and Plaintiff's confidential information.  The risk of unfair prejudice from this evidence substantially outweighs any probative value under Federal Rule of Evidence 403.  *See LaserDynamics, Inc.,* 694 F.3d at 78 (excluding evidence of a large license resulting from a settlement that had "very little relation to demonstrated economic demand for the patented technology" because its probative value was greatly outweighed by "the risk of unfair prejudice, confusion of the issues, and misleading the jury").  Accordingly, Defendant's motion to exclude Benoit's references to the purchase of Defendant by Ethicon and Johnson and Johnson is **GRANTED**.

## X.    Reconsideration of Claim Construction

Defendant moves the Court to reconsider its Second Claim Construction Order in light of the Federal Circuit's recent decision in *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336 (Fed. Cir. 2019).  [ECF No. 290].  Federal Rule of Civil Procedure 59(e) applies to the reconsideration of a claim

construction order.[5]  *KKG, LLC v. Rank Grp., PLC*, No. 2:11-CV-00012-JRG, 2013 WL

1643525, at *6 (E.D. Tex. Apr. 16, 2013).  Rule 59(e) allows reconsideration based on: "(1) an

intervening change in controlling law; (2) the availability of new evidence not previously

available; or (3) the need to correct a clear error of law or prevent manifest injustice."  *Id.* at *6.

Courts are afforded "'broad discretion' in resolving motions for reconsideration" under Rule

59(e).  *Mason v. Fremont Inv. & Loan*, 671 F. App'x 880, 884 (5th Cir. 2016).

      Defendant argues that *MTD Products* created an intervening change in controlling law.

There, the Federal Circuit held that a patent's specifications cannot be used to confer the required

structure to avoid the application of the means-plus-function analysis of 35 U.S.C. § 112(f).  933

F.3d at 1343.  Defendant argues that, as a result, the Court must reconsider its prior claim

construction and apply the means-plus-function analysis to the "adapted to" limitation of Claims

1 and 14 of the '412 Patent.

      When a claim lacks the word "means" it is presumed that the means-plus-function

analysis does not apply.  *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366,

1371 (Fed. Cir. 2015).  That presumption may be overcome if the "claim term fails to 'recite[ ]

sufficiently definite structure' or else recites 'function without reciting sufficient structure for

performing that function.'"  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir.

2015).  In the Second Claim Construction Order, the Court found that since the word "means"

does not appear in the "adapted to" limitation, it was presumed that 35 U.S.C. § 112(f) did not

apply.  [ECF No. 147 at 14].  The Court then held that Defendant could not rebut that

presumption because "handle" in the claim discloses structure and because the claim had

---

[5] Some courts apply Federal Rule of Civil Procedure 54(b) to interlocutory orders, but in any event, courts "frequently apply the same standards" under both rules.  *See, e.g.¸ eTool Dev., Inc. v. Nat'l Semiconductor Corp.*, 881 F. Supp. 2d 745, 748 (E.D. Tex. 2012).

"structural attributes, including the handle itself, a handle opening, and a coupling." [*Id.*]  The Court also held that the '412 Patent recited function with sufficient structure because the "[p]hysical features of the handle, and the types of functions which the handle allows, are detailed in the '412 Patent's claims" and "the term 'handle,' in and of itself, connotes structure." [*Id.*].  The '412 Patent's specifications merely provided "*additional* detail regarding the handle." [*Id.* at 16 (emphasis added)].  The specification was not essential to the Court's prior determination that the "adapted to" limitation disclosed sufficient structure to avoid application of the means-plus-function analysis of 35 U.S.C. § 112(f), and exclusion of the specification does not affect the Court's conclusion.  Accordingly, Defendant's Motion for Reconsideration is **DENIED**.

## XI.    Summary Judgment of No Invalidity of the '412 Patent

Plaintiff seeks summary judgment against Defendant's invalidity claims.  Defendant has made invalidity contentions based on four prior art references: 1) the Morriss System; 2) Ressemann in view of the Morriss System; 3) Makower, including Makower in view of Goldfarb; and 4) McCabe.  [ECF No. 161-1 at APP.0182–83].  The Court previously struck as untimely Defendant's invalidity theories based on Ressemann in view of the Morriss System, Makower in view of Goldfarb, and certain portions of the Morriss System.  [ECF No. 171 at 11].  Of the remaining invalidity theories, Defendant is estopped from arguing those based on Makower and McCabe, because they were rejected by the PTAB during IPR.  [*See* ECF No. 179-2 at APPX0102].  Accordingly, Defendant may only contest the validity of the '412 Patent based on the unstruck portions of the Morriss System reference.

The parties agree that the Morriss System was reduced to practice in November 2006 by John Morriss.  It was then publicly disclosed in U.S. Patent App. No. 12/408,524, which was

filed on March 20, 2009, and published as U.S. Publication No. 2010/0241155 on September 23,

2010 (the "'155 Publication"). The Morriss System was also embodied in the Relieva Flex, one

of Defendant's commercial products that was launched at some point in 2009.

Plaintiff seeks summary judgment that the '412 Patent is not invalid as anticipated

because the Morriss System does not disclose every relevant Claim of the '412 Patent, and in any

event, the Morriss System was abandoned. Plaintiff also seeks summary judgment that the '412

Patent is not invalid as obvious, because Defendant only provides conclusory support for that

theory in its invalidity contentions and Dr. Brodner's expert report.

### a. Anticipation of the '412 Patent

Establishing invalidity by anticipation under 35 U.S.C. § 102 is an especially heavy

burden for a patent challenger. *Koito Mfg. Co. v. Turn–Key–Tech, LLC*, 381 F.3d 1142, 1151

(Fed. Cir. 2004). To show that a patent claim is anticipated under § 102, the movant must show,

by clear and convincing evidence, that each limitation of the claim is described or embodied,

either expressly or inherently, in a single prior reference. *Spansion, Inc. v. Int'l Trade Comm'n*,

629 F.3d 1331, 1356 (Fed. Cir. 2010). Typically, evidence showing anticipation comes from

testimony of an expert, from the perspective of one skilled in the art, who identifies and states

the witness' interpretation of each claim element, consistent with the court's claim interpretation,

and also explains in detail how each claim element is disclosed in the prior art reference.

*Schumer v. Lab. Computer Sys.,* 308 F.3d 1304, 1315–16 (Fed. Cir. 2002).

Plaintiff argues that the Morriss System does not disclose all of the limitations of any of

the asserted claims of the '412 Patent. Plaintiff argues that independent Claims 1 and 14 of the

'412 Patent describe a one-handed device, because they require a person to use up to three

fingers of one hand to position the guide catheter, and then the thumb and index finger of the

same hand to manipulate the working device.  Plaintiff argues that, in contrast, the Morriss System is a two-handed device, as described in the deposition of Defendant's witness, Jordan Trott.

Defendant does not dispute that Claims 1 and 14 of the '412 Patent suggest one-handed use, but it argues that the Morriss System, as embodied in the commercialized Relieva Flex and disclosed in the '155 Publication, are also one-handed devices.  Defendant supports this argument with several pieces of evidence, including Morriss' early drawings and testimony, and the '155 Publication.  While Plaintiff challenges much of this evidence, he does not dispute that the '155 Publication states that a surgeon could grip the catheter like a syringe and advance it through the guide catheter with the same hand.  [ECF No. 221-17 at ACCLAR_APP.000528]. Accordingly, there is a genuine issue of material fact as to whether the Morriss System includes a one-handed device that could invalidate the '412 Patent through anticipation.  *See TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1343 (Fed. Cir. 2010) (conflicting declarations about whether the prior art teaches all of the limitations of the allegedly anticipated patent creates a genuine issue of material fact).  Plaintiff's Motion for Summary Judgment of no invalidity based on anticipation by the Morriss System is **DENIED**.

### b.  Abandonment of the Morriss System

Even if a patent is anticipated by a prior art reference, the patent is not invalidated if the prior reference was abandoned, suppressed, or concealed.  *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1035 (Fed. Cir. 2001).  This can "be inferred based upon the prior inventor's unreasonable delay in making the invention publicly known."  *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1342 (Fed. Cir. 2001).  There is no specific length that is per se

unreasonable. *Id.* Nevertheless, two and a half years can be unreasonable. *Shindelar v. Holdeman*, 628 F.2d 1337, 1343 (C.C.P.A. 1980).

The Morriss System was reduced to practice in November 2006. The patent application for the Morriss System, which was published as the '155 Publication, was filed on March 20, 2009. In 2009, Defendant also launched the Relieva Flex as a commercialized embodiment of the Morriss System. Plaintiff argues that the two-and-a-half-year delay between the reduction to practice of the Morriss System in November 2006 and the filing of the '155 Publication in March 2009 is sufficient from which to infer abandonment, suppression, or concealment. Defendant contests that any delays in publicly revealing the Morriss System should be excused because Defendant was commercializing the Morriss System during that time.

A party may disclose a prior art reference to the public either by seeking a patent or introducing the product to the market. *Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 763 (Fed. Cir. 1995). When doing so through a patent, any delays between the reduction to practice of the reference and the filing of a patent application will not be excused if the delay was the result of commercialization efforts that are not reflected in the patent application. *Dow Chem. Co.*, 267 F.3d at 1343. On the other hand, when an inventor discloses the reference by bringing the product to the market, any delays will be excused if the party worked diligently to commercialize it during the delay. *See Checkpoint Sys., Inc.,* 54 F.3d at 762 ("In cases in which an invention is disclosed to the public by commercialization, courts have excused delay upon proof that the first inventor engaged in reasonable efforts to bring the invention to market.")

Plaintiff argues, and Defendant does not dispute, that any improvements in the Morriss System from Defendant's commercialization efforts were not reflected in the '155 Publication. Accordingly, Defendant cannot rely on the '155 Publication to demonstrate that it did not

abandon, suppress, or conceal the Morriss System. However, Defendant also brought the product to the public's knowledge through the Relieva Flex, and Plaintiff does not dispute Defendant's claim that the delay in bringing that product to the market was the result of its commercialization efforts. Thus, Defendant can use the introduction of the Relieva Flex to demonstrate that it did not abandon, suppress, or conceal the Morriss System. Accordingly, there exist genuine issues of material fact as to whether the Morriss System was abandoned, suppressed, or concealed, and Plaintiff's Motion for Summary Judgment of no invalidity based on anticipation is **DENIED**.

### c. Obviousness of the '412 Patent

Plaintiff moves for summary judgment on Defendant's claim that the '412 Patent is invalid as obvious. A claimed invention is invalid as obvious under 35 U.S.C. § 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious . . . to a person having ordinary skill." 35 U.S.C. § 103. The ultimate determination of obviousness under § 103 is a question of law. *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). This legal determination depends upon underlying factual findings, which the Court is to make by analyzing four factors, commonly referred to as the *Graham* factors: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, also known as objective indicia of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012).

Plaintiff seeks summary judgment that his invention was not obvious.  The majority of Defendant's obviousness argument is based on its invalidity expert, Dr. Brodner, and its invalidity contentions, which both rely on the same conclusory statement:

> To the extent this limitation is not fully disclosed by the Morriss System, this element would have been obvious to one of ordinary skill in the art based on the state of the art in existence at the time, the explicit and implicit teachings of this reference and the art, the differences between the art and the claimed feature and the general knowledge of a person of ordinary skill in the art.

[*e.g.* ECF No. 190 at APPX0020].  This conclusory allegation of obviousness is insufficient to create a genuine issue of material fact.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327–28 (Fed. Cir. 2012) (finding that the lower court properly entered a judgment as a matter of law finding that a patent was not invalidated for obviousness when the challenger presented only conclusory analyses of obviousness).  While the expert report and invalidity chart do perform additional obviousness analyses for Claims 1(g), 1(h), and 14(f), these analyses are part of the portions of the invalidity contentions and Dr. Brodner's report that have been stricken and excluded as untimely.  [*Compare* ECF No. 165 at APP.0069–70, 104 *with id.* at APP.0205–16, 257–65].  As a result, these additional conclusions cannot be considered.

Defendant urges that Dr. Brodner's obviousness conclusions are sufficient when read in conjunction with the "Technology Background and State of the Art" section of his report.  However, that section does not refer to obviousness, nor does Defendant explain how the information contained within it supports Dr. Brodner's obviousness conclusions.  [ECF No. 245-1 at APPX0010–15].  Accordingly, Plaintiff's Motion for Summary Judgment of no invalidity for obviousness is **GRANTED**.

## XII.    Plaintiff's Direct Infringement Claims

Defendant seeks summary judgment on Plaintiff's direct infringement claims.  An accused infringer moving for summary judgment of non-infringement must show that when all reasonable factual inferences are drawn in favor of the patentee, no reasonable jury could find that the asserted claims were infringed.  *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001).  This determination requires a two-step analysis: the claims must be properly construed to determine the scope and meaning of the claims and then the allegedly infringing device must be compared to the construed claims.  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004).  Literal infringement requires that the accused device contain each limitation of the asserted claim.  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

Plaintiff, through his technical expert, Dr. Holmes, presents eleven theories of infringement which apply to all of the asserted claims in the '412 Patent.  [ECF No. 188 at ACCLAR_APP.000606–09].  Defendant characterizes these theories as the Control Mechanism Theories (Theories 1–7 and 9–11), the Guidewire Theory ("Theory 8"), and the Single-Digit Contact Theories ("Theories 1–2, 4–5, 9, and 11").

### a.    Relevant Claim Construction

Defendant focuses on the "working device" and "adapted to" limitations of independent Claims 1 and 14 of the '412 Patent.  In its Second Claim Construction Order, the Court constructed those terms as follows [ECF No. 147 at 7, 10]:

| Claim Terms | Construction |
|---|---|
| "adapted to permit the operator to position a thumb and index finger of the hand to manipulate [the/a] working device via a portion of the working device immediately adjacent to the handle opening" (the "adapted to" limitation) | made to, designed to, or configured to permit the operator to position a thumb and index finger of the hand to manipulate [the/a] working device at a portion of the working device immediately adjacent to the handle opening |
| "working device" | a tool, such as a guide wire, balloon catheter, endoscope, or cutter, that is introduced into the body through a guide catheter and that is used to perform a function within the body |

### b. Plaintiff's Control-Mechanism Theories

Defendant claims that Plaintiff's Control-Mechanism Theories do not support a finding of infringement of the '412 Patent because they do not involve manipulation "at a portion of the working device." They instead involve a person using his or her thumb and/or index finger to touch the wire slider, wire spinner, and/or the balloon slider. Defendant argues that the wire slider, wire spinner, and balloon slider are intervening control-mechanisms that are separate components attached to a working device that the user controls to operate the working device, but they are not themselves working devices.

In its Second Claim Construction Order, the Court interpreted the requirement that manipulation occur "via a portion of the working device" to mean that manipulation would "occur at a portion of the working device, as is explicitly spelled out in the claim language," in accordance with the construction of similar language in Claim 8 in the First Claim Construction Order. [ECF No. 147 at 13]. In the First Claim Construction Order, the Court clarified that manipulation at a portion of the working device requires "contact" with the working device. [ECF No. 105 at 33]. Accordingly, the same requirement of contact applies to the "at a portion of the working device" construction of the "adapted to" limitation in Claims 1 and 14. Plaintiff appears to agree, given that he does not contest Defendant's argument that indirect manipulation

of a working device purely through intervening components that are not part of a working device would be insufficient to satisfy the "adapted to" limitation.

Plaintiff does, however, contend that the permanent attachment of the wire slider, wire spinner, and balloon slider to the balloon catheter and guidewire, the latter of which Defendant agrees are working devices, makes the sliders and spinner also working devices. Whether these three parts are working devices or separate components is a factual dispute that cannot be resolved by summary judgment. *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("[T]he task of determining whether the construed claim reads on the accused product is for the finder of fact."). Accordingly, Defendant's Motion for Summary Judgment of non-infringement based on Plaintiff's Control-Mechanism Theories is **DENIED.**

### c.  Plaintiff's Guidewire Theory

Plaintiff's Guidewire Theory involves the thumb and index finger directly touching the guidewire, which Defendant agrees is a working device. Defendant attacks this theory of infringement by arguing that it is based on an incorrect application of the Court's claim construction by Plaintiff's expert. Specifically, Dr. Holmes states that the Accused Devices "can" be used in a manner in which both the thumb and index finger touch the guidewire. [ECF No. 188 at ACCLAR_APP.000606–09]. Defendant argues, however, that the Court's claim construction of the "adapted to" limitation requires that the device is "made to, designed to, or configured to" operate with the thumb and index finger of the same hand simultaneously on the guidewire. Defendant further argues that the only evidence that the Accused Devices were "made to, designed to, or configured to" operate with the thumb and index finger both manipulating the guidewire was with two hands.

Plaintiff counters that Dr. Holmes testified that he applied the Court's claim construction in his expert report. [ECF No. 243 at APPX0026]. When Dr. Holmes describes the Guidewire Theory in his report and identifies that the "adapted to" limitation is satisfied because the Accused Devices "can" be used with the thumb and index finger touching the guidewire, he was merely apparently suggesting that the Accused Devices were intended to accommodate multiple grips. [*Id.*] Defendant is correct that the "adapted to" limitation, which requires that the infringing product is "made to, designed to, or configured to permit the operator to position a thumb and index finger" to manipulate the working device, involves more than the mere capability of the product to be operated with the thumb and index finger. However, it does not require that the product have only one intended method of use. The Accused Devices may be made, designed, or configured to be used in multiple different manners, which results in various ways that the Accused Devices *can* be operated that are consistent with that use.

Plaintiff also identifies documents in which Defendant envisioned direct manipulation of the guidewire with the thumb and index finger of one hand. [*Id.* at APPX00253, 94]. This includes the deposition of one of Defendant's former directors of research and development. [*Id.* at APPX0244]. *See Guerrero v. Total Renal Care, Inc.*, 932 F. Supp. 2d 769, 776 (W.D. Tex. 2013) ("[C]onflicting deposition testimony . . . creates several genuine issues of material fact."). Plaintiff has established a genuine issue of material fact about whether the Accused Devices were "made to, designed to, or configured to" be operated with the thumb and index finger of one hand, and Defendant's Motion for Summary Judgment of non-infringement based on Plaintiff's Guidewire Theory is **DENIED**.

### d.  Plaintiff's Single-Digit Contact Theories

Plaintiff's Single-Digit Contact Theories involve a user placing either a thumb or index finger on the wire slider, wire spinner, or balloon slider, and the other digit on the handle. Defendant argues that, even assuming the wire slider, wire spinner, and balloon slider are working devices, these theories do not satisfy the "adapted to" limitation because the limitation requires the use of the "thumb and index finger."  The Court previously emphasized that the plain meaning of "and" in the similar "thumb and index finger" language in Claim 8 requires "the use of both the thumb and the index finger."  [ECF No. 105 at 33].

In its Second Claim Construction Order, the Court found instructive its prior construction of Claim 8 when analyzing similar language in Claims 1 and 14.  Accordingly, it construed the disputed term "adapted to permit" in Claims 1 and 14 to mean "[m]ade to, designed to, or configured to permit" which was "in harmony" with the construction of "[f]ormed to allow" in Claim 8 to also mean "[m]ade to, designed to, or configured to permit."  [ECF Nos. 105 at 16; 147 at 12].  At the same time, however, the Court also construed other portions of the "adapted to" limitation differently than analogous limitations in Claim 8.  Specifically, the Court construed Claim 8 to require that the user "*manipulates* the working device with both the thumb and index finger of the hand at a portion of the working device."  [ECF No. 105 at 27 (emphasis added)].  To satisfy this limitation, the Court stated that "the two [digits] must contact the working device."  [*Id.* at 33].  In contrast, the Court interpreted Claims 1 and 14 to require the user "to *position* a thumb and index finger of the hand to manipulate" the working device.  [ECF No. 147 at 10 (emphasis added)].  Thus, for Claims 1 and 14, both the thumb and index finger need to be positioned in a manner to manipulate the working device, but unlike for Claim 8, the construction does not expressly require both digits to perform the manipulation.

Plaintiff claims the Accused Devices were made, designed, or configured to be used in multiple ways. Dr. Holmes has provided several theories about how the Accused Devices were made, designed, or configured to be operated. Those theories involving only one digit contacting the working device, but nevertheless satisfying the "adapted to" limitation of Claims 1and 14, are not foreclosed by the Court's Second Claim Construction Order, and present a question for the jury. *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1152 (Fed. Cir. 1997) ("The application of a properly construed claim to an accused device is a question of fact."). Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's Single-Digit Theories is **DENIED**.

### e. Infringement of Claims 6 and 19

Defendant seeks summary judgment of non-infringement of dependent Claims 6 and 19 of the '412 Patent. Both claims require that "the handle coupling is further adapted to allow movement of the source of suction relative to the handle." ['412 Patent at 6:28-30, 6:56-59, ECF No. 183-3 at ACCLAR_APP.000466-67]. Dr. Holmes maintains that the Accused Devices satisfy this requirement because "suction tubing extends from the handle and connects to a source of suction," which allows the required independent movement of the source of suction relative to the handle. [ECF No. 243 at APPX0086–88, 179–81]. Dr. Holmes further explains that it does not matter that the handle coupling to which the suction tubing is attached is rigid. [*Id.* at APPX0089–90, 182]. Instead, the attachment of the flexible tubing to the rigid handle coupling is sufficient, because it allows the required relative movement of the source of suction. [*Id. at* APPX0088, 181].

Under Plaintiff's theory it is the tube attached to the handle coupling that allows for the movement of the source of suction. The handle coupling is merely acting as would any other

coupling. There is nothing about it that is "*further* adapted" to provide the requisite movement of the source of suction relative to the handle. Accordingly, Plaintiff has not raised a genuine issue of material fact as to infringement of dependent Claims 6 and 19 of the '412 Patent, and Defendant's Motion for Summary Judgment of no direct infringement of those claims is **GRANTED**.

## XIII.    Doctrine of Equivalents

Defendant seeks summary judgment on Plaintiff's claim of infringement of the "adapted to" limitation of independent Claims 1 and 14 under the doctrine of equivalents. Under the doctrine of equivalents, a device infringes if each limitation that is not literally satisfied is satisfied by an equivalent. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1459 (Fed. Cir. 1998) (en banc), *abrogated on other grounds*, *Teva Pharm. USA, Inc. v. Sandoz, Inc*., 574 U.S. 318 (2015). Equivalence requires the accused device to perform "substantially the same function in substantially the same way to obtain the same result" as the limitation. *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.,* 305 F.3d 1303, 1315 (Fed. Cir. 2002). It "must be established on a limitation-by-limitation basis." *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998). Accordingly, "the doctrine of equivalents cannot be used to effectively read out a claim limitation." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019).

Defendant argues that Plaintiff's function-way-result analysis eliminates claim limitations because it ignores the requirement that the thumb and index finger both manipulate the working device and that the manipulation occurs by touching of the working device. However, to accept this argument, the Court would first have to accept Defendant's argument that the limitations of the '412 Patent require necessarily both the thumb and index finger simultaneously to touch a

working device, which Defendant claims does not include the wire spinner, wire slider, or balloon slider. Defendant is merely reiterating its literal direct infringement arguments, which the Court has already addressed in denying Defendant's Motion for Summary Judgment of no literal infringement.

Defendant also argues that Plaintiff's expert opinions regarding the doctrine of equivalents are conclusory and unsupported, because they are internally inconsistent. Dr. Holmes conducted a doctrine of equivalents analysis on Defendant's two main theories of noninfringement: 1) that only one digit touches a working device and 2) that the balloon slider, wire spinner, and wire slider are not working devices. [ECF No. 243 at APPX0074, 76]. In the first scenario, Plaintiff's expert defines the function of the Accused Devices and the devices claimed under the '412 Patent is to allow "positioning a thumb and index finger of the hand to manipulate the working device via a portion of the working device," but in the second scenario, he describes the functions of the Accused Devices and the devices claimed under the '412 Patent as "manipulating the working device via a portion of the working device immediately adjacent to the handle opening." [*Id.*]. Defendant argues that Plaintiff's expert inconsistently assigns two different functions to the patented device and should not be credited.

"Conclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013). Conclusory assertions are those that "fail[] to provide the necessary evidentiary basis to support a claim that there is a genuine issue of material fact on equivalence." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999). What may be an internal inconsistency in Dr. Holmes' report, or simply an alternate analysis, goes to the accuracy and weight of his analysis and conclusions; it does not make his equivalents opinion legally untenable. *See*

*Nkansah v. Martinez*, No. 3:15-CV-00646, 2017 WL 2798520, at \*4 (M.D. La. June 28, 2017)

(stating that an expert's "alleged miscalculations, erroneous assumptions and inconsistencies"

are "left for the jury's consideration"). Dr. Holmes' report contains a detailed analysis of how he

reached his equivalents conclusions. [ECF No. 243 at APPX0074–77]. There are genuine issues

of material fact as to the applicability of the doctrine of equivalents for the jury to consider.

Plaintiff's Motion for Summary Judgment of non-infringement under the doctrine of equivalents

is **DENIED.**

## XIV.    Induced Infringement

Defendant seeks summary judgment on Plaintiff's claim of induced infringement.

Defendant argues that Plaintiff has not established any infringing conduct and that Plaintiff has

not proven that it had the intent to induce infringement. As explained above, Plaintiff has

established a genuine issue of material fact as to whether or not there was infringement of the

'412 Patent's claims, except Claims 6 and 19. Thus, the only remaining issue for the Court to

analyze is Defendant's intent.

Induced infringement requires proving that a "defendant possessed specific intent to

encourage another's infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed.

Cir. 2006). However, "direct evidence is not required; rather, circumstantial evidence may

suffice." *Id.* Plaintiff's sole evidence as to Defendant's specific intent to induce infringement by

others are two photos Defendant used to advertise allegedly infringing uses of the Accused

Devices, which Plaintiff argues "alone are sufficient evidence of inducement to survive summary

judgment." [Response, ECF No. 243 at 18; 211-2 at APPX0255, 58]. Intent can be inferred

from advertisements of an infringing product. *MEMC Elec. Materials, Inc. v. Mitsubishi

Materials Silicon Corp.*, 420 F.3d 1369, 1379 (Fed. Cir. 2005). However, they must evidence an

"intent to *encourage* infringement" and not just a description of an infringing use of the accused product. *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (emphasis present). Accordingly, the court in *Sanofi v. Watson Labs. Inc.* found inducement based on a drug label because there was evidence that the label created "clear encouragement" for physicians to use the drugs in an infringing manner. 875 F.3d 636, 645–46 (Fed. Cir. 2017). In contrast, summary judgment against a finding of induced infringement may be granted when the advertisements encourage a use that the defendant "could have reasonably believed was non-infringing." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 (Fed. Cir. 2009).

The two pictures on which Plaintiff relies only *depict* an allegedly infringing use. Plaintiff has not provided any evidence that those images *encouraged* allegedly infringing use by others. Furthermore, Defendant makes persuasive arguments as to why the depicted use is not infringing, thereby showing that it could have reasonably believed that its advertised uses were non-infringing. No reasonable jury could infer intent to induce infringement from the two pictures alone, and Defendant's Motion for Summary Judgment on Plaintiff's induced infringement claim is therefore **GRANTED**.

### XV.    Statute of Limitations

Defendant seeks to dismiss all of Plaintiff's non-patent claims, arguing that they are barred by limitations. In response to Defendant's Motion to Dismiss, the Court previously held that Plaintiff's contract claims under the NDA and the consulting agreement are both subject to a four-year statute of limitations under Texas law. [ECF No. 43 at 12–13]. However, fraudulent concealment may toll a statute of limitations where a defendant conceals its unlawful conduct either by: (1) failing to disclose its wrongful conduct when there is a duty to disclose or (2) lying

about its conduct. *Timberlake v. A.H. Robins Co*., 727 F.2d 1363, 1366 (5th Cir. 1984) (quoting *Nichols v. Smith*, 507 S.W.2d 518, 519 (Tex. 1974)); *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983); *Arabian Shield Development Co. v. Hunt Oil Co.*, 808 S.W.2d 577, 584 (Tex. App.—Dallas 1991, writ denied).  Similarly, Plaintiff's fraud claims are subject to a four-year statute of limitations, which runs from when the plaintiff discovered or should have, through reasonable diligence, discovered the alleged fraud.  *Cook-Bell v. Mortg. Elec. Registration Sys., Inc.*, 868 F. Supp. 2d 585, 589 (N.D. Tex. 2012).

The parties entered into a tolling agreement on January 14, 2016, and Plaintiff filed this action on December 1, 2016.  [ECF No. 183-4 at ACCLAR_APP.000923].  The agreement applies to actions brought by Plaintiff for "any infringement lawsuit or similar action regarding any of his patents."  [*Id.*]  While the parties dispute whether this covers Plaintiff's non-patent causes of action, Plaintiff's claims are not time barred even if the tolling agreement does not apply to those causes of action.

### a.  Contract Claims

Plaintiff's contract claims allege that Defendant breached the NDA and consulting agreement by using Defendant's confidential information to develop the Accused Devices and obtain the '473 Patent.  Defendant argues that the breach of contract claims accrued on the date Defendant's patent application was filed, September 28, 2008.  Plaintiff argues that the subsequent use of the confidential information to develop the Accused Devices is a separate breach that accrued at a later time.

Under Texas law, there is a distinction "between 1) repeated injury proximately caused by repetitive wrongful or tortious acts and 2) continuing injury arising from one wrongful act. While the former evinces a continuing tort, the latter does not." *Rogers v. Ardella Veigel Inter*

*Vivos Tr. No. 2*, 162 S.W.3d 281, 290 (Tex. App.—Amarillo 2005, pet. denied). Whether a defendant's actions constitute a single legal wrong or multiple repeated violations depends on the nature of the legal obligation and violation at issue. *Compare Daboub v. Gibbons*, 42 F.3d 285, 290–91 (5th Cir. 1995) ("Each time ZZ Top sells a single of Thunderbird, the Nightcaps damages may increase, but the tort was committed when ZZ Top copyrighted the song."); *Guajardo v. Freddie Records, Inc.*, No. CV H-10-02024, 2014 WL 12603179, at *1 (S.D. Tex. May 15, 2014) ("[M]isappropriation of Guerrero's name, image, and likeness would not constitute a continuing tort because the repeated injury arises from the original use of his name, image, and likeness on the music album, not repeated wrongful acts.") *with Mercury Luggage Mfg. Co. v. Domain Prot.*, *LLC*, No. 3:19-CV-01939-M, 2020 WL 376609, at *1 (N.D. Tex. Jan. 22, 2020) (Lynn, C.J.) ("Trademark infringement . . . is a continuous wrong, and as such gives rise to a claim for relief as long as the infringement persists.") (internal quotations omitted). Defendant's alleged misuse of Plaintiff's confidential information is analogous to a misappropriation of trade secrets, which "is a single cause of action and the limitations period begins running without regard to whether the misappropriation is a single or continuing act." *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 365 (5th Cir. 2000).

Plaintiff cites *Kara Tech. Inc. v. Stamps.com Inc.*, in which the Federal Circuit found two separate breaches of an NDA when a party took notes at a meeting and then subsequently used that information. 582 F.3d 1341, 1349–50 (Fed. Cir. 2009). However, in *Kara*, the initial misappropriation of information and the subsequent use of that information were two qualitatively distinct acts, and notably they violated two separate provisions of an NDA. In contrast, the two acts complained of by Plaintiff are two similar uses of confidential information, which are governed by the same provision in the NDA and consulting agreement. Accordingly,

the contract claims accrued when Defendant first used Plaintiff's allegedly confidential information by filing, on September 28, 2008, the provisional patent application that eventually issued as the '473 Patent. That date is well outside the four-year statute of limitations period.

Even if the Court accepts Plaintiff's continuing breach theory, Plaintiff does not identify when the statute of limitations would begin to run under that theory. However, the parties agree that a prototype of the Accused Devices was produced by November 11, 2011, when it was provided to Plaintiff to evaluate. [ECF No. 183-3 at ACCLAR_APP.000288, 566]. Thus, the latest the statute of limitations could begin to run under Plaintiff's theory is November 11, 2011, which still falls outside the four-year statute of limitations period.

Plaintiff finally argues that at least some of his claims under the NDA could not have accrued until the '473 Patent issued on April 9, 2013. Plaintiff argues that the NDA requires the assignment of any patents resulting from the impermissible use of his confidential information, but there were no patents to assign before the '473 Patent was issued. However, the NDA notes that a patent resulting from the impermissible use of confidential information "will be the property of the non-breaching party. The breaching party will and does hereby automatically assign, grant, and convey to the non-breaching party any and all rights, title and interest in such new intellectual property, at the time of such work." [NDA ¶ 2, ECF No. 183-4 at ACCLAR_APP.000838]. The NDA in paragraph 2 does not actually impose any obligations that Defendant can breach, and instead operates as an automatic transfer of ownership. While the "breaching party further agrees that upon request, the breaching party will execute a written assignment of such new intellectual property to the non-breaching party" [*id.*], Plaintiff is not alleging a breach of that provision and is instead seeking specific performance of the assignment provision as a remedy. Accordingly, the date the '473 Patent was issued does not affect the date

of accrual of Plaintiff's contract claims.  The contract claims are barred by limitations, unless they are tolled due to fraudulent concealment.

### b.  Fraudulent Concealment

Plaintiff argues that even if the statute of limitations on his contract claims would otherwise have expired, limitations were tolled by fraudulent concealment.  Fraudulent concealment requires that a plaintiff prove that: (1) the defendant had actual knowledge of the facts giving rise to the plaintiff's cause of action; (2) the defendant concealed its unlawful conduct; and (3) the plaintiff failed, despite reasonable diligence on his part, to discover the facts giving rise to his cause of action.  *Tex. v. Allen Constr. Co.*, 851 F.2d 1526, 1528 (5th Cir. 1988); *Timberlake v. A.H. Robins Co.*, 727 F.2d 1363, 1366 (5th Cir. 1984).  "[F]raud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered."  *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015).  Discovery occurs when the plaintiff learns "of the facts that give rise to its cause of action."  *Santanna Nat. Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 891 (Tex. App. Austin—1997, pet. denied).  However, "[i]rrespective of the potential effect of fraudulent concealment . . . actual knowledge of alleged injury-causing conduct starts the clock on the limitations period."  *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 209 (Tex. 2011).  Although the accrual of a cause of action is normally a question of law, "reasonable diligence is an issue of fact."  *Hooks*, 457 S.W.3d at 58.

Defendant highlights three events which allegedly establish Plaintiff's actual knowledge or deemed knowledge had he acted with due diligence.  On April 22, 2010, the U.S. Patent and Trademark Office published Patent App. No. 61/098,157 (the '157 Application), the provisional patent application that would eventually issue as the '473 Patent, and which allegedly

incorporated Plaintiff's confidential information. [ECF No. 183-4 at ACCLAR_APP.000735].

On November 12, 2012, Plaintiff tested and evaluated a prototype of the Accused Devices. [ECF

No. 183-3 at ACCLAR_APP.000288, 566]. Finally, on January 13, 2013, Plaintiff performed

three procedures on patients with the final commercialized version of the Accused Devices.

[ECF Nos. 183-3 at ACCLAR_APP.000310–11, 322; 183-4 at ACCLAR_APP.000711; 188 at

ACCLAR_APP.000918].

       Publication of a patent application may provide constructive notice of its existence.

*WesternGeco v. Ion Geophysical Corp.*, No. CIV.A. 09-CV-1827, 2009 WL 3497123, at *5

(S.D. Tex. Oct. 28, 2009). However, it must be considered within the context of the parties'

relationship. When "the parties [are] operating under a NDA . . . constructive notice based on

allegedly public information is a disputed issue for the jury to decide." *Quintel Tech., Ltd. v.*

*Huawei Techs. USA, Inc.*, No. 4:15CV307, 2018 WL 446320, at *6 (E.D. Tex. Jan. 17, 2018).

Furthermore, communications between Plaintiff and Defendant indicated the possibility that

Defendant may be pursuing other products that did not incorporate Plaintiff's confidential

information. [ECF No. 243 at APPX0471]. "[A] relationship of trust with the patentee and

positive acts of concealment" may affect the nature of the patentee's duty to investigate. *Stark v.*

*Advanced Magnetics, Inc.*, 29 F.3d 1570, 1577 (Fed. Cir. 1994) (applying Massachusetts law).

For similar reasons, viewing the prototype and final commercialized version of the Accused

Devices does not definitively establish that Plaintiff was sufficiently on notice of his causes of

action. "[D]evelopment of competing technology" is "not necessarily wrongful in and of itself."

*Versata Software, Inc. v. Internet Brands, Inc.*, No. 2:08-CV-313-WCB, 2012 WL 588790, at *4

(E.D. Tex. Feb. 22, 2012) (emphasis omitted). This is especially true in light of the relationship

of trust between the parties.

The degree of investigation and steps a reasonable person would take to exercise due diligence in light of the parties' relationship and Defendant's alleged deception present questions of fact for the jury as to tolling of limitations. Accordingly, Defendant's Motion for Summary Judgment to dismiss Plaintiff's contract claims as time barred is **DENIED** only as to whether or not there was fraudulent concealment that would toll limitations.

### c. Fraud Claims

Plaintiff's fraud claims did not begin to accrue until the alleged fraud was discovered or could have been discovered through the exercise of due diligence. For the same reasons discussed above as to fraudulent inducement, there is a genuine issue of material fact as to when Plaintiff was or, with the exercise of due diligence, should have become aware of the fraud with the exercise of due diligence. Accordingly, Defendant's Motion for Summary Judgment to dismiss Plaintiff's fraud claims as time barred is **DENIED**.

## XVI. The Existence of Confidential Information

Defendant seeks summary judgment to dismiss all of Plaintiff's non-patent claims because each is predicated on Defendant's receipt of Plaintiff's "confidential information." Defendant claims that none of the information is confidential, as defined under the NDA and the consulting agreement. Confidential information under the NDA does not include information that: 1) "was publicly known and made generally available in the public domain prior to the time of disclosure"; 2) "becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party"; or 3) was "already in the possession of the receiving party at the time of disclosure as shown by the parties' files and records immediately prior to the time of disclosure." [NDA ¶ 1, ECF No. 183-4 at ACCLAR_APP.000838]. The consulting agreement, which superseded the NDA on June 6,

2008, similarly defines confidential information to include only "non-public information" and states that Defendant's confidential information would remain the sole property of Defendant. [Consulting Agreement ¶ 2, ECF No. 183-4 at ACCLAR_APP.000905]. In accordance with these definitions, information contained in the '412 Patent would not constitute confidential information because it became publicly known and generally available apart from Defendant's conduct.

Dr. Holmes' report includes opinions that the information Plaintiff alleges to be confidential was not disclosed in the '412 Patent. [ECF No. 188 at ACCLAR_APP.000663–65]. Defendant takes issue with Dr. Holmes' report because it does not include a separate analysis as to whether Defendant already possessed the allegedly confidential information. While Plaintiff will have to prove at trial that Defendant did not already possess the allegedly confidential information, he does not need to do so now to raise a genuine issue of material fact. Plaintiff testified during his deposition that there is a general understanding of confidentiality regarding technical information exchanged when surgical procedures are being observed. [ECF No. 243 at APPX0233]. He also testified that the parties considered their work "top secret" because of how novel their developments were. [*Id.*] Evidence before the Court suggests that Defendant appeared to view their relationship similarly, as on one occasion it noted that it had to be "sensitive to Intellectual Property boundaries" when interacting with Plaintiff. [*Id.* at APPX0328]. Plaintiff's deposition testimony further clarifies his position and belief that specific features were confidential. He testified that he "absolutely" believed that one-handed use was a confidential feature. [*Id.* at APPX0209]. He also explained that he did not know of any other products in which Defendant used his allegedly confidential luer lock[6] information, specifically

---

[6] Dr. Holmes describes that the luer lock functions by connecting the guide catheter to the handle apparatus. [ECF No. 243 at APPX0193].

explaining how one of Defendant's earlier patents did not include such a feature.  [*Id.* at APX0228–29].

Defendant urges that it has affirmatively proven that it already possessed the allegedly confidential information or that it was disclosed by the '412 Patent.  In the Court's view, what Defendant has provided is not definitive proof that the full scope of Plaintiff's alleged confidential information was already known to Defendant.  This is a fact-intensive exercise and such issues are not appropriate for summary judgment.  *See, e.g.*, *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 769 (N.D. Tex. 2006) ("The laches inquiry is fact-intensive, and is often inappropriately disposed of on summary judgment."); *Notley v. Sterling Bank*, No. CIV.A. 3:06-CV-0536-, 2007 WL 188682, at *4 (N.D. Tex. Jan. 24, 2007) ("[T]he maturation of the interim loan agreement is a fact intensive inquiry that is inappropriate for summary judgment.").  Accordingly, Defendant's Motion for Summary Judgment to dismiss all of Plaintiff's non-patent claims based on the nonexistence of confidential information is **DENIED**.

## XVII.    Defendant's Affirmative Defense of Failure to State a Claim

Plaintiff seeks summary judgment on Defendant's affirmative defense that Plaintiff failed to state a claim.  Defendant has clarified that it only sought to maintain this affirmative defense on Plaintiff's contributory infringement claim, which the Court has dismissed.  Accordingly, Plaintiff's Motion for Summary Judgment on Defendant's affirmative defense of failure to state a claim is **GRANTED**.

## XVIII.    Defendant's Affirmative Defense of Equitable Estoppel

Plaintiff seeks summary judgment on Defendant's affirmative defense of equitable estoppel.  Equitable estoppel bars a patentee's infringement action when: 1) the patentee leads

the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent rights, through misleading conduct or silence; 2) the alleged infringer relies on that misleading conduct or silence; and 3) the alleged infringer will be materially prejudiced if the patentee is allowed to bring suit. *Radio Sys. Corp. v. Lalor,* 709 F.3d 1124, 1130 (Fed. Cir. 2013). The decision to apply equitable estoppel is "committed to the sound discretion of the trial judge." *Id.* Plaintiff argues there is no evidence that his conduct was misleading or that Defendant relied on it.[7]

Equitable estoppel can be established through misleading silence. *Id.* When a patentee is on notice of unlicensed infringing activity but does not challenge it, such actions can cause the alleged infringer to reasonably infer that they will not be sued. *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1331 (Fed. Cir. 2016). That is compounded when the patentee actively participates in or supports the allegedly infringing activities. *Id.* There is evidence in the record establishing issues of fact, including witness deposition testimony, that Defendant relied on Plaintiff's suggestion to allow direct access to the guidewire when incorporating that allegedly confidential information into the features of the Accused Devices. [ECF No. 222-1 at ACCLAR_APP.000158]. Accordingly, Plaintiff's Motion for Summary Judgment on Defendant's affirmative defense of equitable estoppel is **DENIED**.[8]

---

[7] To the extent that Defendant advances its affirmative defense against Plaintiff's non-patent causes of action, Plaintiff also challenges the existence of these same requirements, which are needed under Texas law. *See United States v. Brink*, 795 F. Supp. 2d 565, 583 (S.D. Tex. 2011) ("[T]he doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations."). Thus, the Court's ruling on that issue would also be that a fact question is present.

[8] In its Response, Defendant argues that the evidence establishes that it is entitled to summary judgment on the issue of equitable estoppel. To the extent that Defendant now seeks summary judgment on its affirmative defenses but did not timely move for such relief, the Court will not consider granting Defendant such relief at this time.

### XIX.    Defendant's Affirmative Defense of Implied License

Plaintiff seeks summary judgment on Defendant's affirmative defense of implied license. Defendant argues that implied license is "largely derivative, or a re-characterization, of the equitable estoppel defense as applied to patents." [Response, ECF No. 223 at 44]. As a result, Defendant argues Plaintiff's Motion should be denied for the same reasons that the Motion should be denied as to equitable estoppel.

Equitable estoppel and implied license "are not conterminous." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1579 (Fed. Cir. 1997). Implied license requires that: "1) there was an existing relationship between the patentee and infringer; 2) within that relationship the patentee transferred a right to use the patented invention to the patentee; 3) the right was transferred for valuable consideration; 4) the patentee has now denied the existence of the right; and 5) the patentee's statements and conduct created the impression that it consented to the accused infringer making, using, or selling the patented invention." *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 388 (E.D. Tex. 2009) (citing *Wang Labs., Inc.*, 103 F.3d at 1579). Nevertheless, "equitable estoppel and implied license are related" and "courts and commentators relate that implied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel." *Mass Engineered Design, Inc.*, 633 F. Supp. 2d at 387–88. "The primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use, or sell: i.e., a license." *Wang Labs., Inc.*, 103 F.3d at 1581.

The Court finds that there are sufficient similarities between Defendant's equitable estoppel and implied license defenses, such that similar issues of fact exist in the former as do in the latter.  Therefore, Plaintiff's Motion for Summary Judgment to dismiss Defendant's affirmative defense of implied license is **DENIED**.

## XX.    Defendant's Affirmative Defense of Privilege, Justification, and Excuse

Plaintiff seeks summary judgment on Defendant's affirmative defense that its actions were "privileged, justified, or excused."  Plaintiff argues that Defendant insufficiently pleaded these defenses, because it did not identify which actions were justified, privileged, or excused, nor the source of the privilege, justification, or excuse.

Affirmative defenses are subject to the same pleading requirements as a complaint. *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).  A court may grant summary judgment dismissing an affirmative defense that is not adequately pleaded.  *U.S. ex rel. King v. Solvay S.A.*, 304 F.R.D. 507, 510 (S.D. Tex. 2015).  A defendant "must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced."  *Id.* at 509.  Merely pleading the name of an affirmative defense is insufficient if there are not enough factual allegations and if the affirmative defense is not narrow enough that its name alone provides fair notice of the nature of the defense.  *E.E.O.C. v. Courtesy Bldg. Servs., Inc.*, No. 3:10-CV-1911-D, 2011 WL 208408, at *5 (N.D. Tex. Jan. 21, 2011).

In its Answer, Defendant does not identify what actions were justified, privileged, or excused nor the source of the justification, privilege, or excuse.  As a result, Plaintiff was not given proper notice of the nature of the defense.  *See Mumphrey v. Credit Sols. of Am., Inc.*, No. CIV.A. 3:09-CV-1208-M, 2010 WL 652834, at *1 (N.D. Tex. Feb. 24, 2010) (Lynn, J.) (granting motion to strike affirmative defenses for being improperly pleaded when it was not

"possible to understand the genesis of these defenses from [the] Answer as a whole"). Defendant now explains in its Response that its actions were privileged, justified, or excused because it contracted for and paid Plaintiff for the confidential information that it allegedly misappropriated.

The Court may exclude affirmative defenses not timely raised if the delay prejudices the plaintiff. *See LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 402 (5th Cir. 2014) (finding that the lower court did not abuse its discretion in preventing the defendant from using an affirmative defense that it did not raise until after plaintiff's motion for summary judgment because it prejudiced the plaintiff's ability to respond). However, Defendant's defense is essentially the same as its other defenses—that Defendant properly used Plaintiff's confidential information in accordance with the terms of the NDA and consulting agreement. Plaintiff has suffered no prejudice from the delay, and his Motion for Summary Judgment to dismiss Defendant's affirmative defense of privilege, justification, or excuse is therefore **DENIED**.

## XXI.    Defendant's Affirmative Defense of Unclean Hands

Plaintiff seeks summary judgment on Defendant's affirmative defense of unclean hands. The doctrine of unclean hands gives a Court "wide discretion . . . to dismiss [claims] for want of equity." *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001). "[A] determination of unclean hands may be reached when 'misconduct' of a party seeking relief 'has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation,' *i.e.*, 'for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court.'" *Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933)). Any willful act which transgresses equitable standards in the furtherance of

obtaining a patent right "can render the patent unenforceable." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 398 F. Supp. 2d 305, 311 (D. Del. 2005). "Alternatively, if unclean hands occurs during litigation, it bars any recovery by the offending party." *Id.*

Defendant argues that it was acting under the protections of the NDA when it suggested Plaintiff include a second thumbhole suction port to allow a user to control suction when the balloon catheter blocks the first suction port. Plaintiff then incorporated that design into his patent application. Although Plaintiff's May 2008 provisional patent application only included a single suction control hole, his May 2009 nonprovisional patent application included a second suction hole. [ECF No. 221-12 at ACCLAR_APP.000052, 321, 334]. He later also amended the dependent claims to require a second thumbhole suction port in response to a rejection of his application. [*Id.* at ACCLAR_APP.000275–81]. Plaintiff's expert relied on the existence of this second thumbhole port in this litigation to support the validity of the '412 Patent's dependent claims against Defendant's arguments of prior art. [ECF No. 222-1 at ACCLAR_APP.000378]. Plaintiff argues that he already had the idea of the second hole prior to learning of it from Defendant. [ECF No. 245-1 at APPX0165]. However, drawing all reasonable inferences in the light most favorable to Defendant, the Court finds that Defendant has identified evidence creating a genuine dispute of material fact as to the equities of Plaintiff's use of the information provided to him by Defendant under the terms of the NDA. Accordingly, Plaintiff's Motion for Summary Judgment to dismiss Defendant's affirmative defense of unclean hands is **DENIED**.

## XXII.    Assignment of the '473 Patent Family Through Specific Performance

Defendant seeks summary judgment that Plaintiff is not entitled to specific performance of the assignment provision of the NDA. If any party breaches the NDA by using the other's confidential information in an impermissible manner, "any inventions, improvements, or other

intellectual property resulting from such non-permissible use will be the property of the non-breaching party." [ECF No. 183-4 at ACCLAR_APP.000838]. The alleged confidential information was used in the '473 Patent's specifications but does not appear in its claims.

The scope of a patent is defined by its claims and not its specifications. *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002). As a result, Defendant argues that the '473 Patent and its family do not cover any inventions resulting from the use of the allegedly confidential information. Nevertheless, "the descriptive part of the specification aids in ascertaining the scope and meaning of the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). The inclusion of the allegedly confidential information in the specification does not preclude finding that the '473 Patent is an "invention[], improvement[], or other intellectual property resulting from" the impermissible use of Defendant's confidential information and there remain genuine issues of material fact as to whether the '473 Patent is subject to the assignment provision. Defendant's Motion for Summary Judgment that, as a matter of law, Plaintiff is not entitled to assignment of the '473 Patent and its family is **DENIED**.

## XXIII.    Conclusion

For the foregoing reasons, Plaintiff's *Daubert* motions to exclude Dr. Brodner's opinions regarding Defendant's late-disclosed invalidity theories, Dr. Brodner's analysis of Claim 8 of the '412 Patent in ¶¶ 111–32 of his expert report, Matlock and Eghbal's rebuttal testimony that was not already disclosed in their opening reports, and Inglish's cost-based apportionment analysis are **GRANTED**. Furthermore, Plaintiff's Motion to Compel communications between Defendant's counsel and Matlock or Eghbal is **GRANTED**. Defendant's Motion to Strike Dr. Holmes' "supplemental" expert report as untimely and Defendant's *Daubert* motions to exclude

Dr. Holmes' testimony related to that "supplemental" expert report, Benoit's assessment of the applicability of punitive damages, and Benoit's consideration of the sale of Defendant to Johnson and Johnson and Ethicon for $790.5 million are **GRANTED**.

In addition, Plaintiff's Motion for Summary Judgment of no invalidity for obviousness and to dismiss Defendant's affirmative defense of failure to state a claim is **GRANTED**. Defendant's Motion for Summary Judgment of no direct infringement of Claims 6 and 19 and no induced infringement is also **GRANTED**.  In all other respects and as explained above, the parties' Motions are **DENIED**.

**SO ORDERED**.

February 28, 2020.

BARBARA M. G. LYNN
CHIEF JUDGE